```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3
   PERSONAL AUDIO, LLC        | DOCKET NO. 2:13CV270
 4                            |
                              | FEBRUARY 24, 2014
 5   VS.                      |
                              | 9:03 A.M.
 6                            |
   CBS CORPORATION            | MARSHALL, TEXAS
 7

 8   PERSONAL AUDIO, LLC      | DOCKET NO. 2:13CV271
                              |
 9                            | FEBRUARY 24, 2014
   VS.                        |
10                            | 9:03 A.M.
                              |
11 NBCUNIVERSAL MEDIA, LLC    | MARSHALL, TEXAS

12
   ------------------------------------------------------------
13
                VOLUME 1 OF 1, PAGES 1 THROUGH 231
14
           REPORTER'S TRANSCRIPT OF EVIDENTIARY HEARING
15
               BEFORE THE HONORABLE ROY PAYNE
16             UNITED STATES MAGISTRATE JUDGE

17 ------------------------------------------------------------

18

19 APPEARANCES:

20 FOR PERSONAL AUDIO:    THOMAS JOHN WARD, JR.
                          WARD & SMITH LAW FIRM
21                        1127 JUDSON ROAD
                          SUITE 220
22                        LONGVIEW, TEXAS 75606

23                        JEREMY S. PITCOCK
                          THE PITCOCK LAW GROUP
24                        1501 BROADWAY
                          12TH FLOOR
25                        NEW YORK, NEW YORK 10036
```

```
 1                          PAPOOL S. CHAUDHARI
                            REYES BARTOLOMEI BROWNE
 2                          5950 BERKSHIRE LANE
                            SUITE 410
 3                          DALLAS, TEXAS 75225


 4


 5  FOR HOWSTUFFWORKS:      MICHAEL SMITH
                            SIEBMAN BURG PHILLIPS & SMITH
 6                          113 EAST AUSTIN STREET
                            MARSHALL, TEXAS 75671


 7


 8
    FOR CBS CORPORATION AND NBCUNIVERSAL MEDIA:
 9
                            SHARON L. DAVIS
10                          STEVEN LIEBERMANN
                            JENNIFER B. MAISEL
11                          ROTHWELL FIGG ERNST & MANBECK
                            607 14TH STREET NW
12                          SUITE 800
                            WASHINGTON, DC 20005
13
                            JENNIFER PARKER AINSWORTH
14                          WILSON ROBERTSON & CORNELIUS
                            909 ESE LOOP 323
15                          SUITE 400
                            TYLER, TEXAS 75711
16


17
    ALSO IN ATTENDANCE:     BRAD LIDDLE, PERSONAL AUDIO
18                          DAN WAN, CBS CORPORATION
                            HILARY LANE, NBCUNIVERSAL MEDIA
19


20


21  COURT REPORTER:         TONYA B. JACKSON, RPR-CRR
                            FEDERAL OFFICIAL REPORTER
22                          300 WILLOW, SUITE 239
                            BEAUMONT, TEXAS  77701
23


24
        PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
25     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

INDEX

PAGE

(EVIDENCE PRESENTED ON BEHALF OF CBS)

DIRECT EXAMINATION OF SEANA BARUTH - DAVIS        13

CROSS-EXAMINATION OF SEANA BARUTH - PITCOCK       28


DIRECT EXAMINATION OF MR. NORLANDER - DAVIS       35

CROSS-EXAMINATION OF MR. NORLANDER - PITCOCK      48

REDIRECT EXAMINATION OF MR. NORLANDER - DAVIS     57

EXAMINATION OF MATTHEW NORLANDER - THE COURT      61


DIRECT EXAMINATION OF DUSTIN GERVAIS - DAVIS      64

CROSS-EXAMINATION OF DUSTIN GERVAIS - PITCOCK     74

REDIRECT EXAMINATION OF MR. GERVAIS - DAVIS       83


DIRECT EXAMINATION OF J.R. SKAGGS - LIEBERMAN     85

CROSS-EXAMINATION OF J.R. SKAGGS - WARD           94

REDIRECT EXAMINATION MR. SKAGGS - LIEBERMAN       99


DIRECT EXAMINATION OF BRAD LIDDLE - LIEBERMAN     101

CROSS-EXAMINATION OF BRAD LIDDLE - WARD           126

REDIRECT EXAMINATION BRAD LIDDLE - LIEBERMAN      135

RECROSS-EXAMINATION OF BRAD LIDDLE - WARD         142

1          (EVIDENCE PRESENTED ON BEHALF OF NBC)

2

3   DIRECT EXAMINATION ROBERT O'KEEFE - LIEBERMAN    144

4   CROSS-EXAMINATION OF ROBERT O'KEEFE - PITCOCK    159

5   REDIRECT EXAMINATION MR. O'KEEFE - LIEBERMAN     171

6

7   DIRECT EXAMINATION OF SCOTT DRAKE - LIEBERMAN    174

8   CROSS-EXAMINATION OF SCOTT DRAKE - PITCOCK       184

9

10  DIRECT EXAMINATION TED MCCONVILLE - LIEBERMAN    189

11  CROSS-EXAMINATION OF TED MCCONVILLE - PITCOCK    198

12  REDIRECT EXAM OF TED MCCONVILLE - LIEBERMAN      207

13  RECROSS-EXAMINATION TED MCCONVILLE - PITCOCK     211

14

15  ARGUMENT BY MR. LIEBERMAN                        213

16

17  ARGUMENT BY MR. WARD                             222

18

19                    INDEX OF EXHIBITS

20

21  DX-5                                             15

22  EXHIBIT 5                                        28

23  DX-30                                            37

24  DX-5                                             39

25  DX-32                                            43

| | | |
|---|---|---|
| 1 | DX-5 | 48 |
| 2 | DX-5 | 48 |
| 3 | DX-5 | 67 |
| 4 | EXHIBIT 5 | 74 |
| 5 | EXHIBIT 15 | 87 |
| 6 | EXHIBIT 14 | 88 |
| 7 | EXHIBIT 26 | 92 |
| 8 | EXHIBIT 4 | 102 |
| 9 | EXHIBIT 28 | 110 |
| 10 | EXHIBIT 7 | 114 |
| 11 | EXHIBIT 7 | 117 |
| 12 | EXHIBIT 34 | 119 |
| 13 | EXHIBIT 6 | 122 |
| 14 | EXHIBIT 10 | 137 |
| 15 | EXHIBIT 31 | 147 |
| 16 | EXHIBIT 31 | 149 |
| 17 | EXHIBIT 6 | 151 |
| 18 | EXHIBIT 6 | 153 |
| 19 | EXHIBIT 31 | 166 |
| 20 | EXHIBIT 6 | 169 |
| 21 | EXHIBIT D-6 | 181 |
| 22 | EXHIBIT D-6 | 193 |
| 23 | | |
| 24 | P-1 | 34 |
| 25 | EXHIBIT P-2 | 51 |



1    P-2                                          75

2    P-3                                          162

3    EXHIBIT P-4                                  184

1          (OPEN COURT, ALL PARTIES PRESENT.)

2          THE COURT:  For the record, we're here for the

3  motion hearing in *Personal Audio versus CBS* which is Case

4  No. 2:13-270 on our docket.

5          Would counsel state their appearances for the

6  record.

7          MR. WARD:  Good morning, your Honor.  Johnny

8  Ward, along with Jeremy Pitcock and Papool Chaudhari for

9  the plaintiff Personal Audio and also Brad Liddle who is

10  general counsel and CEO for Personal Audio.  We're here

11  and ready.

12          THE COURT:  All right.  Thank you, Mr. Ward.

13          MS. AINSWORTH:  Good morning, your Honor.

14  Jennifer Ainsworth on behalf of CBS Corporation; and with

15  me today is Mr. Steve Lieberman, Sharon Davis, Jennifer

16  Maisel.  And then also from CBS is Mr. Dan Wan.

17          THE COURT:  All right.  Thank you,

18  Ms. Ainsworth.

19          MR. SMITH:  And, Your Honor, for consolidated

20  defendant HowStuffWorks, Michael Smith.

21          THE COURT:  All right.  Thank you, Mr. Smith.

22          Very well.  Are there any issues that we need

23  to take up before we start the hearing?

24          MR. LIEBERMAN:  Good morning, your Honor,

25  Steve Lieberman.  The parties have reached certain

1  agreements subject to the court's approval that we think

2  might expedite the presentation of evidence today.  We

3  wanted to present that to the court for the court's

4  consideration.

5          THE COURT:  All right.

6          MR. LIEBERMAN:  The first agreement was

7  there's a private investigator by the name of Yarborough

8  who had submitted a declaration in this case.  After

9  Mr. Yarborough was deposed, the parties agreed that --

10  agreed to stipulate to the facts in the Yarborough

11  declaration and the admissibility of the Yarborough

12  declaration, in lieu of Mr. Yarborough having to travel

13  to Texas to testify live, since his declaration is

14  undisputed.

15          THE COURT:  And can you give me a record

16  reference for that?  Do you happen to have, in other

17  words, the document number on that declaration?

18          MR. LIEBERMAN:  I can get it for you in just

19  one second, your Honor.

20          THE COURT:  All right.

21          MR. LIEBERMAN:  It was submitted in connection

22  with the reply papers on the motion to transfer, and I'll

23  have the docket number in just a second.

24          No. 2, there are two witnesses whose testimony

25  will be relevant both to the CBS hearing and to the NBC

1  hearing.  They're Mr. J.R. Skaggs, who was another

2  private investigator -- and his declaration was also

3  submitted in connection with the papers, but he will be

4  here in person to testify and is in fact in the courtroom

5  right now.  And the parties have agreed that Mr. Skaggs'

6  testimony given once should, subject to the court's

7  approval, be equally applicable in both proceedings so

8  that he need not say the same thing twice.

9          And the same would be true with Mr. Brad

10 Liddle who is the general counsel and the CEO of Personal

11 Audio.  He will be examined in this proceeding this

12 morning.  His testimony will be equally applicable to

13 this afternoon's proceedings, with your Honor's

14 permission, without him having to testify for a second

15 time.

16          THE COURT:  All right.  I have no problem with

17 those stipulations.

18          They are agreed to by the plaintiff as well?

19          MR. WARD:  They are, your Honor.

20          THE COURT:  All right.

21          MR. LIEBERMAN:  The third item, your Honor,

22 for the convenience of the court we have prepared a

23 binder which has all or virtually all of the exhibits

24 that we would anticipate moving into evidence during the

25 course of the proceedings today.  We don't expect that we

1 will be moving into evidence all of them, but we think

2 it's the universe of virtually all of them and would

3 propose to provide a copy to plaintiff's counsel, to your

4 Honor, and to your Honor's clerk and to put one on the

5 witness stand.  That will save some time in terms of

6 showing exhibits to the witness.

7             THE COURT:  That's fine.

8             MR. LIEBERMAN:  Thank you, your Honor.

9             We have also filed or will shortly file in the

10 next few minutes a two-and-a-half-page memorandum which

11 simply has excerpts from various Federal Circuit cases

12 and cases from this court on two issues that discovery

13 has suggested will likely be particularly relevant to the

14 court's ruling and we provided a copy to plaintiff's

15 counsel and with the court's permission I'll hand up a

16 copy of that memorandum to the court.

17             MR. WARD:  We saw that this morning for the

18 first time.  Don't have a problem with it, assuming if

19 there's something that we think needs to be corrected we

20 have an opportunity to submit a response to that.

21             THE COURT:  All right.  We'll take up at the

22 end of the hearing whether there's a need for further

23 briefing.

24             MR. WARD:  Okay.

25             MR. LIEBERMAN:  And I'm told, in response to

1  your Honor's question, that Mr. Yarborough's declaration

2  is DI No. 22, No. 9.

3              THE COURT:  Okay.  Thank you.

4              MR. LIEBERMAN:  This is a copy of the

5  memorandum for the court.  This is the court's hearing

6  binder.  We've included in the court's binder, for the

7  court's convenience, the declarations that have been

8  filed, although since witnesses are here live we wouldn't

9  expect to try to move those into evidence but we thought

10  the court might want them.  If I may put the witness

11  binder on the --

12              THE COURT:  Yes.

13              MR. LIEBERMAN:  Thank you, your Honor.

14              This is a copy for your Honor's law clerk.

15              THE COURT:  Thank you.

16              MR. WARD:  Thank you.

17              MR. LIEBERMAN:  And, your Honor, we just want

18  to make the court aware that Mr. Dustin Gervais, a CBS

19  employee, will be the corporate designee during the

20  hearing this morning; and he is in the courtroom now.

21              THE COURT:  All right.  Thank you,

22  Mr. Lieberman.

23              MR. LIEBERMAN:  Thank you, your Honor.

24              THE COURT:  Is there any request regarding

25  sequestration of witnesses?

1          MR. WARD:  We would like to invoke the Rule,

2    your Honor.

3          THE COURT:  All right.  Mr. Ward, do you have

4    witnesses present in the courtroom at this time?

5          MR. WARD:  Only Mr. Liddle, who is our

6    corporate representative.  We'd ask that he be excused

7    from the Rule.

8          THE COURT:  All right.  The corporate

9    representatives can remain in, one for each side clearly.

10          MR. LIEBERMAN:  We have two witnesses -- three

11    witnesses who are not corporate representatives; and

12    we're asking them to leave the courtroom now, your Honor.

13          THE COURT:  All right.  That's fine.

14          Okay.  And, Mr. Lieberman, you may proceed

15    with your motion.

16          MR. LIEBERMAN:  Thank you, my colleague

17    Ms. Davis will be handling the first witness.

18          THE COURT:  All right.

19          MS. DAVIS:  We just sent her out, your Honor,

20    because I wasn't sure if -- let me get her.

21          THE COURT:  Yes.  That's fine.

22          MS. DAVIS:  Your Honor, CBS calls Ms. Seana

23    Baruth to the stand.

24          (Oath administered.)

25          MS. DAVIS:  May I proceed, your Honor?

13

1      THE COURT:  Yes, Ms. Davis.  Go ahead.

2          DIRECT EXAMINATION OF SEANA BARUTH

3          CALLED ON BEHALF OF DEFENDANT CBS

4  BY MS. DAVIS:

5  Q.    Good morning, Ms. Baruth.  Could you please tell

6  us your full name?

7  A.    Seana Baruth.

8  Q.    Are you currently employed, Ms. Baruth?

9  A.    I am.

10 Q.    Who is your current employer?

11 A.    Showtime.

12 Q.    And what is Showtime's relationship, if any, with

13 CBS Corporation?

14 A.    Showtime is a subsidiary of CBS.

15 Q.    How long have you been employed by Showtime?

16 A.    Two years in April.

17 Q.    And what is your current title at Showtime?

18 A.    Vice-president of product management Showtime

19 Anytime.

20 Q.    And could you explain for us what Showtime Anytime

21 is?

22 A.    Showtime Anytime is a product that Showtime

23 subscribers can use across platforms to watch episodes of

24 Showtime programming, including on showtimeanytime.com,

25 which is I believe at issue in this case.

EVIDENTIARY HEARING

14

1  Q.    And what is -- when you say "showtimeanytime.com,"

2  what is that?

3  A.    It's a Web site, a Web destination.

4  Q.    Could you tell us just very briefly a little bit

5  about your background in the digital technology area

6  before you came to Showtime two years ago?

7  A.    Sure.  I was lucky enough to be in the Bay Area

8  during the dot-com explosion in the late Nineties, and

9  that's when I got involved in working on digital media

10  specifically.  Since that time it has been the sole focus

11  of my career.  I have been at NBC, I have been at

12  Pandora, I have been at the Travel Channel and at Marvel,

13  in all those cases working on digital technology, until

14  most recently joining Showtime two years ago.

15  Q.    Where is your office located for Showtime?

16  A.    1633 Broadway in New York.

17  Q.    And where do you currently reside?

18  A.    In Astoria, Queens, New York.

19  Q.    Could you explain a little bit more about what

20  your job responsibilities are as vice-president of

21  product management for the Showtime Anytime product?

22  A.    Yes.  I am responsible for design, development,

23  and implementation on an ongoing basis for the Showtime

24  Anytime product suite, including showtimeanytime.com.

25  Q.    Do you work with a particular team or group of

15

1 employees with respect to the showtimeanytime.com site?

2 A.    Yes.  I have ten developers on my team, seven

3 full-time and three contractors.

4 Q.    And what do those developers do for you with

5 respect to the showtimeanytime.com site?

6 A.    They are responsible for writing the code,

7 implementing features, basically doing everything to

8 render showtimeanytime.com to the end user.

9 Q.    Where is that development team for

10 showtimeanytime.com based?

11 A.    In New York -- eight of them are in New York

12 currently.  One of them, a contractor, is in Halifax,

13 Nova Scotia; and the other is in Florida temporarily

14 although he will be returning to New York full-time in

15 April.

16 Q.    Let's just run through that a little bit.  Could

17 you provide us with the -- a list of the seven full-time

18 developers that you referred to on your team at Showtime?

19 A.    Yes.  There's Francia Riesco, Mike Akrum, Matt

20 Caron, Melinda Chin, Jonathan Nonon, Ryan Clark, and

21 Jason Pelzer, are the full-time employees.  The

22 contractors are James Richards, Shane Kerr, and Sameera

23 Thangudu.

24 Q.    And are all of those employees under your

25 supervision?

1  A.      They are.

2  Q.      And you mentioned that one of the contractors is

3  based in Halifax, Nova Scotia?

4  A.      Yes.

5  Q.      Could you tell me which one of those contractors

6  that is?

7  A.      Shane Kerr.

8  Q.      And you referred to one of your developers working

9  in Florida.  Which developer were you referring to?

10  A.      That's Matt Caron.

11  Q.      And what are the circumstances that led Mr. Caron

12  to be working in Florida?

13  A.      He did work in New York and had some personal

14  family issues.  So -- he's valuable.  He's very good at

15  his job.  So, we let him relocate to Florida temporarily;

16  and now he's coming back.

17  Q.      I believe you should have a binder of exhibits in

18  front of you, Ms. Baruth.  Do you see that?

19  A.      I do.

20  Q.      If you could turn to Tab 5 in your binder.

21          Are you there?

22  A.      I'm there.

23  Q.      Do you recognize the exhibit that's been marked

24  for identification as DX-5?

25  A.      I do.

1  Q.     And could you tell us for the record what the

2  title of the document that's been marked for

3  identification DX-5 is?

4  A.     "Plaintiff's First Amended Disclosure of Asserted

5  Claims and Infringement Contentions."

6           MS. DAVIS:  Defendants would move the

7  admission of DX-5.

8           MR. PITCOCK:  No objection.

9           THE COURT:  Exhibit 5 is admitted.

10 BY MS. DAVIS:

11 Q.     If you would turn in DX -- Exhibit DX-5, on page

12 6, just to direct you to the right page, do you recognize

13 the list of items on page 6 of DX-5?

14 A.     I do.

15 Q.     And can you tell me what your understanding is as

16 to what that represents?

17 A.     My understanding is that this represents the list

18 of series that have episodes presented on

19 showtimeanytime.com.

20 Q.     And which are the episodes listed in that DX-5

21 document that are episodes that are available or series

22 that are available on showtimeanytime.com?

23 A.     On page 6, *60 Minutes Sports* is noted and through

24 the end of the list on page 8.  Those are the series that

25 have episodes listed and available on

1    showtimeanytime.com.

2    Q.    What aspects of the technology that is used for

3    those episodes listed in DX-5 for Showtime -- to make

4    those available online, what aspects of that technology

5    do you and your team provide?

6    A.    My team is responsible for the development of

7    showtimeanytime.com; so, the design, the development, the

8    implementation.  They write the code that makes the site

9    work.

10   Q.    Is there source code associated with the

11   showtimeanytime.com Web site?

12   A.    There is.

13   Q.    And if you needed to obtain a copy of that source

14   code to make it available for inspection in a litigation,

15   where would you attain that code from?

16   A.    I'd get the source code from our source code

17   repository which lives on development machines in

18   New York.

19   Q.    What third-party technology, if any, do you use to

20   play video on the showtimeanytime.com site?

21   A.    We use a company called "Brightcove."  They

22   provide a product that includes a video player that we

23   use on showtimeanytime.com.

24   Q.    Where is Brightcove located?

25   A.    In Massachusetts.

1  Q.     Do you have a particular representative or set of

2  representatives that you deal with from Brightcove?

3  A.     We do.

4  Q.     And where are those representatives who you deal

5  with from Brightcove with respect to the video player?

6  A.     I believe they're in Boston, Massachusetts.

7  Q.     Does your team do anything to customize the

8  Brightcove video player product for its use on the

9  showtimeanytime.com Web site?

10  A.     We do.  The Brightcove product -- for example,

11  there are many different ways that we customize it; but,

12  for example, one way we might customize it is that it has

13  to look and feel like the showtimeanytime.com site.  So,

14  we implement changes to it so that it looks and feels and

15  matches the site.

16  Q.     Does Showtime use any third parties to host any of

17  the video content relating to showtimeanytime.com?

18  A.     We do.

19  Q.     And what is the role of those third parties in

20  hosting the video content?

21  A.     We use content delivery networks, or CDNs, to host

22  the video files so that no matter where you are, if

23  you're playing back a video file, it can play back most

24  efficiently, I guess would be a good way of saying it.

25  Q.     Do these content distribution networks have any

1  involvement in designing or programming the systems that

2  are used to make the video content available?

3  A.     No, they do not.

4          MR. PITCOCK:  Objection, leading, lacks

5  foundation.

6          THE COURT:  Let me see.  I'll overrule the

7  objection.

8          Would you restate the question?

9          MS. DAVIS:  Certainly, your Honor.

10 BY MS. DAVIS:

11 Q.     What role, if any, do the content distribution

12 networks have in designing or programming the systems

13 used to play video on showtimeanytime.com?

14 A.     They have no role in programming

15 showtimeanytime.com.

16 Q.     In general, who would you say are the most

17 knowledgeable witnesses as to the technology used at

18 Showtime to make Showtime TV episodes available at

19 showtimeanytime.com?

20 A.     Myself and the members of my team are the most

21 knowledgeable in that respect.

22 Q.     Are there documents related to the technology used

23 at Showtime to make TV episodes available online at

24 showtimeanytime.com?

25 A.     Yes, there are documents.

1  Q.      And where are those documents located?

2  A.      We have some documents that are in our wiki.  We

3  have a ticketing system that is an online system to use

4  for breaking work down so the developers can do work, and

5  we have -- we have printed documents and documents on

6  computers in New York.

7  Q.      So, to the extent -- you referred to the wiki and

8  the ticketing system.  Are those paper documents or

9  electronic documents?

10  A.      They are electronic documents.

11  Q.      To the extent there are hard copy or paper

12  documents related to this technology, where would those

13  documents be located?

14  A.      In our offices in New York.

15  Q.      Are there departments other than your team that

16  are involved in the process of putting video episodes

17  onto showtimeanytime.com?

18  A.      Yes, there are.

19  Q.      Could you identify those departments that have

20  those roles?

21  A.      There are two departments.  One is the scheduling

22  department, and the other is the programming

23  department -- I'm sorry -- the video operations

24  department.

25  Q.      Could you explain what the scheduling department

1  does?

2  A.     The scheduling department is responsible for

3  designating what episodes should appear on

4  showtimeanytime.com at what time.

5  Q.     Does the scheduling department use a computer

6  system to implement that scheduling -- that scheduling

7  process?

8  A.     They do.

9  Q.     And where is the scheduling department located?

10  A.     They're in New York.

11  Q.     Is there a particular individual within the

12  scheduling department that is -- that you work with most

13  closely or is most knowledgeable concerning

14  showtimeanytime.com's work with the scheduling

15  department?

16  A.     Yes.  I would say that Deborah Meyers is probably

17  the best contact.

18  Q.     And where is she located?

19  A.     She's in New York.

20  Q.     You mentioned the video operations team or

21  department?

22  A.     Uh-huh.

23  Q.     What does the video operations team do?

24  A.     They are responsible for processing the video and

25  pushing it out to the CDNs as well as pushing the

1    metadata for those videos to showtimeanytime.com so that

2    we can present it.

3    Q.      And is there an individual in the video operations

4    team that you work with most closely with respect to

5    showtimeanytime.com?

6    A.      Yes, there is.

7    Q.      And who is that individual?

8    A.      His name is Jim Occhiuto.

9    Q.      And where is Mr. Occhiuto located?

10   A.      He is in New York.

11   Q.      Would Mr. Occhiuto be the most knowledgeable

12   witness concerning the role that the video operations

13   team has in the operation of showtimeanytime.com?

14   A.      Yes, he would.

15   Q.      Does Showtime keep records and information about

16   the extent that showtimeanytime.com is used to access

17   videos?

18   A.      We do.

19   Q.      What types of information does Showtime keep track

20   of with respect to the usage of showtimeanytime.com?

21   A.      Lots of things, like which episodes are played,

22   how frequently they're played, how much -- how much time

23   watched there is, how many visitors we have, that sort of

24   thing.

25   Q.      Is there a particular group or team within

EVIDENTIARY HEARING

24

1  Showtime that collects and maintains that data?

2  A.    There are a couple of teams.  My team is one of

3  them.  The other is the research team that performs that

4  function for the network as a whole.

5  Q.    And is there a particular individual within the

6  research team who would be knowledgeable concerning the

7  information available about showtimeanytime.com usage?

8  A.    Yes.  A woman by the name of Christine Sanzillo.

9  Q.    And where is Ms. Sansoto?

10 A.    Sanzillo?

11 Q.    Yes.  Where is she located?

12 A.    She is in New York.

13 Q.    Does Showtime also keep financial records related

14 to the showtimeanytime.com product?

15 A.    Yes, we do.

16 Q.    And is there a particular person within Showtime

17 who would be knowledgeable about those records?

18 A.    Yes.  A gentleman by the name of Chris Hill.

19 Q.    And where is Mr. Hill located?

20 A.    He is in New York.

21 Q.    Are you familiar with a Showtime employee named

22 Julia Veale?

23 A.    I am.

24 Q.    Could you tell me who Ms. Veale is?

25 A.    She is my boss.

1  Q.     And is Ms. Veale knowledgeable about certain

2  aspects of showtime.com -- showtimeanytime.com's business

3  operations?

4  A.     She absolutely is.

5  Q.     Do you work with her on a regular basis?

6  A.     Very much so.  Every day.

7  Q.     And where is Ms. Veale located?

8  A.     She is in New York.

9  Q.     Are there any marketing efforts associated with

10 the showtimeanytime.com product?

11 A.     There's limited marketing at this point, but there

12 is some marketing.

13 Q.     And where are the people who are responsible for

14 the marketing of showtimeanytime.com located?

15 A.     They're located in New York.

16 Q.     Is there a particular witness who you deal with

17 with respect to -- a particular person who you deal with

18 within Showtime with respect to the marketing of

19 showtimeanytime.com?

20 A.     Yes.  Virginia Juliano.

21 Q.     And where is Ms. Juliano located?

22 A.     She's in New York.

23 Q.     Are there any departments or areas at Showtime

24 that you have regular dealings with respect to

25 showtimeanytime.com who are based outside of New York?

26

1  A.      Yes, the programming team.

2  Q.      And what does the programming team do?

3  A.      The programming team is responsible for deciding

4  what series Showtime wants to make or what movies we're

5  going to put on the service.  So, they are involved in

6  showtimeanytime.com only to the extent that they provide

7  the television.

8  Q.      Where is the programming department located?

9  A.      In Southern California.

10  Q.      Does the programming department have any

11  involvement in the technology relating to how

12  showtimeanytime.com works?

13  A.      No, not at all.

14  Q.      Are you familiar with a part of the CBS

15  Corporation referred to as "CBS Interactive"?

16  A.      I am.

17  Q.      Have you had reason to have contact with CBS

18  Interactive employees as part of your job

19  responsibilities relating to providing video on

20  showtimeanytime.com?

21  A.      Yes.  Once -- occasionally, and once that I am

22  particularly aware of.

23  Q.      And can you tell us what circumstance it was

24  that -- just in general terms what circumstance it was

25  that led you to have contact with CBS Interactive?

1  A.    We were -- we were and are investigating a new

2  product feature, and we spoke with Patty Hirsch at CBS

3  Interactive in New York about that feature.

4  Q.    Do you know what department or area of CBS

5  Interactive Ms. Hirsch is in?

6  A.    I actually don't know her specific department.  I

7  just know that when we were talking about providing

8  subscription video directly to consumers, we went to

9  speak to Ms. Hirsch because her department had billing

10 solutions that we wanted to investigate.

11 Q.    As part of your job as vice-president for product

12 management for Showtime Anytime, are you familiar with

13 the people who work at Showtime who have responsibilities

14 directly relating to showtimeanytime.com?

15 A.    Yes.

16 Q.    Are any of those persons with whom you're familiar

17 who have responsibilities relating to showtimeanytime.com

18 located in the State of Texas?

19 A.    No, they're not.

20        MS. DAVIS:  I have no further questions, your

21 Honor.  I pass the witness.

22        THE COURT:  All right.  Before Mr. Pitcock

23 starts, would you just spell your name for me?

24        THE WITNESS:  Yes.  My first name is

25 S-E-A-N-A.  The last name is B, as in boy, A-R-U-T-H.

1      THE COURT:  Okay.  Thank you.

2      CROSS-EXAMINATION OF SEANA BARUTH

3  BY MR. PITCOCK:

4  Q.    Good morning, Ms. Baruth.

5  A.    Hi, Mr. Pitcock.

6  Q.    So, if you could look at what was marked as

7  Defendants' Exhibit 5, which were the plaintiff's

8  infringement contentions.

9  A.    I still have it open.

10  Q.    So, if you'd look at page -- starting on page 3,

11  there's a listing of shows at the Web site www.cbs.com.

12  Do you see that?

13  A.    I do.

14  Q.    And it includes *60 Minutes*; and if you keep going

15  down the pages, it includes *CSI*, *The Good Wife*, *How I Met*

16  *Your Mother*, other TV shows associated with CBS the

17  television station.  Would you agree with that?

18  A.    Yes.

19  Q.    And you have no responsibilities with respect to

20  any of these CBS shows that are listed from page 3 to

21  page 6 until you get to *60 Minutes Sports*?

22  A.    That's correct.

23  Q.    And do you have any knowledge of relevant

24  witnesses or documents with respect to any of those

25  shows?

```
 1  A.      I do not.

 2  Q.      And if you'll turn with me to page 9, there's a

 3  listing of various podcasts.  Do you see that?

 4  A.      I do.

 5  Q.      And it goes from page 9 through the top of

 6  page 11.  Do you see that, ma'am?

 7  A.      Yes.

 8  Q.      And do you have any knowledge with regard to

 9  relevant witnesses or documents when it comes to any of

10  these podcasts?

11  A.      I do not.

12  Q.      Now, you mentioned that one of the developers --

13  one of the people who writes code for Showtime Anytime is

14  currently located in Florida; is that correct?

15  A.      That's correct.

16  Q.      And you also mentioned that one of the contractors

17  who writes code for Showtime Anytime is in Halifax,

18  Nova Scotia?

19  A.      Yes.

20  Q.      And where would their documents be located?

21  A.      They would -- if they had documents that were

22  relevant to showtimeanytime.com, they would be part of

23  the wiki or part of the ticketing system that I mentioned

24  earlier.

25  Q.      So, can those documents to the wiki or the
```

1   ticketing system, can they be uploaded or downloaded

2   anywhere there's an Internet connection?

3   A.      They can be if you have the right credentials.

4   Q.      So, just so it's clear, the developer in Florida,

5   he has been able to create documents or write code there

6   that could then be used at Showtime Anytime; is that

7   correct?

8   A.      Yes, that's correct.  He has a specific setup.

9   When he was in New York, we configured his computer in

10  specific ways that would allow him to access those

11  documents and to write code.

12  Q.      Now, you mentioned that a company called

13  "Brightcove" in Massachusetts provides the video player

14  that's used with the various shows listed in the

15  infringement contentions for Showtime Anytime; is that

16  correct?

17  A.      Yes, that's correct.

18  Q.      And where is that source code located?

19  A.      The source code -- the customized source code

20  lives in our source code depository.

21  Q.      So, the original source code that's used, does it

22  live in Massachusetts?

23  A.      I don't have access to Brightcove's operations;

24  so, I don't know.

25  Q.      And who would be the most relevant witnesses at

EVIDENTIARY HEARING

31

1  Brightcove?

2  A.    I'm not sure.  We have a contact there by the name

3  of Pablo Silva.  He has taken over recently as our

4  account rep, but I don't know if he is a technologist or

5  simply a sales guy.

6  Q.    So, just so we're clear, you don't know the

7  programmers who are mostly responsible for coding the

8  original source code for the video player?

9  A.    I do not.

10  Q.    Now, you mentioned that there were third-party

11  companies that hosted video for Showtime Anytime; is that

12  correct?

13  A.    Yes.

14  Q.    And, so, are those the content delivery networks?

15  A.    They are.

16  Q.    And where is the Showtime Anytime content hosted?

17  A.    The Web site is hosted on servers in Florida.

18  Q.    And the video content itself, does it come from

19  servers in Florida?

20  A.    Well, the benefit of content delivery networks is

21  that they are a distributed system.  So, there are

22  servers various places that serve the video files

23  specifically.

24  Q.    Do you know if there's one in Texas?

25  A.    I don't know.

1  Q.     I'm just going to show you up here on this -- I'll

2  call it "Elmo," and I'm going to show you a document.  I

3  don't know if it's in the defendants' list or not, but

4  it's the initial disclosures for CBS.

5           Can you see that, ma'am?

6  A.     I can.

7  Q.     And there's a listing here of representatives of

8  CBS who may have technical knowledge of the accused

9  systems.  Do you see that?

10  A.     I do.

11  Q.     And of all the people listed here, other than

12  yourself, who are you familiar with their work?

13  A.     With their work?

14  Q.     Yes.

15  A.     I'm not familiar with any of their work.  I met

16  Matt Norlander and Dustin Gervais as a result of this

17  process.

18  Q.     But you've never worked with them before?

19  A.     Correct.

20  Q.     And you don't know what teams they work with?

21  A.     Correct.

22  Q.     And you don't know where those teams are located?

23  A.     Correct.

24  Q.     And you don't know where the documents for those

25  teams would be located; is that correct?

33

1  A.     Yes.

2  Q.     Do you see this list of persons having knowledge

3  of prior art?  Do you see that, ma'am?

4  A.     I do.

5  Q.     And are you familiar with any of the people on

6  this list?

7  A.     I am not.  It's cut off here for me.  Is Jerry

8  Bonnell the last name on the list?

9  Q.     I will show you the entire list, although I can't

10 do it at the same time.  Actually it extends to the next

11 page.

12 A.     Okay.  Then no, I'm not familiar with anyone on

13 this list.

14 Q.     Okay.  I'm going to show you page 2 just to make

15 sure.

16 A.     I'm not familiar with anyone here either.

17 Q.     So, is it safe to say that for the companies

18 listed, you have no idea of who the relevant witnesses

19 would be for those companies with respect to the prior

20 art?

21 A.     That's correct.

22 Q.     You don't know where they're located?

23 A.     I don't.

24 Q.     You have no idea where their documents might be?

25 A.     That's correct.

1    MR. PITCOCK:  Your Honor, I'd like to offer

2 the initial disclosures of CBS as Exhibit P-1 into

3 evidence.

4    MS. DAVIS:  No objection, your Honor.

5    THE COURT:  All right.  P-1 is admitted.

6 BY MR. PITCOCK:

7 Q. Ms. Baruth, you've traveled to Los Angeles,

8 Seattle, DC, and Las Vegas for work over the past year or

9 so?

10 A. That's correct.

11    MR. PITCOCK:  I have no further questions

12 pending redirect, your Honor.

13    MS. DAVIS:  I don't have any questions for the

14 witness, your Honor.  May the witness be excused?

15    THE COURT:  All right.  Just one moment.

16    (Discussion off the record between the court

17 and law clerk.)

18    THE COURT:  All right.  Thank you, Ms. Baruth,

19 very much.

20    THE WITNESS:  Thank you, your Honor.

21    THE COURT:  You may step down.

22    MS. DAVIS:  May the witness be excused, your

23 Honor?

24    THE COURT:  Yes.  You are excused.

25    THE WITNESS:  Thank you, your Honor.

1    MS. DAVIS:  Excuse me for a moment.  I'm just

2 going to get the next witness, your Honor.

3    THE COURT:  Sure.

4    (Oath administered.)

5    MS. DAVIS:  Your Honor, CBS calls at this time

6 Mr. Matt Norlander.

7    THE COURT:  All right.  Mr. Norlander, I think

8 you'll need to raise that mic a little bit.  You're a

9 little taller than the last witness.

10    MS. DAVIS:  I think maybe a foot, your Honor.

11    DIRECT EXAMINATION OF MATTHEW NORLANDER

12    CALLED ON BEHALF OF DEFENDANT CBS

13 BY MS. DAVIS:

14 Q.    Good morning, Mr. Norlander.  Could you please

15 tell us your full name?

16 A.    Matthew Robert Norlander.

17 Q.    Are you currently employed, Mr. Norlander?

18 A.    Yes.

19 Q.    Who is your current employer?

20 A.    CBSSports.com is my primary current employer.

21 Q.    And could you explain a little bit about how that

22 relates to CBS Corporation that's the defendant here?

23 A.    I am a full-time college basketball writer for

24 CBSSports.com and those duties also include producing and

25 uploading the podcasts for CBSSports.com, specifically

1 the *Eye on College Basketball Podcast*.

2 Q.      Okay.  And is that CBSSports.com part of the CBS

3 Corporation family of companies?

4 A.      Yes.

5 Q.      How long have you been employed at CBS?

6 A.      Since December of 2010.

7 Q.      And you mentioned you have certain

8 responsibilities relating to podcasts, in particular the

9 *Eye on College Basketball Podcast*.  Could you explain a

10 little bit about what you do with respect to the

11 production of the *Eye on College Basketball Podcast*?

12 A.      Absolutely.  Basically I make sure the podcast

13 goes from a recording on a computer to being uploaded and

14 hosted by CBSSports.com using a specific software tool on

15 the back end on cstv.com which falls under the

16 CBSSports.com umbrella.  So, it's my responsibility to

17 produce and edit and upload that podcast so it can be

18 downloaded off CBSSports.com; and that's also tied to the

19 downloads on iTunes.

20 Q.      Where is your office located?

21 A.      I work out of my home.

22 Q.      And where is your home currently?

23 A.      In Norwalk, Connecticut.

24 Q.      And where is Norwalk, Connecticut, in relationship

25 to New York City?

A.      It's approximately 35 miles north of New York

City.

Q.      You mentioned, with respect to your explanation of

what you do with respect to the podcasts, a "software

tool."  Could you explain just a little bit about what

you're referring to there as the software tool?

A.      Sure.  It's basically an interface where -- you

know, there are a number of podcasts all connected to

CBSSports.com on this interface, dozens, more than 60;

and specifically for me, I select one of them.  Within

that, I log in an episode title.  I upload the podcast

via FTP to the server and from that -- this tool is

connected to that FTP server.  So, I'll type in the

rundown, type in the title, click "submit"; and basically

from there it filters right into the RSS feed.

Q.      Do you have a binder of documents up there in

front of you?

A.      Yes.

Q.      Could you turn to tab DX -- what's DX-30 in the

binder that's up there in front of you?

A.      Yes.

Q.      Are you there?

A.      I am.

Q.      Do you recognize the document that's been marked

for identification as DX-30?

1  A.     Yes.

2  Q.     Could you explain to the court what DX-30 is?

3  A.     Yes.  This is the interface/tool that I use to

4  upload the podcasts on a twice-weekly basis throughout

5  the season, and specifically Podcast No. 30 is the one

6  that I used.  But yes, this is the tool essentially that

7  I use to select and then use to upload the podcast.

8         MS. DAVIS:  Your Honor, defendants move the

9  admission of DX-30.

10        MR. PITCOCK:  Your Honor, we object to the

11 admission of this document.  It was never produced to us

12 in litigation to date.  It certainly wasn't produced to

13 us before the deposition of this witness.

14        THE COURT:  Ms. Davis?

15        MS. DAVIS:  Your Honor, this is a document to

16 illustrate the testimony of the witness today; and he can

17 explain, if you want, where he got it and how he obtained

18 it.

19        MR. PITCOCK:  Your Honor, respectfully, if

20 they wanted to use this document, they should have

21 produced it so we would have had a chance to question the

22 witness on it before in his deposition.

23        MS. DAVIS:  Your Honor, if I may, this

24 particular issue came up in the course of the questioning

25 of the witness during his deposition testimony.

39

 1          MR. PITCOCK:  Your Honor, he submitted a

 2   declaration nine months ago that had to do with the

 3   podcasting tool and, so, this issue has been well-known

 4   to counsel for the defendants for a long time and it

 5   should have been produced long ago if they wanted to use

 6   it here.

 7          THE COURT:  Ms. Davis, I do think that you

 8   have an obligation to produce the relevant documents

 9   before the hearing.  At this point I'll sustain the

10   objection, but you can question him about the subject

11   matter of it.

12          MS. DAVIS:  Certainly, your Honor.

13   BY MS. DAVIS:

14   Q.    Let me ask you to turn to a different exhibit, to

15   DX-5 in your binder, Mr. Norlander.

16          Are you there?

17   A.    I am.

18   Q.    And do you recognize DX-5?

19   A.    Apologies.  I am on DOO5.

20          THE COURT:  I think that's what she's talking

21   about.

22   BY MS. DAVIS:

23   Q.    Yeah.  I think it should be Tab 5.

24   A.    Okay.  Sorry.  Yes.

25   Q.    Okay.  If you could turn to around page 9 of

40

1  Exhibit 5 where there's a list of podcasts.

2  A.    Yes.

3  Q.    Do you see that?

4  A.    Yes, I do.

5  Q.    And are you familiar with that list of podcasts?

6  A.    Yes.

7  Q.    Which of the podcasts that are listed on -- in

8  DX-5 there are CBS Sports podcasts?

9  A.    Specifically the *Fantasy Football Podcast*, the

10 *Fantasy Baseball Podcast*, the *College Football Podcast*,

11 the *College Basketball Podcast*, the *Football Podcast*, the

12 *Basketball Podcast*, and the *Baseball Podcast*; and that

13 correlates, by the way, with the cstv.com extension on

14 the URL which falls under the umbrella of CBSSports.com

15 and has for many years.

16 Q.    And which of those CBS Sports podcasts in

17 Exhibit 5 is the one that you personally are responsible

18 for publishing on the Internet?

19 A.    I am responsible for the *College Basketball*

20 *Podcast*.

21 Q.    Is the same software tool that you described

22 earlier that you use for the Eye on Basketball -- *Eye on*

23 *College Basketball Podcast* used by others at CBS Sports

24 to publish other CBS Sports podcasts?

25 A.    Yes.

41

1  Q.     And how do you know that?

2  A.     I know that because -- I know it for a couple of

3  reasons.  One, I have a colleague on the sports desk at

4  CBSSports.com, your Honor, who taught me how to use it

5  essentially; but in first learning of it, he both went

6  over on the phone and, you know, there -- he discussed

7  with many of my other colleagues that are like me, that

8  are writers, basically how to use it.  We all use the

9  same one on the interface that I discussed earlier.  With

10 all of us dealing with podcasts, it's all the same tool,

11 it's all the same procedure in terms of uploading the

12 podcasts to CBSSports.com.  So, yes, we all use the same

13 protocol when it comes to uploading the podcasts to the

14 site.

15 Q.     And is there information that you can tell from

16 the tool itself that the tool is being used for podcasts

17 other than the podcasts that you yourself are publishing?

18         MR. PITCOCK:  Objection, form.

19 A.     Yes.  You can tell that the podcast being used by

20 others in -- simply by looking at recent upload times.

21 For example, if you would check in the past week or so,

22 you would have seen that there would have been an *Eye on*

23 *College Basketball Podcast* that would have been uploaded

24 to the site on a specific day in February.  You could see

25 the same of the *Eye on Basketball*, the *Eye on College*

1  *Football*, all of these. It indicates to you both the

2  very first podcast that was ever uploaded in one column

3  and then the most recent podcast that was uploaded in the

4  column adjacent to it.

5  BY MS. DAVIS:

6  Q.     And are you familiar, from your work with the

7  software tool, of whether or not the podcasts that are

8  listed as CBS Sports podcasts in DX-5 are also resident

9  on that same list on the software tool?

10  A.     Yes, they are in the same -- under the same --

11  they all fall under the same umbrella. They all are on

12  the same software tool.

13  Q.     Do you have an understanding as to how the

14  software tool that is used by CBS Sports for its podcasts

15  was developed?

16  A.     Yes, a general understanding.

17  Q.     And what is that understanding?

18  A.     The understanding is that it was developed by two

19  men, two former employees at CBSSports.com who are no

20  longer there.

21  Q.     And did you -- do you have an understanding as to

22  who specifically those former CBS employees are who

23  worked on this particular software tool?

24  A.     Yes. Jacques Dupoux and Paul Bronshteyn.

25  Q.     And how did you attain that understanding as to

1  the two former employees who worked on this podcasting

2  tool used by CBS Sports?

3  A.    I was informed of this by my colleague at

4  CBSSports.com, Adam Aizer, who is basically the

5  connection between those men and me and that -- Adam was

6  the one who also informed me and taught me how to use the

7  tool.

8  Q.    And have you seen any information concerning where

9  Mr. Bronshteyn and Mr. Dupoux are located now since they

10 have left CBS?

11 A.    I have researched and looked up their current

12 whereabouts and living -- where they live, yes.

13 Q.    If you would turn in your binder to Exhibit 32 --

14 or DX-32 marked for identification.

15 A.    Yes.

16 Q.    Do you recognize Exhibit 32?

17 A.    I do.

18 Q.    And could you tell the court what Exhibit 32 is?

19 A.    This is a *LinkedIn* page for Jacques Dupoux that I

20 have seen before.

21 Q.    Where did you see Mr. Dupoux's *LinkedIn* page

22 before?

23 A.    I've looked at it on my computer.

24       MS. DAVIS:  Defendants move the admission of

25 DX-32.

1        MR. PITCOCK:  Your Honor, again this is an

2   exhibit that's never been produced to us.  It wasn't

3   submitted as an exhibit to his declaration even though

4   this person was named; and as we will find out in cross,

5   he's never met this person before in his life.

6        MS. DAVIS:  Your Honor, if I may briefly,

7   Mr. Dupoux's *LinkedIn* page, as well as Mr. Bronshteyn's

8   *LinkedIn* page which we'll get to, were both submitted as

9   exhibits with respect to the original motion to transfer.

10  The only change with respect to Exhibit 32 and what we'll

11  be talking about in DX-33 is that we updated them just to

12  double-check that they were still timely since it's been

13  about six months since the original papers were filed.

14  But we provided copies of those with respect to the

15  original filing on the motion to transfer, your Honor.

16  So, there's really no surprise here.

17        THE COURT:  I guess my real issue with this

18  document is that it is a *LinkedIn* page, and I don't have

19  any reason to believe that it's anything other than

20  hearsay representation from the Internet.  We don't know

21  if it is accurate, up-to-date, or otherwise correct.  If

22  the only thing this witness did was look up Mr. Dupoux on

23  *LinkedIn*, I'm afraid that's not what I would consider a

24  firsthand knowledge basis for the testimony.  I'll

25  sustain the objection to Exhibit 32.

1          MS. DAVIS:  Your Honor?

2          THE COURT:  Yes.

3          MS. DAVIS:  Perhaps I can try and lay a little

4   additional foundation.  I do believe that this would be

5   within the confines of Rule 803(17) exception to the

6   hearsay rule; but perhaps I can lay a little foundation

7   for that, your Honor.

8          THE COURT:  All right.  Go ahead.

9   BY MS. DAVIS:

10  Q.    Mr. Norlander, first of all, with respect to

11  Mr. Dupoux's *LinkedIn* page at DX-32, when did you last

12  look at the *LinkedIn* profile for Mr. Dupoux?

13  A.    I last looked at the *LinkedIn* profile for

14  Mr. Dupoux last night, in addition to a number of other

15  sources that Mr. Dupoux specifically identifies himself

16  online, his *Twitter* page, his *Facebook*, and his

17  meetup.com profile.  As of last night all indicate that

18  he is located in New York City.

19  Q.    Let me ask another question.  In your area in

20  journalism, sportswriting in particular, is *LinkedIn* a

21  resource that is typically used to determine where people

22  are currently employed?

23  A.    It would be --

24          MR. PITCOCK:  Objection, lacks foundation.

25          THE COURT:  I'll overrule the objection.

A.     It would absolutely be a source that I and many

other journalists would use to help identify the location

of a certain subject for any sort of story.  It would not

be, you know, the sole source but like I said, I mean, I

diligently would try and find second, third, fourth

sources on locations and I did that with *Twitter*, his

*Facebook*, and meetup.com profile.  As of last night, all

specifically state that he lives in Brooklyn, New York,

as of last night in his latest profile updates.

THE COURT:  Mr. Lieberman, give you a chance

to be heard.

MS. DAVIS:  Did you mean --

THE COURT:  I'm sorry.  Mr. Pitcock.  I

apologize.

MR. PITCOCK:  None of the other sources that

are supposedly being used to authenticate this document

have been produced or submitted into evidence.  I don't

think that he can establish a foundation that it's a

business record or some other exception to the hearsay

rule.  And again, as we will learn on cross, this witness

has never met them.  He has no way of authenticating

their pictures or history or experience other than by,

you know, thirdhand hearsay sources.

THE COURT:  I'll sustain the objection.  I --

it's no surprise that this witness might rely on items

1  like *LinkedIn* and *Twitter*.  I'm sure he relies on hearsay

2  all the time.  This is clearly hearsay.  So, I'll sustain

3  the objection.

4  BY MS. DAVIS:

5  Q.    Mr. Norlander, in your experience, is it a typical

6  practice in your work as a journalist to use various

7  online resources to locate individuals?

8  A.    Yes.

9  Q.    And based on what you have done in connection with

10  this matter, do you have a belief as to where Mr. Dupoux

11  is located?

12  A.    I do.  I believe that he's located in New York.

13  My history in the journalism field would corroborate that

14  information.  Yes.

15             MR. PITCOCK:  Objection, your Honor.  This is

16  again based on hearsay that's already been excluded.

17             THE COURT:  I'll sustain the objection.

18  There's no foundation that this witness knows Mr. Dupoux.

19  He's simply saying that he has looked on the Internet and

20  formed a belief about where he lives.  That's clearly

21  hearsay.  I'll sustain the objection.

22  BY MS. DAVIS:

23  Q.    With respect to Mr. Bronshteyn, Mr. Norlander, did

24  you go through the same process that you've already

25  described with respect to Mr. Dupoux?

48

1  A.     Yes.  And I'd like to add that I have also spoken

2  with my colleague at CBSSports.com, Mr. Aizer, who has

3  connection with these men and who has indicated to me

4  that they live in the current locations.

5          MR. PITCOCK:  Doesn't help them with the

6  hearsay objection, your Honor.

7          THE COURT:  I'll sustain the hearsay

8  objection.  If the witness with knowledge was here, it

9  would be a different matter; but I'll sustain the

10 objection.

11 BY MS. DAVIS:

12 Q.     Mr. Norlander, with respect to the CBS Sports

13 podcasts that have been identified in this case in DX-5,

14 are there any potential witnesses that you're aware of

15 who are located in the State of Texas?

16 A.     There are no potential witnesses located in the

17 State of Texas.

18         MS. DAVIS:  I have no further questions, your

19 Honor.  I pass the witness.

20         CROSS-EXAMINATION OF MATTHEW NORLANDER

21 BY MR. PITCOCK:

22 Q.     If you could open your binder to DX-5, please.

23         Now, on pages 3 through 8, there's a listing

24 of various TV episodes which were made available online.

25 Do you have any knowledge of relevant information with

1  respect to any of the shows?

2  A.    Can you be more specific with the question,

3  please, sir?

4  Q.    Absolutely.  So, do you have any knowledge of the

5  operation, design, or development of any of the shows

6  listed on page 3, starting with *48 Hours*, through *Gigolos*

7  on page 8?

8  A.    I do not.

9  Q.    Do you have any knowledge of the relevant

10  witnesses or documents with respect to any of these

11  shows?

12  A.    I do not.

13  Q.    Now, if you'll turn to page 9, there are podcasts

14  listed, from *60 Minutes* on page 9 to *Courtwatch* on

15  page 10.  Do you see that, sir?

16  A.    I apologize.

17  Q.    I'll repeat the question.  It's easy to --

18  A.    I see the -- I accidentally flipped to Exhibit 9

19  in the binder.  Apologies.

20  Q.    No problem.  I'll repeat my question just because

21  I want the record to be clear.

22        So, there are a listing of podcasts on page 9,

23  starting with *60 Minutes*, that goes to -- well, it

24  extends on beyond, but to *Courtwatch* on page 10.  Do you

25  have any knowledge of the design or operation or

50

1  development of any of those podcasts?

2  A.    No.

3  Q.    And the only podcasts you have any knowledge of

4  are the sports podcasts starting with *Fantasy Football* on

5  page 10 through *Baseball* on page 11; is that correct?

6  A.    Yes.

7  Q.    And of those sports-related podcasts, you only run

8  one of them, the *College Basketball Podcast*; is that

9  correct?

10  A.    Yes.

11  Q.    Now, you have been at CBS for two years, sir?

12  A.    No.  I have been at CBSSports.com since December

13  of 2010.

14  Q.    You don't have a technical degree?

15  A.    I do not have a technical degree.

16  Q.    You're a writer.

17  A.    I am a writer.

18  Q.    Have you ever seen a patent infringement analysis?

19  A.    I have not seen a patent infringement analysis to

20  my knowledge.

21  Q.    Do you understand that this is a hearing about

22  relevant witnesses and documents related to a patent

23  case?

24  A.    It's my general understanding that that is what

25  this case pertains to.

1  Q.     Now, you mentioned "podcasting tool."  Is what you

2  learned about podcasting tool, is that all from

3  Mr. Aizer?

4  A.     Yes.

5  Q.     And he lives in Florida?

6  A.     Yes.

7  Q.     And that's where CBS Sports is headquartered,

8  correct?

9  A.     CBSSports.com specifically is headquartered in

10  Florida.

11  Q.     Now, of the other sports-related podcasts, one of

12  them is run at least in part by somebody in North

13  Carolina?

14  A.     Yes.

15  Q.     And another one is run from somebody in Minnesota?

16  A.     Yes.

17  Q.     And there's one that used to be run from Indiana?

18  A.     Yes.

19  Q.     Now, do you recall the declaration that you

20  submitted in this case, sir?

21  A.     I do.

22         MR. PITCOCK:  Your Honor, I'd like to mark as

23  Exhibit P-2 the "Declaration of Matt Norlander in Support

24  of Defendants' Motion to Transfer Venue."

25         THE COURT:  All right.  You're marking it at

1   this time?

2            MR. PITCOCK:  Offering it into evidence, your

3   Honor.  I'm sorry.

4            THE COURT:  Okay.  Is there any objection,

5   Ms. Davis?

6            MS. DAVIS:  No objection, your Honor.

7            THE COURT:  All right.  P-2 will be admitted.

8            MR. PITCOCK:  Permission to approach, your

9   Honor?

10           THE COURT:  Yes.

11  BY MR. PITCOCK:

12  Q.    Is this the declaration you submitted in support

13  of CBS's motion to transfer venue?

14  A.    It appears to be that, yes.

15  Q.    Now, in your declaration at page 7, there are

16  various statements regarding the podcasting tool that you

17  referred to in your testimony; is that correct?

18  A.    Could you -- are you referring to the booklet

19  here, specifically Exhibit 7?  You said "page 7."

20  Q.    Actually -- I'm sorry.  I may have misspoke.  I

21  meant paragraph 7 of P-2, which is your declaration.

22  A.    Okay.  Yes.

23  Q.    Now, do you recall that early in your deposition

24  last week you couldn't remember which podcasts used the

25  tool?

1  A.     No.  That's not entirely accurate.

2  Q.     Well, do you remember testifying you couldn't be

3  sure which podcasts used the tool?

4  A.     I would not say that's a fair statement or a fair

5  question because under the -- my impression of the

6  questions that you were asking in the deposition, I

7  basically misinterpreted what you were asking and, so, my

8  answer might have led you to believe that, but that's

9  not -- that's not the message that I thought I was

10  conveying or trying to get across specifically and, so,

11  later in the deposition I made sure it would be

12  crystal-clear about the podcast tool and its universal

13  input from other CBSSports.com employees.

14  Q.     In fact, you did that in response to questions

15  from your counsel, Ms. Davis, right?

16  A.     Yes.

17  Q.     And you conferred with your counsel during every

18  deposition break we took, didn't you, about your

19  testimony?

20  A.     Yes.

21  Q.     Now, if you turn back to your declaration, you

22  understand that you swore under penalty of perjury that

23  you had personal knowledge of these facts?

24  A.     Yes.

25  Q.     And you don't mention anywhere in here that all

1  these facts came from Mr. Aizer?

2  A.      Can you repeat the question, please?

3  Q.      Well, Mr. Aizer, who lives in Florida, isn't

4  mentioned anywhere in your declaration, correct?

5  A.      Mr. Aizer does not appear to be mentioned anywhere

6  in my declaration.

7  Q.      And you didn't mention that Mr. Aizer was the

8  person who taught you how to use this podcasting tool?

9  A.      My declaration does not show specifically that I

10 mentioned Mr. Aizer taught me how to use the software

11 tool.

12 Q.      Now, the two people who are mentioned as creating

13 the software tool, have you ever met them?

14 A.      I have not.  If you're referring to Mr. Paul

15 Bronshteyn and Jacques Dupoux, I have not met them.

16 Q.      Now, were you employed by CBS at the time this

17 tool was developed or allegedly developed?

18 A.      I was not, to the best of my knowledge.

19 Q.      Now, when you spoke to Mr. Aizer to get this

20 information, was he in Florida?

21 A.      Yes.

22 Q.      And, in fact, Mr. Aizer runs multiple podcasts --

23 or you believe he runs multiple podcasts from Florida

24 that are listed in the initial -- or I'm sorry -- the

25 infringement contentions?

1  A.    I believe that he -- I know that he was

2  responsible and still is for running the *Fantasy Football*

3  *Podcast*.  I believe he might have had a specific hand in

4  the -- also the *Fantasy Baseball Podcasts* because those

5  are the only two podcasts that are produced, uploaded,

6  edited from the CBSSports.com headquarters in Fort

7  Lauderdale, Florida.

8  Q.    Well, the others are spread all around the country

9  except for yours, correct?

10  A.    They're in a very few specific remote locations.

11  Q.    Now, would you agree with me that Mr. Aizer has

12  relevant knowledge regarding this litigation?

13  A.    Yes.

14  Q.    Would you agree with me that he probably has more

15  relevant knowledge than you do regarding this litigation?

16  A.    Yes.

17  Q.    I know it's tough to be a relatively young and new

18  employee.  Do you think your employer and source of

19  income would have been upset if you had refused to sign

20  this declaration?

21        MS. DAVIS:  Objection, your Honor.

22  Speculative.

23        THE COURT:  What's the objection?

24        MS. DAVIS:  Objection, your Honor.  He's

25  calling for speculation.

1          THE COURT:  I'll overrule the objection.

2  A.    Can you repeat the question, please?

3  BY MR. PITCOCK:

4  Q.    Yes.  The question is:  Do you think your

5  employer, your source of income, CBS, would have been

6  upset with you if you had refused to sign this

7  declaration?

8  A.    I want to be specific here.  I'm employed by

9  CBSSports.com and not CBS.  These are two very, very

10  different entities, your Honor.  And it is my belief that

11  they would not have been upset if I had refused to sign

12  this declaration, CBSSports.com specifically.

13  Q.    Do you have any idea why Mr. Aizer didn't submit a

14  declaration?

15  A.    I have no idea.

16  Q.    Do you think it could be because he lives in

17  Florida?

18  A.    Sir, I have no --

19          MS. DAVIS:  Objection, your Honor.  Same

20  objection.  He's just asking the witness now to speculate

21  about things he can't possibly have knowledge of.

22          THE COURT:  I'll sustain that objection.

23          MR. PITCOCK:  No further questions.

24          THE COURT:  Anything further, Ms. Davis?

25                    **

57

         REDIRECT EXAMINATION OF MATTHEW NORLANDER

1  BY MS. DAVIS:

3  Q.     Just very briefly, Mr. Norlander.

4          Are there any current CBS Sports employees who

5  would have personal knowledge with respect to the design

6  and development of the software tool?

7  A.     Can you -- I apologize.  Can you please repeat the

8  question?

9  Q.     Sure, sure.  The software tool that we have been

10 talking about --

11 A.     Yeah.

12 Q.     -- are there any current CBS Sports employees who

13 would have personal knowledge with respect to the design

14 or the development of that software tool?

15         MR. PITCOCK:  Objection, foundation, your

16 Honor.

17         THE COURT:  I'll allow the question, but I --

18 in any event, we'll see what the foundation is.  But the

19 witness can say whether he knows.

20 A.     I believe so, yes.  Yeah, I -- I apologize if I'm

21 misinterpreting the question here.  But are you asking if

22 there is a current CBS employee that understands how the

23 tool works?

24 BY MS. DAVIS:

25 Q.     My question was going to the design and

1  development, but let me --

2  A.     Oh.

3  Q.     Let me ask you a different question.

4  A.     Okay.

5  Q.     Has the tool that you use to put the podcasts

6  online for CBSSports.com changed during the time that you

7  have been at cbs.com?

8  A.     No.

9  Q.     CBSSports.com.  I apologize.

10  A.     It has not changed at all.  It has been the exact

11  same procedure, the exact same steps along the way from

12  the very beginning to now.

13  Q.     And was that tool in use at CBSSports.com when you

14  first arrived at CBSSports.com?

15  A.     Yes.

16  Q.     And based on your conversations with your

17  colleagues at CBSSports.com, did you have an

18  understanding as to whether that tool had been in place

19  for some time before you arrived?

20        MR. PITCOCK:  Objection, your Honor.

21  Foundation, hearsay.

22        THE COURT:  Well, I -- your question is

23  whether he has been told that by other employees?

24        MS. DAVIS:  Based upon his work conversations

25  with his colleagues, your Honor, whether he had

1 understanding when he got there as to whether or not this

2 was a new tool or this was a tool that had been in place

3 for a while.

4        THE COURT:  I'll allow him to answer that

5 question.

6 A.    Yes.  When I began working there, I began working

7 with the podcasts, I was -- frankly I was told how it

8 works and informed that it had been there and yes the --

9 the institution of the tool was in existence before I

10 began working at CBSSports.com.

11 BY MS. DAVIS:

12 Q.    And the colleagues that you work with at

13 CBSSports.com, do any of them get involved in developing

14 the technology that is used for putting the podcasts on

15 the Web site?

16        MR. PITCOCK:  Objection, foundation.

17        THE COURT:  I think you do need to lay a

18 foundation for that first.

19        MS. DAVIS:  Certainly.

20 BY MS. DAVIS:

21 Q.    Are you familiar with the work that your

22 colleagues who also are responsible for publishing

23 podcasts at CBSSports.com do?

24 A.    Currently?

25 Q.    Yes.

1  A.      Yes.  Yes.

2  Q.      And based on your interaction with those

3  colleagues, do any of those colleagues who publish the

4  podcasts at CBSSports.com have any involvement in the

5  technological development of the programs and tools used

6  to post those podcasts online?

7               MR. PITCOCK:  Objection, foundation, hearsay.

8               THE COURT:  He can answer whether he knows if

9  they do or not.

10  A.      Are you asking if my current colleagues at

11  CBSSports.com had any involvement with the development of

12  the tool?

13  BY MS. DAVIS:

14  Q.      And whether they are -- currently in their job

15  responsibilities are involved with developing that

16  technology.

17  A.      They are not.

18               MR. PITCOCK:  Objection, your Honor.  Again --

19               THE COURT:  I'll overrule --

20               MR. PITCOCK:  That's a different question --

21               THE COURT:  As to that question, I'll overrule

22  it.

23               MS. DAVIS:  I have no further questions, your

24  Honor.

25               THE COURT:  All right.  I have just a couple

61

1  of questions, and then we'll let Mr. Norlander go.

2              EXAMINATION OF MATTHEW NORLANDER

3  BY THE COURT:

4  Q.    Just to make sure I understand your testimony,

5  Mr. Norlander, you are responsible for creating the

6  content of the basketball podcast that you've testified

7  about; is that right?

8  A.    Your Honor, not entirely.  I was the former host

9  of the podcast.  Now there's a different host who is a

10 bit older than I am and not as tech savvy.  So, while I

11 still contribute to the podcast and occasionally talk on

12 it, the only consistency in role that I've had with the

13 podcast is, because I'm a little more tech savvy with it,

14 I have been responsible for uploading the podcasts from

15 its inception at CBSSports.com, specifically *Eye on*

16 *College Basketball* live, through the FTP and out to the

17 CBSSports.com servers.

18 Q.    And you mentioned there are more than 60 other

19 CBSSports.com podcasts; is that right?

20 A.    There are.  And, your Honor, just to be specific,

21 some of those are now defunct.  Some of them are still

22 active.  But they're all housed under the same section

23 basically on cstv.com which CBSSports.com long ago

24 overtook.  It's just -- the nature of podcasts is that

25 you -- you know, people develop them, they want to go be

1  able to find them and listen to them.  So, you need to

2  house and archive all of these podcasts so this is where

3  they originally were and in order to still have all

4  the -- that they remain there.

5  Q.    So, there are people like you who are responsible

6  for hosting or creating the content of these podcasts

7  and -- is that right?

8  A.    There are.  And most of them are similar to me in

9  job description.  We're writers, we're bloggers, but also

10 have, you know, a knack for being able to record and

11 produce podcasts.

12 Q.    And they're, to the best of your knowledge,

13 scattered around the country?

14 A.    Specifically there are two in North Carolina.

15 There is one in Minnesota.  And the baseball one used to

16 be -- is no longer in existence but used to be in

17 Indiana.  So, now they are only in two other specific

18 states outside of where I am.

19 Q.    All 60 of them are just in those locations?

20 A.    I can't speak specifically to the history of every

21 single podcast; but most of them, the ones that are

22 defunct, to my knowledge were produced in-house at

23 CBSSports.com.  Only recently with the advent of Skype

24 and the ability to upload these podcasts to CBSSports.com

25 servers with writers that had the capability and

1  knowledge like myself did they start to ask us, you know,

2  "Since you can do this, you can take it off our hands at

3  the desk here if you want to just upload the podcast

4  yourself," Matt in Connecticut or one of my colleagues

5  who live in North Carolina.

6  Q.    So, the others that you mentioned that are based

7  at CBSSports.com, that's at the headquarters in Florida?

8  A.    Yes.  Fort Lauderdale, Florida, is the hub for

9  CBSSports.com's editorial desk in addition to, you

10  know -- anything relating to CBSSports.com from a

11  headquarters standpoint is located in Fort Lauderdale,

12  Florida, your Honor.

13  Q.    All right.  Very good.

14          THE COURT:  Thank you, Mr. Norlander.

15          THE WITNESS:  Thank you, your Honor.

16          THE COURT:  You may step down.

17          THE WITNESS:  Good morning, and thank you.

18          THE COURT:  Good morning.

19          MS. DAVIS:  May the witness be excused, your

20  Honor?

21          THE COURT:  Yes, the witness is excused.

22          MS. DAVIS:  Your Honor, CBS calls Dustin

23  Gervais.

24          (Oath administered.)

25                        **

64

DIRECT EXAMINATION OF DUSTIN GERVAIS

CALLED ON BEHALF OF DEFENDANT CBS

BY MS. DAVIS:

Q.    Mr. Gervais, could you please state your name for us?

A.    Dustin Derrick Gervais.

Q.    Are you currently employed, Mr. Gervais?

A.    I am.

Q.    Who is your current employer?

A.    CBS Radio News.

Q.    And what is the relationship between CBS Radio News and CBS Corporation?

A.    CBS Radio News is part of CBS News, CBS News is part of CBS Broadcasting, and then CBS Broadcasting is part of the greater CBS Corporation.

Q.    How long have you been employed at CBS?

A.    Since 2004.

Q.    Can you describe briefly for us your educational background?

A.    I got a bachelor's degree from Hofstra University where I was the top of my class.  I majored in audio-radio and philosophy.

Q.    What is your current title at CBS Radio News?

A.    I am the new media manager there.

Q.    How long have you been the new media manager for

1 CBS Radio News?

2 A.      Since 2010.

3 Q.      And could you explain to us what your job

4 responsibilities are as the new media manager for

5 CBS Radio News?

6 A.      I'm basically responsible for the distribution of

7 all CBS Radio News content outside of the traditional

8 terrestrial broadcast radio content.

9 Q.      Is one of those ways that CBS radio content is

10 distributed through the Internet?

11 A.      Yes.  We distribute it through our Web site at

12 cbsradionews.com which is part of cbsnews.com and then

13 also cbsradionewsfeed.com.

14 Q.      What responsibilities do you have with respect to

15 podcasts that may be made available on the CBS Radio Web

16 sites?

17 A.      So, I am involved with the production, creation of

18 some of the content, transferring the content from

19 various areas; and then I'm also responsible for

20 designing the code that goes around the podcast itself on

21 the Web sites.

22 Q.      Where is your office located?

23 A.      In New York, Manhattan.

24 Q.      And where do you currently reside, Mr. Gervais?

25 A.      I live in Brooklyn.

1  Q.     Is there a -- strike that.

2          Do you work with other employees at CBS Radio

3  News to put the podcasts on the Web sites?

4  A.     I do.

5  Q.     And who is it that you work with to do that?

6  A.     I work with a number of entry-level people --

7  they're called "desk associates" -- and I have trained

8  them all in using the tools that are -- that we use to

9  upload these podcasts.  And they're all in New York.

10 Q.     You mentioned that you're responsible for the code

11 that goes around the podcasts.  Is there a third-party

12 vendor that's involved in some of the technology for

13 playing the podcasts?

14 A.     Yes.  Harris Media is our third-party vendor; and

15 they use a subcontractor called "Synergy" who I believe

16 actually wrote the code for that, for the podcasts

17 themselves.

18 Q.     If you would in the binder in front of you turn to

19 Tab 5, or DX-5 --

20 A.     Okay.

21 Q.     -- that's already been admitted into evidence.

22 A.     I'm there.

23 Q.     And if you would turn to page -- I think it's

24 around page 9 --

25 A.     Uh-huh.

1  Q.      -- of that document DX-5.  Are you there?

2  A.      I'm on it.

3  Q.      Are you familiar with the list of episodes or

4  podcasts that's included in DX-5?

5  A.      Yes.  I am responsible for all of the podcasts on

6  page 9 and then on the top of 10, *What's in the News* and

7  *Now. What.* and *Courtwatch*.

8  Q.      The technology that CBS Radio News uses for making

9  the podcasts available that are listed there in DX-5 that

10 you just identified that you have responsibility for, is

11 that technology in-house at CBS Radio or does it also

12 involve outside technology?

13 A.      The technology of the podcasts themselves is part

14 of -- controlled by Harris Media, and then Synergy wrote

15 that code.

16 Q.      Where is Synergy located?

17 A.      Well, let me say Harris Media is in New York; and

18 then Synergy is in New Jersey.

19 Q.      And can you explain to the court what it is that

20 Synergy provides in -- that allows CBS Radio News to put

21 the podcasts on the Web sites?

22 A.      They've written the code that enables us to take

23 the content and metadata and create a podcast out of it.

24 Q.      Is there source code associated with the podcasts

25 being put on the Web sites for CBS Radio News?

1  A.     Yes, there is.

2  Q.     And if you needed to obtain a copy of that source

3  code for inspection in a litigation, where would you go

4  to obtain that code?

5  A.     We would go to Harris Media first.  They would be

6  holding the code.

7  Q.     Do you have a particular representative or set of

8  representatives that you deal with from Harris Media or

9  Synergy?

10  A.     Yes.  I am in contact with Lee Harris on a regular

11  basis and Ryan Froehlich from Synergy.

12  Q.     Where is Mr. Harris physically located?

13  A.     He's in New York, Manhattan.

14  Q.     And what about Mr. -- is it Froehlich?

15  A.     Yeah, I believe so.  He is in New Jersey.

16  Q.     Who in your view is the person or persons that are

17  most knowledgeable as to the technology used at CBS Radio

18  News to make podcasts available online?

19  A.     As far as the technology of the -- of the

20  production of the podcasts, that would be me.  In terms

21  of the actual creation of the podcast itself, it would be

22  the Harris Media and Synergy folks that we mentioned.

23  Q.     Are there documents that relate to the technology

24  used at CBS Radio News to make podcasts available online?

25  A.     Yes.

1  Q.    Where would those documents be located?

2  A.    New York and New Jersey.

3  Q.    Would those include documents both at CBS and at

4  Harris Media and Synergy?

5  A.    Yes.

6  Q.    Does CBS Radio News have records or information

7  about the extent of usage of the podcasts at CBS Radio

8  News?

9  A.    Yes.  Synergy, in their code, has also provided us

10  ways to track click-throughs and downloads; so, that data

11  is all in New York.

12  Q.    And who would be the person who is most

13  knowledgeable about that information about how the CBS

14  Radio News podcasts are used?

15  A.    I would have that knowledge.  I look at those

16  numbers on a regular basis.

17  Q.    Does CBS Radio News keep financial records

18  relating to the podcasts on CBS Radio News?

19  A.    Yes, we do.

20  Q.    And who would be the persons most knowledgeable

21  about those financial records?

22  A.    I handle the day-to-day operations, and then the

23  budgeting is done through Linda Coombs.

24  Q.    And what is Ms. Coombs' position or title?

25  A.    She's the operations manager at CBS Radio News.

70

1  Q.    And where is Mr. Coombs located?

2  A.    She's also in New York.

3  Q.    As part of your job responsibilities, are you

4  aware of those persons who have direct responsibilities

5  relating to the CBS Radio News podcasts?

6  A.    I'm sorry.  Could you repeat that one more time?

7  Q.    Sure.  As part of your job responsibilities, are

8  you familiar with the individuals who would have direct

9  job responsibilities relating to the CBS Radio News

10 podcasts?

11 A.    Yes.

12 Q.    Are any of those individuals located in Texas?

13 A.    No.

14 Q.    Did you also investigate the location of witnesses

15 and documents relating to cbs.com?

16 A.    I did.

17 Q.    What did you do to investigate the location of

18 witnesses and documents relating to cbs.com?

19        MR. PITCOCK:  Your Honor, objection.  He is

20 going to base all of this on again discussions with third

21 parties who are not present, and he has no

22 responsibilities for any of the contents at cbs.com as

23 opposed to these podcasts.

24        THE COURT:  All right.  Well, I'll -- I will

25 defer a ruling on the objection until we get to specific

1  questions, but at this point she's just asking him what

2  he did.  So, I'll allow him to answer that.

3  A.    I had conversation with a couple of

4  representatives at cbs.com, and then I also followed up

5  by looking up information about them on our company

6  directory.

7  BY MS. DAVIS:

8  Q.    And who were the individuals that you spoke to

9  about the operations of cbs.com?

10 A.    A Mr. Randell -- he is the vice-president of

11 engineering for cbs.com -- and an Elizabeth Wright.  She

12 is the vice-president of financial planning and analysis

13 for cbs.com.

14 Q.    Where is Mr. Randell located?

15 A.    He is in --

16       MR. PITCOCK:  Objection, hearsay, foundation.

17       THE COURT:  He is now being asked about

18 employees of cbs.com.  And what is the relationship of

19 cbs.com to his employer?

20       MS. DAVIS:  They're both part of the CBS

21 Corporation group of companies, your Honor.

22       MR. PITCOCK:  I'll withdraw the objection for

23 now, your Honor.

24       THE COURT:  All right.  I'll allow him to

25 answer questions about employees of the CBS family.

A.      I'm sorry.  I forgot the question.

BY MS. DAVIS:

Q.      I think I did, too.  Why don't I just pick up I think where I left off -- oh.  Where is Mr. Randell located?

A.      In my conversations with him and according to the CBS employee directory, he is in San Francisco.

Q.      And you also mentioned that you spoke to Ms. Wright?

A.      That's correct.

Q.      And where is Ms. Wright located?

A.      According to my conversation with her and the internal CBS directory, she is in New York.

Q.      In your conversation with Mr. Randell, did you inquire as to the location of witnesses who would have knowledge with respect to the cbs.com video episodes online?

A.      I discussed with him the locations of the teams that he works with, not specific individuals.

Q.      Okay.  And what did Mr. Randell inform you as to how -- well, where the teams that work on cbs.com video episodes are located?

A.      He told me that the majority of the technical people are in San Francisco; and a majority of the business operations are done in New York, which makes

1 sense given where they're -- the individual people are

2 located according to the directory.

3 Q.    Did you do any additional investigation to confirm

4 the information that Mr. Randell and Ms. Wright had

5 provided you?

6 A.    As I said, I looked them up in the CBS directory

7 and found all of the information that they had given me

8 matched what was in the directory.

9 Q.    I think you already talked a little bit about what

10 Mr. Randell's job responsibilities are.  Can you tell us

11 what Ms. Wright's job responsibilities are?

12 A.    Sure.  She handles the analytics in terms of

13 downloads and also making sure that money collected for

14 the cbs.com podcasts is accounted for correctly.

15 Q.    Do you have an understanding as to where the sales

16 functions or sales team associated with cbs.com is

17 located?

18 A.    Those are in New York, yes.

19 Q.    Do you have an understanding as to who the head of

20 the sales team for cbs.com is?

21 A.    That's Ken Lagana, according to my conversations

22 and the CBS directory.

23 Q.    And where is Mr. Lagana located?

24 A.    In New York.

25 Q.    And did you have -- do you have an understanding

1  as to where the analytics team is located for cbs.com?

2  A.    With Elizabeth Wright in New York.

3  Q.    And do you have an understanding as to where the

4  financial team is relating to the cbs.com Web site?

5  A.    Also in New York.

6  Q.    Did you in your investigation make inquiries as to

7  whether or not there were any potential witnesses about

8  cbs.com video episodes who would be located in Texas?

9  A.    I did ask that specifically, and I was told there

10  were none.

11          MS. DAVIS:  I have no further questions.  I

12  pass the witness.

13          THE COURT:  All right.  Thank you.

14          CROSS-EXAMINATION OF DUSTIN GERVAIS

15  BY MR. PITCOCK:

16  Q.    If you could open your binder to Exhibit 5.

17  A.    I am there.

18  Q.    And just so your testimony is clear, you're

19  responsible only for certain podcasts.  If you look at

20  page 9, starting with *60 Minutes* to *Courtwatch*; is that

21  correct?

22  A.    That's correct.  That's my direct responsibility.

23  Q.    And you have no responsibilities with respect to

24  any of the television episodes that are listed on

25  pages 3, 4, 5, 6, 7, and 8; is that correct?

1  A.     Yes.  No direct responsibility there.

2  Q.     So, your knowledge regarding any of these shows is

3  solely based on your conversations with various people at

4  cbs.com?

5  A.     I have some knowledge based on the day-to-day

6  operations of working at CBS.

7  Q.     Let me show you what's been previously marked as

8  Exhibit P-2.  I think you have it in --

9  A.     This one (indicating)?

10 Q.     Oh, no.  I'm sorry.  P-1.  I apologize.

11         It's the initial disclosures of CBS.

12 A.     Is that in the binder or --

13 Q.     It is not in the binder.  It should be a

14 stand-alone document just like this one.

15         I'll put it up on the Elmo so you don't need

16 to worry about it.

17 A.     Yeah.  Thank you.  This seems to be 17 so...

18 Q.     Now, of all -- so, Mr. Randell, he is the

19 vice-president of engineering in California who has

20 knowledge of the design, development, and operation of

21 the accused infringing Web sites; is that correct?

22 A.     That's my understanding.

23 Q.     And he leads a development team of over 25 people;

24 is that correct?

25 A.     That's my understanding.

1  Q.     And the majority of them are located in

2  California?

3  A.     Yes, that's my understanding.

4  Q.     And he works for CBS Interactive, Inc.; is that

5  correct?

6  A.     Yes, that's my understanding.

7  Q.     So, you're not that familiar with that part of the

8  CBS corporate umbrella?

9  A.     There are very specific different areas of the

10  company.  So, sometimes there's a division on how things

11  are divided.  So...

12  Q.     Was it your understanding that CBS Interactive,

13  Inc., is the part of CBS that runs the cbs.com Web site?

14  A.     Could you repeat that one more time?

15  Q.     Sure.  Is it your understanding that CBS

16  Interactive, Inc., is the part of the CBS corporate

17  family that runs cbs.com?

18  A.     Yes, among other Web sites.

19  Q.     And, so, all these shows in Exhibit 5 in the

20  binder, you understand that all these shows hosted at

21  cbs.com, they're under the responsibility of CBS

22  Interactive, Inc.?

23  A.     That's my understanding.  We didn't go through

24  each show, but that's my understanding.

25  Q.     And CBS Interactive, Inc., is headquartered in

 1  San Francisco?

 2  A.     Well, like I said, there are some people in

 3  San Francisco and some businesspeople in New York.

 4  Q.     My question was:  Is CBS Interactive headquartered

 5  in San Francisco?

 6  A.     I guess I'm differing on what you mean by the term

 7  "headquartered."

 8  Q.     You don't understand that's their main office in

 9  California?

10  A.     It's not their only office.

11  Q.     I didn't say it was their only office.  And I

12  don't mean to be argumentative.  Do you understand that

13  it's their headquarters or not?

14  A.     I'm not sure.

15  Q.     So, if you look at the other relevant witnesses

16  who are listed as being part of CBS Interactive, do you

17  know who Joseph Akbrud is?

18  A.     Yes.  I work with him on a regular basis.

19  Q.     Okay.  And does he work on the TV shows or the

20  podcasts?

21  A.     No, he works at cbsnews.com.  So, he would

22  probably -- well, yeah, he works at cbsnews.com.

23  Q.     So, you think he works on some of the TV shows?

24  A.     Not for -- not the ones that we were talking about

25  on pages 3, 4, 5, 6, et cetera.

1  Q.     Do you think he works on the podcasts that are

2  listed on pages 9, 10, and 11?

3  A.     No.  No.  I'm sorry.

4  Q.     So, do you have any idea what the relevance of

5  Mr. Akbrud would be to this case?

6  A.     He may not work directly on those shows but he may

7  have knowledge of some of the systems that were

8  developed, but I wouldn't -- I don't know that for sure.

9  Q.     Now, do you see where Corey Downs is listed?

10  A.     I see that here.

11  Q.     And do you know his responsibilities at CBS?

12  A.     I do not.

13  Q.     He wasn't mentioned in respect to any of your

14  conversations?

15  A.     No.

16  Q.     Do you know that Mr. Downs is located in

17  Los Angeles?

18  A.     I don't know that.

19  Q.     And you don't know what his responsibility would

20  be with respect to knowledge in the case?

21  A.     I do not.

22  Q.     And you don't know where his documents would be

23  located?

24  A.     I do not.

25  Q.     Now, do you remember at your deposition when we

1  discussed the chief technology officer and chief

2  information officer of CBS Interactive?

3  A.     Yes, I remember that coming up.

4  Q.     And you remember that person being Mr. Yared?

5  A.     I remember you showing me some documents saying

6  so.

7  Q.     But you don't have any understanding of the chief

8  technology officer of CBS Interactive's role with respect

9  to these Web sites?

10  A.     Not specifically.

11  Q.     Do you recall seeing that there was information

12  that indicated that he lived in California?

13  A.     I recall you showing me information saying that.

14  Q.     Did you look him up in the company directory the

15  way you did for some of these other witnesses?

16  A.     I did not.

17  Q.     And you didn't talk to him before you gave your

18  testimony today?

19  A.     No.

20  Q.     And would you agree with me that Mr. Randell would

21  be more knowledgeable than yourself regarding the

22  operation of the cbs.com Web site?

23  A.     Yes.

24  Q.     You had your discussion with Mr. Randell under the

25  direction of counsel; is that correct?

 1  A.      What do you mean by "under the direction of"?

 2  Q.      I'm sorry.  Was counsel present when you talked to

 3  Mr. Randell?

 4  A.      Yes.

 5  Q.      And did they participate in that discussion?

 6  A.      Only to a very limited extent.

 7  Q.      Now, do you have any reason other than this

 8  litigation to have discussions with Mr. Randell?

 9  A.      I wouldn't think so, but something might come up.

10  Q.      So, is it safe to say that you don't have any

11  personal knowledge of the location of the documents

12  associated with Mr. Randell's work?

13  A.      In terms of the documents specifically?

14  Q.      Yes.

15  A.      Only what he told me.

16  Q.      Now, who are the ten most knowledgeable witnesses

17  for cbs.com of these teams you have been describing?

18  A.      As far as specific names?

19  Q.      Yes.

20  A.      Other than Mr. Randell and Ms. Wright, I couldn't

21  give you ten.

22  Q.      Could you give me a third?

23  A.      Joe Akbrud who is listed here who I know may have

24  knowledge as well.

25  Q.      But you don't know he has any relevant knowledge,

1  do you, sir?

2  A.      Not for sure.

3  Q.      And is it safe to say that of these relevant

4  witnesses you have no idea where their relevant documents

5  might be kept?

6  A.      I would guess they would be kept where they are

7  located.

8  Q.      So, largely in California?

9  A.      Or New York.

10  Q.      Let me show you a list of people in the same

11  initial disclosures who are listed as being knowledgeable

12  about prior art.  And it extends over two pages; so, I'll

13  have to do this in waves.  But I want to know if you're

14  familiar with the location of any of them.

15  A.      Not that I can see on the screen.

16  Q.      Do you have any relevant knowledge regarding any

17  of these prior art witnesses or companies?

18  A.      No.

19  Q.      I'm going to show you the rest of this list.

20          Does that change your answers?

21  A.      No.

22  Q.      How about these prior art witnesses (indicating)?

23  Do you know any of them?

24  A.      No.

25  Q.      Don't know where they're located?

1   A.      No.

2   Q.      And for all the witnesses listed with respect to

3   prior art, is it safe to say you have no idea where their

4   relevant documents might be?

5   A.      I do not, no.

6   Q.      Are you familiar with CrunchBase?

7   A.      My understanding it's a tech crunch of database of

8   companies.

9   Q.      And I want to show you a printout of CrunchBase.

10  Do you see all the people listed there for CBS

11  Interactive?

12  A.      I see a list of people, yes.

13  Q.      And do you know any of the people listed here for

14  CBS Interactive?

15  A.      Personally?

16  Q.      Yes.

17  A.      No.

18  Q.      Is it safe to say that you have no idea where

19  they're located?

20  A.      Not on an individual basis, no.

21  Q.      And is it safe to say that you have no idea where

22  their documents are kept?

23  A.      Not specifically, no.

24  Q.      Now, do you know why Mr. Randell isn't here

25  testifying today?

83

```
 1  A.      I do not.

 2  Q.      Could it be because he's located in California?

 3  A.      I --

 4          MS. DAVIS:  Objection, your Honor.  Calls for

 5  speculation.

 6          THE COURT:  I'll sustain the objection.

 7  BY MR. PITCOCK:

 8  Q.      And just to be clear, you have no personal

 9  knowledge with regard to the sports-related podcasts?

10  A.      No.

11          MR. PITCOCK:  Nothing, pending redirect, your

12  Honor.

13          THE COURT:  All right.

14          REDIRECT EXAMINATION OF DUSTIN GERVAIS

15  BY MS. DAVIS:

16  Q.      Mr. Gervais, Mr. Pitcock was asking you some

17  questions about a Mr. Akbrud.  Do you recall that?

18  A.      Uh-huh.  That's correct.

19  Q.      Where is Mr. Akbrud located?

20  A.      He is in New York.

21  Q.      Is it your understanding that Mr. Akbrud works for

22  CBS Interactive?

23  A.      Yes.

24  Q.      I'm going to call your attention to the document

25  that counsel still has up on the screen, that CrunchBase
```

84

1  document.  Do you see that?

2  A.    I do.

3  Q.    And is it -- do you have an understanding as to

4  whether CBS Interactive works on Web sites other than the

5  cbs.com Web site?

6  A.    Yes.

7  Q.    Do you have an idea of about how many Web sites

8  CBS Interactive has under its umbrella?

9  A.    I believe it's about 30.

10 Q.    Do you know whether any of the individuals listed

11 on the document that Mr. Pitcock put on the screen from

12 CrunchBase have any direct responsibility or -- let me

13 strike that.

14       Do you know if any of those individuals have

15 any direct knowledge as to the operation of the provision

16 of video episodes on cbs.com?

17 A.    As far as these people who are listed here, I

18 don't know whether they do or not.

19            MS. DAVIS:  No further questions, your Honor.

20            THE COURT:  All right.  Thank you.  You may

21 step down, Mr. Gervais.

22            THE WITNESS:  Thank you, your Honor.

23            MS. DAVIS:  May the witness be excused, your

24 Honor?

25            THE COURT:  Yes.  The witness is excused.  And

1  we'll take a recess of about ten minutes.

2              (Recess, 10:55 a.m. to 11:10 a.m.)

3              THE COURT:  Ms. Davis and Mr. Lieberman, who

4  is your next witness?

5              MR. LIEBERMAN:  Your Honor, CBS calls Mr. J.R.

6  Skaggs.

7              THE COURT:  All right.

8              (Oath administered.)

9               DIRECT EXAMINATION OF J.R. SKAGGS

10              CALLED ON BEHALF OF DEFENDANT CBS

11  BY MR. LIEBERMAN:

12  Q.     Good morning, Mr. Skaggs.

13  A.     Good morning.

14  Q.     Could you please tell the court what you do for a

15  living?

16  A.     I'm a private investigator.

17  Q.     And give us a brief rundown of your educational

18  background.

19  A.     I received a Bachelor of Business Administration

20  from The University of Texas in 1984.

21  Q.     And before that, where did you go to high school?

22  A.     I went to high school in Plainview, Texas.

23  Q.     And where do you work out of?

24  A.     Where do I work now?

25  Q.     Where do you work out of?  Where is your office?

86

1  A.      In Houston, Texas.

2  Q.      How long have you been a private investigator in

3  Texas?

4  A.      Since 1982.

5  Q.      Tell us how you first came to be a private

6  investigator.

7  A.      I started working part-time as an apprentice for a

8  gentleman by the name of Doug Graham who was an ex-FBI

9  agent who had an investigations company in New Braunfels,

10  Texas.  This is while I was attending The University of

11  Texas at Austin.

12  Q.      And have you remained a private investigator since

13  graduating from University of Texas at Austin in 1984?

14  A.      I have.

15  Q.      And are you licensed as a private investigator in

16  Texas?

17  A.      Yes.

18  Q.      Are you being compensated for your time here

19  today?

20  A.      I plan to be.  I will be submitting an invoice.

21  Q.      For your regular time?

22  A.      Yes.

23  Q.      Did there come a time in this case where you were

24  asked to conduct an investigation on behalf of CBS and

25  NBC?

1  A.      There was.

2  Q.      Okay.  Directing your attention to the day

3  July 23, 2013, can you tell us what you did in your

4  investigation?

5  A.      I drove from Houston to Beaumont, Texas.  I went

6  to a business at the address 3827 Phelan Boulevard and

7  observed the business and surroundings, took photographs,

8  and spoke with the owner of the business.

9  Q.      And tell us what you observed.

10 A.      I observed a business by the name of "PostNet"

11 which I understand to be a nationwide chain of pack and

12 ship and mailbox service businesses.

13 Q.      Could you turn to Exhibit 15 in your notebook,

14 please?

15 A.      (Complies.)

16 Q.      And tell us what Exhibit 15 is.

17 A.      The cover page reads "Exhibit B."  The following

18 page is a photograph that I took of the front of the

19 PostNet business.

20 Q.      And does the photograph fairly and accurately

21 represent the front of the business at 3827 Phelan avenue

22 in Beaumont?

23 A.      Yes.

24         MR. LIEBERMAN:  I move the admission of

25 Exhibit 15, your Honor.

1          THE COURT:  Any objection?

2          MR. WARD:  No objection.

3          THE COURT:  It is admitted.

4    BY MR. LIEBERMAN:

5    Q.     Did you take any photographs inside at that

6    location?

7    A.     Yes.

8    Q.     Okay.  And could you tell us, first, what did you

9    see inside the location when you went inside?

10   A.     Immediately inside the door and to the right as

11   you walk in was a bank of mailboxes.  Beyond that were

12   some areas where you can prepare packages to be shipped.

13   And toward the rear was a desk with the employees of the

14   business working behind it.

15   Q.     And could you turn to Exhibit 14 in your binder,

16   please, and tell us what that is?

17   A.     The cover page is marked "Exhibit A."  The

18   following page is a photograph I took of the

19   aforementioned bank of mailboxes.

20   Q.     And there's some type material in the top

21   right-hand corner of the page.  Can you tell us what that

22   is and who put that information there?

23   A.     It signifies which particular box is numbered 180.

24   Q.     And does this photograph which you took fairly and

25   accurately represent the bank of mailboxes that you saw

1  inside 3827 Phelan avenue?

2  A.    Yes.

3        MR. LIEBERMAN:  I would move its admission,

4  your Honor.

5        MR. WARD:  No objection.

6        THE COURT:  It is admitted.

7  BY MR. LIEBERMAN:

8  Q.    Did you take any steps, Mr. Skaggs, to see whether

9  Personal Audio had a suite of offices or an office or a

10  room or any physical location at the 3827 Phelan avenue

11  address?

12  A.    I spoke with the owner and inquired as to whether

13  there were office suites in that location, to which he

14  said no.  I did not specifically mention the name

15  "Personal Audio."

16  Q.    Okay.  But you actually obtained through your

17  visits and speaking with the owner that there were no

18  suites available in that building?

19  A.    That's correct.

20  Q.    Now, in your -- in this case you were deposed by

21  Personal Audio; is that correct?

22  A.    That's correct.

23  Q.    And where were you deposed by Personal Audio?

24  A.    In Beaumont, Texas.

25  Q.    And do you know whose office it was?

1  A.     I'm not sure whose office it was.  It did not have

2  any nameplate or any official designation.

3  Q.     Could you describe what you saw in the office

4  while you were being deposed there?

5  A.     Well, I -- I think "office" would be using the

6  term loosely.  It was a small reception area just inside

7  the door from the hallway, and beyond the reception area

8  was a -- somewhat of a conference room with a table that

9  barely fit in the conference room.  There appeared to be

10 a temporary wall that had been put up, a modular wall,

11 inside the conference room.

12 Q.     Was there a telephone in the conference room, sir?

13 A.     I'm not sure.  I know that the attorney that

14 presented me for the deposition, Mr. Lea, brought a

15 speakerphone to enable one of the other lawyers to

16 participate by telephone.  Also brought a long cord that

17 would have been able to reach any point inside either of

18 the rooms of that office, and he was told that there was

19 not a place to plug that in.

20 Q.     Did you observe a landline telephone in that

21 conference room where you were deposed?

22 A.     I did not.

23 Q.     Now, did something unusual happen during the

24 course of the deposition?

25 A.     Yes.

1  Q.     Could you tell us about that, please?

2  A.     I was told to stand up and walk to the corner just

3  to my right where there were three boxes and was

4  instructed to remove certain items from the boxes and

5  read the lettering thereon.

6  Q.     By the way, who was it who was questioning you at

7  that deposition?

8  A.     It was Mr. Papool Chaudhari.

9  Q.     And did you examine the three boxes as

10  Mr. Chaudhari requested?

11  A.     I did.

12  Q.     Did he also ask you to read into the record a

13  label that you found on the front page of a document in

14  Box 1?

15  A.     Yes, he did.

16  Q.     All right.  Do you recall exactly word for word

17  what that label said?

18  A.     Not exactly.  I did see it in my transcript and...

19         MR. LIEBERMAN:  Your Honor, if I might show

20  the witness his deposition to refresh his recollection as

21  to what the label said which he read into evidence.

22         THE COURT:  All right.

23  BY MR. LIEBERMAN:

24  Q.     Mr. Skaggs, if you could turn, please, to page 52

25  of your deposition, starting at about line 6.  If you

1 could read the question you were asked and the answer

2 that you gave.

3 A.     Yes.  It says, "And if you would please remove the

4 paper in that box.  Can you pick up the first document

5 that you see -- the first document?  Yeah.  What's --

6 what's that document labeled?"

7        My response was "Box 1, GC received via

8 Federal Express with a letter from P. Arenz stating to

9 store docs in the Personal Audio space, in parentheses,

10 DTD06/23/09."

11 Q.     What did you understand the 06/23/09 to represent?

12 A.     It would appear to be a date.

13 Q.     June 23rd, 2009?

14 A.     Yes, June 23rd, 2009.

15 Q.     And did you subsequently learn who P. Arenz was?

16 A.     I did.

17 Q.     Okay.  Who is P. Arenz?

18 A.     I learned that he is an attorney for Personal

19 Audio.

20 Q.     Okay.  Could you turn, please, in your binder to

21 Exhibit 26?

22 A.     (Complies.)

23 Q.     And tell us what this document is, please.

24 A.     It is a case docket for a civil matter before the

25 Eastern District of Texas, Lufkin Division, Case

1  No. 9:09-cv-00111-RC.

2  Q.     During the course of your 30-plus years as a

3  private investigator, have you had experience reading

4  docket sheets from federal and state court cases?

5  A.     Yes, I have.

6  Q.     Okay.  Can you tell us the name of the plaintiff

7  and the name of the defendant in this case?

8  A.     The name of the plaintiff is Personal Audio, LLC.

9  The first defendant is Apple, Inc.

10 Q.     Thank you.  If you could turn, please, to the

11 third page of this exhibit.

12        MR. LIEBERMAN:  Your Honor, I move this

13 exhibit into evidence.

14        MR. WARD:  No objection.

15        THE COURT:  All right.  D-26 is admitted.

16 BY MR. LIEBERMAN:

17 Q.     If you could turn to the third page of D-26 and

18 tell me if you see a Mr. P. Arenz listed here on this

19 document?

20 A.     I do.  Patrick, middle initial M, last name Arenz,

21 Robins Kaplan Miller & Ciresi.

22 Q.     And what city is his office in?

23 A.     Minneapolis, Minnesota.

24 Q.     And could you look at the first page of this

25 exhibit and tell us on what date this lawsuit was filed

94

1  by Personal Audio?

2  A.     On June 25th, 2009.

3  Q.     Using your 30 years of investigative skills and

4  experience, could you help us to understand from the

5  label that you were asked by Mr. Chaudhari to read into

6  the record when you were in Personal Audio's offices,

7  what happened on the date on the label?

8  A.     It would reasonably seem that the box from which

9  the label was removed was sent to Mr. Arenz on June 23rd,

10  2009.

11  Q.     I'm sorry.  Sent "to" Mr. Arenz or "from"

12  Mr. Arenz?

13  A.     Well, a letter from him stating that the documents

14  be stored in the Personal Audio space.  I would infer

15  that Mr. Arenz instructed for the documents to be sent to

16  Personal Audio's space.

17  Q.     And that the documents were sent two days before

18  the lawsuit was filed by Personal Audio against Apple?

19  A.     That would be my inference.

20         MR. LIEBERMAN:  I have no further questions

21  for the witness at this time.

22              CROSS-EXAMINATION OF J.R. Skaggs

23  BY MR. WARD:

24  Q.     Good morning, Mr. Skaggs.

25  A.     Good morning.

1  Q.     My name is Johnny Ward.  We have not met before,

2  have we, sir?

3  A.     No, not to my knowledge.

4  Q.     And I'll be really brief with you.  You know that

5  we offered to let you stay home and just introduce your

6  pictures into evidence if you had wanted to stay home?

7  Did you know that?

8  A.     No, I did not.

9  Q.     Okay.  Now, when you did this investigation and

10  you went and took pictures of the post office box, did

11  you have Mr. Brad Liddle's declaration with you?

12  A.     I did not.

13  Q.     You did not?  Have you ever seen his declaration?

14  A.     Not to my knowledge.

15  Q.     Okay.  So, you wouldn't have known that at the

16  time Personal Audio filed a response to the motion to

17  transfer venue that was filed in this case by CBS, that

18  he identified himself as the only employee of Personal

19  Audio?  You didn't know that?

20  A.     No.

21  Q.     Did your lawyers ever ask you to go investigate

22  whether or not his assertion in his declaration that he

23  worked in Personal Audio's licensing office located in

24  Houston, Texas -- did they ever ask you to go take

25  pictures of that office?

96

1  A.     They did not.

2  Q.     Did you know that they had an office in Houston at

3  the time?

4  A.     I did not.

5  Q.     Now, you office in Houston, correct?

6  A.     Yes.

7  Q.     And you have been taking direction from lawyers in

8  Washington, DC, correct?

9  A.     I don't know at which point you speak of.  I was

10  given my directions by another investigative firm in

11  New York.

12  Q.     Mr. Yarborough?

13  A.     Correct.

14  Q.     Okay.  Did you have any trouble communicating over

15  the phone, or did y'all have to travel and meet

16  face-to-face to have your conversations?

17  A.     You're speaking of Mr. Yarborough and I?

18  Q.     Yes, sir.

19  A.     Our interaction was by phone and by email.

20  Q.     And you were able to email documents and

21  photographs back and forth to each other?

22  A.     Yes.

23  Q.     Without any trouble?

24  A.     Well, I don't recall him sending any to me.  It

25  was a one-way stream going from me to him.

1  Q.     Were you asked to do any investigation to find out

2  whether or not Personal Audio had been a Texas company

3  since at least 2009?

4  A.     I was not.

5  Q.     No investigation as to what offices it has?

6          MR. LIEBERMAN:  Objection.  This is beyond the

7  scope of the direct examination, your Honor.

8          THE COURT:  I'll overrule the objection.

9  A.     Could you repeat the question?

10 BY MR. WARD:

11 Q.     Yeah.  Any investigation as to what offices it

12 currently has?

13 A.     No.

14 Q.     No follow-up that you've done, correct?

15 A.     I have done follow-up.

16 Q.     But you haven't followed up to see the office in

17 Plano; is that right?

18 A.     That's correct.

19 Q.     Okay.  And have you done any investigation that

20 would enable you to have an opinion one way or the other

21 as to whether or not Personal Audio had paid over $75,000

22 in taxes -- franchise taxes in 2011-2012?

23         MR. LIEBERMAN:  Objection, your Honor.  Beyond

24 the scope of direct.  This witness was called for a very

25 limited purpose.

1      THE COURT:  Well, the subject matter of the

2  direct is the test and the subject matter involved his

3  investigation of the plaintiff's presence in Texas.  So,

4  I'll overrule the objection.

5  BY MR. WARD:

6  Q.    Did you do any investigation of whether or not

7  Personal Audio had paid over $75,000 in franchise taxes

8  between 2011 and 2012 in Texas?

9  A.    No.

10  Q.    Or to determine whether or not it did in fact have

11  over $2 million in bank accounts in Beaumont in July of

12  2013?  Do you have an opinion one way or the other

13  whether or not that factual assertion is accurate?

14  A.    I have no --

15      MR. LIEBERMAN:  Objection, your Honor.  The

16  question is based on facts not in evidence.

17      THE COURT:  Obviously I'm not assuming that

18  any of Mr. Ward's questions are factual.  They're simply

19  questions as to whether or not this witness has included

20  those in his investigation.  So, I'll take them with that

21  limitation; but I'll allow the question.

22  A.    Restate, please.

23  BY MR. WARD:

24  Q.    Did you do anything to determine whether or not

25  Personal Audio's assertion that it maintained over

1  $2 million in bank accounts in Beaumont at the time the

2  defendants filed this motion to transfer venue, whether

3  or not that in fact existed or not?

4  A.     I have no such knowledge.

5  Q.     All right.

6          MR. WARD:  No further questions.  I'll pass

7  the witness.

8          REDIRECT EXAMINATION OF J.R. Skaggs

9  BY MR. LIEBERMAN:

10  Q.     Mr. Skaggs, Mr. Ward asked you on

11  cross-examination if you had seen the Bradley Liddle

12  declaration.  If you could turn to Exhibit 7 in your

13  binder.

14          Do you have that in front of you now?

15  A.     Yes.

16  Q.     Could you just read the title of that document

17  into the record?

18  A.     It's the "Declaration of Brad Liddle in Support of

19  Plaintiff's Opposition to Certain Defendants' Motion to

20  Transfer Venue."

21  Q.     Directing your attention to paragraph 4 of the

22  declaration, Exhibit 7, could you read the last sentence

23  into the record, please?

24  A.     "Personal Audio LLC's principal place of business

25  is located at 3827 Phelan Boulevard, Suite 180, Beaumont,

1  TX 77707 and can be contacted through a local telephone

2  number whose area code is associated with Beaumont,

3  Texas."

4  Q.      And just so there's no lack of clarity here, this

5  is the address that you visited during the course of your

6  investigation, correct?

7  A.      I visited 3827 Phelan Boulevard, but there's no

8  such Suite 180 at that location.

9  Q.      All you found there was Mailbox 180; is that

10  right?

11  A.      That's right.

12  Q.      Thank you very much.

13          MR. LIEBERMAN:  No further questions.

14          MR. WARD:  Nothing further.

15          THE COURT:  Thank you, Mr. Skaggs.  You can

16  step down, and you are excused.

17          THE WITNESS:  Thank you.

18          MR. LIEBERMAN:  Your Honor, CBS calls as an

19  adverse witness Mr. Brad Liddle, the general counsel and

20  CEO of Personal Audio.

21          (Oath administered.)

22                          **

23                          **

24                          **

25                          **

EVIDENTIARY HEARING

1      DIRECT EXAMINATION OF BRAD LIDDLE

2          CALLED AS AN ADVERSE WITNESS

3            ON BEHALF OF DEFENDANT CBS

4  BY MR. LIEBERMAN:

5  Q.    Good morning, Mr. Liddle.

6  A.    Good morning.

7  Q.    On April 1, 2013, you were hired by Personal Audio

8  as its general counsel, correct?

9  A.    That is correct.

10 Q.    And at the time you were hired by Personal Audio

11 as its general counsel, you had been an associate for two

12 years at the Houston law firm of Collins Edmonds,

13 correct?

14 A.    Yes.

15 Q.    So, you were a second-year associate.

16 A.    Yes.

17 Q.    And at the time you were hired on April 1st, 2013,

18 you were the only employee of Personal Audio, correct?

19 A.    That's correct.

20 Q.    And you were promoted to CEO as well as general

21 counsel in October of 2013, correct?

22 A.    Yes.

23 Q.    Now, before becoming CEO, you had had no formal

24 training in the preparation or examination of balance

25 sheets or income statements or profit and loss

1  statements, correct?

2  A.     No formal training, correct.

3  Q.     And you had never been an executive at any

4  corporation before, correct?

5  A.     That's correct.

6  Q.     And before becoming general counsel of Personal

7  Audio, you had never yourself negotiated any license

8  agreements; is that correct?

9  A.     Not as the lead attorney, no.

10  Q.     You were a very junior associate at the firm; and

11  you worked on some matters where other people negotiated

12  license agreements but not you, correct?

13  A.     That's correct.

14  Q.     And by the way, your compensation as general

15  counsel and CEO includes a percentage of Personal Audio's

16  licensing revenue, correct?

17  A.     That's correct.

18  Q.     I'd like to turn your attention to a filing made

19  by Personal Audio, the initial disclosures, which you'll

20  see in your binder as Exhibit 4.

21         Do you have that document in front of you?

22  A.     Yes.

23  Q.     Now, as part of your job as general counsel, you

24  review court filings made on behalf of Personal Audio,

25  correct?

EVIDENTIARY HEARING

1  A.     Yes.

2  Q.     And you try to exercise diligence to ensure that

3  the court filings are accurate, correct?

4  A.     Yes, of course.

5  Q.     All right.  If you could look at Exhibit 4,

6  please, which was served on February 14th, 2014 -- that's

7  the right date, correct, February 14th, 2014?

8  A.     Are you asking if that's the date of the document?

9  Q.     Yes.

10 A.     Yes.

11 Q.     And directing your attention to pages 1 through 3,

12 you see a list of witnesses identified by Personal Audio

13 as the persons knowledgeable regarding the issues in this

14 case, correct?

15 A.     Yes.

16 Q.     And the first four people listed, the individuals

17 on page 1, those are the only individuals who are

18 associated with Personal Audio or were in the past

19 associated with Personal Audio, correct?

20 A.     Can you rephrase that, please?

21 Q.     Sure.  The four people listed on page 1, the first

22 four witnesses, those are people who either work for or

23 are shareholders of Personal Audio or people who were

24 associated with Personal Audio in the past, correct?

25 A.     That's correct.

1 Q.     And the witnesses listed on page 2 and page 3,

2 those are witnesses associated with other entities,

3 correct?

4 A.     Correct.

5 Q.     So, let's look at the first witness, James Logan.

6 Mr. Logan is the founder of Personal Audio?

7 A.     Yes.

8 Q.     And he lives in New Hampshire?

9 A.     Yes.

10 Q.     And you've seen the '504 patent before, correct?

11 A.     Yes.

12 Q.     On the front page of the '504 patent, Mr. Logan is

13 listed as an inventor, correct?

14 A.     Yes.

15 Q.     And his address is listed as Candia,

16 New Hampshire, correct?

17 A.     Yes.

18         MR. LIEBERMAN:  Your Honor, I would move into

19 evidence Defendants' Exhibit 4, the initial disclosures.

20         MR. WARD:  No objection.

21         THE COURT:  All right.  D-4 will be admitted.

22 BY MR. LIEBERMAN:

23 Q.     The second witness listed on Personal Audio's

24 initial disclosures is Mr. Charles Call, correct?

25 A.     Yes.

1 Q.    And Mr. Call lives in North Carolina, correct?

2 A.    That is my understanding, yes.

3 Q.    And the third witness listed on the initial

4 disclosures for Personal Audio is Daniel Goessling,

5 correct?

6 A.    Yes.

7 Q.    Mr. Goessling was another inventor of the '504

8 patent, correct?

9 A.    Correct.

10 Q.    Mr. Logan was one inventor, Mr. Call a second,

11 Mr. Goessling a third, correct?

12 A.    Correct.

13 Q.    And looking at the face of the '504 patent which

14 you'll find as Exhibit 1 in your binder, at the time the

15 patent application was filed, Mr. Goessling listed his

16 residence as Massachusetts, correct?

17 A.    Let me get there.

18        That's correct.

19 Q.    And you're aware, sir, that Mr. Goessling

20 currently resides in Massachusetts, correct?

21 A.    That is my understanding.

22 Q.    And you would agree that the conception of the

23 invention claimed in the '504 patent was not done in

24 Texas, correct?

25 A.    I am not sure where it was done.

EVIDENTIARY HEARING

106

1  Q.    Please answer my question.  You will agree that

2  the conception of the invention claimed in the patent was

3  not done in Texas, correct?

4  A.    I don't have any personal knowledge of where it

5  was conceived.

6  Q.    Do you recall being deposed in this lawsuit, sir?

7  A.    Yes.

8  Q.    Do you recall taking an oath to tell the truth

9  during the deposition?

10  A.    Yes, of course.

11         MR. LIEBERMAN:  May I approach the witness,

12  your Honor?

13         THE COURT:  Yes.

14  BY MR. LIEBERMAN:

15  Q.    I'm showing you a copy of the transcript of your

16  deposition in this lawsuit.  Directing your attention to

17  page 76, do you recall being asked this question and

18  giving this answer, starting at line 17:

19         "And none of the inventors did their inventing

20  in Texas, correct?"

21         Answer, "Not to my knowledge"?

22  A.    Yeah.  I don't have any knowledge.  I don't know.

23  Q.    Your understanding is that the inventing with

24  respect to the '504 patent was done either in

25  Massachusetts or in New Hampshire, correct?

1  A.      It very well could have been, but I don't --

2  Q.      That's your understanding, sir, as general counsel

3  and CEO of Personal Audio, correct?

4          MR. WARD:  Well, your Honor, if he's going to

5  impeach him, he ought to let him read the very next

6  answer that he gave in response to the same question.  He

7  says he doesn't know.  "I don't have any knowledge of

8  that."

9  A.      I actually say I'm not a hundred percent certain

10  of where it was conceived.  I don't know.

11  BY MR. LIEBERMAN:

12  Q.      Could you turn to page 77 of your deposition?

13  A.      Sure.  I'm there.

14  Q.      Line 13, do you recall being asked this question

15  and giving this answer:

16          "But you know it was done in either

17  Massachusetts or New Hampshire, correct?"

18          "I don't know that."

19          Question, "That's your understanding?"

20          Answer, "That is my understanding."

21          Do you recall giving that answer to those

22  questions?

23  A.      Yes, I do.

24  Q.      Okay.  And you don't have any basis for believing

25  that the invention claimed in the '504 patent took place

1  in Texas, correct?

2  A.     I have no knowledge of that.

3  Q.     Now, in the initial disclosures, you are the only

4  one of the four Personal Audio affiliated witnesses who

5  resides in Texas, correct?

6  A.     Correct.

7  Q.     And you're the only one of the four Personal Audio

8  affiliated witnesses who works in Texas, correct?

9  A.     Correct.

10  Q.     And you're identified as being knowledgeable

11  concerning the creation, formation, and operation of

12  Personal Audio, correct?

13  A.     Correct.

14  Q.     But you have no personal knowledge regarding the

15  creation or formation of Personal Audio, correct?

16  A.     I -- I've read the corporate papers where the

17  entity was formed.

18  Q.     You have no personal knowledge regarding the

19  creation or formation of Personal Audio, correct?

20  A.     I've read -- like I said, I've read the corporate

21  papers, the certificate of formation, the operating

22  agreement.

23  Q.     But you weren't working for Personal Audio back

24  then.  You didn't talk to any of the --

25  A.     That's correct.

1  Q.    Okay.  You're also listed as knowledgeable with

2  respect to the licensing of patents owned by Personal

3  Audio, correct?

4  A.    Correct.

5  Q.    Since you've arrived at Personal Audio, the '504

6  patent has not been licensed by itself to any entity,

7  correct?

8  A.    That's correct.

9  Q.    And as we went over a moment ago, before you

10  joined Personal Audio, you yourself had never negotiated

11  any license agreements, correct?

12  A.    Correct.

13  Q.    Now, turning back to Mr. Goessling, one of the

14  co-inventors, he has not been involved with Personal

15  Audio since 1996, correct?

16  A.    That is my understanding.

17  Q.    And in another litigation brought by Personal

18  Audio, Mr. Goessling was deposed by Apple; and then

19  Personal Audio filed a motion seeking to prevent the use

20  of that deposition testimony by Apple at the trial,

21  correct?

22  A.    Correct.

23  Q.    And the testimony that Personal Audio sought to

24  exclude from Mr. Goessling was what Apple characterizes

25  as an admission by Mr. Goessling that this prior patent

1 that was involved in the Apple suit was invalid, correct?

2 A.    I don't know what the -- his testimony involved.

3 Q.    If you could turn, please, to Exhibit 28 in your

4 binder.  Do you recognize that document as "Personal

5 Audio Motion in Limine Number 4" in the *Personal Audio*

6 *versus Apple* case?

7 A.    Yes.

8          MR. LIEBERMAN:  We would move the admission of

9 Exhibit 28, your Honor.

10          MR. WARD:  I don't have any objection, your

11 Honor.

12          THE COURT:  All right.  Exhibit 28 will be

13 admitted.

14 BY MR. LIEBERMAN:

15 Q.    Turning your attention to page 3 of that motion,

16 could you read out loud to the court the second sentence

17 in the first full paragraph on the page?

18 A.    I'm sorry.  Which sentence?

19 Q.    The second sentence in the first full paragraph on

20 the page.

21 A.    "Apple has since asserted that Mr. Goessling

22 admitted that the asserted claims are invalid."  See

23 example Exhibit B at 50 (reading).

24 Q.    Thank you.  So, it's fair to say, looking at this

25 document, using your experience as a lawyer, that

1  Personal Audio argued in another case that Mr. Goessling

2  had made critical admissions regarding the invalidity of

3  a Personal Audio patent, correct?

4          THE COURT:  Now, Mr. Lieberman, that's not

5  what that says.  You know that.  It says "Apple has

6  asserted."

7          MR. LIEBERMAN:  I'm sorry.  I misspoke, your

8  Honor.  I apologize.

9          THE COURT:  All right.

10          MR. LIEBERMAN:  Let me rephrase.

11          THE COURT:  Okay.

12  BY MR. LIEBERMAN:

13  Q.    What this document is saying is that -- in a

14  Personal Audio brief, that Apple has characterized

15  Mr. Goessling as having admitted in a deposition that

16  this prior Personal Audio patent was invalid, correct?

17  A.    I believe that's what Apple has characterized,

18  yes.

19  Q.    And you understand that Mr. Goessling's testimony

20  came in by deposition, not by him appearing in person at

21  the trial, correct?

22  A.    Yes, I understand that.

23  Q.    Okay.  Personal Audio has no control over

24  Mr. Goessling.  You couldn't make him show up at trial,

25  correct?

1  A.     I don't know that.

2  Q.     Now, at the time this lawsuit was filed against

3  NBC and CBS on April 12th, 2013, Personal Audio had no

4  physical office anywhere in the Eastern District of

5  Texas, correct?

6  A.     That's correct.

7  Q.     The only physical space that Personal Audio had in

8  the Eastern District of Texas at that time was a mailbox,

9  correct?

10  A.     That's correct.

11  Q.     And the mailbox was a couple of inches high and a

12  couple of inches wide and maybe 12 inches deep, correct?

13  A.     Yes.

14  Q.     And this was Mailbox No. 180 at the PostNet store

15  at 3827 Phelan Boulevard, correct?

16  A.     Yes.

17  Q.     And we'll come back to the mailbox in a second,

18  but I want to put some focus on other contact that

19  Personal Audio has with the Eastern District of Texas.

20  And you heard Mr. Ward ask Mr. Skaggs some questions

21  about those other locations.

22  A.     Okay.

23  Q.     Personal Audio now has a lease on three rooms in a

24  building in Plano, Texas, correct?

25  A.     Yes.

1  Q.    And the lease for those rooms began in November of

2  2013, correct?

3  A.    Yes.

4  Q.    And that was after the filing of the lawsuit

5  against NBC and CBS, correct?

6  A.    Correct.

7  Q.    In fact, it was several months after NBC and CBS

8  had filed a motion to transfer at the end of June, 2013,

9  correct?

10  A.    Correct.

11  Q.    Personal Audio also has two rooms in an office in

12  Beaumont, correct?

13  A.    Correct.

14  Q.    And that's the office where Mr. Chaudhari took the

15  deposition of Mr. Skaggs?

16  A.    Correct.

17  Q.    And the office you had heard Mr. Skaggs describe?

18  A.    Correct.

19  Q.    And those rooms Personal Audio leased beginning in

20  September of 2013, correct?

21  A.    Correct.

22  Q.    And that was after the lawsuit was filed against

23  NBC and CBS, correct?

24  A.    Correct.

25  Q.    And it was also after the motion to transfer had

1  been filed, correct?

2  A.    Correct.

3  Q.    So, to summarize, the only physical space Personal

4  Audio had in the Eastern District of Texas at the time of

5  the filing of the lawsuit was the mailbox which you

6  characterized as its principal place of business at the

7  time, correct?

8  A.    Correct.

9  Q.    Now, Mr. Ward, when he asked -- when he was

10 questioning Mr. Skaggs, made reference to a Houston

11 location.  The Houston location is some space that you

12 got after the lawsuit was filed, correct?

13 A.    Correct.

14 Q.    So, you didn't have the Houston space at the time

15 the lawsuit was filed.

16 A.    That is correct.

17 Q.    And that's a space for which you pay two or $300 a

18 month?

19 A.    That's correct.

20 Q.    And the space is actually abandoned now.  You're

21 not using it, correct?

22 A.    No, because I moved to Plano.  No, because I

23 opened an office in Plano.

24 Q.    Now, in opposition to the motion to transfer, you

25 filed the declaration, Exhibit 7 in your binder, that you

1  heard about during my questioning of Mr. Skaggs, correct?

2  A.      Correct.

3  Q.      And in this declaration you represented to the

4  court that Personal Audio's principal place of business

5  was located at that Phelan avenue address, correct?

6  A.      Correct.

7  Q.      And you made reference to the principal place of

8  business being at Suite 180, correct?

9  A.      Correct.

10 Q.      But in fact there is no room or no office

11 designated as Suite 180 at that address, correct?

12 A.      Correct.  We called the mailbox a "suite."

13 Q.      Well, that's what you called it in your

14 declaration.

15 A.      Correct.  And in the other filings.

16 Q.      That's right.  You submitted a declaration to the

17 Massachusetts court calling it a suite also, correct?

18 A.      I -- I'm sure I did.

19 Q.      Now, you don't dispute that Suite 180 is really

20 just a mailbox, right?

21 A.      I do not.

22 Q.      And looking at exhibit -- withdrawn.

23          At the time you submitted your declaration to

24 this court representing to the court that Personal

25 Audio's principal place of business was Suite 180 at this

EVIDENTIARY HEARING

116

1  address, you had actually been to that location, correct?

2  A.     That's correct.

3  Q.     So, you knew that what you were referring to as

4  Suite 180 was only a mailbox, correct?

5  A.     Correct.

6  Q.     And you had been there to, not surprisingly, pick

7  up mail, correct?

8  A.     Correct.

9  Q.     If you were submitting a declaration to this court

10  today and describing Personal Audio's principal place of

11  business back at the time the lawsuit was filed, would

12  you use that phrase "Suite 180" again?

13  A.     Well, that's how we characterized it at the time.

14  That was in the initial complaint that we filed against

15  the other consolidated defendants and that was in the

16  complaint we filed against CBS and NBC and, so, I just

17  went with what the other papers said.

18  Q.     Well, let me ask the question this way.

19  A.     Sure.

20  Q.     Do you agree that referring to this mailbox as the

21  principal place of business of Personal Audio and as

22  being a "suite" was misleading to the court?

23  A.     I don't think it was misleading.  That's just how

24  we characterized it.  If I had to do it again, I would

25  probably just put "Box 180"; but I wasn't around when the

117

1  original papers were filed.

2  Q.     But you were around, obviously, when you signed

3  your declaration.

4  A.     Of course.

5  Q.     Now, I want to look at another representation that

6  was in that declaration.  If you could turn back to

7  Exhibit 7.  Take a look at that same sentence in

8  paragraph 4 that makes reference to "Suite 180."

9          You state there that Personal Audio "can be

10  contacted through a local telephone number whose area

11  code is associated with Beaumont, Texas," correct?

12  A.     Correct.

13  Q.     But at the time you signed this declaration on

14  July 15th, 2013, there was no physical phone anywhere in

15  Beaumont, Texas, that rang when someone dialed that

16  number, correct?

17  A.     That's correct.

18  Q.     And before July of 2013, when someone called that

19  telephone number with the Beaumont area code, the phone

20  just rolled over to Mr. Richard Baker, correct?

21  A.     That's correct.

22  Q.     And, in fact, the first time you ever recall

23  receiving a rollover call made to this number was in

24  September, 2013, correct?

25  A.     That's correct.

1  Q.    And Mr. Baker has his principal offices in

2  Massachusetts, correct?

3  A.    Correct.

4  Q.    And he resides in Massachusetts, correct?

5  A.    Correct.

6  Q.    And you've already told us that both the Plano and

7  the Beaumont offices were leased by Personal Audio only

8  after NBC and CBS had filed their motions to transfer,

9  correct?

10  A.    Correct.

11  Q.    And with respect to those offices, the decision to

12  lease the office wasn't made until after filing the

13  motion to transfer, correct?

14  A.    Can you repeat the question?

15  Q.    Sure.  With respect to those offices, Personal

16  Audio's decision to lease those offices was not made

17  until after NBC and CBS had filed their motion to

18  transfer, correct?

19  A.    Well, we were in the process of locating an office

20  in Beaumont at the time the transfer motion was filed.

21  Q.    You would agree that with respect to the Plano

22  office the decision to lease an office was made after the

23  filing of the motion to transfer, correct?

24  A.    Correct.

25  Q.    And with respect to the office space in Beaumont,

EVIDENTIARY HEARING

1  you don't remember taking any concrete steps of any kind

2  to establish an office in the Eastern District of Texas

3  before the motion to transfer was filed, correct?

4  A.    Can you repeat that, please?

5  Q.    With respect to the office space in Beaumont, you

6  don't remember taking any concrete steps to establish an

7  office in the Eastern District of Texas before the motion

8  to transfer was filed, correct?

9  A.    I don't remember any concrete steps.

10  Q.    Now, at the time that you were hired -- withdrawn.

11       You were -- you obtained your job with

12  Personal Audio as a result of answering an advertisement

13  that Personal Audio had placed, correct?

14  A.    Yes.

15  Q.    And let me show you what has been marked for

16  identification as Defendants' Exhibit 34.

17       MR. LIEBERMAN:  May I approach the witness,

18  your Honor?

19       THE COURT:  Yes.

20  BY MR. LIEBERMAN:

21  Q.    In your deposition you mentioned having responded

22  to an advertisement.  That's how you got the job, right?

23  A.    That's right.

24  Q.    And Exhibit 34 is the advertisement to which you

25  responded, correct?

1  A.     It looks like it, yes.

2          MR. LIEBERMAN:  Your Honor, we would move the

3  admission of Exhibit 34.

4          MR. WARD:  No objection.

5          THE COURT:  All right.  D-34 is admitted.

6  BY MR. LIEBERMAN:

7  Q.     Now, in this advertisement, Personal Audio said

8  that the person who would be hired would be -- help to

9  locate and set up preferably in the Houston area.  Do you

10 see that?

11 A.     Yes.

12 Q.     So, at the time this advertisement went out, as

13 far as you can tell from this ad, there was no

14 contemplation whatsoever of setting up a physical office

15 in the Eastern District of Texas, correct?

16 A.     Correct.

17 Q.     And by the way, the advertisement says that the

18 person to be hired would be serving as a second chair in

19 licensing discussions.  Do you see that?

20 A.     Yes, I do.

21 Q.     And the first chair would be an experienced senior

22 licensing executive based remotely, correct?

23 A.     Correct.

24 Q.     And you understood that to be Mr. Richard Baker in

25 Massachusetts, correct?

A.      I didn't at the time I applied, no; but I do now.

Q.      And you also understood it when you interviewed

with Mr. Baker, correct?

A.      Yes, I did.

Q.      And in the requirements for the person applying,

you see that it says (reading) a legal postgraduate

degree with zero to five years' experience?

A.      Yes.

Q.      Before you became general counsel at Personal

Audio, you were familiar with the Eastern District of

Texas local rules regarding disclosures in patent cases?

A.      Yes.

Q.      And if you look at D-5 in the binder.  That's

"Plaintiff's First Amended Disclosure of Asserted

Claims."  And if you would turn to page 27 of D-5 *[sic]*.

        Do you see that there's a discussion there of

(reading) documents evidencing the conception, reduction

to practice, and development of the claimed invention

under Local Rule 3-2(b)?

A.      What page are we on?  I'm sorry.

Q.      Page 27.

        MR. WARD:  I think you meant Exhibit 6.

You've got him in 5.

        MR. LIEBERMAN:  Oh, I'm sorry.  I apologize.

                        **

 1  BY MR. LIEBERMAN:

 2  Q.     If you could turn to Exhibit 6, please.

 3         MR. LIEBERMAN:   Thank you, Mr. Ward.

 4  BY MR. LIEBERMAN:

 5  Q.     Do you see the reference on page 27 in Exhibit 6

 6  to Rule 3-2(b) documents?

 7  A.     Yes.

 8  Q.     And nowhere in that response do you indicate that

 9  the conception and reduction to practice documents were

10  located in the Eastern District of Texas, correct?

11  A.     That's correct.

12  Q.     Now, in the next section, Rule 3-2(c), you advise

13  that a copy of the file history is available for

14  inspection and copying upon reasonable request at

15  Suite 180, correct?

16  A.     Correct.

17  Q.     Now, the file history really wasn't in the

18  mailbox, right?

19  A.     No, but we could have made it available for

20  inspection and copying upon request.  That's what we

21  stated.

22  Q.     Well, what you state is it's "available for

23  inspection and copying upon reasonable request at"; and

24  you list Suite 180, correct?

25  A.     Correct.

1  Q.      And that implies and suggests that the documents

2  could be inspected at Suite 180, correct?

3  A.      Correct.

4  Q.      And in fact you knew that that was not correct.

5  A.      Correct.  But we could have made them available

6  for inspection and copying upon request.

7  Q.      Now, going back to the conception and reduction to

8  practice documents, you heard Mr. Skaggs' testimony about

9  that -- the copy of the page that was in Box 1 of the

10 documents that he was shown in the Personal Audio office?

11 A.      Yes.

12 Q.      And those are the original conception and

13 reduction to practice documents?

14 A.      Yes, I believe so.

15 Q.      And you agree that those original conception and

16 reduction to practice documents were originally located

17 with Mr. Arenz at the Robins Kaplan offices in Minnesota

18 and were sent at Mr. Arenz's request, two days before the

19 lawsuit was filed against Apple, to the Eastern District

20 of Texas, correct?

21 A.      I'm aware of that now.  I had no knowledge of that

22 before I heard the testimony.

23 Q.      But you don't dispute that fact?

24 A.      I don't.  I have no knowledge of it.

25 Q.      Personal Audio was owned by Mr. Logan and Mr. Call

1 and two family trusts owned by Mr. Logan, correct?

2 A.      That's correct.

3 Q.      And none of the owners of Personal Audio reside in

4 the Eastern District of Texas, correct?

5 A.      That's correct.

6 Q.      And none of them reside in Texas at all, correct?

7 A.      That's correct.

8 Q.      And the decision to sue NBC and CBS, that decision

9 was made at least in part by Mr. Baker who resides in

10 Massachusetts, correct?

11 A.      That is correct.

12 Q.      And as CEO of Personal Audio, you report to

13 Mr. Logan in New Hampshire every couple of weeks,

14 correct?

15 A.      That is correct.

16          MR. LIEBERMAN:  I pass the witness, your

17 Honor.

18          THE COURT:  Mr. Ward, we are basically at noon

19 now.  If you think you have just a few minutes with

20 Mr. Liddle, I'll let you go now so we can finish up; but

21 if you're going to require more than a few minutes, I'll

22 break.

23          MR. WARD:  It's always dangerous to tell the

24 court that it's just going to be a few.  I think the

25 better decision is to wait until after lunch.  I don't

 1    think it will be long.  I'm anticipating about 15

 2    minutes.

 3              THE COURT:  All right.  Well, then we'll take

 4    a recess until 1:00 o'clock.  Thank you.

 5              (Recess, 12:01 p.m. to 1:08 p.m.)

 6              MR. LIEBERMAN:  Your Honor, we just wanted to

 7    apprise the court that NBC's corporate designee, Mr. Ted

 8    McConville, is in the courtroom.  Since this witness is

 9    joined for both hearings, we thought it was appropriate;

10    but if the court has an objection, of course we'll ask

11    him to step outside.

12              THE COURT:  He's not going to be called or

13    offered in connection with CBS?

14              MR. LIEBERMAN:  He will not, your Honor.

15              THE COURT:  Then that's fine.

16              MR. LIEBERMAN:  Thank you, your Honor.

17              THE COURT:  He will be allowed to remain in

18    the courtroom as the corporate designee of NBC.

19              MR. WARD:  May we proceed, your Honor?

20              THE COURT:  You may.  Do I understand that the

21    movant has completed their presentation?  Is that -- I

22    know we left off with the end of your last witness,

23    Mr. Liddle.  And do you have any further witnesses?

24              MR. LIEBERMAN:  We have no further witnesses.

25    Of course, we may have redirect after Mr. Ward has

 1  crossed Mr. Liddle.

 2          THE COURT:  Oh, Mr. Liddle is still

 3  testifying.  I'm sorry.  I forgot that.

 4          MR. LIEBERMAN:  And then subject to how your

 5  Honor wishes to proceed, I do have some closing remarks

 6  at some point that are very brief I would like to

 7  deliver.  I don't know if your Honor would want it after

 8  CBS or after the entire --

 9          THE COURT:  That's fine.  I'm sorry.  I jumped

10  ahead.  When I saw Mr. Ward, I was thinking he was

11  starting his side.

12          In any event, Mr. Liddle, I will remind you

13  that your testimony is under the same oath you took this

14  morning.

15          MR. LIDDLE:  Yes, your Honor.

16          THE COURT:  Go ahead.

17              CROSS-EXAMINATION OF BRAD LIDDLE

18  BY MR. WARD:

19  Q.    Good afternoon, Mr. Liddle.  Do you understand

20  what the purpose is of our hearing today?

21  A.    Yes, I do.  I understand the purpose of the

22  hearing is for Defendants CBS and NBC to show that it's

23  clearly more convenient to litigate the case in the

24  Southern District of New York.

25  Q.    There's been no allegation that venue is improper,

EVIDENTIARY HEARING

127

1  correct?

2  A.     Not that I'm aware of.

3  Q.     Now, let's start off with a little bit of

4  background that I don't think we got from your

5  cross-examination by Mr. Lieberman.

6          Are you a resident in Texas?

7  A.     I am, yes.

8  Q.     Do you have a family here?

9  A.     I do, yes.

10  Q.     And tell us about your family.

11  A.     I have a wife and two children; and we live in

12  Allen, Texas.

13  Q.     And is that within the Eastern District of Texas?

14  A.     Yes.

15  Q.     In Collin County?

16  A.     Yes, that's correct.

17  Q.     And are you licensed to practice law in the State

18  of Texas?

19  A.     I am, yes.

20  Q.     And how long have you been licensed to practice

21  here?

22  A.     Since November, 2010.

23  Q.     And are you also a licensed attorney with the

24  Patent and Trademark Office?

25  A.     I am, yes.

1  Q.    And how long have you been licensed with the

2  Patent and Trademark Office?

3  A.    Since March of 2013.

4  Q.    All right.  Now, prior to working for Personal

5  Audio, you told us about your work for the Collins

6  Edmonds firm in Houston; is that right?

7  A.    That's right.

8  Q.    And you were living in Houston at the time you

9  answered the advertisement from Personal Audio?

10  A.    That's correct.

11  Q.    And you had an interview.  Who did you interview

12  with?

13  A.    I interviewed with Richard Baker and Jim Logan.

14  Q.    And after that interview were you ultimately

15  offered the job?

16  A.    I was, yes.

17  Q.    And tell us, was it an increase in pay, a decrease

18  in pay to go from Collins Edmonds to Personal Audio?

19  A.    It was an increase in pay.

20  Q.    And what was your starting salary when you started

21  working for Personal Audio?

22  A.    It was $140,000 per year.

23  Q.    Any benefits on top of that?

24  A.    No.

25  Q.    All right.  What about -- there was a reference to

1 some percentage that you might receive out of any

2 recovery.  What percentage interest do you have in any

3 recoveries?

4 A.    1 percent.

5 Q.    You referenced Mr. Logan and Mr. Call.  Those are

6 actually the inventors on the '504 patent which is the

7 patent-in-suit, correct?

8 A.    That's correct.

9 Q.    And what's your understanding of why they set

10 Personal Audio up?  Why was it formed?

11        MR. LIEBERMAN:  Objection, your Honor.  Lack

12 of foundation.  He wasn't working for the company at the

13 time.  He'd have no idea.

14        THE COURT:  I'll overrule the objection.  He

15 is testifying about his company's history.  I think that,

16 much like the witnesses called by CBS, is within the

17 scope of personal knowledge.  I'll overrule that.

18 A.    My understanding was in 2009 the company was

19 formed in order to monetize the patents that they had.

20 BY MR. WARD:

21 Q.    And was that a part of your job responsibilities

22 as well when you were hired as general counsel, to assist

23 in licensing the patents -- not just the patent-in-suit

24 but the other patents that are in Personal Audio's

25 portfolio?

EVIDENTIARY HEARING

130

1  A.      That's correct.

2  Q.      And when you were hired by Personal Audio, did

3  they in fact pay for office space in Texas for you to

4  work out of?

5  A.      Yes.  When I was hired, I was instructed to locate

6  Personal Audio's office in Houston, Texas, which they

7  paid for.

8  Q.      And were you living in Houston, Texas, at that

9  time?

10  A.      I was, yes.

11  Q.      And with your wife and maybe one child?

12  A.      That's right, yeah.

13  Q.      You've had another one since that time; is that

14  right?

15  A.      That's correct.

16  Q.      And I know that at the time that you signed your

17  declaration, you were the sole employee of Personal

18  Audio; is that right?

19  A.      That's right.

20  Q.      And you made that assertion in your declaration;

21  is that right?

22  A.      Yes, sir, that's right.

23  Q.      And you also identified this office space in

24  Houston; is that right?

25              MR. LIEBERMAN:  Objection, leading, your

1  Honor.  This is Mr. Ward's witness.

2          THE COURT:  All right.  I'll sustain the

3  objection.

4  BY MR. WARD:

5  Q.    Did you identify any office space in your

6  declaration?

7  A.    I did, yes.

8  Q.    And where was that office space located?

9  A.    It was in Houston, Texas.

10 Q.    All right.  Tell the court about your job

11 responsibilities at the time you were hired and whether

12 or not they've grown.

13 A.    At the time I was hired, I was hired as the

14 general counsel; and my job responsibilities were to

15 oversee the litigation and assist with the licensing

16 program.

17 Q.    And are there a number of lawsuits pending between

18 Beaumont and in the Marshall Division as well?

19 A.    There are, yes.

20 Q.    In managing those lawsuits, do you manage

21 different law firms?

22          MR. LIEBERMAN:  Objection, leading, your

23 Honor.

24          MR. WARD:  Your Honor, I asked him if he

25 managed law firms.

1              THE COURT:  Overruled.

2  A.     I do manage several law firms.

3  BY MR. WARD:

4  Q.     And is this your sole source of income, or do you

5  have other jobs that you're working on?

6  A.     This is my sole source of income.

7  Q.     And do you stay busy in this job?

8  A.     Yes, I do.

9  Q.     Have you stayed busy in the job since you started?

10  A.     I have, yes.

11  Q.     Is it what I consider a 40- to 60-hour workweek

12  or --

13  A.     Yeah, that would be a good summary, yes.

14  Q.     And have your responsibilities changed since you

15  started?

16  A.     They have, yes.  When I was promoted to CEO of the

17  company, I took over running the entire licensing

18  program.  I'm also managing the patent portfolio and

19  still overseeing the litigation efforts.

20  Q.     And have you in fact entered into any license

21  agreements since you've been working as Personal Audio's

22  general counsel?

23  A.     I have, yes.

24  Q.     And I guess -- is it just the '504 patent, or

25  would it be for the entire portfolio of Personal Audio's

1 patents?

2 A.      They were for the entire portfolio of patents.

3 Q.      And do you have any plans to leave this job

4 currently?

5 A.      I do not.

6 Q.      Are there other employees now that work for

7 Personal Audio?

8 A.      There are, yes.

9 Q.      And how many employees does Personal Audio have

10 part-time or full-time?

11 A.      We have about six that I manage.

12 Q.      And identify who those employees are and where

13 they're located.

14 A.      Sure.  So, we have -- in Plano, Texas, Adam Reed

15 and Eric Carr.  In Houston, Texas, we have a young lady

16 named Fei Ji.  In Massachusetts we have an employee named

17 Richard Baker, although he's a consultant; he's not an

18 actual employee.  And then we have a Dan Henry who is

19 located in New Jersey.

20 Q.      Okay.  There was also --

21 A.      And --

22 Q.      -- a reference to a trial in Beaumont involving

23 Apple.  Do you recall that?

24 A.      Yes, I do.

25 Q.      And do you know whether Apple challenged the

EVIDENTIARY HEARING

134

1  validity of the patent in that case?

2  A.    Yes, they did.  They challenged it during the

3  litigation, and they also put the patent into reexam.

4  Q.    All right.  And from reviewing CBS and NBC's

5  motion to transfer venue, do you know whether or not they

6  are alleging that this forum is inconvenient to any of

7  the witnesses associated with their invalidity defense?

8           MR. LIEBERMAN:  Objection, your Honor.  This

9  isn't to elicit any fact testimony.  This is making a

10  legal argument to the court.

11           THE COURT:  I'll overrule the objection.  Go

12  ahead.

13  A.    Can you restate that, please?

14  BY MR. WARD:

15  Q.    Sure.  Are you aware of any witnesses that the

16  defendants have identified with respect to any invalidity

17  defense that would be inconvenienced by a trial in the

18  Eastern District of Texas?

19  A.    I have not, no.

20  Q.    Do you know whether they have conceded that the

21  '504 is valid?

22  A.    I do not know.

23  Q.    Now, there were some statements in your

24  declaration about taxes paid in Texas.  Has Personal

25  Audio paid franchise taxes in the State of Texas?

1 A.      Yes.

2 Q.      And approximately how much have they paid, to your

3 knowledge, since the company was formed in 2009?

4 A.      I'm only aware of the payments in 2011 and 2012;

5 and those are approximately $80,000.

6 Q.      All right.

7          MR. WARD:  Your Honor, that's all I have.  I

8 pass the witness.

9          THE COURT:  All right.

10          REDIRECT EXAMINATION OF BRAD LIDDLE

11 BY MR. LIEBERMAN:

12 Q.      Mr. Ward asked you some questions about other

13 employees of Personal Audio.

14 A.      Correct.

15 Q.      And you made reference to a Mr. Reed and a

16 Mr. Carr, correct?

17 A.      Correct.

18 Q.      Both Mr. Reed and Mr. Carr were hired after the

19 motion to transfer was filed, correct?

20 A.      That's correct.

21 Q.      And you also made reference to an employee -- I

22 didn't hear the name -- another employee in the Eastern

23 District.  What was that person's name?

24 A.      Are you speaking of Fei Ji?

25 Q.      That's it.

EVIDENTIARY HEARING

136

1  A.    Yes.

2  Q.    When was that person hired?

3  A.    She was hired -- I don't recall the exact date.

4  Q.    But it was after the motion to transfer was filed,

5  correct?

6  A.    I don't know.  I don't recall.

7  Q.    You don't recall her being hired before June 28th,

8  2013, do you?

9  A.    I don't.  I don't recall.

10  Q.    Just so we're clear about what you don't recall,

11  you were the person who hired her, correct?

12  A.    I am.  I can't remember the exact date that I

13  hired her.  I don't want to --

14  Q.    And you can't tell this court that she was hired

15  before the motion to transfer was filed, correct?

16  A.    I don't remember when she was hired.

17  Q.    You do remember she was hired after the lawsuit

18  was brought against NBC and CBS, correct?

19  A.    That's correct.

20  Q.    Now, Mr. Reed and Mr. Carr work 10 to 15 hours a

21  week and get paid $13 an hour; is that right?

22  A.    Yes, that's right.

23  Q.    And Fei Ji -- did I pronounce the name right?

24  A.    It's Fei, F-E-I.

25  Q.    Fei.

1  A.      Yes.

2  Q.      She is also a temporary employee?

3  A.      Yes, she is.

4  Q.      And she gets paid $15 an hour?

5  A.      It's either 13 or 15.  I can't remember.

6  Q.      So, all the employees in the Eastern District of

7  Texas were hired after the motion to transfer was filed

8  with the exception of Fei, as to whom you can't remember

9  when that person was hired but you know it was after the

10 lawsuit was filed, correct?

11 A.      That's correct.

12 Q.      Now, Mr. Ward asked you some questions about your

13 job responsibilities; and you talked about your

14 promotion.  You also talked about Mr. Baker who you said

15 was a contract employee.

16 A.      That's right.

17 Q.      In fact, since you've become general counsel,

18 Personal Audio has repeatedly represented to the world

19 that Mr. Baker is vice-president of licensing for

20 Personal Audio, correct?

21 A.      That's correct.

22 Q.      And has done so in press releases that you have

23 reviewed and approved as CEO of Personal Audio, correct?

24 A.      That's correct.

25 Q.      And if you look at Exhibit 10 in your binder,

1  that's a press release that Personal Audio issued on

2  April 12th, 2013, announcing the lawsuits against NBC and

3  CBS, correct?

4  A.     That's correct.

5              MR. LIEBERMAN:  We would move Exhibit 10 into

6  evidence, your Honor.

7              MR. WARD:  No objection.

8              THE COURT:  All right.  D-10 is admitted.

9  BY MR. LIEBERMAN:

10  Q.     And in that press release -- which by the way --

11  withdrawn.

12              In that press release, you describe in the

13  text of the press release Richard Baker as the

14  vice-president of licensing, correct?

15  A.     Correct.

16  Q.     And people with questions are referred to

17  Mr. Baker, at the very end of the press release, for more

18  information, correct?

19  A.     Correct.

20  Q.     They're not referred to you, correct?

21  A.     I -- I would say so, yes.

22  Q.     In fact, you're not mentioned at all in this press

23  release.

24  A.     I am not.

25  Q.     And just so that we're clear because your

139

1  testimony was awhile ago this morning, Mr. Baker is

2  located in Massachusetts, correct?

3  A.     That's correct.

4  Q.     When you were hired, you were interviewed by

5  Mr. Baker who lives in Massachusetts and Mr. Logan who

6  lives in New Hampshire, correct?

7  A.     That's correct.

8  Q.     Mr. Ward asked you about certain licenses that

9  Personal Audio had granted.  You'll agree with me that

10  Personal Audio has not granted any licenses -- has not

11  obtained any licensees with respect to the '504 patent

12  alone, correct?

13  A.     That's correct.

14  Q.     That is, any settlements, any licenses that

15  Personal Audio has done have related to a basket of

16  patents, including the patents that were asserted against

17  Apple but which are not being asserted against NBC and

18  CBS, correct?

19  A.     That's correct.

20  Q.     Now, Mr. Ward asked you about the various

21  witnesses that have been identified on the issue of

22  invalidity.  Have you tried to contact or speak to any of

23  those witnesses?

24  A.     I have not.

25  Q.     So, you don't have any personal knowledge as to

1  where those witnesses are, correct?

2  A.    I do not.

3  Q.    Have you tried to talk to Mr. Goessling?

4  A.    Have I personally tried to talk to Mr. Goessling?

5  Q.    Yes.

6  A.    I have not.

7  Q.    Do you know of anybody at Personal Audio who has

8  tried to talk to Mr. Goessling about the '504 patent?

9          MR. WARD:  Your Honor, I object.  Any

10 knowledge he has of which witnesses have been contacted

11 would be attorney-client privilege in his capacity as

12 counsel for Personal Audio.

13         THE COURT:  I'll say that he can refrain from

14 testifying regarding any evidence he's gotten from

15 counsel.

16         MR. WARD:  All right.

17         THE COURT:  Or any knowledge he's gotten from

18 counsel.

19         MR. WARD:  And, your Honor, just to point out,

20 he is also general counsel for Personal Audio.  So, steps

21 he's taken in connection with the litigation, I'd just

22 caution the witness not to reveal any investigation or

23 steps to that -- that involve the litigation.

24         THE COURT:  All right.

25                       **

BY MR. LIEBERMAN:

Q.    Mr. Liddle, you understand that Mr. Goessling, an inventor of the '504 patent, gave testimony which at least Apple characterized as being extremely adverse to Personal Audio's position in an earlier litigation, correct?

A.    I don't know what his exact testimony was.

THE COURT:  Well, I -- Mr. Lieberman, I think the only issue here relates to where Mr. Goessling may be; and the nature of his testimony, what it might be about, I think is something that has no relevance to this venue hearing.  So, given his role with the company, I'll ask you to limit your questions to his location.

BY MR. LIEBERMAN:

Q.    As we went over this morning, Mr. Goessling is, to the best of your understanding, living in Massachusetts now, correct?

A.    Yes.

Q.    And you don't have any control over Mr. Goessling?

A.    I do not.

Q.    And Personal Audio doesn't as far as you know?

A.    As far as I know.

MR. LIEBERMAN:  I have no further questions, your Honor.

MR. WARD:  One, your Honor.

1          THE COURT:  If it relates to a new matter that

2   came up on redirect.

3          MR. WARD:  It does.  It relates to

4   Mr. Goessling.

5          THE COURT:  All right.

6          RECROSS-EXAMINATION OF BRAD LIDDLE

7   BY MR. WARD:

8   Q.    Mr. Lieberman characterized this testimony as

9   damaging to Personal Audio, correct?

10  A.    Correct.

11  Q.    Do you know what the finding was in that case in

12  Beaumont, whether the patent was held to be valid or

13  invalid?

14  A.    All claims were held valid and infringed.

15         MR. WARD:  Nothing further.

16         THE COURT:  All right.  Thank you.  You may

17  step down.

18         THE WITNESS:  Thank you, your Honor.

19         MR. LIEBERMAN:  Your Honor, CBS has no further

20  witnesses.

21         THE COURT:  All right.  Very well.  Thank you.

22         Mr. Ward and Mr. Pitcock?

23         MR. WARD:  Personal Audio has no witnesses

24  that it's going to call.

25         THE COURT:  Okay.  Very good.  Then obviously

1  I have the briefs that have been filed already, and I

2  know that there is a memorandum that CBS has offered.  Is

3  there any request to submit any further briefing on the

4  venue issue?

5           MR. PITCOCK:  I'm sorry, your Honor.  We just

6  got this memorandum today, and I have not had a chance to

7  review it.  So, we'd like to reserve the right to respond

8  to it if the court is going to take it under submission.

9           THE COURT:  All right.  That's reasonable

10 under the circumstances, and we'll figure out a time

11 frame for that.

12           Mr. Lieberman?

13           MR. LIEBERMAN:  Your Honor, the memorandum was

14 submitted this morning simply as excerpts from various

15 cases.  There's no legal argument in it.  And as you

16 know, from the perspective of NBC and CBS, there's

17 considerable time sensitivity in this matter because of

18 activities that are coming up in the case.  We would ask

19 if either at this point or after the evidence is

20 presented with respect to NBC, that we be able to make a

21 brief oral presentation to your Honor on issues that we

22 think are particularly pertinent in light of the evidence

23 that's come out.

24           THE COURT:  Mr. Ward?

25           MR. WARD:  Your Honor, we got it this morning.

1  I think we could have you a response, if we think there's

2  any response necessary, by -- what's today -- by

3  Wednesday at noon.

4            THE COURT:  All right.  I think that's

5  reasonable.  I'll say that, then.

6            And, Mr. Lieberman, if time permits today

7  after we finish the second hearing, I'll be happy to

8  allow you time to make any oral remarks you want to make.

9            MR. LIEBERMAN:  Thank you, your Honor.

10           THE COURT:  Okay.  Then we can proceed at this

11  time with the hearing in the NBC matter.

12           MR. LIEBERMAN:  Your Honor, NBC calls as its

13  first witness Mr. Rob O'Keefe.

14           (Oath administered.)

15           DIRECT EXAMINATION OF ROBERT O'KEEFE

16            CALLED ON BEHALF OF DEFENDANT NBC

17  BY MR. LIEBERMAN:

18  Q.    Good morning.  Would you tell the court your full

19  name.

20  A.    Robert Joseph O'Keefe.

21  Q.    And by whom are you employed?

22  A.    NBCUniversal.

23  Q.    How long have you been at NBC, Mr. O'Keefe?

24  A.    I've been at NBC for 14 years and the parent

25  company altogether 17 years.

1  Q.     Can you give us a brief overview of your

2  educational background?

3  A.     Sure.  I graduated St. John's University.  I

4  graduated with a computer science degree in 1996.

5  Q.     What is your current title at NBC?

6  A.     I'm director of digital video solutions.

7  Q.     And where is your office?

8  A.     We're located in New York at 5 Times Square.

9  Q.     Where do you currently reside?

10  A.     I live in New Jersey.

11  Q.     Can you tell us a little bit about yourself, your

12  family?

13  A.     Sure.  I've been married to my wife for 16 years.

14  We have three sons.  I come from a rather large family

15  myself.  I'm one of seven.  Most of them are in the civil

16  service.  I have a brother who is a firefighter, another

17  brother who is in the Secret Service, and actually I have

18  a sister studying to be a court reporter.

19  Q.     Thank you.  And what does your wife do for a

20  living?

21  A.     She is a teacher.

22  Q.     Could you tell the court what your job

23  responsibilities are as director of digital video

24  solutions at NBC?

25  A.     Yes.  My team is centrally located inside the NBC

1  company.  We provide video services for all of our

2  networks, all of our brands.  And by that I mean the

3  provisioning of video content, the distribution of the

4  content, and the playback of that content through our

5  systems.

6  Q.    Can you tell the court what you mean by you and

7  your team providing a centralized service for all the

8  different brands?

9  A.    Sure.  Video publishing is a complicated process

10  and each of the brands in their day-to-day support of

11  their Web sites require this, but they don't necessarily

12  have the wherewithal to be able to support it themselves.

13  So, we centralize that function within my group; and we

14  provide the expertise on that.

15  Q.    Can you give a few examples of brands you would

16  support?

17  A.    Sure.  Bravo; Oxygen; USA Network; NBC the

18  broadcast network; Telemundo, another broadcast network

19  for Spanish language.  We support each of those brands

20  with their video services.

21  Q.    And can you describe your and your team's

22  responsibilities with respect to the technology at issue

23  in this case for making TV shows available on the

24  Internet?

25  A.    Yes.  My team is the -- I guess the key decision

1  maker in terms of what technologies we're going to use,

2  how they're going to be implemented, how we use them to

3  support different other activities inside our

4  organization, like how we monetize them and measure that

5  content; and we act as subject matter experts to the

6  brands on these topics.

7  Q.     You mentioned your team.  How many people are on

8  your team?

9  A.     Currently there's 38 people on my team.  That

10  fluctuates from time to time, but it stays steady.  So,

11  it's somewhere in the mid 30s.

12  Q.     And have you prepared a list of those team

13  members?

14  A.     I have prepared a list, yes.

15  Q.     And could you turn to Exhibit 31 in your binder,

16  please?

17          Tell the court what this document is.

18          MR. PITCOCK:  Your Honor, objection.  Again

19  this is a list that has never been produced to us.  We've

20  never seen it.  We didn't have a chance to review it

21  prior to this witness' deposition, and we don't think it

22  should be part of the record.

23          MR. LIEBERMAN:  Your Honor, Mr. Pitcock

24  questioned the witness at his deposition about the

25  identity of his team members.  Because it's a little

1  difficult to remember the names of all 38 members of the

2  team, we thought it would be helpful to the court and to

3  everybody in this proceeding if the witness put together

4  a list of the names of the individuals and where those

5  individuals reside and work.  We've done this for the

6  benefit of the court.  It was prepared with the witness'

7  personal knowledge.  These are people he supervises; so,

8  there's no issue there.  And of course we could always

9  use the document simply to refresh the witness'

10  recollection.

11          THE COURT:  Were these witnesses all testified

12  about during the deposition?

13          MR. PITCOCK:  No, your Honor.  We didn't know

14  about some of them because we never received this list

15  before.  It would have been nice to have had it before

16  the deposition so we could have.

17          MR. LIEBERMAN:  Mr. Pitcock was free to ask

18  about everybody on the witness' team.  He did, and he

19  identified the names of various management employees.  He

20  didn't ask the names of all the people on the team.

21          MR. PITCOCK:  I certainly could have if I had

22  been given this list before his deposition.

23          MR. LIEBERMAN:  This is not a document that

24  should be extremely useful to the court.

25          THE COURT:  You know, given that -- with the

1 representation that this is just a listing of the

2 witnesses and where they -- well, is it where they reside

3 or where they work?

4            THE WITNESS:  It's where they work, your

5 Honor.

6            THE COURT:  I'll allow it to be introduced for

7 that purpose.

8            And you may cross-examine about the list

9 afterwards.

10            MR. LIEBERMAN:  Thank you, your Honor.

11 BY MR. LIEBERMAN:

12 Q.    Looking at Defendants' Exhibit 31 in evidence,

13 could you tell the court what this document is and how

14 you came about to prepare it?

15 A.    Sure.  This is a list of the members of my team.

16 It includes the management folks, the developers, the

17 quality assurance resources.  I put it together just to

18 be able to articulate exactly who is on my team and where

19 they work from.

20 Q.    Out of the 38 individuals on the list, how many of

21 them work in New York?

22 A.    I think the number was 27.

23 Q.    And are there any individuals on your team in

24 Texas?

25 A.    There is.

1  Q.      Who is that?

2  A.      Harish Patel.

3  Q.      And where does he live?

4  A.      He resides north of Dallas.

5  Q.      And what is his role?

6  A.      Harish is an iteration manager on my team.  And by

7  that I mean he really just runs -- he's a coordinator.

8  He sets up meetings and facilitates note taking.

9  Q.      Please describe how your team operates.

10  A.      My team, it operates -- I guess I have a director

11  of solution delivery -- her name is Hristina Galabova --

12  and then I have two managers.  One is Sameer Arya; he

13  heads up my player and services team.  The other is

14  Ashwin Katta; he heads up my TV Everywhere experience

15  team.  Between the three of them, they provide direction

16  to all the developers and the QA resources to support, in

17  Sameer's case, the creation of the player and the video

18  content management system for the publishing,

19  distribution, and playback of video; in the case of

20  Ashwin, he supports the actual -- building the

21  experiences that expose that content.

22  Q.      And where do these individuals work?

23  A.      They all reside and work -- I'm sorry.  I

24  shouldn't say -- they all work in New York.

25  Q.      And as far as you know, do they all reside in the

1 New York area?

2 A.     Hristina and Sameer live in New York.  Ashwin

3 lives in New Jersey.

4 Q.     Could you turn, please, in your binder to

5 Defendants' Exhibit 5 in evidence, which is the first

6 amended infringement contentions?

7          I may have misstated.  Exhibit 5 is

8 "Plaintiff's First Amended Disclosure of Asserted Claims

9 and Infringement Contentions."  Do you have that there?

10          Well -- okay.  If you could look, please, at

11 Exhibit 6.

12 A.     Yes.

13 Q.     This is the plaintiff's first amended infringement

14 contentions for NBC.  I'd like you to -- have you seen

15 this document before?

16 A.     Yes, I have.

17 Q.     I'd like you to turn to pages 3 to 17 of this

18 document.  And I ask you whether you recognize pages 3

19 through 17.

20 A.     I do.

21 Q.     And what role do you and your team provide with

22 respect to the technology for making the nbc.com TV shows

23 listed on pages 3 through 6 available online?

24 A.     Well, with regard to nbc.com, my team is solely

25 responsible for the video content management system

1 player and capability to produce those episodes for

2 online consumption.

3 Q.    And what technology do you use to make the full

4 episodes available online at nbc.com?

5 A.    As of mid-January we transitioned into a new

6 platform.  Just to be clear, the name of the company --

7 it's a third-party service -- it's also called

8 "thePlatform."  But prior to managing their solution on

9 thePlatform, we provided a homegrown solution -- it was

10 called the "video content management system" -- and the

11 host of that player.  My team built that in-house and

12 supported it out of our offices in New York.

13 Q.    And where is thePlatform, the company, located?

14 A.    ThePlatform company is located in Seattle,

15 Washington.

16 Q.    Does thePlatform, the company, have a technical

17 account manager for NBC?

18 A.    They do.  His name is Matan Bareket, and he is

19 located in New York City as well.

20 Q.    Can you describe in laymen's terms -- withdrawn.

21       Does your team use thePlatform right out of

22 the box, or do you customize it in some way?

23 A.    thePlatform is so entitled because it is a set of

24 services that we could then build upon and customize for

25 the purposes of NBCUniversal so -- to meet our specific

1   needs.

2   Q.     And can you describe in laymen's terms how your

3   team customizes thePlatform product?

4   A.     I think in laymen's terms it's similar to, I

5   think, you know, maybe a set of Legos.  Right?  You have

6   a certain set of capability with those Legos; but you can

7   build them and put them together to form, you know, a

8   specific solution for your brand.

9   Q.     And using that analogy, how would you describe

10  your own role?

11  A.     I guess I'm the chief Lego builder in that regard.

12  Q.     All right.  What are the primary products you use

13  from thePlatform?

14  A.     The primary products are two.  One is called

15  "MPX," and that is the -- their solution for

16  delivering -- or for storing video content and creating

17  feeds to syndicate that.  And then the other is called

18  the "PDK," which stands for the "player development kit";

19  and that's used for the actual video player or for the

20  consumption of those feeds.

21  Q.     Turning back to Exhibit 6.  I had already asked

22  you about the nbc.com shows on pages 3 through 6.  Now

23  I'd like you to look at pages 6 and 7 for the next set of

24  shows.

25              What role do you and your team provide with

1  respect to the technology for making the NBC News TV

2  shows listed on pages 6 to 7 available online?

3  A.    My team is not directly responsible for making

4  these shows available online.  However, we are intimately

5  familiar with the technology that is used for each of

6  these episodes.  We consult with the NBC News team on it.

7  And Ted McConville is part of that team, and I believe

8  you will be speaking to him later.

9  Q.    Thank you.  Turning to page 8 of Exhibit 6, what

10 role do you and your team provide with respect to the

11 technology for making the Bravo TV shows on page 8

12 available online?

13 A.    My team is subject matter experts with regards to

14 the shows for Bravo.  It is a brand located in New York.

15 The technical resources for Bravo reside in New York, and

16 they leverage thePlatform to which they turn to us for

17 advice in terms of how to make those shows available.

18           MR. LIEBERMAN:  Your Honor, at this point I'd

19 like to move Exhibit D-6 into evidence.

20           MR. PITCOCK:  No objection, your Honor.

21           THE COURT:  All right.  It is admitted.

22 BY MR. LIEBERMAN:

23 Q.    Right after the Bravo shows on page 8, we have

24 Syfy TV shows on pages 8 and 9.  What role do you and

25 your team provide with respect to the technology for

1 making the Syfy TV shows available online?

2 A.      Like Bravo, Syfy leverages thePlatform to provide

3 the service.  They look to my team for leadership in this

4 space and direction.  I am aware of all the Syfy

5 technical resources and support them in their endeavors

6 to make these videos available.

7 Q.      If you could turn to page 10 of Exhibit 6.  What

8 role do you and your team provide with respect to the

9 technology for making the MSN Latino TV shows listed on

10 page 10 available online?

11 A.      My team does not directly support the video

12 solution for the folks at Telemundo.  They are supported

13 through a third-party arrangement with Microsoft.  I am

14 aware of their technical team, I am aware of their

15 solution, and I support them the best I can with regards

16 to that solution.

17 Q.      Looking at pages 10 and 11, after MSN Latino we

18 see reference to a number of USA Network TV shows.  What

19 role do you and your team provide with respect to the

20 technology for making USA Network TV shows listed on

21 pages 10 and 11 available online?

22 A.      Yes.  The USA Network video solution is also based

23 upon thePlatform.  It is the same as Bravo and Syfy.

24 They consult me for support of that solution.

25 Q.      Looking at page 11, right after USA Network we

1  have "*mun dos*" or mun$^2$ TV shows, on pages 11 and 12.

2  What role do you and your team provide with respect to

3  the technology for making the mun$^2$ TV shows listed on

4  pages 11 and 12 available online?

5  A.    mun$^2$ is currently in a transition.  They are

6  leveraging thePlatform, and we support some of their

7  videos but not necessarily the accused episodes here.

8  The accused episodes here are based off another solution

9  similar to thePlatform called "Brightcove."  I'm aware of

10  how they leverage Brightcove and the technical resources

11  that support that for mun$^2$.

12  Q.    Turning to page 13, we see that the CNBC shows

13  start to be listed on page 13.  Could you tell the court

14  what role you and your team provide with respect to the

15  technology for making the CNBC TV shows listed on page 13

16  available online?

17  A.    CNBC has -- had a homegrown solution as well for

18  their video service.  It is supported by their team; and

19  a colleague of mine, Scott Drake, could speak to that

20  directly.  But I am aware of their solution overall and

21  how they use it to support these episodes.

22  Q.    And are you aware that Mr. Drake is sitting out in

23  the hallway waiting to testify?

24  A.    I am.

25  Q.    On page 13 there are a number of Oxygen shows

1 listed.  What role do you and your team provide with

2 respect to the technology for making the Oxygen TV shows

3 listed on page 13 available online?

4 A.     Oxygen also leverages thePlatform to provide their

5 video solution.  I am familiar with all the Oxygen tech

6 leads.  I consult them and provide support as it relates

7 to their video solution.

8 Q.     On pages 13 and 14 are references to Style TV

9 shows.  What role do you and your team provide with

10 respect to the technology for making the Style TV shows

11 listed on pages 13 and 14 available online?

12 A.     Style is a network that as present no longer

13 exists; but when it did exist, it was leveraging

14 thePlatform for their services as well.  I am familiar

15 with the technical folks that were over at the Style

16 Network and how they made these shows available online.

17 Q.     Beginning on page 14, there's reference to Golf

18 Channel TV shows, pages 14 to 17.  What role do you and

19 your team provide with respect to the technology for

20 making the Golf Channel TV shows listed on those pages

21 available online?

22 A.     My team is not responsible for making the Golf

23 Channel videos available online as is listed here in the

24 accused episodes.  However, I have made some of these

25 videos available through another solution for NBC proper.

1  So, I work very closely with their team.  I know where

2  all those tech individuals reside, and I've supported

3  them on their current efforts to provide these videos.

4  Q.     And are you also knowledgeable about the processes

5  for making NBC sports shows, including the Golf Channel

6  network shows, available online?

7  A.     I am.

8  Q.     In general, overall, who would you say is the most

9  knowledgeable person as to the technology used at NBC to

10  make TV episodes available online?

11  A.     I am.  It's my responsibility inside our

12  organization.

13  Q.     Where were the documents created with relation to

14  technology used at NBC to make TV episodes available

15  online?

16  A.     The documents are created by my team, the vast

17  majority of which reside in New York.

18  Q.     What department is most knowledgeable about

19  revenue and ad sales at NBC in connection with the

20  episodes listed in Exhibit D-6?

21  A.     That would be --

22          MR. PITCOCK:  Objection to form and lacks

23  foundation.  There's been no foundation laid for this

24  witness' knowledge.

25          THE COURT:  All right.  Would you ask the

1  witness his foundation?

2  BY MR. LIEBERMAN:

3  Q.     During your years at NBC, have you had occasion to

4  interact from time to time with people in the revenue and

5  ad sales areas?

6  A.     I have.

7  Q.     And what department is most knowledgeable about

8  revenue and ad sales at NBC?

9  A.     NBC has centralized their ad sales into the NBC

10  sales organization.

11  Q.     And where is the NBC sales organization?

12  A.     It is located in New York.

13             MR. LIEBERMAN:  Pass the witness, your Honor.

14             THE COURT:  All right.

15             CROSS-EXAMINATION OF ROBERT O'KEEFE

16  BY MR. PITCOCK:

17  Q.     All right.  So -- I'm sorry.  You testified that

18  thePlatform provides the Legos for your team to build

19  upon; is that correct?

20  A.     Yes.

21  Q.     And they're located in Seattle, Washington?

22  A.     Yes.

23  Q.     And information about the episodic TV shows that

24  you have been testifying about is stored on their servers

25  in Seattle, Washington?

1  A.      Yes.

2  Q.      And that company provides a video management

3  content system that's used with these various TV shows

4  that you have been testifying about, correct?

5  A.      That is correct, but it's one that we then

6  customize to support our specific needs.

7  Q.      So, the customization that you do, what percentage

8  of the code do you change?

9  A.      There -- it would be tough to estimate what the

10  percentage is, but it's a fair amount of customization to

11  support our needs.

12  Q.      Well, would the video content management system

13  work without any customization by NBC?

14  A.      No.

15  Q.      What customization is necessary?

16  A.      There are -- we have upstream workflows with our

17  broadcast technology in order to be able to get that

18  video content into our video content management system,

19  thePlatform system.  We have to enable that relationship;

20  we have to build out those profiles in order to be able

21  to support that.

22          And then by "work," I suppose you could say

23  that it would be able to store that information and make

24  it available for online consumption.  However, in order

25  to make it useful to our brands and to be able to display

1  the information they need to make it available online,

2  that requires another degree of customization.

3  Q.     Now, thePlatform also provides the player

4  development kit used for viewing the episodic TV shows?

5  A.     Yes.

6  Q.     And you were able to name five employees in

7  Seattle that work for thePlatform off the top of your

8  head, weren't you?

9  A.     Yes.

10  Q.     And when you were asked to name them all at your

11  deposition, I believe your testimony was that we'd be

12  there all day.

13  A.     Something to that extent.  It's a -- I know a lot

14  of employees at thePlatform.

15  Q.     Now, do you think employees at thePlatform in

16  Washington have relevant information when it comes to the

17  episodic TV video provided by NBC?

18  A.     I think the knowledge of the NBC setup is in a

19  small group of resources at thePlatform.  Many of the

20  folks that I named for you previous were leaders --

21  leadership at thePlatform, sales folks at thePlatform.

22  But there's two main folks at thePlatform that support

23  NBC's specific implementation.  They are technical

24  account managers at thePlatform.  One is Joshua Handsaker

25  who is located in Seattle, and the other is Matan Bareket

162

who is located in New York.

Q.    So, in terms of the code that went into
thePlatform, is it your understanding most of that coding
was done in Seattle?

A.    Yes.

Q.    And I just want to show you the initial
disclosures that were submitted by NBC in this matter.
In fact --

            MR. PITCOCK:  I don't know how you -- do you
want me to mark it as "P-3"; or do you want me to start
over, Mr. Lieberman?

            MR. LIEBERMAN:  I have no preference.

            MR. PITCOCK:  I'd like to mark as Exhibit P-3
and move into evidence Defendant NBCUniversal Media,
LLC's, initial disclosures.

            THE COURT:  Any objection?

            MR. LIEBERMAN:  None, your Honor.

            THE COURT:  All right.  P-3 is admitted.

            MR. PITCOCK:  Permission to approach, your
Honor.

            THE COURT:  Yes.

BY MR. PITCOCK:

Q.    Now, I want you to review this document and see
whether any mention is made of thePlatform or its
employees.

```
 1  A.    No.

 2  Q.    And if you'll look on page 4, do you see Rena

 3  Patel listed there?

 4  A.    Yes.

 5  Q.    And she negotiated the contract with thePlatform,

 6  correct?

 7  A.    She did.

 8  Q.    And she lives in Los Angeles, California?

 9  A.    I am not sure where Rena lives.

10  Q.    I'm sorry.  Does she work in Los Angeles,

11  California?

12  A.    Yes.

13  Q.    And Tom Blaxland runs a team of operators that

14  puts content into the video technology solutions; is that

15  correct, sir?

16  A.    Tom Blaxland runs a team of operators who use the

17  systems that my team provides.

18  Q.    And do they use those systems to put content

19  into --

20  A.    Yes.

21  Q.    Mr. Blaxland, he also works in Los Angeles?

22  A.    Yes.

23  Q.    And Jesus Cortez works for Mr. Blaxland's group in

24  Los Angeles, correct?

25  A.    Yes.
```

EVIDENTIARY HEARING

164

1  Q.     And a person named Trideed Dasgupta, T-R-I-D-E-E-D

2  D-A-S-G-U-P-T-A, found thePlatform as a potential video

3  technology for NBC?

4  A.     No.  thePlatform was a solution that we already

5  had in place.  Trideed was looking to bring NBC -- as I

6  mentioned before, they were on a homegrown solution.  So,

7  he was looking at the -- really the benefit of bringing

8  them on from a financial perspective.

9  Q.     I see.  And Mr. Dasgupta lives in California as

10 well -- or I'm sorry.  He works in California as well?

11 A.     Yes.

12 Q.     Mr. Eddie Lee, who is a VP of technology, makes

13 requests relating to the technology for video content?

14 A.     He does.

15 Q.     And he works in Los Angeles?

16 A.     Yes.

17 Q.     And Mr. Michael Martin, who is the senior

18 vice-president of NBC digital product technology and

19 operations, he has responsibilities for the nbc.com

20 Web site?

21 A.     He does.

22 Q.     And he also works in Los Angeles?

23 A.     He does.

24 Q.     And you don't make the decisions about what

25 appears on the Web sites; is that correct?

1  A.    I don't make decisions about what appears on the

2  Web sites.  I just provide the solution by which I

3  make -- those videos are made available.

4  Q.    Now, you don't have any personal knowledge of

5  online episodic TV advertising or revenue or marketing,

6  do you, sir?

7  A.    Can you clarify the question for me?

8  Q.    Sure.  You -- well, do you have any personal

9  knowledge with respect to episodic TV advertising?  Is

10 that something that you work on from day to day?  Do you

11 know how much is spent on advertising, how advertising is

12 done?

13 A.    I do, sir, with regards to the implementation of

14 the video solution that allows for the advertising.  I

15 don't in terms of what it actually generates.

16 Q.    So, you don't have any personal knowledge of the

17 revenue generated by any of these shows?

18 A.    That's correct.

19 Q.    And do you have any personal knowledge of the

20 marketing related to these shows?

21 A.    No, sir.

22 Q.    And at your deposition last week you couldn't even

23 name who to ask with respect to advertising or revenue;

24 is that correct?

25 A.    As it relates to a specific individual, that's

 1  correct.

 2  Q.    Now, I wanted to go over the exhibit -- excuse me.

 3         MR. PITCOCK:  I'm sorry, your Honor.  I'm just

 4  trying to locate the exhibit with the listing of names

 5  that...

 6         THE COURT:  All right.  Is it No. 31?

 7         MR. PITCOCK:  Is it at Tab 31?

 8         MR. LIEBERMAN:  We handed you a loose copy.

 9         MR. PITCOCK:  It's also at Tab 31.

10         MR. LIEBERMAN:  Here's another copy.

11         MR. PITCOCK:  Thank you.

12  BY MR. PITCOCK:

13  Q.    I see there are people who work on your team who

14  live in Georgia?

15  A.    Yes.  They are developers on my team.

16  Q.    So, they are involved in writing code to modify

17  thePlatform, for example?

18  A.    At the direction of my managers, yes.

19  Q.    And there are people who work in Washington State?

20  A.    Yes, also developers.

21  Q.    Portland, Oregon?

22  A.    Yes.

23  Q.    Denver, Colorado?

24  A.    Yes.

25  Q.    Conshohocken, Pennsylvania?

EVIDENTIARY HEARING

1  A.     Yes.

2  Q.     Boston, Massachusetts?

3  A.     Yes.

4  Q.     A few from India; is that correct?

5  A.     Yes.  Those are again QA resources or quality

6  assurance resources.  All the individuals that you have

7  identified take direction from my folks in New York.

8  Q.     Right.  But they reside outside of New York; is

9  that correct?

10 A.     That's correct, yes.

11 Q.     You testified that Mr. Patel -- who I guess is an

12 administrator who helps set up meetings and coordinate

13 activities for your group; is that correct?

14 A.     Yes.

15 Q.     And you said he lives north of Dallas.  Do you

16 know what city he actually lives?

17 A.     On his resumé it's listed as Frisco, Texas.

18 Q.     Now, with respect to all the TV shows in your

19 testimony that your team isn't personally responsible

20 for, do you know the location of the relevant witnesses

21 and documents with respect to online video?

22 A.     I'm sorry.  Can you repeat that question?

23 Q.     Of course.  I'll even try to rephrase it a little

24 bit.

25         So, in your testimony you went through a long

EVIDENTIARY HEARING

1  list of various TV shows, some of which your team was

2  responsible for and some of which your team was not

3  responsible for.  And my question for you is:  Do you

4  know the location of relevant witnesses and documents for

5  the TV episodes your team is not responsible for?

6  A.    Yes.

7  Q.    And how do you know that?

8  A.    In my day -- day-to-day job, my responsibilities,

9  I interact with the folks who are responsible for those

10  other brands in consulting and advising on their video

11  solutions and what we also provide.

12  Q.    Now, the person who has written code for use with

13  metrics and advertising is in Seattle, Washington?

14  A.    With regards to our solution, the solution my team

15  supports?

16  Q.    Yes.

17  A.    That -- that statement is one -- he's one of the

18  developers who would work on that.

19  Q.    Is --

20  A.    He's not the only developer who works on it.

21  Q.    His name is Kevin Campbell?

22  A.    That's correct.

23  Q.    And one of the people who tests code for you is in

24  Portland, Oregon; is that correct, sir?

25  A.    Yes.

EVIDENTIARY HEARING

169

1   Q.     And I guess that's Hudson Genovese?

2   A.     Yes.

3   Q.     So, documents related to episodic TV distribution

4   by CBS over the Internet are located primarily in

5   New Jersey?

6   A.     I'm sorry.  Can you repeat that question?

7   Q.     Yes.  Documents related to episodic TV

8   distribution by CBS over the Internet, I believe your

9   testimony is that they're located somewhere within

10  New Jersey.

11  A.     Sir, you asked about CBS.

12  Q.     I'm so sorry.  NBC.  I must have mistyped it.

13  A.     The documents are created in Jersey, yes -- I'm

14  sorry.  Actually they're created in New York.  My team is

15  located in New York.

16  Q.     Are they stored on servers in New Jersey?

17  A.     I believe so, yes.

18  Q.     And do you know whether documents are located

19  anywhere else such as in California?

20  A.     I do not know.

21  Q.     And, so, just -- if you could turn to Tab 6 --

22  well, actually, real quick before you do that.

23          So, all these people who work on your team,

24  are they able to upload and download documents, with the

25  right credentials, anywhere there's an Internet

 1  connection?

 2  A.    Specifically what documents?  I mean --

 3  Q.    Well, for example, the code that you have been

 4  talking about modifying, can that be done anywhere?

 5  A.    Yes.

 6  Q.    If you look at page 18 and the top of page 19,

 7  there's a listing of podcasts.  Do you see that, sir?

 8  A.    Yes, I do.

 9  Q.    And do you have any responsibilities with respect

10  to these podcasts?

11  A.    No, I do not.

12  Q.    And you mentioned a Mr. McConville having

13  responsibilities with respect to some of the NBC News

14  shows; is that correct?

15  A.    Yes.

16  Q.    And by that you're referring to all the shows

17  listed on pages 6, 7 -- well, pages 6 and 7?

18  A.    I'm referring to the -- some of those shows and

19  the team and the technologies that are used to support

20  all of those shows, yes.

21  Q.    And Mr. McConville currently resides in Seattle;

22  is that correct?

23  A.    I believe so.

24            MR. PITCOCK:  Nothing, pending any redirect.

25                        **

```
 1              REDIRECT EXAMINATION OF ROBERT O'KEEFE
 2   BY MR. LIEBERMAN:
 3   Q.    Mr. Pitcock asked you about Mr. McConville and
 4   where he resides.  Do you know whether he has any plans
 5   to move to New York next month?
 6              MR. PITCOCK:  Objection, lacks foundation.
 7              THE COURT:  The question is "do you know."
 8              THE WITNESS:  Yes.
 9   BY MR. LIEBERMAN:
10   Q.    Does he?
11   A.    Yes.
12              MR. PITCOCK:  Same objection.
13   BY MR. LIEBERMAN:
14   Q.    Mr. Pitcock asked you about podcasts I believe on
15   pages 18 and 19.  Who do you understand has
16   responsibility -- withdrawn.
17              Who do you understand are the most
18   knowledgeable people at NBC regarding those podcasts?
19              MR. PITCOCK:  Objection, lacks foundation.
20              MR. LIEBERMAN:  Let me rephrase the question,
21   your Honor, if that's okay.
22              THE COURT:  I'll overrule the objection.
23   A.    I understand Scott Drake has that knowledge.
24   BY MR. LIEBERMAN:
25   Q.    And Mr. McConville and Mr. Drake are both here
```

1  today to testify?

2  A.      Yes, they are.

3  Q.      Now, Mr. Pitcock asked you about various members

4  of your 38-person team who are in a number of different

5  locations around the country.  Are any of those people

6  your top-level lieutenants or managers on your team?

7  A.      They are not.

8  Q.      And how many top-level lieutenants/managers do you

9  have on your team?

10  A.      I have three, and they are located in New York.

11  Q.      And you yourself are located where?

12  A.      I am also located in New York.

13  Q.      By the way, there was reference to documents being

14  stored in New Jersey.  How far away is the NBC office in

15  New Jersey from the NBC office in New York City?

16  A.      Perhaps no more than 10 miles.

17  Q.      Mr. Pitcock asked you a number of questions where

18  he seems to have pulled out the names of virtually

19  everybody at NBC who worked somewhere other than in

20  New York -- Mr. Blaxland, Mr. Lee, Mr. Martin.  Do any of

21  those people have more -- as much or more knowledge as

22  you and your teams do -- you and your team does regarding

23  the technology used to provide the content on the NBC Web

24  sites?

25  A.      With regard to those individuals mentioned, they

1    rely on my team to provide that technology.

2    Q.    And Ms. Patel, what was her role with respect to

3    thePlatform?

4    A.    Negotiating the rates that we pay thePlatform.

5    Q.    And Mr. Pitcock asked you certain questions about

6    whether thePlatform was listed on the initial

7    disclosures.  In your view, which is -- withdrawn.

8          Mr. Pitcock asked you certain questions about

9    the disclosures regarding thePlatform or the fact that

10   there aren't any disclosures regarding thePlatform in the

11   initial disclosures for NBC.  Does NBC use thePlatform

12   technology without customization?

13   A.    No.

14   Q.    And are there people who customize thePlatform

15   listed on the NBC initial disclosures?

16   A.    Yes.

17   Q.    And where is all the customization done?

18   A.    The customization is done by various developers

19   and QA resources; but the direction, the task definition

20   occurs in New York.

21   Q.    With you and your team?

22   A.    Yes.

23          MR. LIEBERMAN:  I have no further questions,

24   your Honor.

25          THE COURT:  All right.  Very well.  Thank you.

1  You may step down.

2              THE WITNESS:  Thank you.

3              MR. LIEBERMAN:  Your Honor, could this witness

4  be excused?

5              THE COURT:  Yes, he is excused.

6              MR. LIEBERMAN:  NBC now calls Mr. Scott Drake

7  to the stand.

8              (Oath administered.)

9              DIRECT EXAMINATION OF SCOTT DRAKE

10             CALLED ON BEHALF OF DEFENDANT NBC

11 BY MR. LIEBERMAN:

12 Q.    Could you tell the court your full name, please?

13 A.    Scott Drake.

14 Q.    For whom do you work?

15 A.    NBCUniversal.

16 Q.    What is your title?

17 A.    I'm senior vice-president of technology for the

18 NBC News Group, NBCUniversal.

19 Q.    And where do you work?

20 A.    I work at NBCUniversal headquarters at Rockefeller

21 Center, New York City.

22 Q.    And where do you live?

23 A.    I live in Milton, Georgia.  It's about 20 miles

24 outside of Atlanta.  I commute four days a week.  I fly

25 up on Monday mornings to New York, LaGuardia Airport, and

1  then go to my office at Rockefeller Center and then fly

2  back on Thursdays to see my family.

3  Q.    For how long have you been doing this?

4  A.    Since about 2005.

5  Q.    Why do you do this?

6  A.    Well, I love my job at NBC -- I have worked there

7  since 1999 -- but I love my family, too.  And my extended

8  family is also in the Atlanta area -- my brother, my

9  sister, my aunts and uncles, my cousins -- and we all

10 live about 10 miles away from each other.

11        I have been married for about 27 years.  Me

12 and my wife have 3 kids, and it's -- you know, to balance

13 out the family with a job that's so demanding, we thought

14 it's a good way to kind of do both.

15 Q.    How do you like traveling?

16 A.    I don't really like it.  I do it twice a week and

17 I've done it for eight years, but I really -- I don't

18 particularly enjoy travel as much.  In fact, I've

19 probably only flown out of the country, out of the United

20 States, a couple of times for business, you know, once to

21 London, once to Copenhagen; and I've taken my wife for an

22 anniversary trip to Paris about 15 years ago.

23 Q.    Could you tell us -- could you tell the court

24 about your educational background, please?

25 A.    Yeah.  I went to Park Ridge High School in

1  New Jersey, and then I attended Rutgers University.  I

2  played tight end at Rutgers, while it's not -- it is a

3  Division I school.  Maybe not as big as the SEC or the

4  Big 12, but I enjoyed my time there.

5  Q.     What was your degree in?

6  A.     In civil engineering.  I also learned a lot about

7  computers and software.

8  Q.     What did you do before joining NBC in 1999?

9  A.     So, I worked for Bloomberg as a software

10 developer.  While I was there, I was promoted to

11 essentially run the Bloomberg Web site.  And I developed

12 also an expertise -- we syndicated a lot of sites.  That

13 way I also developed an expertise in setting up other

14 media sites.

15 Q.     And what was your prior job at NBC before the one

16 you have now?

17 A.     So, as of I think August of 2013, I was a senior

18 vice-president of CNBC technology and quantitative

19 services.

20 Q.     And where did you work in that role?

21 A.     At CNBC headquarters in Englewood Cliffs,

22 New Jersey.

23 Q.     How far is Englewood Cliffs, New Jersey, from New

24 York City?

25 A.     Just right over the bridge.  Maybe about 5 miles,

1  something like that.

2  Q.     So, not like Texas distances.

3  A.     No, not like Texas distances.

4  Q.     Could tell the court how long you held your

5  previous position and what you did in that job?

6  A.     Yeah.  So, I held that position about 14 years.  I

7  started in 1999 and ended in August of 2013.  I was in

8  charge of all the CNBC digital products and services, and

9  I would say data services for our on-air TV products.

10  Q.     What is the relationship between CNBC and the

11  defendant in this case, NBCUniversal Media, LLC?

12  A.     So, CNBC is owned and operated by NBCUniversal

13  which is located in New York City.

14  Q.     Okay.  And is there a difference between NBC and

15  CNBC?

16  A.     So, I think of NBC as more of the prime time and

17  CNBC as a financial news network or business network.

18  Q.     And where physically do you work now?

19  A.     I work for NBCUniversal headquarters at 75

20  Rockefeller Center Plaza.

21  Q.     So, if you could look, please, at Tab 7 in your

22  binder.

23  A.     Uh-huh.

24  Q.     This is the first amended complaint.

25  A.     7?

1  Q.    Tab 6.  I'm sorry.

2  A.    6.  Okay.  I'm in Tab 6.

3         MR. LIEBERMAN:  Your Honor, we have had a

4  brief snafu with the exhibits.  If I may approach the

5  witness and hand him a copy of the complaint.

6         THE COURT:  Yes.

7  BY MR. LIEBERMAN:

8  Q.    If you could look, please, at the "First Amended

9  Complaint for Patent Infringement" against NBC,

10 specifically paragraph 10 of that document.

11 A.    Yes.

12 Q.    First could you look at the last page of the

13 document and tell me when this was filed?

14 A.    The last page?  It's dated June 10th, 2013.

15        MR. LIEBERMAN:  Your Honor, may I hand up a

16 copy to the bench of this document?

17        THE COURT:  Yes.

18 BY MR. LIEBERMAN:

19 Q.    Looking at the podcasts listed in paragraph 10,

20 could you tell the court whether you played any role with

21 respect to the podcasts identified in that paragraph?

22 A.    Yeah.  All the podcasts that have "CNBC" on it, as

23 of August of 2013, me and my team were responsible for

24 dealing with all the technology concerns with the

25 podcasts and also the dissemination of those podcasts

1   over the Internet.

2   Q.    And how many CNBC podcasts are listed in that

3   paragraph 10?

4   A.    Eight.

5   Q.    And can you identify the other members of your

6   team who had responsibility for those podcasts?

7   A.    Yeah.  Phil DeLeon, Nilesh Thakur, and Vito

8   Tattoli.

9   Q.    And were there any members of your team who

10  reported to any of these individuals?

11  A.    Oh, yeah.  There was a group of video editors that

12  reported -- five video editors that reported to Vito

13  Tattoli.  So, there was probably approximately about

14  eight people.

15  Q.    And where does Mr. Phil DeLeon work?

16  A.    In Englewood Cliffs, New Jersey.

17  Q.    Mr. Nilesh Thakur?

18  A.    Englewood, New Jersey.

19  Q.    Vito Tattoli?

20  A.    Englewood, New Jersey.

21  Q.    And could you tell the court what each of these

22  people do specifically?

23  A.    So, Phil is a front-end developer, helps out with

24  a lot of the setup of the podcasts.  Nilesh is our

25  director of software operations.  He handled a lot of the

1  workflow tools.  And then Vito and his team actually

2  produce the actual video for the podcasts.

3  Q.     And do you know where Mr. Tattoli's team works?

4  A.     Yeah.  Englewood Cliffs, New Jersey.

5  Q.     As far as you know, do any of these individuals

6  commute as you do from some remote location?

7  A.     No.

8  Q.     You testified that you no longer hold the position

9  of senior vice-president of CNBC technology and

10  quantitative services.  What is your new position?

11  A.     I'm the senior vice-president of technology for

12  the NBC News Group.

13  Q.     And who has taken your old position as senior

14  vice-president of CNBC technology and quantitative

15  services?

16  A.     Scott Boyarsky.

17  Q.     And where does Mr. Boyarsky work?

18  A.     He's in the same CNBC office as where I used to

19  work in Englewood Cliffs, New Jersey.

20  Q.     That's the office where you worked for 14 years?

21  A.     For 14 years, yes.  That's correct.

22  Q.     Where does Mr. Boyarsky live?

23  A.     He lives in New Jersey.

24  Q.     Who are the most knowledge people at NBC regarding

25  the technology used to disseminate CNBC podcasts?

1  A.     Can you repeat that again?

2  Q.     Who are the most knowledgeable people at NBC

3  regarding the technology used to disseminate CNBC

4  podcasts?

5  A.     That would be Scott Boyarsky and my old team and

6  myself.

7  Q.     Directing your attention now to what's been --

8  withdrawn.

9         Directing your attention to what's in evidence

10 as Exhibit D-6, the "Amended Disclosure of Asserted

11 Claims and Infringement Contentions."  Could you first

12 look at page 28 and tell me what the date is on this

13 document?

14 A.     On Tab 28?

15 Q.     This is D-6, Tab 6 --

16 A.     Okay.

17 Q.     -- page 28.

18 A.     And what are you asking?

19 Q.     What's the date on the document?

20 A.     August 9th, 2013.

21 Q.     Okay.  So, you had previously looked at paragraph

22 10 of the complaint which was dated June 10th of 2013.

23 I'm now going to ask you to look at pages 18 and 19 of

24 the infringement contentions which is dated August 9th,

25 2013.

1  A.      Okay.

2  Q.      Can you tell me what's listed in the chart on

3  pages 18 and 19?

4  A.      There are a series of eight podcasts.

5  Q.      And this isn't the identical list of podcasts that

6  was in the complaint, correct?

7  A.      Correct.

8  Q.      Can you tell me out of these eight podcasts, for

9  how many of them do you have personal knowledge regarding

10 the technology used to disseminate any of these podcasts?

11 A.      Six of them.  Any of them that are available at

12 CNBC.

13 Q.      So, can you tell the court where the CNBC ones

14 start and where they end, looking at pages 18 and --

15 A.      Yeah.  Starts at *CNBC Suze Orman Show* and ends on

16 page 19 at *CNBC Options Action*.

17 Q.      And which group is now in charge of the technology

18 for disseminating those six podcasts?

19 A.      Scott Boyarsky and my old team.

20 Q.      Could you look at Exhibit 6, page 13 now?  Do you

21 see starting at the top of the page and running about

22 halfway down a reference to certain CNBC episodes?

23 A.      Yes.

24 Q.      Could you tell me what role you played in your

25 former job with respect to the dissemination of these

1  CNBC episodes?

2  A.    So, we work with Bravo's team actually doing T.V.

3  Everywhere; and these were part of that dissemination

4  through Rob's efforts.

5  Q.    And what role does your former team continue to

6  play, if any, with respect to the dissemination of these

7  CNBC episodes.

8  A.    They still support it and work with Rob's team in

9  creating content.

10  Q.    Does NBCUniversal have any personnel knowledgeable

11  regarding the technology used to disseminate CNBC

12  podcasts or episodes in the Eastern District of Texas?

13  A.    No.

14  Q.    Does NBCUniversal have any personnel knowledgeable

15  regarding the technology used to disseminate the CNBC

16  podcasts or episodes anywhere in the State of Texas?

17  A.    No.

18  Q.    Where was the technology used to disseminate the

19  podcasts or episodes developed?

20  A.    At CNBC headquarters in Englewood Cliffs, New

21  Jersey.

22  Q.    How do you know that?

23  A.    Because me and my team developed the technology at

24  CNBC.

25  Q.    Thank you.

1           MR. LIEBERMAN:  I'll pass the witness, your

2    Honor.

3           MR. PITCOCK:  I'd like to mark as Exhibit P-4

4    and move into admission the "Declaration of Scott Drake

5    in Support of Defendants' Motion to Transfer Venue."

6           MR. LIEBERMAN:  Your Honor, the witness is

7    present here in person.  I'm not sure why the declaration

8    should be going into evidence.

9           THE COURT:  I'm pretty sure he intends to

10   attempt to use it for impeachment, would be my guess.

11   But why don't you go ahead and use it first, and then

12   we'll deal with its admission.

13          MR. PITCOCK:  Certainly, your Honor.

14             CROSS-EXAMINATION OF SCOTT DRAKE

15   BY MR. PITCOCK:

16   Q.    Well, Mr. Drake, do you recall mentioning that you

17   live in Georgia in your declaration?

18   A.    No.  I didn't think that -- I didn't think it was

19   relevant.

20   Q.    You understand this is a motion to transfer venue

21   from Texas to New York?

22   A.    But all the technology and all the knowledge is in

23   Englewood Cliffs, New Jersey.

24   Q.    Except for you, sir.  You reside in Georgia, don't

25   you?

1  A.     But I'm --

2            MR. LIEBERMAN:  Objection, argumentative.

3            THE COURT:  Overruled.

4  A.     I live in New Jersey -- I mean, I live in Georgia;

5  but I work in New Jersey at that time.

6  BY MR. PITCOCK:

7  Q.     Well, you lived in Georgia and commuted back and

8  forth to New Jersey every week for eight years.  Is that

9  your testimony?

10 A.     Yes, that's correct.

11 Q.     How long would it take you to get from your home

12 to the airport in Georgia?

13 A.     Approximately 45 minutes.

14 Q.     And then you go to the airport in Georgia, and you

15 fly into LaGuardia; is that correct?

16 A.     That is correct.

17 Q.     And how long does that flight take?

18 A.     Most times it takes two hours.

19 Q.     And then I guess for a lot of the time you were

20 coming from LaGuardia which is a New York airport in

21 Queens, correct?

22 A.     That is correct.

23 Q.     And you were commuting to Englewood Cliffs,

24 New Jersey; is that right?

25 A.     That is correct.

EVIDENTIARY HEARING

186

1  Q.    And how long would that take, sir?

2  A.    It's only 12 miles from LaGuardia Airport to

3  Englewood Cliffs.

4  Q.    I understand it's 12 miles, but that can be a

5  really long commute.

6  A.    Actually in the morning on Monday mornings, I'm

7  going reverse traffic way.  Most people are coming into

8  the city; I'm going out.  I make it, you know, in under

9  30 minutes.

10  Q.    How about when you're going back on Thursday?

11  A.    Going back to New York?

12  Q.    Well, when you're going from Englewood Cliffs,

13  New Jersey, where you work there, and you're going to

14  LaGuardia, how long would that take on a Thursday evening

15  before you flew back to Georgia?

16  A.    It depends on the time of day, but usually if I'm

17  leaving -- I usually leave in the evening.  Take me

18  anywhere from 30 minutes to 40 minutes.

19  Q.    Did it ever take longer than that?

20  A.    There's been occasions where it's taken longer,

21  yes.

22  Q.    Now, in your declaration you state that "The

23  principal technical, marketing, and sales documentation

24  relating to CNBC Podcasts is located primarily in

25  Englewood Cliffs, New Jersey"; is that correct?

1  A.      That is correct.

2  Q.      Where else are documents located?

3  A.      Documents for the podcasts?

4  Q.      Any -- yes, relating to the CNBC podcasts, are

5  there technical, marketing, or sales documents that

6  reside outside of Englewood Cliffs, New Jersey?

7  A.      Englewood Cliffs, New Jersey, and maybe New York,

8  too.

9  Q.      Not in Los Angeles?

10 A.      Not to my knowledge.

11 Q.      Now, the system at CNBC for documents, it allows

12 you to download or upload them from anywhere; is that

13 correct?

14 A.      Yeah.  We use a wiki that lets you upload and

15 download information.

16 Q.      And in fact you've worked on those documents from

17 your home in Georgia, correct?

18 A.      Occasionally I work in Georgia, yes.

19 Q.      And you fly more than 50,000 miles a year, sir?

20 A.      Yes.

21         MR. PITCOCK:  Your Honor, at this time I'd

22 like to again move into admission this witness'

23 declaration.

24         THE COURT:  All right.  Any objection?

25         MR. LIEBERMAN:  I don't have an objection,

 1   your Honor.

 2                THE COURT:  All right.  What is the number?

 3                MR. PITCOCK:  It would be Exhibit No. P-4,

 4   your Honor.

 5                THE COURT:  All right.  P-4 is admitted.

 6   BY MR. PITCOCK:

 7   Q.    And do you have any knowledge of the location of

 8   any witnesses related to the prior art in this matter,

 9   sir?

10   A.    Excuse me?  Can you repeat that?

11   Q.    Well, you understand this is a patent case?

12   A.    Uh-huh.

13   Q.    And one of the things that people try to prove in

14   patent cases is that the technology was known before the

15   patent.  Do you understand that?

16   A.    Yes.

17   Q.    And do you have any knowledge of any relevant

18   personnel with respect to such prior technology?

19   A.    I -- could you repeat that again?  I just want to

20   make sure I understand the question.

21   Q.    Sure.  I used the legal term "prior art" which is

22   what's -- you know, prior technology related to the

23   podcasts.  Do you have any personal knowledge of the

24   location of any witnesses or documents with respect to

25   prior art?

1  A.     No, I don't.

2              MR. PITCOCK:  Nothing further at this time.

3              THE COURT:  All right.

4              MR. LIEBERMAN:  We have nothing further, your

5  Honor, and ask that the witness be excused.

6              THE COURT:  All right.  Thank you, sir.  You

7  may step down.  You are excused.

8              MR. LIEBERMAN:  NBC calls its next witness,

9  Mr. Ted McConville.

10             (Oath administered.)

11      DIRECT EXAMINATION OF EDWARD J. "TED" MCCONVILLE

12             CALLED ON BEHALF OF DEFENDANT NBC

13  BY MR. LIEBERMAN:

14  Q.     Please tell the court your name.

15  A.     Edward John McConville.

16  Q.     Are you known by any other name?

17  A.     I go by "Ted McConville."

18  Q.     And for whom do you work?

19  A.     NBCUniversal.

20  Q.     What's your current job title there?

21  A.     Director of video engineering.

22  Q.     For which part?

23  A.     For the News Digital.

24  Q.     And how long have you been the director of video

25  engineering?

1  A.      Since 2005.

2  Q.      Could you briefly describe your work experience in

3  the TV industry?

4  A.      Yes.  I started out of high school working at a TV

5  station.  I was actually working in scenery.  Then I was

6  on training course to become a cameraman and then after

7  that I moved into the technical side and that's when I

8  got my technical training in Australia.  Then I moved to

9  Canada.  I worked in television and film there.  In 1978

10  I moved to Los Angeles.  I worked for Complete --

11          THE REPORTER:  "Complete" -- I'm sorry?  I'm

12  having a hard time hearing you.

13          THE WITNESS:  I'm sorry.

14          THE REPORTER:  You moved to Los Angeles and

15  worked for whom?

16          THE WITNESS:  Complete Post.

17          THE REPORTER:  Complete Post.  Thank you.

18  BY MR. LIEBERMAN:

19  Q.      Please continue.

20  A.      And I worked for them for 15 years as an

21  engineering manager.  Our work there was primarily on

22  situation comedies, film transfers, and commercials.

23          In 1995 I was recruited to Microsoft to work

24  on their interactive television properties, and a year

25  into that I was asked to transfer as an employee on loan

1  to the msnbc.com joint venture.

2  Q.    And has there been a period of time in your career

3  where you've worked on the issue of getting video into

4  media Web sites?

5  A.    Yes, it has.

6  Q.    And for how long have you been working in that

7  area?

8  A.    Since I started with the msnbc.com joint venture.

9  Q.    What is your current residence address?

10 A.    I live in Kirkland, Washington.

11 Q.    Do you have any plans for moving?

12 A.    I am.  I'm relocating to New York City on

13 March 16th.

14 Q.    And why are you moving to New York?

15 A.    I was advised when Microsoft sold out of the joint

16 venture, somewhere around May of 2012, that my job would

17 be relocated to New York.

18 Q.    And have there been some delays in making the move

19 over the last couple of months?

20 A.    Yes.  Yes, sir, there have been.

21 Q.    But the delays are now done and --

22 A.    The delays are finally over, yes; and I received a

23 move date.

24 Q.    Boxes packed?

25 A.    Boxes are packed as we speak.

1  Q.    Is it just you who is being moved to New York from

2  Washington?

3  A.    No.  My fiancée is moving with me.

4  Q.    I was actually thinking more about the people on

5  your team, but that's good to know too.

6  A.    Well, she's the most important.

7  Q.    Okay.  Fair enough.

8  A.    Yes.  One other person on my team is also being

9  moved to New York.

10  Q.    And who is that person?

11  A.    That's Simon church.

12  Q.    And when will Mr. Church be moving to New York?

13  A.    He is scheduled to move in August of this year.

14  Q.    Now, have you traveled to New York often for your

15  work?

16  A.    I have.

17  Q.    Approximately how many times?

18  A.    Three times a year.

19  Q.    And who was on your team at NBC News Digital?

20  A.    I have five people on my team.

21  Q.    Who were they?

22  A.    I have Simon Church, Kevin Crumley, Bill Geer,

23  Brian Zimmer, and as of today Kenny Chin.

24  Q.    And where are those team members located?

25  A.    Brian Zimmer and Kenny Chin are located at

EVIDENTIARY HEARING

193

 1  30 Rock.

 2  Q.    30 Rock, for the court, is --

 3  A.    Sorry.  I'm sorry.  Rockefeller Center in

 4  New York.

 5  Q.    And where are the others?

 6  A.    The others are located in Seattle, Washington.

 7  Q.    I think you mentioned Mr. Church is going to be

 8  relocating?

 9  A.    That is correct.

10  Q.    And where will he be relocating to?

11  A.    He'll be relocating to 30 Rock, to New York City.

12  Q.    Who do you report to?

13  A.    Currently I report to Greg Carter in New York.

14  Q.    Who did you report to until last week?

15  A.    Marcus Saxton in New York.

16  Q.    I'm going to ask you to direct your attention to

17  Exhibit D-6 which is in your binder.  And please turn

18  your attention to pages 6 and 7 of this document.  These

19  are plaintiff's infringement contentions.

20        Do you see on pages 6 and 7 there are a number

21  of episodes from NBC News?

22  A.    I do.

23  Q.    Do you have a role with respect to the NBC News

24  shows identified in pages 6 and 7 of these infringement

25  contentions in Exhibit D-6?

1  A.     Yes.  On some of these shows, me and my team are

2  involved in it.

3  Q.     And describe the role that -- withdrawn.

4         Describe what you and your team do with

5  respect to these shows.

6  A.     So, we provide the technology that converts the

7  files that are necessary to get up on the Web for these

8  particular shows.

9  Q.     And let's break that down a little bit.  Describe

10  for the court the process of taking an NBC News show and

11  publishing it over the Internet.

12  A.     So, it starts off with a system called "Avid" in

13  New York.  That records a show, for example, *Nightly*

14  *News*.  Once that show is started, an editorial person

15  will then be able to view that on an editing client

16  machine and break the show down into individual segments.

17  When they have finished making an individual segment,

18  that then -- that drops a file into my team's world and

19  that triggers our production systems to then produce

20  files -- four different types of files that are necessary

21  to go up on the Web so that the video can be shown on the

22  Web.

23  Q.     And where does the -- after the *Nightly News*, or

24  whatever the show, goes on the air, where does the

25  recording onto the digital editing system take place?

EVIDENTIARY HEARING

195

1  A.      That takes place in New York.

2  Q.      And where does the use of the Avid system take

3  place?

4  A.      That is in New York.

5  Q.      And where is the output file produced?

6  A.      In New York.

7  Q.      And where is it sent?

8  A.      It's sent to what's called a "content delivery

9  network," a CDN; and we upload into an entry point in

10 New York.

11 Q.      And when the final formats are ready, how -- and

12 here I'm interested in geographically -- sort of how and

13 where are the files uploaded onto the Web?

14 A.      We upload them into an entry point into the

15 content delivery network in New York.  The entry points

16 all use airline -- airport designations.  So, LGA is

17 where we upload them.  I do not know where they go after

18 that within the distribution system.

19 Q.      Do any of these steps that you've described for

20 the court take place in Texas?

21 A.      No.

22 Q.      Are there any people in Texas who are

23 knowledgeable about these steps with respect to the NBC

24 News episodes?

25 A.      No, there are not.

1  Q.    Who is the most knowledgeable person at NBC -- or

2  who are the most knowledgeable people at NBC about the

3  systems for making TV episodes listed on pages 6 and 7

4  with respect to NBC News available over the Internet?

5  A.    So, with regard to the shows on pages 6 and 7 that

6  are strictly -- come under the news division, I would say

7  Stokes Young who is in New York; Eric Zuckerman who is in

8  New York; and on the technical side is with the player,

9  Hayley Lawrence who is in Seattle.

10  Q.    And who is the most knowledgeable regarding the

11  process for the msnbc shows?

12  A.    That would be Sam Go and Hayley Lawrence.

13  Q.    Okay.  Where is Mr. Go?

14  A.    Ms. Go.

15  Q.    Ms. Go.

16  A.    Ms. Go is in New York City.

17  Q.    Please direct your attention to pages 18 and 19 of

18  Exhibit 6, the infringement contentions.

19        Do you have a role with respect to any of the

20  podcasts identified on pages 18 to 19 of the infringement

21  contentions?

22  A.    The only podcast that I am aware of that we have

23  an association with is *ZeitGeist*.

24  Q.    And what steps are performed with respect to

25  making *ZeitGeist* podcasts available on the Internet, and

1  who does those steps?

2  A.    So, very similar to the video, the material is

3  ingested into an Avid editing system.  The start and stop

4  points of the show are selected by a production editor.

5  A file drops into my world.  And in the case of

6  *ZeitGeist,* I have a process that determines that that is

7  a podcast and that a new what we call an "RSS file" has

8  to be created and my process automatically triggers,

9  makes that file, and pushes it up onto the Web.

10 Q.    Who developed the software that does that?

11 A.    I developed that software that makes the RSS file.

12 Q.    And were you in Texas when you developed that

13 software?

14 A.    No.  I was in Redmond, Washington.

15 Q.    Where is the software located for getting the NBC

16 News podcasts up on the Internet?

17 A.    That's stored at Rockefeller Center in New York.

18 Q.    And who is the most knowledgeable person at NBC

19 about how the podcast system works?

20 A.    That would be myself and David Britt-Friedman.

21 Q.    Where are the documents and the systems located

22 for making NBC News shows available online?

23 A.    That's in New York at Rockefeller Center.

24 Q.    And where is the -- withdrawn.

25        Where is the source code located?

1  A.     The source code is stored on servers in New York

2  City.

3  Q.     And do you know who has knowledge about ad sales

4  or revenue in connection with the NBC News videos?

5  A.     I do not know.

6  Q.     Where is David Britt-Friedman?  Where does he work

7  out of?

8  A.     He works out of New York, Rockefeller Center.

9  Q.     Is there anybody at NBC in Texas who is

10 knowledgeable about the technology used to put NBC News

11 podcasts and TV episodes -- and the TV episodes we

12 discussed up on the Internet?

13 A.     There is not.

14        MR. LIEBERMAN:  I pass the witness, your

15 Honor.

16    CROSS-EXAMINATION OF EDWARD J. "TED" MCCONVILLE

17 BY MR. PITCOCK:

18 Q.     So, when you developed the podcast, you were in

19 Redmond, Washington?

20 A.     That is correct.

21 Q.     And you've lived in Kirkland, Washington, since

22 the -- since April of 2013 at least.  I guess for much

23 longer than that; is that correct?

24 A.     I've lived in Kirkland since 1998.

25 Q.     And your team currently has three people who live

EVIDENTIARY HEARING

199

1  and work in Seattle?

2  A.     That is correct.

3  Q.     And you mentioned that you travel extensively to

4  New York; is that correct?

5  A.     I wouldn't call it "extensive."  Three times a

6  year approximately.

7  Q.     So, it would be incorrect to say that you travel

8  extensively to New York?

9  A.     Yes.

10  Q.     Do you recall submitting a declaration in this

11  case?

12  A.     Yes.

13  Q.     Do you see paragraph 7, sir?

14  A.     I do.

15  Q.     It says, "While I currently reside in Redmond,

16  Washington, I travel to New York City extensively for

17  work"?

18  A.     It's --

19  Q.     Do you see that, sir?

20  A.     Yes, I do see it.

21  Q.     Do you remember putting that in your declaration?

22  A.     It seems extensive to me.

23  Q.     So, it seems extensive to you now?

24  A.     Traveling seems extensive to me, yes, sir.

25  Q.     All right.  But it didn't a few minutes ago.

1          MR. LIEBERMAN:  Objection, your Honor.

2   Argumentative.

3          THE COURT:  I'll overrule the objection.

4   BY MR. PITCOCK:

5   Q.     You can answer.  Did it seem extensive to you a

6   few minutes ago when you were answering my question,

7   travel to New York?

8   A.     Any travel seems extensive to me.

9   Q.     So, one trip to New York City, that would be

10  extensive travel?

11  A.     No, one is not extensive.

12  Q.     Now, you mentioned a -- I guess what I'll call

13  "video processing" or "editing system" in New York --

14  A.     Uh-huh.

15  Q.     -- called "Avid"; is that correct?

16  A.     Correct.

17  Q.     Now, did NBC develop that program?

18  A.     No.  That's manufactured by a company called

19  "Avid."

20  Q.     Manufactured by a company called "Avid"?

21  A.     Yes.

22  Q.     And where is that company located?

23  A.     I believe they're in Massachusetts.

24  Q.     And does -- do any of the products you're

25  responsible for use thePlatform?

1  A.    Yes, we do.

2  Q.    Okay.  So, all the video products for CNBC, they

3  use thePlatform; is that correct?

4  A.    I don't know about CNBC.

5  Q.    I'm sorry.  NBC News.  I apologize, sir.  Over the

6  Web, I should say.

7  A.    Yes.  We are migrating to thePlatform.  I don't

8  know how extensive that is at this time.

9  Q.    And they're located in Seattle, Washington?

10  A.    They are in Seattle.

11  Q.    Do you know any employees in Seattle?

12  A.    I have only met one or two employees in meetings.

13  I do not know them directly.

14  Q.    Now, your deposition in this case took place in

15  Seattle, Washington; is that correct?

16  A.    That is correct.

17  Q.    Now, during your deposition do you remember

18  identifying Mr. Locke as potentially having relevant

19  information?

20  A.    I do.

21  Q.    And he resides in Washington State?

22  A.    He does.

23  Q.    Now, are you able to access relevant documents for

24  your work at your home in Washington?

25  A.    I can with the right credentials, yes.

1 Q.     Who is your -- I'm sorry.  Strike that.

2         You testified about content delivery networks.

3 Which content delivery networks do you use?

4 A.     We use Akamai and another company called

5 "Limelight Networks."

6 Q.     And when you say "content delivery network,"

7 they're -- after you edit the video with the Avid process

8 developed by that company, you then upload the video and

9 does -- is thePlatform used for managing that content?

10 A.     Yes, they are.

11 Q.     Okay.  And then after thePlatform is used for

12 managing the content, then it's distributed by a content

13 distribution network, CDN?

14 A.     That is correct.

15 Q.     And, so, is your understanding that those servers

16 are located throughout the United States so that anybody

17 who wants to see a relevant video doesn't have to wait

18 for it to come from New York?

19 A.     I understand they are worldwide, yes.

20 Q.     Okay.  So, would it be your understanding that

21 this content, if somebody were to access it from the

22 Eastern District of Texas, is probably coming from a

23 server in Texas?

24 A.     I don't know that for sure.  I'm led to believe

25 that that is how the system would work.

203

1 Q.    Well, given your technical expertise, wouldn't you

2 want to reduce the lag time between a request for video

3 and actually displaying it on the computer screen?

4 A.    Correct.

5 Q.    So, you'd want that server as close geographically

6 to the user as possible.  Is that your understanding?

7 A.    I'd want a server that works connected to the

8 user.  It doesn't necessarily mean it has to be right

9 next-door to them.  A server farm right next-door to them

10 could be overloaded with users.  So, I would want them to

11 go somewhere else where they could be served.

12 Q.    So, who are the most relevant witnesses at the

13 content delivery networks?

14 A.    I don't know.  I only deal with sales --

15 occasionally a salesperson.

16 Q.    And do you know where their documents would be

17 located?

18 A.    No, I do not.

19 Q.    And do you know who the most relevant people would

20 be at the -- strike that.

21       Do you know who the most relevant witnesses

22 would be at thePlatform?

23 A.    No, I don't.

24 Q.    Do you know where their documents would be

25 located?

1  A.     I do not know.

2  Q.     Now, for their software, do you think that they

3  have copies of the source code?

4  A.     Which source code?

5  Q.     Well, for the -- that's a good question.

6         So, you use their software to provide a

7  platform for services; is that correct?

8  A.     That is correct.

9  Q.     And I understand it's modified; but that original

10 source code was developed by them and presumably in

11 Seattle, Washington?

12 A.     I don't know where it was developed.

13        THE COURT:  Mr. Pitcock, we're going to take a

14 recess here.  I've got a criminal matter to take up at

15 3:00 which won't take too long, but if you could just --

16 everybody can keep their stuff where it is.  If you could

17 just make the podium clear.

18        MR. PITCOCK:  Yes, your Honor.  No problem.

19        THE COURT:  And we'll take back up here at

20 about 3:15.

21        MR. PITCOCK:  No problem.

22        THE COURT:  Take a brief recess while we

23 gather the criminal case in.

24        (Recess, 3:01 p.m. to 3:24 p.m.)

25        THE COURT:  Mr. McConville, if you would come

1  back up on the stand.  Thank you.

2         And, Mr. Pitcock, you have the witness.

3         MR. PITCOCK:  Yes, your Honor.

4  BY MR. PITCOCK:

5  Q.    So, earlier in your testimony you were talking

6  about thePlatform.

7  A.    Yes.

8  Q.    Do you recall that?

9  A.    (Moving head up and down.)

10 Q.    So, you stated that they had two different

11 products, the MPX and the PDK; is that correct?

12 A.    I don't believe I mentioned that.

13        MR. LIEBERMAN:  That was another witness, your

14 Honor.

15        MR. PITCOCK:  Sorry.

16        THE COURT:  All right.  Well, I think the

17 witness cleared it up.  Go ahead.

18 BY MR. PITCOCK:

19 Q.    Are you aware of those two --

20 A.    I am aware of it.

21 Q.    Okay.  And what does the MPX do?

22 A.    I believe the MPX is the -- is the video content

23 management system, and I believe the PDK refers to the

24 player.

25 Q.    And what do you have to do to a video file in

1  order to get it to work with MPX?

2  A.     I don't know that.

3  Q.     Okay.  When we say "video content management

4  system," would that piece of the software be responsible

5  for taking an uploaded file and converting it into

6  various Web formats for viewing?

7  A.     It's possible.  I don't use it that way.

8  Q.     How do you use it?

9  A.     I don't use it directly.

10 Q.     Oh, you don't use it.  I'm sorry.

11 A.     I don't use it directly, no.

12 Q.     Okay.  And some of the NBC News podcasts are

13 produced in Redmond, Washington; is that correct?

14 A.     No, that's not correct.  The podcasts are all --

15 any podcasts are produced in New York.

16 Q.     None are produced in Washington, DC?

17 A.     No.  There are no staff there to produce them.

18 Q.     I'm going to show you your declaration.  It

19 says -- you see paragraph 4 there, sir?

20 A.     Yes.

21 Q.     The second sentence says, "Some of the NBC News

22 Podcasts are produced in Redmond, Washington"?

23 A.     At the time that would have been correct.

24 Q.     So, at the time you filed your declaration.

25 A.     Yes, that is correct.

1  Q.     Okay.  So, since the time of the filing of the

2  motion to transfer, podcasts that were produced in

3  Redmond, Washington, have been moved to New York City?

4  A.     That is correct.

5  Q.     And some of the podcasts that were produced in

6  Washington, DC, have now been moved to New York City?

7  A.     Correct.

8  Q.     And some of the podcasts that were produced in

9  London, England, have now been moved to New York City?

10  A.     I believe whatever was done in London is not done

11  anymore.

12  Q.     I guess would any relevant documents have been

13  moved from Washington State or Washington, DC, to

14  New York City?

15  A.     Yes, at some stage they would have.

16          MR. PITCOCK:  Nothing further at this time,

17  your Honor.

18          THE COURT:  All right.

19    REDIRECT EXAMINATION OF EDWARD J. "TED" MCCONVILLE

20  BY MR. LIEBERMAN:

21  Q.     Mr. McConville, the documents that were moved from

22  Washington State to New York City, were they moved so

23  that NBC could argue there were fewer documents in

24  Washington than there were in New York for the purpose of

25  this transfer motion?

1          MR. PITCOCK:  Objection --

2  A.    No.

3          MR. PITCOCK:  -- lacks foundation.

4          THE COURT:  Could you ask him how he knows?

5          MR. LIEBERMAN:  Sure.

6  BY MR. LIEBERMAN:

7  Q.    Why were the documents moved?

8  A.    The documents were moved as part of NBC winding

9  down the production side in Redmond, Washington, and

10  moving it all to New York.

11  Q.    And were you one of the people who made decisions

12  regarding moving the documents?

13  A.    The documents that pertained to what I did, yes.

14  Q.    And was one of your reasons for moving the

15  documents to make a transfer motion to New York more

16  attractive than it had been before?

17  A.    No, it wasn't.

18  Q.    Thank you.  Now, Mr. Pitcock berated you on

19  cross-examination about the word "extensive."  Do you

20  recall that?

21  A.    I do.

22          THE COURT:  I must say, for anyone reviewing

23  the record, that was the most gentle berating I have

24  heard, if in fact that's what it was.  But anyway, go

25  ahead.

1  BY MR. LIEBERMAN:

2  Q.    Let me rephrase my question.

3         Mr. Pitcock gently berated you with respect to

4  the use of the "extensive."  On your direct testimony do

5  you recall you talked about having traveled to New York

6  about three or four times a year, I think?

7  A.    That's correct.

8  Q.    If you could look at paragraph 7 of your

9  declaration.

10        MR. LIEBERMAN:  Your Honor, may I approach the

11  witness and give him a copy of his declaration?

12        THE COURT:  Certainly.

13  BY MR. LIEBERMAN:

14  Q.    If you could look, please, at paragraph 7, the

15  same sentence that has the word "extensive" in it -- or

16  "extensively" in it.  In a portion of the sentence that

17  Mr. Pitcock didn't read to you, did you say anything

18  about how many times you had traveled to New York in

19  2013?

20  A.    I'm sorry.  Could you ask that again?

21  Q.    Did you say anything in that sentence with the

22  word "extensively" about how many times you had traveled

23  to New York that year?

24  A.    I'm sorry.  I'm not following you.

25  Q.    Look at paragraph 7 of your declaration.

1  A.      Right.

2  Q.      The third line down.

3  A.      Yes.

4  Q.      In the same sentence with the word "extensively,"

5  do you say how many times you had traveled to New York

6  that year?

7  A.      Yes.

8  Q.      How many times did you say you had traveled to

9  New York that year?

10  A.      Three times.

11  Q.      And was that the same number that you testified to

12  on direct examination?

13  A.      Yes.

14  Q.      By the way, when you travel to New York on

15  business, how long would you typically stay each time?

16  A.      Generally two weeks.

17  Q.      Now, Mr. Pitcock asked you questions about certain

18  Akamai and Limelight servers and are they all over the

19  place.  Do you remember that?

20  A.      Yes.

21  Q.      Just to be clear, the servers we're talking about

22  are not NBC servers.  They belong to either Akamai or

23  Limelight or some other content management provider,

24  correct?

25  A.      That is correct.

1  Q.    And these Akamai and Limelight servers, they would

2  also be used by -- could you estimate what percentage of

3  Fortune 100 companies in the United States?

4        MR. PITCOCK:  Objection to form.  Lacks

5  foundation.

6        THE COURT:  Well, I'll allow him to answer the

7  question if he can.

8  A.    I'm sorry.  I don't know.  A lot.  I know that.

9  BY MR. LIEBERMAN:

10 Q.    Akamai and Limelight servers are regularly used to

11 disseminate content by most large media companies?

12 A.    Yes.

13 Q.    Mr. Pitcock asked you certain questions

14 regarding...

15        MR. LIEBERMAN:  I have no further questions,

16 your Honor.

17        THE COURT:  Okay.

18        MR. PITCOCK:  I just have a couple, your

19 Honor, within the scope of his redirect.

20        THE COURT:  If they deal with new matter on

21 redirect, you may ask.

22   RECROSS-EXAMINATION OF EDWARD J. "TED" MCCONVILLE

23 BY MR. PITCOCK:

24 Q.    The sentence in your declaration, if you look at

25 paragraph 7, it says actually "Since the beginning of

1  this year I have travelled to New York City for business

2  on three separate occasions."  Do you see that?

3  A.     Yes.

4  Q.     And that was signed on the 27th day of June, 2013?

5  A.     Correct.

6  Q.     And, so, that was approximately half the year; is

7  that correct?

8  A.     Yes.

9  Q.     And you don't think you were implying that you'd

10 visit New York City more than three times over the course

11 of the calendar year?

12 A.     Of this year?

13 Q.     Yes.

14 A.     Probably not because of the fact that we were

15 building our new facility in Seattle.

16 Q.     And Mr. Lieberman said you stayed for two weeks at

17 a time when you visited New York City?

18 A.     On this particular occasion probably one week, but

19 typically, in the past, two weeks.

20          MR. PITCOCK:  Nothing further.

21          THE COURT:  All right.  Thank you,

22 Mr. McConville.  You may step down, and you're free to

23 go.

24          THE WITNESS:  Thank you, your Honor.

25          MR. LIEBERMAN:   NBC has no further witnesses,

1  your Honor.

2          THE COURT:  All right.  Thank you,

3  Mr. Lieberman.

4          MR. WARD:  Your Honor, we don't have any

5  further witnesses.  There are a couple of facts that we'd

6  like the court to take judicial notice of.

7          THE COURT:  Well, I tell you what.  Why don't

8  I let Mr. Lieberman make his remarks, and I'll let you

9  point those out after he does.  And you can respond.

10          MR. WARD:  Perfect.

11          MR. LIEBERMAN:  Thank you, your Honor.

12          Your Honor, an appropriate touchstone for the

13  analysis in this case I would suggest is precisely what

14  this court did about a year ago in the *Scott Clare versus*

15  *Chrysler Group* case.  In that case the court transferred

16  the case to the Eastern District of Michigan.  The first

17  thing the court did in its analysis was hold, we believe

18  correctly, that -- and this is quoting the court's

19  language at page 146 of the hearing transcript -- "the

20  facts are to be viewed as of the time of filing of the

21  lawsuit," citing the recent *EMC* case from the Federal

22  Circuit.

23          And here the temporal issue is of particular

24  significance with respect to Personal Audio's contacts

25  and contacts in Texas.  It's I think less significant

1 with respect to NBC and CBS, although, you know, there

2 may be some significance there.

3        It's undisputed, based on Mr. Liddle's

4 admissions, that at the time of the filing of the lawsuit

5 Personal Audio had no office of any kind in the Eastern

6 District of Texas.  It only had a mailbox.  And I won't

7 go any further into the way Personal Audio represented

8 that it -- what it said about that mailbox.  Mr. Liddle

9 has admitted that its phone number was not answered in

10 the Eastern District of Texas before the filing of the

11 lawsuit -- in fact, it was not answered in the Eastern

12 District of Texas anytime before the transfer motion --

13 that it rolled over to Mr. Baker in Massachusetts.

14        There was one employee that Personal Audio had

15 in the Eastern District of Texas, and that was Mr. Liddle

16 who was hired 12 days before the time the lawsuit was

17 filed.  And I think it can be reasonably concluded that

18 at the time Mr. Liddle was hired, Personal Audio

19 anticipated a new round of litigation with additional

20 entities.  Indeed it had just filed litigation against

21 entities other than NBC and CBS.

22        Let's look at the way Personal Audio is

23 organized.  The general counsel and now the CEO of

24 Personal Audio was someone who was a second-year

25 associate at a law firm in Houston with no training that

1   would have given him expertise to be general counsel of a

2   company or the CEO of the company, but in fact he doesn't

3   appear to make the decisions.  Before the lawsuit was

4   filed, he spoke with Mr. Baker about whether to file the

5   lawsuit.  Mr. Baker is in Massachusetts.  And he reports

6   every few weeks to Mr. Logan who is in New Hampshire.

7   The company is run out of New Hampshire or run out of

8   Massachusetts.  It is not run out of Texas.

9           The original documents which Personal Audio

10  has referred to in this case, the evidence today revealed

11  that those documents were moved into the Eastern District

12  of Texas from the Robins Kaplan offices in Minneapolis,

13  Minnesota, by litigation counsel or at the request of

14  litigation counsel two days before Personal Audio sued

15  Apple.  That is precisely the sort of activity that the

16  Federal Circuit says should be disregarded.  And here I

17  would cite both the *Zimmer* and the *Hoffmann-LaRoche*

18  cases.

19          There's also a patina here of what looks to me

20  to be an effort to create a misleading record with regard

21  to Personal Audio's contacts with the Eastern District of

22  Texas, and that's found in three things.  It's found in

23  the representation to this court -- and by the way, to

24  other courts as well -- that Personal Audio's principal

25  place of business was Suite 180 at that 3827 Phelan

1  Boulevard address when it was -- there was no suite,

2  there was no room.  There were no activities going on

3  there.  It was a mailbox.  And the language was used in

4  the declaration and in other litigation documents filed

5  by Personal Audio leaving the impression that this was an

6  active office.  For example, the language in the Rule

7  3-2(b) disclosure or 3-2(c) disclosures which said that

8  the prosecution history documents could be examined at

9  the Personal Audio facility at Suite 180 and it obviously

10  could not.

11          There was also in the declaration a reference

12  to the phone number with the Beaumont area code.  The

13  clear intent of that language was to suggest to the court

14  that the phones were being answered in Beaumont, there

15  were people working on this in Beaumont.  They weren't.

16          At the time of this lawsuit, Personal Audio

17  had nobody in the Eastern District of Texas.  They had

18  nobody in Texas.  They had no office in the Eastern

19  District of Texas, and the only employee they had had

20  been hired 12 days before.  These are just the types of

21  reasons that the federal -- that the Federal Circuit has

22  said are entitled to no weight.  Again, the *Zimmer* case,

23  *Hoffmann-LaRoche*, and the *Microsoft* case.

24          Looking at the other side of the equation, the

25  NBC and the CBS context, I would start with the language

1  that this court used in the *Scott Clare* case at page 147

2  of the transcript.  Open quote, I start from the

3  presumption that's been set out by the Federal Circuit

4  that the headquarters or base of the alleged infringing

5  party will be the source of most of the proof, end quote.

6  And that's what the evidence here has shown.

7        Let me start with the NBC evidence.  NBC has

8  presented testimony from three witnesses who explained

9  their degree of knowledge, why they were knowledgeable,

10  who was on their team.  Virtually all of the people at

11  NBC with knowledge regarding the podcasts and the

12  episodes that were accused of infringement are

13  headquartered in New York.  They work out of New York or

14  out of Englewood Cliffs, New Jersey, which is 10, 15

15  minutes away.  There are some technical aspects in the

16  State of Washington; but when you're dealing with a

17  company that has 30,000 employees, it would be surprising

18  if you didn't have some employees who were located in

19  other parts of the country.  And if there were a general

20  rule that if you have employees located in different

21  parts of the country, that defeats a motion for transfer.

22  No motion for transfer would ever be granted.  That, I

23  submit, is not the law.

24        With respect to CBS, for CBS Showtime which

25  constitutes, I believe, just over half of the shows that

1  have been accused by Personal Audio, Seana Baruth's

2  testimony went in completely unrebutted that literally

3  everybody with knowledge of the relevant technology was

4  located in New York.

5         With respect to CBS Radio, the testimony was

6  that most of the key witnesses and the third-party

7  entities that provide technology are in New York and

8  New Jersey.  For cbs.com the testimony is a little less

9  unilateral.  There's considerable technological --

10  presence of technological witnesses in the northern part

11  of California, although there was testimony that there

12  are a significant number of technological witnesses in

13  New York as well.  The testimony is that all the

14  business, the metrics, all of that is done in New York

15  for cbs.com.

16         For the sports podcasts, we have a

17  concentration of witnesses in a number of different

18  places but including Florida.  I would point out to the

19  court that when you're talking about how much of the case

20  really is podcasts, the revenue from the podcasts in this

21  case are going to be a minuscule portion of the total

22  accused revenue in this case.  You're talking about low,

23  single-digit percentage.  So, that's going to be a very,

24  very small part of the case.  And Florida is not Texas.

25         What we have is a stunning, striking,

1   startling absence of any witness with material knowledge

2   in the State of Texas much less the Eastern District of

3   Texas.  The best Personal Audio has been able to come up

4   with is 1 of 38 members of Mr. O'Keefe's team, an

5   administrative person whose responsibility principally

6   consists of scheduling meetings and taking notes.

7           We have here the identification of -- for

8   CBS -- identification for CBS of important third-party

9   witnesses Synergy and Harris who are located in New York

10  and New Jersey.  That's something that this court has

11  held is quite important.  We also have, as this court

12  pointed out in the *Scott Clare* case, a nonparty witness

13  who neither side can compel to testify, an inventor of

14  this patent who your Honor can attribute whatever weight

15  your Honor wishes to the testimony as to -- I'm sorry.

16  Let me take a step back.

17          Mr. Goessling, one of the inventors, is in the

18  State of Massachusetts.  Mr. Goessling was characterized

19  by Apple as having testified in the *Apple* case that he

20  believed that the patent was invalid.  Mr. Goessling is

21  obviously somebody that we were very interested in, and

22  we'd like to have Mr. Goessling testify at trial.  He

23  apparently has no connection to Personal Audio.  It is

24  certainly going to be a lot easier to get Mr. Goessling

25  to testify in New York if he lives in Massachusetts than

1   it will be to get him down to Texas to testify.  And he

2   can be a very important witness for NBC and CBS.

3          In terms of the convenience and the cost of

4   attendance for willing witnesses, which this court has

5   said is important in the *Scott Clare* case and the Federal

6   Circuit said it's important, for NBC virtually all of the

7   relevant witnesses are in New York and New Jersey.  Maybe

8   there were a few in Washington State.  There's nobody in

9   Texas or near Texas.  For CBS, again you've got New York

10  and New Jersey.  You've got some in California.  You've

11  got some in Florida.  You've got none in Texas.

12         Plaintiff's own witness in their 26(a)(1)

13  disclosures -- they listed four witnesses.  Two of them

14  are in New England, Mr. Logan in New Hampshire,

15  Mr. Baker -- Mr. Logan in New Hampshire, Mr. Call in

16  North Carolina.  Mr. Baker is the vice-president of

17  licensing who is the senior to Mr. Liddle in terms of

18  experience; he's in Massachusetts.  Personal Audio's own

19  witnesses, except Mr. Liddle, would have to travel

20  extensively for the case to proceed in Texas.  And the

21  fact that they consent or may consent to testifying in

22  Texas is entitled to no significance.  If a plaintiff

23  could simply say, "My witnesses all consent to come and

24  testify in Texas," nobody would ever get a case

25  transferred.  That's not the law.

1          Will Mr. Brad Liddle be a key witness at the

2   trial of this action?  I don't think that anybody

3   believes that Mr. Liddle is going to be a key witness in

4   this case.  I know your Honor has tried scores and scores

5   of patent cases; and I suspect that your Honor has seen

6   very, very short testimony, if any testimony, from the

7   person in charge of licensing for the patentee.

8          Issues of judicial efficiency.  First, the

9   Federal Circuit and the *Vistaprint* and the *Verizon*

10  *Holdings* cases and Judge Love in the *Auto-Dimensions* case

11  has made very clear that just because there are other

12  cases that are pending in a particular district does not

13  mean that the judicial convenience factors trump the

14  other factors under 1404.  And here not only do you have

15  a transfer motion by NBC and a transfer motion by CBS,

16  you have a transfer motion by HowStuffWorks.  You have a

17  lawsuit filed by FOX.  It's the first filed action in the

18  District of Massachusetts, and the court in Massachusetts

19  is going to be deciding on March 4th whether that action

20  should be the one to proceed rather than the infringement

21  suit of the Personal Audio filed -- the second filed

22  action that they have filed here in Texas.  So, the --

23  even the judicial efficiency arguments, it's not at all

24  clear that they weigh in favor of Personal Audio.

25          The test here, the burden we have to meet, is

1  it substantially more convenient for this case to proceed

2  in New York.  I would suggest --

3          THE COURT:  I think it's actually "clearly

4  more convenient," is it not?

5          MR. LIEBERMAN:  I defer to your Honor.

6          THE COURT:  I hear it a lot but --

7          MR. LIEBERMAN:  Okay.

8          THE COURT:  Go ahead.

9          MR. LIEBERMAN:  The test is it clearly more

10  convenient than -- I feel very comfortable, your Honor,

11  as the evidence went in today; and we ask that the court

12  consider that evidence and as expeditiously as it can

13  grant the motion to transfer both the NBC and CBS cases

14  to the Southern District of New York.

15          Thank you, your Honor.

16          THE COURT:  All right.  Thank you,

17  Mr. Lieberman.

18          MR. WARD:  Your Honor, Johnny Ward for

19  Personal Audio.  If I could, I'll just respond to some of

20  Mr. Lieberman's remarks and in the course of that

21  response ask the court to take judicial notice of the

22  facts that we want to bring to the court's attention, if

23  that's okay.

24          THE COURT:  All right.

25          MR. WARD:  As the court is well aware, the

1  standard is it's clearly more convenient for the

2  defendants to have this case tried in New York versus the

3  Eastern District of Texas.  That is the test.  There's no

4  dispute that venue is proper here in the Eastern District

5  of Texas.  That argument has not been made by either

6  defendant.

7          There's no dispute that Personal Audio, LLC,

8  is a legitimate company formed under the laws of the

9  State of Texas, formed by the inventors of the

10  patents-in-suit for the purpose of monetizing its

11  intellectual property.  Personal Audio has been

12  litigating in this district since 2009 with the original

13  case filed, albeit on different patents, in Beaumont.

14  That case was tried to verdict where its patent was held

15  valid and infringed.  It was resolved while on appeal.

16  Personal Audio is a growing company.  There's no dispute

17  about that.  As much as the defendants dislike that fact,

18  it is a fact.

19          You heard from its general counsel, Mr. Brad

20  Liddle.  It's undisputed that they are paying him a

21  substantial salary, that his job functions are real, that

22  he is involved in the day-to-day management of litigation

23  and licensing of the patent involved in this lawsuit.  I

24  know some folks are very opposed to that business model,

25  but it's not been outlawed.  It is Personal Audio's

224

1  business model, and it doesn't make any apologies for it.

2  As long as companies are going to use Personal Audio's

3  property without its permission, it intends to pursue

4  those infringers via this company to have those companies

5  honor its intellectual property.

6          There's no dispute that Personal Audio has

7  millions of dollars in its bank account in Beaumont.  It

8  now has offices in Beaumont and Plano.  Mr. Liddle

9  resides in the Eastern District of Texas.

10          Now, interestingly, your Honor knows that this

11 case will involve issues of invalidity and numerous prior

12 art references.  At least according to the defendants'

13 disclosures, they intend to pursue those defenses; yet,

14 they didn't identify a single witness who would be --

15 that it would be more convenient to try this case in the

16 Southern District of New York than the Eastern District

17 of Texas.  And I think the reason they did that is

18 obvious.  Had they had a witness, they certainly would

19 have brought it to the court's attention.

20          I do want to respond to Mr. Lieberman's

21 comments about Personal Audio creating a misleading

22 record.  Mr. Liddle's declaration is of course part of

23 Personal Audio's response.  It's clear that he says he's

24 the sole employee of Personal Audio with his office

25 located in Houston.  I think that the reference to a

1   suite is not accurate.  I think Mr. Liddle owned up to

2   that as being not accurate; and hindsight being 20/20, if

3   he had formed this company back when it was formed, that

4   wouldn't be the most accurate representation.  There is a

5   suite in Beaumont.  They were in the process of setting

6   up a suite.  To the extent that becomes important, I'd

7   point out that the depositions taken of Mr. Skaggs were

8   taken in that suite in Beaumont.

9          I also would call the court's attention to the

10  defendants' stated reason for filing this motion to

11  transfer venue.  In their briefing on page 5, they argue

12  to the court that "because these cases" -- this is the

13  first full sentence on the top of page 5 of their motion

14  to transfer venue -- "because these cases will involve

15  defenses based on the non-infringement of the '504

16  patent, trial of these cases are likely to involve

17  testimony from third-party and party witnesses located in

18  or near the Southern District of New York."  So, the

19  focus of the motion was on non-infringement.

20         However, listening through the testimony about

21  source code and documents, there has been nothing to tie

22  the location of documents relating to source code or any

23  of these other documents or servers to their defense of

24  non-infringement.  They talk about the location of

25  documents which are located on servers in New Jersey and

1  Seattle and California and Florida, but they have done

2  nothing to tell the court "This is why these documents

3  are relevant to our defense of non-infringement."  I

4  think that's a burden that they have to explain, why the

5  documents and why the witnesses are relevant; and I think

6  they have wholly failed to do that.

7         I'll start with NBC and work back to CBS.  NBC

8  proffered three witnesses, a Mr. Drake who supplied a

9  declaration who it turned out -- this fact was not

10 present in his declaration -- turned out he was a

11 resident of the state of Georgia.  And I'd request that

12 the court take judicial notice that there are six nonstop

13 flights from Atlanta to Shreveport each day on Delta and

14 that the mileage from the Shreveport airport to the

15 Marshall courthouse is approximately 35 miles.

16         THE COURT:  Well, I'll certainly take judicial

17 notice that there's regular air service between Atlanta

18 and Shreveport; and the distance between Shreveport and

19 Marshall is something that's easily determined.  So, I

20 don't have a problem with those.  As to whether it's six

21 or not, I'm --

22         MR. WARD:  I just pulled it up on Delta's

23 Web site.

24         THE COURT:  I understand that, but I won't go

25 that far with judicial notice.

1           MR. WARD:  There have been some folks who

2    weren't aware that there was an interstate running

3    through Marshall.  So, maybe you ought to take judicial

4    notice of the fact that I-20 runs through Marshall as

5    well.

6           Mr. McConville, another witness proffered by

7    NBC, has resided in Washington State.  He has been

8    planning on moving to New York since he supplied his

9    declaration back last year; but as we stand here today,

10   he still is a resident of Washington State.

11          These are two of the three witnesses that NBC

12   has brought to you saying they're going to be

13   inconvenienced by a trial in the Eastern District of

14   Texas and that it would be more convenient for them to

15   try the case in New York.

16          And then, of course, Mr. O'Keefe who obviously

17   is a resident of New York; but again I'd point out that

18   the documents that he identifies and the witnesses he

19   identifies with respect to how those witnesses and

20   documents play into their defense of non-infringement,

21   there was no explanation of that provided by NBC or any

22   witness.

23          With respect to CBS, again three witnesses.

24   And I kind of put them in three buckets.  You've got

25   Mr. Norlander who testified with respect to

1  CBSSports.com; Mr. Gervais who testified with respect to

2  cbs.com, the television shows that are hosted on the Web;

3  and then Ms. Baruth who testified with respect to

4  Showtime.

5          With respect to CBSSports.com, the court

6  learned through Mr. Norlander that it is headquartered in

7  Florida, that all the information that he gathered was

8  from an individual more knowledgeable than himself,

9  Mr. Aicker, A-I-C-K-E-R *[sic]*, who is also identified

10 in the defendants' disclosure who also resides in

11 Florida.

12         Mr. Gervais testified about a Mr. Randell,

13 with respect to the television shows, who works for CBS

14 Interactive.  He's more knowledgeable than Mr. Gervais.

15 He knew more about the Web sites.  Admittedly --

16 Mr. Gervais admitted these facts freely.  Mr. Randell

17 works in San Francisco which is also where CBS

18 Interactive is headquartered.

19         Ms. Baruth did testify about Showtime, and

20 the court can look at the infringement contentions that

21 are part of the record to determine what percentage of

22 the accused products are composed of Showtime

23 programming.  She had no knowledge of the location

24 of witnesses or documents relating to CBS or

25 CBSSports.com.

1             Ultimately, it appears that a CBS and NBC
2    transfer will not make this case more convenient except
3    for maybe Mr. Lieberman who is located in Washington, DC.
4    He will be traveling to New York to defend his clients.
5    It will not result in judicial economy.  You've got cases
6    now currently pending in the Eastern District of Texas.
7    If you grant this motion, then you have cases pending in
8    the Eastern District of Texas and there's a DJ action
9    pending in Massachusetts and then there are also cases
10   pending in New York and HowStuffWorks wants to move the
11   case to Georgia.  So, you've got multiple venues if you
12   follow the defendants' argument that this is going to
13   somehow streamline the cases and promote judicial economy
14   by granting this motion to transfer these cases to the
15   Southern District of New York.
16             As the defendants freely admit there are
17   relevant witnesses located all over the country,
18   witnesses of the parties.  We don't know about third
19   parties.  There's been no evidence with respect to third
20   parties in the defense of invalidity.
21             As the court is well aware -- you've seen a
22   number of patent cases both in this courtroom and in
23   Judge Gilstrap's courtroom.  They are typically battles
24   of the experts.  Just as this venue hearing has resulted
25   in depositions being taken all over the country, that's

1  what happens in patent cases.  Folks get deposed.

2  Experts testify; and there's typically one or two

3  corporate representatives and maybe a stray third party

4  that testifies with respect to invalidity.  Which brings

5  me to Mr. Goessling.

6          The defendants certainly made no attempt to go

7  depose him to find out what testimony he might have with

8  respect to the patent at issue in this case.  He

9  testified with respect to a different patent in the case

10  in Beaumont, and I think he's a red herring in the list

11  of folks that you ought to be considering for persons

12  with knowledge of relevant facts.

13          For those reasons we'd ask that the court deny

14  NBC and CBS's motions to transfer.

15          THE COURT:  I appreciate your arguments, and

16  of course I know that there are far more extensive

17  arguments already made in the briefs.  I will await any

18  response by the plaintiff to the brief memorandum that

19  has been filed by the defendants today, and I would

20  expect any response to be similarly briefed and focused

21  on the authorities cited.

22          MR. WARD:  And there may be no response; and

23  if we determine that before noon on Wednesday, we'll

24  certainly notify the court of that fact as well.

25          THE COURT:  All right.  In that case I will

231

1  take the matter under advisement and issue a ruling as

2  soon as practical.

3

4          (Proceedings adjourned, 4:02 p.m.)

5

6

7  COURT REPORTER'S CERTIFICATION

8          I HEREBY CERTIFY THAT ON THIS DATE,

9  FEBRUARY 28, 2014, THE FOREGOING IS A CORRECT TRANSCRIPT

10  FROM THE RECORD OF PROCEEDINGS.

11

12

13          /s/_____
            TONYA JACKSON, RPR-CRR
14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$13** [1] - 136:21
**$140,000** [1] - 128:22
**$15** [1] - 137:4
**$300** [1] - 114:17
**$75,000** [2] - 97:21, 98:7
**$80,000** [1] - 135:5

**'**

**'504** [15] - 104:10, 104:12, 105:7,
105:13, 105:23, 106:24, 107:25, 109:5,
129:6, 132:24, 134:21, 139:11, 140:8,
141:3, 225:15

**/**

**/s** [1] - 231:13

**0**

**06/23/09** [1] - 92:11

**1**

**1** [13] - 1:13, 91:14, 92:7, 101:7,
103:11, 103:17, 103:21, 105:14, 123:9,
129:4, 219:4
  **10** [20] - 5:14, 49:15, 49:24, 50:5, 67:6,
78:2, 136:20, 137:25, 138:5, 155:7,
155:10, 155:17, 155:21, 172:16,
175:10, 178:10, 178:19, 179:3, 181:22,
217:14
  **100** [1] - 211:3
  **10036** [1] - 1:25
  **101** [1] - 3:22
  **102** [1] - 5:8
  **10:55** [1] - 85:2
  **10th** [2] - 178:14, 181:22
  **11** [8] - 29:6, 50:5, 78:2, 155:17,
155:21, 155:25, 156:1, 156:4
  **110** [1] - 5:9
  **1127** [1] - 1:21
  **113** [1] - 2:6
  **114** [1] - 5:10
  **117** [1] - 5:11
  **119** [1] - 5:12
  **11:10** [1] - 85:2
  **12** [8] - 112:12, 156:1, 156:4, 176:4,
186:2, 186:4, 214:16, 216:20
  **122** [1] - 5:13
  **126** [1] - 3:23
  **12:01** [2] - 125:5
  **12th** [2] - 112:3, 138:2
  **12TH** [1] - 1:24
  **13** [11] - 3:6, 107:14, 137:5, 156:12,
156:13, 156:15, 156:25, 157:3, 157:8,
157:11, 182:20
  **135** [1] - 3:24
  **137** [1] - 5:14
  **14** [10] - 5:6, 88:15, 144:24, 157:8,

157:11, 157:17, 157:18, 177:6, 180:20,
180:21
  **1404** [1] - 221:14
  **142** [1] - 3:25
  **144** [1] - 4:3
  **146** [1] - 213:19
  **147** [2] - 5:15, 217:1
  **149** [1] - 5:16
  **14th** [2] - 103:6, 103:7
  **14TH** [1] - 2:11
  **15** [11] - 4:21, 5:5, 87:13, 87:16, 87:25,
125:1, 136:20, 137:5, 175:22, 190:20,
217:14
  **1501** [1] - 1:24
  **151** [1] - 5:17
  **153** [1] - 5:18
  **159** [1] - 4:4
  **15th** [1] - 117:14
  **16** [1] - 145:13
  **162** [1] - 6:2
  **1633** [1] - 14:16
  **166** [1] - 5:19
  **169** [1] - 5:20
  **16th** [1] - 191:13
  **17** [6] - 75:17, 106:18, 144:25, 151:17,
151:19, 157:18
  **171** [1] - 4:5
  **174** [1] - 4:7
  **18** [7] - 170:6, 171:15, 181:23, 182:3,
182:14, 196:17, 196:20
  **180** [18] - 88:23, 99:25, 100:8, 100:9,
112:14, 115:8, 115:11, 115:19, 115:25,
116:4, 116:12, 116:25, 117:8, 122:15,
122:24, 123:2, 215:25, 216:9
  **181** [1] - 5:21
  **184** [2] - 4:8, 6:3
  **189** [1] - 4:10
  **19** [7] - 170:6, 171:15, 181:23, 182:3,
182:16, 196:17, 196:20
  **193** [1] - 5:22
  **1978** [1] - 190:9
  **198** [1] - 4:11
  **1982** [1] - 86:4
  **1984** [2] - 85:20, 86:13
  **1995** [1] - 190:23
  **1996** [2] - 109:15, 145:4
  **1998** [1] - 198:24
  **1999** [3] - 175:7, 176:8, 177:7
  **1:00** [1] - 125:4
  **1:08** [1] - 125:5
  **1st** [1] - 101:17

**2**

**2** [5] - 8:24, 33:14, 98:11, 99:1, 104:1
  **20** [1] - 174:23
  **20/20** [1] - 225:2
  **20005** [1] - 2:12
  **2004** [1] - 64:17
  **2005** [2] - 175:4, 190:1

  **2009** [8] - 92:13, 92:14, 94:2, 94:10,
97:3, 129:18, 135:3, 223:12
  **2010** [4] - 36:6, 50:13, 65:2, 127:22
  **2011** [2] - 98:8, 135:4
  **2011-2012** [1] - 97:22
  **2012** [3] - 98:8, 135:4, 191:16
  **2013** [25] - 87:3, 98:12, 101:7, 101:17,
101:21, 112:3, 113:2, 113:8, 113:20,
117:14, 117:18, 117:24, 128:3, 136:8,
138:2, 176:17, 177:7, 178:14, 178:23,
181:20, 181:22, 181:25, 198:22,
209:19, 212:4
  **2014** [5] - 1:4, 1:9, 103:6, 103:7, 231:9
  **207** [1] - 4:12
  **211** [1] - 4:13
  **213** [1] - 4:15
  **22** [1] - 11:2
  **220** [1] - 1:21
  **222** [1] - 4:17
  **23** [1] - 87:3
  **231** [1] - 1:13
  **239** [1] - 2:22
  **23rd** [3] - 92:13, 92:14, 94:9
  **24** [2] - 1:4, 1:9
  **25** [1] - 75:23
  **25th** [1] - 94:2
  **26** [2] - 5:7, 92:21
  **26(a)(1** [1] - 220:12
  **27** [5] - 121:15, 121:21, 122:5, 149:22,
175:11
  **27th** [1] - 212:4
  **28** [10] - 3:7, 4:22, 5:9, 110:3, 110:9,
110:12, 181:12, 181:14, 181:17, 231:9
  **28th** [1] - 136:7
  **2:13-270** [1] - 7:4
  **2:13CV270** [1] - 1:3
  **2:13CV271** [1] - 1:8

**3**

**3** [14] - 28:10, 28:20, 48:23, 49:6,
74:25, 77:25, 103:11, 104:1, 110:15,
151:17, 151:18, 151:23, 153:22, 175:12
  **3-2(b** [3] - 121:19, 122:6, 216:7
  **3-2(c** [2] - 122:12, 216:7
  **30** [8] - 38:5, 84:9, 94:3, 186:9, 186:18,
193:1, 193:2, 193:11
  **30,000** [1] - 217:17
  **30-plus** [1] - 93:2
  **300** [1] - 2:22
  **30s** [1] - 147:11
  **31** [8] - 5:15, 5:16, 5:19, 147:15,
149:12, 166:6, 166:7, 166:9
  **32** [5] - 43:13, 43:16, 43:18, 44:10,
44:25
  **323** [1] - 2:14
  **34** [5] - 5:12, 5:24, 119:16, 119:24,
120:3
  **35** [3] - 3:9, 37:1, 226:15
  **37** [1] - 4:23

**38** [4] - 147:9, 148:1, 149:20, 219:4
**38-person** [1] - 172:4
**3827** [8] - 87:6, 87:21, 89:1, 89:10, 99:25, 100:7, 112:15, 215:25
**39** [1] - 4:24
**3:00** [1] - 204:15
**3:01** [1] - 204:24
**3:15** [1] - 204:20
**3:24** [1] - 204:24

## 4

**4** [11] - 5:8, 74:25, 77:25, 99:21, 102:20, 103:5, 104:19, 110:5, 117:8, 163:2, 206:19
**40** [2] - 132:11, 186:18
**400** [1] - 2:15
**410** [1] - 2:2
**43** [1] - 4:25
**45** [1] - 185:13
**48** [4] - 3:10, 5:1, 5:2, 49:6
**4:02** [1] - 231:4
**4th** [1] - 221:19

## 5

**5** [20] - 4:22, 5:4, 16:20, 17:9, 28:7, 39:23, 40:1, 40:17, 66:19, 74:16, 74:25, 76:19, 77:25, 121:23, 145:8, 151:5, 151:7, 176:25, 225:11, 225:13
**50** [1] - 110:23
**50,000** [1] - 187:19
**51** [1] - 5:25
**52** [1] - 91:24
**57** [1] - 3:11
**5950** [1] - 2:2

## 6

**6** [36] - 5:13, 5:17, 5:18, 5:20, 17:12, 17:13, 17:23, 28:21, 74:25, 77:25, 91:25, 121:22, 122:2, 122:5, 151:11, 151:23, 153:21, 153:22, 153:23, 154:2, 154:9, 155:7, 169:21, 170:17, 178:1, 178:2, 181:15, 182:20, 193:18, 193:20, 193:24, 196:3, 196:5, 196:18
**60** [9] - 17:23, 28:14, 28:21, 37:9, 49:14, 49:23, 61:18, 62:19, 74:20
**60-hour** [1] - 132:11
**607** [1] - 2:11
**61** [1] - 3:12
**64** [1] - 3:14
**67** [1] - 5:3

## 7

**7** [27] - 5:10, 5:11, 52:15, 52:19, 52:21, 74:25, 99:12, 99:22, 114:25, 117:7, 153:23, 154:2, 170:17, 177:21, 177:25, 193:18, 193:20, 193:24, 196:3, 196:5, 199:13, 209:8, 209:14, 209:25, 211:25
**74** [2] - 3:15, 5:4

**75** [2] - 6:1, 177:19
**75225** [1] - 2:3
**75606** [1] - 1:22
**75671** [1] - 2:6
**75711** [1] - 2:15
**76** [1] - 106:17
**77** [1] - 107:12
**77701** [1] - 2:22
**77707** [1] - 100:1

## 8

**8** [8] - 17:24, 48:23, 49:7, 74:25, 154:9, 154:11, 154:23, 154:24
**800** [1] - 2:12
**803(17** [1] - 45:5
**83** [1] - 3:16
**85** [1] - 3:18
**87** [1] - 5:5
**88** [1] - 5:6

## 9

**9** [13] - 11:2, 29:2, 29:5, 39:25, 49:13, 49:14, 49:18, 49:22, 66:24, 67:6, 74:20, 78:2, 154:24
**909** [1] - 2:14
**92** [1] - 5:7
**94** [1] - 3:19
**99** [1] - 3:20
**9:03** [2] - 1:5, 1:10
**9:09-cv-00111-RC** [1] - 93:1
**9th** [2] - 181:20, 181:24

## A

**A-R-U-T-H** [1] - 27:25
**a.m** [2] - 85:2
**A.M** [2] - 1:5, 1:10
**abandoned** [1] - 114:20
**ability** [1] - 62:24
**able** [17] - 30:5, 62:1, 62:10, 90:17, 96:20, 143:20, 146:12, 149:18, 160:17, 160:20, 160:23, 160:25, 161:6, 169:24, 194:15, 201:23, 219:3
**absence** [1] - 219:1
**absolutely** [2] - 25:4, 46:1
**Absolutely** [2] - 36:12, 49:4
**access** [5] - 23:16, 30:10, 30:23, 201:23, 202:21
**accidentally** [1] - 49:18
**according** [4] - 72:6, 73:2, 73:21, 224:12
**According** [1] - 72:12
**account** [4] - 31:4, 152:17, 161:24, 224:7
**accounted** [1] - 73:14
**accounts** [2] - 98:11, 99:1
**accurate** [4] - 44:21, 53:1, 98:13, 103:3, 225:1, 225:2, 225:4
**accurately** [2] - 87:20, 88:25

**accused** [9] - 32:8, 75:21, 156:7, 156:8, 157:24, 217:12, 218:1, 218:22, 228:22
**act** [1] - 147:5
**Action** [1] - 182:16
**action** [5] - 221:2, 221:17, 221:19, 221:22, 229:8
**active** [2] - 61:22, 216:6
**activities** [4] - 143:18, 147:3, 167:13, 216:2
**activity** [1] - 215:15
**actual** [5] - 68:21, 133:18, 150:20, 153:19, 180:2
**ad** [6] - 120:13, 158:19, 159:5, 159:8, 159:9, 198:3
**Adam** [3] - 43:4, 43:5, 133:14
**add** [1] - 48:1
**addition** [2] - 45:14, 63:9
**additional** [3] - 45:4, 73:3, 214:19
**address** [9] - 87:6, 89:11, 100:5, 104:15, 115:5, 115:11, 116:1, 191:9, 216:1
**adjacent** [1] - 42:4
**adjourned** [1] - 231:4
**administered** [8] - 12:24, 35:4, 63:24, 85:8, 100:21, 144:14, 174:8, 189:10
**Administration** [1] - 85:19
**administrative** [1] - 219:5
**administrator** [1] - 167:12
**admissibility** [1] - 8:11
**admission** [12] - 17:7, 38:9, 38:11, 43:24, 87:24, 89:3, 109:25, 110:8, 120:3, 184:4, 184:12, 187:22
**admissions** [2] - 111:2, 214:4
**admit** [1] - 229:16
**admitted** [18] - 17:9, 34:5, 52:7, 66:21, 88:3, 89:6, 93:15, 104:21, 110:13, 110:22, 111:15, 120:5, 138:8, 154:21, 162:18, 188:5, 214:9, 228:16
**Admittedly** [1] - 228:15
**advent** [1] - 62:23
**adverse** [2] - 100:19, 141:4
**ADVERSE** [1] - 101:2
**advertisement** [7] - 119:12, 119:22, 119:24, 120:7, 120:12, 120:17, 128:9
**advertising** [7] - 165:5, 165:9, 165:11, 165:14, 165:23, 168:13
**advice** [1] - 154:17
**advise** [1] - 122:12
**advised** [1] - 191:15
**advisement** [1] - 231:1
**advising** [1] - 168:10
**affiliated** [2] - 108:4, 108:8
**aforementioned** [1] - 88:19
**afraid** [1] - 44:23
**afternoon** [1] - 126:19
**afternoon's** [1] - 9:13
**afterwards** [1] - 149:9
**agent** [1] - 86:9

**ago** [11] - 14:6, 14:14, 39:2, 39:5, 61:23, 109:9, 139:1, 175:22, 199:25, 200:6, 213:14
**agree** [10] - 28:17, 55:11, 55:14, 79:20, 105:22, 106:1, 116:20, 118:21, 123:15, 139:9
**agreed** [4] - 8:9, 8:10, 9:5, 9:18
**agreement** [2] - 8:6, 108:22
**agreements** [5] - 8:1, 102:8, 102:12, 109:11, 132:21
**ahead** [9] - 13:1, 45:8, 126:10, 126:16, 134:12, 184:11, 205:17, 208:25, 222:8
**Aicker** [1] - 228:9
**AICKER** [1] - 228:9
**AIDED** [1] - 2:25
**Ainsworth** [2] - 7:14, 7:18
**AINSWORTH** [2] - 2:13, 7:13
**air** [3] - 177:9, 194:24, 226:17
**airline** [1] - 195:16
**airport** [5] - 185:12, 185:14, 185:20, 195:16, 226:14
**Airport** [2] - 174:25, 186:2
**Aizer** [12] - 43:4, 48:2, 51:3, 54:1, 54:3, 54:5, 54:7, 54:10, 54:19, 54:22, 55:11, 56:13
**Akamai** [5] - 202:4, 210:18, 210:22, 211:1, 211:10
**Akbrud** [6] - 77:17, 78:5, 80:23, 83:17, 83:19, 83:21
**Akrum** [1] - 15:19
**albeit** [1] - 223:13
**ALL** [1] - 7:1
**allegation** [1] - 126:25
**alleged** [1] - 217:4
**allegedly** [1] - 54:17
**alleging** [1] - 134:6
**Allen** [1] - 127:12
**allow** [9] - 30:10, 57:17, 59:4, 71:2, 71:24, 98:21, 144:8, 149:6, 211:6
**allowed** [1] - 125:17
**allows** [3] - 67:20, 165:14, 187:11
**alone** [2] - 75:14, 139:12
**ALSO** [1] - 2:17
**altogether** [1] - 144:25
**amended** [3] - 151:6, 151:13, 177:24
**Amended** [5] - 17:4, 121:14, 151:8, 178:8, 181:10
**amount** [1] - 160:10
**AN** [1] - 101:2
**analogy** [1] - 153:9
**analysis** [5] - 50:18, 50:19, 71:12, 213:13, 213:17
**analytics** [2] - 73:12, 74:1
**AND** [1] - 2:8
**and..** [1] - 91:18
**Angeles** [11] - 34:7, 78:17, 163:8, 163:10, 163:21, 163:24, 164:15, 164:22, 187:9, 190:10, 190:14
**anniversary** [1] - 175:22

**announcing** [1] - 138:2
**Answer** [2] - 106:21, 107:20
**answer** [13] - 53:8, 59:4, 60:8, 71:2, 71:25, 92:1, 106:1, 106:18, 107:6, 107:15, 107:21, 200:5, 211:6
**answered** [4] - 128:9, 214:9, 214:11, 216:14
**answering** [2] - 119:12, 200:6
**answers** [1] - 81:20
**anticipate** [1] - 9:24
**anticipated** [1] - 214:19
**anticipating** [1] - 125:1
**Anytime** [12] - 13:19, 13:20, 13:22, 14:21, 14:24, 27:12, 29:13, 29:17, 30:6, 30:15, 31:11, 31:16
**anytime** [1] - 214:12
**anyway** [1] - 208:24
**Apologies** [2] - 39:19, 49:19
**apologies** [1] - 224:1
**apologize** [9] - 46:14, 49:16, 57:7, 57:20, 58:9, 75:10, 111:8, 121:24, 201:5
**appeal** [1] - 223:15
**appear** [4] - 22:3, 54:5, 92:12, 215:3
**APPEARANCES** [1] - 1:19
**appearances** [1] - 7:5
**appeared** [1] - 90:9
**appearing** [1] - 111:20
**Apple** [19] - 93:9, 94:18, 109:18, 109:20, 109:24, 110:1, 110:6, 110:21, 111:5, 111:14, 111:17, 123:19, 133:23, 133:25, 139:17, 141:4, 215:15, 219:19
**applicable** [2] - 9:7, 9:12
**application** [1] - 105:15
**applied** [1] - 121:1
**applying** [1] - 121:5
**appreciate** [1] - 230:15
**apprentice** [1] - 86:7
**apprise** [1] - 125:7
**approach** [6] - 52:8, 106:11, 119:17, 162:19, 178:4, 209:10
**appropriate** [2] - 125:9, 213:12
**approval** [2] - 8:1, 9:7
**approved** [1] - 137:23
**April** [7] - 13:16, 15:15, 101:7, 101:17, 112:3, 138:2, 198:22
**archive** [1] - 62:2
**area** [13] - 14:5, 27:4, 45:19, 90:6, 90:7, 100:2, 117:10, 117:19, 120:9, 151:1, 175:8, 191:7, 216:12
**Area** [1] - 14:7
**areas** [5] - 25:23, 65:19, 76:9, 88:12, 159:5
**Arenz** [10] - 92:8, 92:15, 92:17, 93:18, 93:20, 94:9, 94:11, 94:12, 94:15, 123:17
**Arenz's** [1] - 123:18
**argue** [2] - 207:23, 225:11
**argued** [1] - 111:1

**ARGUMENT** [2] - 4:15, 4:17
**argument** [4] - 134:10, 143:15, 223:5, 229:12
**argumentative** [2] - 77:12, 185:2
**Argumentative** [1] - 200:2
**arguments** [3] - 221:23, 230:15, 230:17
**arrangement** [1] - 155:13
**arrived** [3] - 58:14, 58:19, 109:5
**art** [10] - 33:3, 33:20, 81:12, 81:17, 81:22, 82:3, 188:8, 188:21, 188:25, 224:12
**articulate** [1] - 149:18
**Arya** [1] - 150:12
**AS** [1] - 101:2
**Ashwin** [3] - 150:14, 150:20, 151:2
**aspects** [4] - 18:2, 18:4, 25:2, 217:15
**asserted** [5] - 110:21, 110:22, 111:6, 139:16, 139:17
**Asserted** [4] - 17:4, 121:14, 151:8, 181:10
**assertion** [4] - 95:22, 98:13, 98:25, 130:20
**assist** [2] - 129:22, 131:15
**associate** [4] - 101:11, 101:15, 102:10, 214:25
**associated** [13] - 18:10, 25:9, 28:16, 67:24, 73:16, 80:12, 100:2, 103:18, 103:19, 103:24, 104:2, 117:11, 134:7
**associates** [1] - 66:7
**association** [1] - 196:23
**assuming** [2] - 10:18, 98:17
**assurance** [2] - 149:17, 167:6
**Astoria** [1] - 14:18
**Atlanta** [4] - 174:24, 175:8, 226:13, 226:17
**attain** [2] - 18:15, 42:25
**attempt** [2] - 184:10, 230:6
**ATTENDANCE** [1] - 2:17
**attendance** [1] - 220:4
**attended** [1] - 176:1
**attending** [1] - 86:10
**attention** [15] - 83:24, 87:2, 99:21, 102:18, 103:11, 106:16, 110:15, 181:7, 181:9, 193:16, 193:18, 196:17, 222:22, 224:19, 225:9
**attorney** [5] - 90:13, 92:18, 102:9, 127:23, 140:11
**attorney-client** [1] - 140:11
**attractive** [1] - 208:16
**attribute** [1] - 219:14
**Audio** [120] - 7:3, 7:9, 7:10, 9:11, 89:9, 89:15, 89:21, 89:23, 92:9, 92:19, 93:8, 94:1, 94:14, 94:18, 95:16, 95:19, 97:2, 97:21, 98:7, 99:24, 100:20, 101:7, 101:10, 101:18, 102:7, 102:19, 102:24, 103:12, 103:18, 103:19, 103:23, 103:24, 104:6, 105:4, 107:3, 108:4, 108:7, 108:12, 108:15, 108:19, 108:23, 109:3, 109:5, 109:10, 109:15, 109:18,

109:19, 109:23, 110:5, 111:1, 111:3, 111:14, 111:16, 111:23, 112:3, 112:7, 112:19, 112:23, 113:11, 113:19, 114:4, 116:21, 117:9, 118:7, 119:12, 119:13, 120:7, 121:10, 123:10, 123:25, 124:3, 124:12, 128:5, 128:9, 128:18, 128:21, 129:10, 130:2, 130:18, 133:7, 133:9, 134:25, 135:13, 137:18, 137:20, 137:23, 138:1, 139:9, 139:10, 139:15, 140:7, 140:12, 140:20, 141:21, 142:9, 142:23, 214:5, 214:7, 214:14, 214:18, 214:22, 214:24, 215:9, 215:14, 216:5, 216:9, 216:16, 218:1, 219:3, 219:23, 221:21, 221:24, 222:19, 223:7, 223:11, 223:16, 224:6, 224:21, 224:24

**AUDIO** [4] - 1:3, 1:8, 1:20, 2:17

**audio** [1] - 64:22

**Audio's** [22] - 94:6, 94:16, 95:23, 98:25, 102:15, 104:23, 115:4, 115:25, 116:10, 118:16, 129:24, 130:6, 132:21, 132:25, 141:5, 213:24, 215:21, 215:24, 220:18, 223:25, 224:2, 224:23

**audio-radio** [1] - 64:22

**August** [6] - 176:17, 177:7, 178:23, 181:20, 181:24, 192:13

**aunts** [1] - 175:9

**AUSTIN** [1] - 2:6

**Austin** [2] - 86:11, 86:13

**Australia** [1] - 190:8

**authenticate** [1] - 46:16

**authenticating** [1] - 46:21

**authorities** [1] - 230:21

**Auto** [1] - 221:10

**Auto-Dimensions** [1] - 221:10

**automatically** [1] - 197:8

**available** [48] - 17:21, 17:22, 17:25, 18:4, 18:14, 20:2, 20:18, 20:23, 24:7, 48:24, 65:15, 67:9, 68:18, 68:24, 89:18, 122:13, 122:19, 122:22, 123:5, 146:23, 151:23, 152:4, 154:2, 154:4, 154:12, 154:17, 155:1, 155:6, 155:10, 155:21, 156:4, 156:16, 157:3, 157:11, 157:16, 157:21, 157:23, 157:25, 158:6, 158:10, 158:14, 160:24, 161:1, 165:3, 182:11, 196:4, 196:25, 197:22

**avenue** [4] - 87:21, 89:1, 89:10, 115:5

**Avid** [7] - 194:12, 195:2, 197:3, 200:15, 200:19, 200:20, 202:7

**await** [1] - 230:17

**aware** [21] - 11:18, 26:22, 48:14, 70:4, 105:19, 123:21, 127:2, 134:15, 135:4, 155:4, 155:14, 156:9, 156:20, 156:22, 196:22, 205:19, 205:20, 222:25, 227:2, 229:21

**awhile** [1] - 139:1

---

## B

**Bachelor** [1] - 85:19

**bachelor's** [1] - 64:20

**background** [6] - 14:5, 64:19, 85:18,

127:4, 145:2, 175:24

**Baker** [18] - 117:20, 118:1, 120:24, 121:3, 124:9, 128:13, 133:17, 137:14, 137:19, 138:13, 138:17, 139:1, 139:5, 214:13, 215:4, 215:5, 220:15, 220:16

**balance** [2] - 101:24, 175:12

**bank** [6] - 88:11, 88:19, 88:25, 98:11, 99:1, 224:7

**Bareket** [2] - 152:18, 161:25

**barely** [1] - 90:9

**BARTOLOMEI** [1] - 2:1

**BARUTH** [4] - 3:6, 3:7, 13:2, 28:2

**Baruth** [10] - 12:23, 13:5, 13:7, 13:8, 16:18, 28:4, 34:7, 34:18, 228:3, 228:19

**Baruth's** [1] - 218:1

**base** [2] - 70:20, 217:4

**Baseball** [4] - 40:10, 40:12, 50:5, 55:4

**baseball** [2] - 62:15

**based** [16] - 15:10, 16:3, 25:25, 47:9, 47:16, 58:16, 60:2, 63:6, 75:3, 75:5, 98:16, 120:22, 155:22, 156:8, 214:3, 225:15

**Based** [1] - 58:24

**basis** [9] - 14:23, 25:5, 38:4, 44:24, 68:11, 69:16, 77:18, 82:20, 107:24

**basket** [1] - 139:15

**basketball** [2] - 35:23, 61:6

**Basketball** [12] - 36:1, 36:9, 36:11, 40:11, 40:12, 40:19, 40:22, 40:23, 41:23, 41:25, 50:8, 61:16

**battles** [1] - 229:23

**Bay** [1] - 14:7

**Beaumont** [27] - 87:5, 87:22, 89:24, 98:11, 99:1, 99:25, 100:2, 113:12, 117:11, 117:15, 117:19, 118:7, 118:20, 118:25, 119:5, 131:18, 133:22, 142:12, 216:12, 216:14, 216:15, 223:13, 224:7, 224:8, 225:5, 225:8, 230:10

**BEAUMONT** [1] - 2:22

**became** [1] - 121:9

**become** [2] - 137:17, 190:6

**becomes** [1] - 225:6

**becoming** [2] - 101:23, 102:6

**BEFORE** [1] - 1:15

**began** [4] - 59:6, 59:10, 113:1

**Beginning** [1] - 157:17

**beginning** [3] - 58:12, 113:19, 211:25

**behalf** [3] - 7:14, 86:24, 102:24

**BEHALF** [10] - 3:4, 4:1, 13:3, 35:12, 64:2, 85:10, 101:3, 144:16, 174:10, 189:12

**behind** [1] - 88:14

**belief** [3] - 47:10, 47:20, 56:10

**believes** [1] - 221:3

**belong** [1] - 210:22

**bench** [1] - 178:16

**benefit** [3] - 31:20, 148:6, 164:7

**benefits** [1] - 128:23

**berated** [2] - 208:18, 209:3

**berating** [1] - 208:23

**BERKSHIRE** [1] - 2:2

**best** [6] - 22:17, 54:18, 62:12, 141:16, 155:15, 219:3

**better** [1] - 124:25

**Between** [1] - 150:15

**between** [10] - 34:16, 43:5, 64:11, 98:8, 131:17, 177:10, 177:14, 203:2, 226:17, 226:18

**beyond** [3] - 49:24, 90:7, 97:6

**Beyond** [2] - 88:11, 97:23

**big** [1] - 176:3

**Big** [1] - 176:4

**Bill** [1] - 192:22

**billing** [1] - 27:9

**binder** [30] - 9:23, 11:6, 11:11, 16:17, 36:20, 37:16, 37:20, 39:15, 43:13, 48:22, 49:19, 66:18, 74:16, 75:12, 75:13, 76:20, 88:15, 92:20, 99:13, 102:20, 105:14, 110:4, 114:25, 121:13, 137:25, 147:15, 151:4, 177:22, 193:17

**bit** [13] - 14:4, 14:19, 15:16, 35:8, 35:21, 36:10, 37:5, 61:10, 73:9, 127:3, 145:11, 167:24, 194:9

**Blaxland** [4] - 163:13, 163:16, 163:21, 172:20

**Blaxland's** [1] - 163:23

**bloggers** [1] - 62:9

**Bloomberg** [2] - 176:9, 176:11

**Bonnell** [1] - 33:8

**booklet** [1] - 52:18

**boss** [1] - 24:25

**Boston** [2] - 19:6, 167:2

**Boulevard** [5] - 87:6, 99:25, 100:7, 112:15, 216:1

**box** [5] - 88:23, 92:4, 94:8, 95:10, 152:22

**Box** [4] - 91:14, 92:7, 116:25, 123:9

**Boxes** [2] - 191:24, 191:25

**boxes** [3] - 91:3, 91:4, 91:9

**boy** [1] - 27:25

**Boyarsky** [5] - 180:16, 180:17, 180:22, 181:5, 182:19

**Brad** [7] - 7:9, 9:9, 95:11, 99:18, 100:19, 221:1, 223:19

**BRAD** [9] - 2:17, 3:22, 3:23, 3:24, 3:25, 101:1, 126:17, 135:10, 142:6

**Bradley** [1] - 99:11

**brand** [2] - 153:8, 154:14

**brands** [8] - 146:2, 146:8, 146:10, 146:15, 146:19, 147:6, 160:25, 168:10

**Braunfels** [1] - 86:9

**Bravo** [7] - 146:17, 154:11, 154:14, 154:15, 154:23, 155:2, 155:23

**Bravo's** [1] - 183:2

**break** [4] - 53:18, 124:22, 194:9, 194:16

**breaking** [1] - 21:4

**Brian** [2] - 192:23, 192:25

**bridge** [1] - 176:25
**brief** [9] - 85:17, 95:4, 111:14, 126:6, 143:21, 145:1, 178:4, 204:22, 230:18
**briefed** [1] - 230:20
**briefing** [3] - 10:23, 143:3, 225:11
**briefly** [5] - 14:4, 44:6, 57:3, 64:18, 190:2
**briefs** [2] - 143:1, 230:17
**Brightcove** [10] - 18:21, 18:24, 19:2, 19:5, 19:8, 19:10, 30:13, 31:1, 156:9, 156:10
**Brightcove's** [1] - 30:23
**bring** [2] - 164:5, 222:22
**bringing** [1] - 164:7
**brings** [1] - 230:4
**Britt** [2] - 197:20, 198:6
**Britt-Friedman** [2] - 197:20, 198:6
**broadcast** [4] - 65:8, 146:18, 160:17
**Broadcasting** [2] - 64:14
**Broadway** [1] - 14:16
**BROADWAY** [1] - 1:24
**Bronshteyn** [4] - 42:24, 43:9, 47:23, 54:15
**Bronshteyn's** [1] - 44:7
**Brooklyn** [2] - 46:8, 65:25
**brother** [3] - 145:16, 145:17, 175:8
**brought** [6] - 90:14, 90:16, 109:17, 136:18, 224:19, 227:12
**BROWNE** [1] - 2:1
**buckets** [1] - 227:24
**budgeting** [1] - 69:23
**build** [4] - 152:24, 153:7, 159:18, 160:20
**builder** [1] - 153:11
**building** [4] - 89:18, 112:24, 150:20, 212:15
**built** [1] - 152:11
**burden** [2] - 221:25, 226:4
**BURG** [1] - 2:5
**Business** [1] - 85:19
**business** [25] - 25:2, 46:19, 72:25, 87:6, 87:7, 87:8, 87:10, 87:19, 87:21, 88:14, 99:24, 114:6, 115:4, 115:8, 115:25, 116:11, 116:21, 175:20, 177:17, 210:15, 212:1, 215:25, 218:14, 223:24, 224:1
**businesses** [1] - 87:12
**businesspeople** [1] - 77:3
**busy** [2] - 132:7, 132:9
**BY** [89] - 4:15, 4:17, 13:4, 17:10, 20:10, 28:3, 34:6, 35:13, 39:13, 39:22, 42:5, 45:9, 47:4, 47:22, 48:11, 48:21, 52:11, 56:3, 57:2, 57:24, 59:11, 59:20, 60:13, 61:3, 64:3, 71:7, 72:2, 74:15, 83:7, 83:15, 85:11, 88:4, 89:7, 91:23, 93:16, 94:23, 97:10, 98:5, 98:23, 99:9, 101:4, 104:22, 106:14, 107:11, 110:14, 111:12, 119:20, 120:6, 122:1, 122:4, 126:18, 129:20, 131:4, 132:3, 134:14, 135:11, 138:9, 141:1, 141:14, 142:7,

144:17, 149:11, 154:22, 159:2, 159:16, 162:22, 166:12, 171:2, 171:9, 171:13, 171:24, 174:11, 178:7, 178:18, 184:15, 185:6, 188:6, 189:13, 190:18, 198:17, 200:4, 205:4, 205:18, 207:20, 208:6, 209:1, 209:13, 211:9, 211:23

## C

**calendar** [1] - 212:11
**California** [15] - 26:9, 75:19, 76:2, 77:9, 79:12, 81:8, 83:2, 163:8, 163:11, 164:9, 164:10, 169:19, 218:11, 220:10, 226:1
**CALLED** [8] - 13:3, 35:12, 64:2, 85:10, 101:2, 144:16, 174:10, 189:12
**cameraman** [1] - 190:6
**Campbell** [1] - 168:21
**Canada** [1] - 190:9
**Candia** [1] - 104:15
**capability** [3] - 62:25, 152:1, 153:6
**capacity** [1] - 140:11
**career** [2] - 14:11, 191:2
**Carolina** [5] - 51:13, 62:14, 63:5, 105:1, 220:16
**Caron** [3] - 15:20, 16:10, 16:11
**Carr** [4] - 133:15, 135:16, 135:18, 136:20
**Carter** [1] - 193:13
**Case** [2] - 7:3, 92:25
**case** [61] - 8:8, 13:25, 48:13, 50:23, 50:25, 51:20, 78:5, 78:20, 86:23, 89:20, 92:24, 93:7, 95:17, 103:14, 110:6, 111:1, 126:23, 134:1, 142:11, 143:18, 146:23, 150:17, 150:19, 177:11, 188:11, 197:5, 199:11, 201:14, 204:23, 213:13, 213:15, 213:16, 213:21, 215:10, 216:22, 216:23, 217:1, 218:19, 218:21, 218:22, 218:24, 219:12, 219:19, 220:5, 220:20, 220:24, 221:4, 221:10, 222:1, 223:2, 223:13, 223:14, 224:11, 224:15, 227:15, 229:2, 229:11, 230:8, 230:9, 230:25
**cases** [22] - 10:11, 10:12, 14:13, 93:4, 121:11, 143:15, 188:14, 215:18, 221:5, 221:10, 221:12, 222:13, 225:12, 225:14, 225:16, 229:5, 229:7, 229:9, 229:13, 229:14, 229:22, 230:1
**caution** [1] - 140:22
**CBS** [153] - 1:6, 2:8, 2:18, 3:4, 7:3, 7:14, 7:16, 8:25, 11:18, 12:22, 13:3, 13:13, 13:14, 26:14, 26:15, 26:17, 26:25, 27:2, 27:4, 28:16, 28:20, 32:4, 32:8, 34:2, 35:5, 35:12, 35:22, 36:2, 36:5, 40:8, 40:16, 40:23, 40:24, 42:8, 42:14, 42:22, 43:2, 43:10, 48:12, 50:11, 51:7, 54:16, 56:5, 56:9, 57:4, 57:12, 57:22, 63:22, 64:2, 64:10, 64:11, 64:12, 64:13, 64:14, 64:15, 64:16, 64:23, 65:1, 65:5, 65:7, 65:9, 65:15, 66:2, 67:8, 67:11, 67:20, 67:25, 68:17, 68:24, 69:3,

69:6, 69:7, 69:13, 69:17, 69:18, 69:25, 70:5, 70:9, 71:20, 71:25, 72:7, 72:13, 73:6, 73:22, 75:6, 75:11, 76:4, 76:8, 76:12, 76:13, 76:15, 76:16, 76:21, 76:25, 77:4, 77:16, 78:11, 79:2, 79:8, 82:10, 82:14, 83:22, 84:4, 84:8, 84:5, 85:10, 86:24, 95:17, 100:18, 101:3, 112:3, 113:5, 113:7, 113:23, 116:16, 118:8, 118:17, 124:8, 125:13, 126:8, 126:22, 129:16, 134:4, 136:18, 138:3, 139:18, 142:19, 143:2, 143:16, 169:4, 169:8, 169:11, 214:1, 214:21, 216:25, 217:24, 218:5, 219:8, 220:2, 220:9, 221:15, 222:13, 226:7, 227:23, 228:13, 228:17, 228:24, 229:1
**CBS's** [2] - 52:13, 230:14
**cbs.com** [29] - 58:7, 70:15, 70:18, 70:22, 71:4, 71:9, 71:11, 71:13, 71:18, 71:19, 72:16, 72:21, 73:14, 73:16, 73:20, 74:1, 74:4, 74:8, 75:4, 76:13, 76:17, 76:21, 79:22, 80:17, 84:5, 84:16, 218:8, 218:15, 228:2
**cbsnews.com** [3] - 65:12, 77:21, 77:22
**cbsradionews.com** [1] - 65:12
**cbsradionewsfeed.com** [1] - 65:13
**CBSSports.com** [41] - 35:20, 35:24, 35:25, 36:2, 36:14, 36:16, 36:18, 37:9, 40:14, 41:4, 41:12, 42:19, 43:4, 48:2, 50:12, 51:9, 53:13, 55:6, 56:9, 56:12, 58:6, 58:9, 58:13, 58:14, 58:17, 59:10, 59:13, 59:23, 60:4, 60:11, 61:15, 61:17, 61:19, 61:23, 62:23, 62:24, 63:7, 63:10, 228:1, 228:5, 228:25
**CBSSports.com's** [1] - 63:9
**CDN** [2] - 195:9, 202:13
**CDNs** [2] - 19:21, 22:25
**Center** [7] - 174:21, 175:1, 177:20, 193:3, 197:17, 197:23, 198:8
**centralize** [1] - 146:13
**centralized** [2] - 146:7, 159:9
**centrally** [1] - 145:25
**CEO** [12] - 7:10, 9:10, 100:20, 101:20, 101:23, 102:15, 107:3, 124:12, 132:16, 137:23, 214:23, 215:2
**Certain** [1] - 99:19
**certain** [14] - 7:25, 25:1, 36:7, 46:3, 74:19, 91:4, 107:9, 139:8, 153:6, 173:5, 173:8, 182:22, 210:17, 211:13
**Certainly** [5] - 20:9, 39:12, 59:19, 184:13, 209:12
**certainly** [7] - 38:12, 148:21, 219:24, 224:18, 226:16, 230:6, 230:24
**certificate** [1] - 108:21
**CERTIFICATION** [1] - 231:7
**CERTIFY** [1] - 231:8
**cetera** [1] - 77:25
**chain** [1] - 87:11
**chair** [2] - 120:18, 120:21
**challenged** [2] - 133:25, 134:2

**chance** [4] - 38:12, 46:10, 143:6, 147:20

**change** [3] - 44:10, 81:20, 160:8

**changed** [3] - 58:6, 58:10, 132:14

**changes** [1] - 19:14

**Channel** [5] - 14:12, 157:18, 157:20, 157:23, 158:5

**characterized** [8] - 111:14, 111:17, 114:6, 116:13, 116:24, 141:4, 142:8, 219:18

**characterizes** [1] - 109:24

**charge** [3] - 177:8, 182:17, 221:7

**Charles** [1] - 104:24

**chart** [1] - 182:2

**CHAUDHARI** [1] - 2:1

**Chaudhari** [5] - 7:8, 91:8, 91:10, 94:5, 113:14

**check** [2] - 41:21, 44:12

**chief** [4] - 79:1, 79:7, 153:11

**child** [1] - 130:11

**children** [1] - 127:11

**Chin** [3] - 15:20, 192:23, 192:25

**Chris** [1] - 24:18

**Christine** [1] - 24:8

**Chrysler** [1] - 213:15

**church** [1] - 192:11

**Church** [3] - 192:12, 192:22, 193:7

**Circuit** [7] - 10:11, 213:22, 215:16, 216:21, 217:3, 220:6, 221:9

**circumstance** [2] - 26:23, 26:24

**circumstances** [2] - 16:11, 143:10

**Ciresi** [1] - 93:21

**cite** [1] - 215:17

**cited** [1] - 230:21

**citing** [1] - 213:21

**City** [22] - 36:25, 37:2, 45:18, 152:19, 172:15, 174:21, 176:24, 177:13, 191:12, 193:11, 196:16, 198:2, 199:16, 200:9, 207:3, 207:6, 207:9, 207:14, 207:22, 212:1, 212:10, 212:17

**city** [3] - 93:22, 167:16, 186:8

**civil** [3] - 92:24, 145:15, 176:6

**claimed** [4] - 105:23, 106:2, 107:25, 121:18

**Claims** [4] - 17:5, 121:15, 151:8, 181:11

**claims** [2] - 110:22, 142:14

**Clare** [4] - 213:14, 217:1, 219:12, 220:5

**clarify** [1] - 165:7

**clarity** [1] - 100:4

**Clark** [1] - 15:20

**class** [1] - 64:21

**clear** [15] - 30:4, 31:6, 49:21, 53:12, 74:18, 83:8, 136:10, 138:25, 152:6, 204:17, 210:21, 216:13, 221:11, 221:24, 224:23

**cleared** [1] - 205:17

**clearly** [7] - 12:9, 47:2, 47:20, 126:23,

222:3, 222:9, 223:1

**clerk** [3] - 10:4, 11:14, 34:17

**click** [2] - 37:14, 69:10

**click-throughs** [1] - 69:10

**client** [2] - 140:11, 194:15

**clients** [1] - 229:4

**Cliffs** [14] - 176:21, 176:23, 179:16, 180:4, 180:19, 183:20, 184:23, 185:23, 186:3, 186:12, 186:25, 187:6, 187:7, 217:14

**close** [1] - 203:5

**closely** [3] - 22:13, 23:4, 158:1

**closing** [1] - 126:5

**CNBC** [33] - 156:12, 156:15, 156:17, 176:18, 176:21, 177:8, 177:10, 177:12, 177:15, 177:17, 178:22, 179:2, 180:9, 180:14, 180:18, 180:25, 181:3, 182:12, 182:13, 182:15, 182:16, 182:22, 183:1, 183:7, 183:11, 183:15, 183:20, 183:24, 186:24, 187:4, 187:11, 201:2, 201:4

**co** [1] - 109:14

**co-inventors** [1] - 109:14

**code** [44] - 15:6, 18:8, 18:10, 18:14, 18:15, 18:16, 29:13, 29:17, 30:5, 30:11, 30:18, 30:19, 30:20, 30:21, 31:8, 65:20, 66:10, 66:16, 67:15, 67:22, 67:24, 68:3, 68:4, 68:6, 69:9, 100:2, 117:11, 117:19, 160:8, 162:2, 166:16, 168:12, 168:23, 170:3, 197:25, 198:1, 204:3, 204:4, 204:10, 216:12, 225:21, 225:22

**coding** [2] - 31:7, 162:3

**colleague** [5] - 12:16, 41:3, 43:3, 48:2, 156:19

**colleagues** [9] - 41:7, 58:17, 58:25, 59:12, 59:22, 60:3, 60:10, 63:4

**collected** [1] - 73:13

**collects** [1] - 24:1

**college** [1] - 35:23

**College** [11] - 36:1, 36:9, 36:11, 40:10, 40:11, 40:19, 40:23, 41:23, 41:25, 50:8, 61:16

**Collin** [1] - 127:15

**Collins** [3] - 101:12, 128:5, 128:18

**Colorado** [1] - 166:23

**column** [2] - 42:2, 42:4

**com** [1] - 14:8

**comedies** [1] - 190:22

**comfortable** [1] - 222:10

**coming** [6] - 16:16, 79:3, 143:18, 185:20, 186:7, 202:22

**comments** [1] - 224:21

**commercials** [1] - 190:22

**communicating** [1] - 96:14

**commute** [3] - 174:24, 180:6, 186:5

**commuted** [1] - 185:7

**commuting** [1] - 185:23

**companies** [11] - 31:11, 33:17, 33:19, 36:3, 71:21, 81:17, 82:8, 211:3, 211:11, 224:2, 224:4

**company** [32] - 18:21, 30:12, 71:5,

76:10, 79:14, 86:9, 97:2, 129:12, 129:18, 132:17, 135:3, 141:12, 144:25, 146:1, 152:6, 152:13, 152:14, 152:16, 160:2, 200:18, 200:20, 200:22, 202:4, 202:8, 215:2, 215:7, 217:17, 223:8, 223:16, 224:4, 225:3

**company's** [1] - 129:15

**compel** [1] - 219:13

**compensated** [1] - 86:18

**compensation** [1] - 102:14

**Complaint** [1] - 178:9

**complaint** [6] - 116:14, 116:16, 177:24, 178:5, 181:22, 182:6

**Complete** [4] - 190:10, 190:11, 190:16, 190:17

**completed** [1] - 125:21

**completely** [1] - 218:2

**complicated** [1] - 146:9

**Complies** [2] - 87:15, 92:22

**composed** [1] - 228:22

**computer** [6] - 22:5, 30:9, 36:13, 43:23, 145:4, 203:3

**COMPUTER** [1] - 2:25

**COMPUTER-AIDED** [1] - 2:25

**COMPUTERIZED** [1] - 2:24

**computers** [2] - 21:6, 176:7

**conceded** [1] - 134:20

**conceived** [2] - 106:5, 107:10

**concentration** [1] - 218:17

**conception** [7] - 105:22, 106:2, 121:17, 122:9, 123:7, 123:12, 123:15

**concerning** [5] - 22:13, 23:12, 24:6, 43:8, 108:11

**concerns** [1] - 178:24

**concluded** [1] - 214:17

**concrete** [3] - 119:1, 119:6, 119:9

**conduct** [1] - 86:24

**conference** [5] - 90:8, 90:9, 90:11, 90:12, 90:21

**conferred** [1] - 53:17

**configured** [1] - 30:9

**confines** [1] - 45:5

**confirm** [1] - 73:3

**connected** [3] - 37:8, 37:13, 203:7

**Connecticut** [3] - 36:23, 36:24, 63:4

**connection** [12] - 8:21, 9:3, 30:2, 43:5, 47:9, 48:3, 125:13, 140:21, 158:19, 170:1, 198:4, 219:23

**consent** [3] - 220:21, 220:23

**Conshohocken** [1] - 166:25

**consider** [3] - 44:23, 132:11, 222:12

**considerable** [2] - 143:17, 218:9

**consideration** [1] - 8:4

**considering** [1] - 230:11

**consistency** [1] - 61:12

**consists** [1] - 219:6

**consolidated** [2] - 7:19, 116:15

**constitutes** [1] - 217:25

**consult** [3] - 154:6, 155:24, 157:6

consultant [1] - 133:17
consulting [1] - 168:10
consumers [1] - 27:8
consumption [3] - 152:2, 153:20, 160:24
contact [7] - 22:17, 26:17, 26:25, 31:2, 68:10, 112:18, 139:22
contacted [3] - 100:1, 117:10, 140:10
contacts [3] - 213:24, 213:25, 215:21
contemplation [1] - 120:14
content [50] - 19:17, 19:20, 19:21, 19:25, 20:2, 20:11, 31:14, 31:16, 31:18, 31:20, 61:6, 62:6, 65:7, 65:8, 65:9, 65:18, 67:23, 146:3, 146:4, 147:5, 150:18, 150:21, 151:25, 152:10, 153:16, 160:3, 160:12, 160:18, 163:14, 163:18, 164:13, 172:23, 183:9, 195:8, 195:15, 202:2, 202:3, 202:6, 202:9, 202:12, 202:21, 203:13, 205:22, 206:3, 210:23, 211:11
Contentions [3] - 17:5, 151:9, 181:11
contentions [11] - 28:8, 30:15, 54:25, 151:6, 151:14, 181:24, 193:19, 193:25, 196:18, 196:21, 228:20
contents [1] - 70:22
context [1] - 216:25
continue [2] - 183:5, 190:19
contract [2] - 137:15, 163:5
contractor [1] - 15:12
contractors [5] - 15:3, 15:22, 16:2, 16:5, 29:16
contribute [1] - 61:11
control [2] - 111:23, 141:19
controlled [1] - 67:14
convenience [4] - 9:22, 11:7, 220:3, 221:13
convenient [8] - 126:23, 222:1, 222:4, 222:10, 223:1, 224:15, 227:14, 229:2
conversation [3] - 71:3, 72:12, 72:14
conversations [7] - 58:16, 58:24, 72:6, 73:21, 75:3, 78:14, 96:16
converting [1] - 206:5
converts [1] - 194:6
conveying [1] - 53:10
Coombs [2] - 69:23, 70:1
Coombs' [1] - 69:24
coordinate [1] - 167:12
coordinator [1] - 150:7
Copenhagen [1] - 175:21
copies [2] - 44:14, 204:3
copy [16] - 10:3, 10:14, 10:16, 11:4, 11:14, 18:13, 21:11, 68:2, 106:15, 122:13, 123:9, 166:8, 166:10, 178:5, 178:16, 209:11
copying [4] - 122:14, 122:20, 122:23, 123:6
cord [1] - 90:16
Corey [1] - 78:9
CORNELIUS [1] - 2:14
corner [2] - 88:21, 91:2

corporate [11] - 11:19, 12:6, 12:8, 12:11, 76:8, 76:16, 108:16, 108:20, 125:7, 125:18, 230:3
corporation [1] - 102:4
CORPORATION [3] - 1:6, 2:8, 2:18
Corporation [8] - 7:14, 13:13, 26:15, 35:22, 36:3, 64:12, 64:15, 71:21
Correct [51] - 32:19, 32:21, 32:23, 96:13, 104:4, 105:9, 105:12, 108:6, 108:9, 108:13, 109:4, 109:12, 109:22, 113:6, 113:10, 113:13, 113:16, 113:18, 113:21, 113:24, 114:2, 114:8, 114:13, 115:2, 115:6, 115:9, 115:12, 115:15, 116:5, 116:8, 117:12, 118:3, 118:5, 118:10, 118:24, 120:16, 120:23, 122:16, 122:25, 123:3, 123:5, 135:14, 135:17, 138:15, 138:19, 142:10, 182:7, 200:16, 203:4, 207:7, 212:5
correct [250] - 28:22, 29:14, 29:15, 30:7, 30:8, 30:16, 30:17, 31:12, 32:25, 33:21, 33:25, 34:10, 44:21, 50:5, 50:9, 51:8, 52:17, 54:4, 55:9, 72:10, 74:21, 74:22, 74:25, 75:21, 75:24, 76:5, 79:25, 83:18, 89:19, 89:21, 89:22, 96:5, 96:8, 97:14, 97:18, 100:6, 101:8, 101:9, 101:13, 101:18, 101:19, 101:21, 102:1, 102:2, 102:4, 102:5, 102:8, 102:12, 102:13, 102:16, 102:17, 102:25, 103:3, 103:7, 103:14, 103:19, 103:24, 103:25, 104:3, 104:10, 104:13, 104:16, 104:24, 105:1, 105:5, 105:8, 105:11, 105:16, 105:18, 105:20, 105:24, 106:3, 106:20, 106:25, 107:3, 107:17, 108:1, 108:5, 108:8, 108:12, 108:15, 108:19, 108:25, 109:3, 109:7, 109:8, 109:11, 109:15, 109:21, 110:1, 111:3, 111:16, 111:21, 111:25, 112:5, 112:6, 112:9, 112:10, 112:12, 112:15, 112:24, 113:2, 113:5, 113:9, 113:12, 113:20, 113:23, 114:1, 114:7, 114:12, 114:16, 114:19, 114:21, 115:1, 115:5, 115:8, 115:11, 115:17, 116:1, 116:2, 116:4, 116:7, 117:11, 117:16, 117:17, 117:20, 117:21, 117:24, 117:25, 118:2, 118:4, 118:9, 118:13, 118:18, 118:23, 119:3, 119:8, 119:13, 119:25, 120:15, 120:22, 120:25, 121:3, 122:10, 122:11, 122:15, 122:24, 123:2, 123:4, 123:20, 124:1, 124:2, 124:4, 124:5, 124:6, 124:7, 124:10, 124:11, 124:14, 124:15, 127:1, 127:16, 128:10, 129:7, 129:8, 130:1, 130:15, 135:16, 135:19, 135:20, 136:5, 136:11, 136:15, 136:18, 136:19, 137:10, 137:11, 137:20, 137:21, 137:23, 137:24, 138:3, 138:4, 138:14, 138:18, 138:20, 139:2, 139:3, 139:6, 139:7, 139:12, 139:13, 139:18, 139:19, 140:1, 141:6, 141:17, 142:9, 159:19, 160:4, 160:5, 163:6, 163:15, 163:24, 164:25, 165:18, 165:24, 166:1, 167:4,

167:9, 167:10, 167:13, 168:22, 168:24, 170:14, 170:22, 180:21, 182:6, 185:10, 185:15, 185:16, 185:21, 185:22, 185:25, 186:25, 187:1, 187:13, 187:17, 193:9, 198:20, 198:23, 199:2, 199:4, 200:15, 201:3, 201:15, 201:16, 202:14, 204:7, 204:8, 205:11, 206:13, 206:14, 206:23, 206:25, 207:4, 209:7, 210:24, 210:25, 212:7
CORRECT [1] - 231:9
corrected [1] - 10:19
correctly [2] - 73:14, 213:18
correlates [1] - 40:13
corroborate [1] - 47:13
Cortez [1] - 163:23
cost [1] - 220:3
counsel [33] - 7:5, 7:10, 9:10, 10:3, 10:15, 39:4, 53:15, 53:17, 79:25, 80:2, 83:25, 100:19, 101:8, 101:11, 101:21, 102:6, 102:15, 102:23, 107:2, 121:9, 129:22, 131:14, 132:22, 137:17, 140:12, 140:15, 140:18, 140:20, 214:23, 215:1, 215:13, 215:14, 223:19
country [8] - 55:8, 62:13, 172:5, 175:19, 217:19, 217:21, 229:17, 229:25
County [1] - 127:15
couple [11] - 24:2, 41:2, 60:25, 71:3, 112:11, 112:12, 124:13, 175:20, 191:19, 211:18, 213:5
course [18] - 9:25, 38:24, 90:24, 93:2, 100:5, 103:4, 106:10, 117:4, 125:10, 125:25, 148:8, 167:23, 190:6, 212:10, 222:20, 224:22, 227:16, 230:16
court [2] - 8:3, 9:22, 10:12, 10:16, 11:5, 11:10, 11:18, 34:16, 38:2, 43:18, 67:19, 85:14, 93:4, 102:24, 103:3, 110:16, 115:4, 115:17, 115:24, 116:9, 116:22, 124:24, 125:7, 125:10, 131:10, 134:10, 136:14, 143:8, 144:18, 145:18, 145:22, 146:6, 147:17, 148:2, 148:6, 148:24, 149:13, 156:13, 174:12, 175:23, 177:4, 178:20, 179:21, 182:13, 189:14, 193:2, 194:10, 195:20, 213:6, 213:14, 213:15, 213:17, 215:23, 216:13, 217:1, 218:19, 219:10, 219:11, 220:4, 221:18, 222:11, 222:21, 222:25, 225:12, 226:2, 226:12, 228:5, 228:20, 229:21, 230:13, 230:24
COURT [174] - 1:1, 2:21, 3:12, 7:1, 7:2, 7:12, 7:17, 7:21, 8:5, 8:15, 8:20, 9:16, 9:20, 10:7, 10:21, 11:3, 11:12, 11:15, 11:21, 11:24, 12:3, 12:8, 12:13, 12:18, 12:21, 13:1, 17:9, 20:6, 27:22, 28:1, 34:5, 34:15, 34:18, 34:21, 34:24, 35:3, 35:7, 38:14, 39:7, 39:20, 44:17, 45:2, 45:8, 45:25, 46:10, 46:13, 46:24, 47:17, 48:7, 51:25, 52:4, 52:7, 52:10, 55:23, 56:1, 56:22, 56:24, 57:17, 58:22, 59:4, 59:17, 60:8, 60:19, 60:21, 60:25, 61:3, 63:14, 63:16, 63:18, 63:21, 70:24,

71:17, 71:24, 74:13, 83:6, 83:13, 84:20, 84:25, 85:3, 85:7, 88:1, 88:3, 89:6, 91:22, 93:15, 97:8, 98:1, 98:17, 100:15, 104:21, 106:13, 110:12, 111:4, 111:9, 111:11, 119:19, 120:5, 124:18, 125:3, 125:12, 125:15, 125:17, 125:20, 126:2, 126:9, 126:16, 129:14, 131:2, 132:1, 134:11, 135:9, 138:8, 140:13, 140:17, 140:24, 141:8, 142:1, 142:5, 142:16, 142:21, 142:25, 143:9, 143:24, 144:4, 144:10, 148:11, 148:25, 149:6, 154:21, 158:25, 159:14, 162:16, 162:18, 162:21, 166:6, 171:7, 171:22, 173:25, 174:5, 178:6, 178:17, 184:9, 185:3, 187:24, 188:2, 188:5, 189:3, 189:6, 200:3, 204:13, 204:19, 204:22, 204:25, 205:16, 207:18, 208:4, 208:22, 209:12, 211:6, 211:17, 211:20, 212:21, 213:2, 213:7, 222:3, 222:6, 222:8, 222:16, 222:24, 226:16, 226:24, 230:15, 230:25, 231:7

**court's** [12] - 8:1, 8:3, 9:6, 10:14, 10:15, 11:5, 11:6, 11:7, 213:18, 222:22, 224:19, 225:9

**courthouse** [1] - 226:15

**courtroom** [8] - 9:4, 11:20, 12:4, 12:12, 125:8, 125:18, 229:22, 229:23

**courts** [1] - 215:24

**Courtwatch** [4] - 49:14, 49:24, 67:7, 74:20

**cousins** [1] - 175:9

**cover** [2] - 87:17, 88:17

**create** [3] - 30:5, 67:23, 215:20

**created** [5] - 158:13, 158:16, 169:13, 169:14, 197:8

**creating** [6] - 54:12, 61:5, 62:6, 153:16, 183:9, 224:21

**creation** [6] - 65:17, 68:21, 108:11, 108:15, 108:19, 150:17

**credentials** [3] - 30:3, 169:25, 201:25

**criminal** [2] - 204:14, 204:23

**critical** [1] - 111:2

**cross** [6] - 44:4, 46:20, 99:11, 127:5, 149:8, 208:19

**CROSS** [16] - 3:7, 3:10, 3:15, 3:19, 3:23, 4:4, 4:8, 4:11, 28:2, 48:20, 74:14, 94:22, 126:17, 159:15, 184:14, 198:16

**cross-examination** [3] - 99:11, 127:5, 208:19

**CROSS-EXAMINATION** [16] - 3:7, 3:10, 3:15, 3:19, 3:23, 4:4, 4:8, 4:11, 28:2, 48:20, 74:14, 94:22, 126:17, 159:15, 184:14, 198:16

**cross-examine** [1] - 149:8

**crossed** [1] - 126:1

**CRR** [2] - 2:21, 231:13

**Crumley** [1] - 192:22

**crunch** [1] - 82:7

**CrunchBase** [4] - 82:6, 82:9, 83:25, 84:12

**crystal** [1] - 53:12

**crystal-clear** [1] - 53:12

**CSI** [1] - 28:15

**cstv.com** [3] - 36:15, 40:13, 61:23

**current** [16] - 13:10, 13:17, 35:19, 35:20, 43:11, 48:4, 57:4, 57:12, 57:22, 60:10, 64:9, 64:23, 145:5, 158:3, 189:20, 191:9

**customization** [8] - 160:7, 160:10, 160:13, 160:15, 161:2, 173:12, 173:17, 173:18

**customize** [7] - 19:7, 19:11, 19:12, 152:22, 152:24, 160:6, 173:14

**customized** [1] - 30:19

**customizes** [1] - 153:3

**cut** [1] - 33:7

## D

**D-10** [1] - 138:8

**D-26** [2] - 93:15, 93:17

**D-34** [1] - 120:5

**D-4** [1] - 104:21

**D-5** [2] - 121:13, 121:15

**D-6** [8] - 5:21, 5:22, 154:19, 158:20, 181:10, 181:15, 193:17, 193:25

**D005** [1] - 39:19

**Dallas** [2] - 150:4, 167:15

**DALLAS** [1] - 2:3

**damaging** [1] - 142:9

**Dan** [2] - 7:16, 133:18

**DAN** [1] - 2:18

**dangerous** [1] - 124:23

**Daniel** [1] - 105:4

**Dasgupta** [2] - 164:1, 164:9

**DASGUPTA** [1] - 164:2

**data** [3] - 24:1, 69:10, 177:9

**database** [1] - 82:7

**DATE** [1] - 231:8

**date** [12] - 38:12, 44:21, 92:12, 93:25, 94:7, 103:7, 103:8, 136:3, 136:12, 181:12, 181:19, 191:23

**dated** [3] - 178:14, 181:22, 181:24

**David** [2] - 197:20, 198:6

**Davis** [9] - 7:15, 12:17, 13:1, 38:14, 39:7, 52:5, 53:15, 56:24, 85:3

**DAVIS** [62] - 2:9, 3:6, 3:9, 3:11, 3:14, 3:16, 12:19, 12:22, 12:25, 13:4, 17:6, 17:10, 20:9, 20:10, 27:20, 34:4, 34:13, 34:22, 35:1, 35:5, 35:10, 35:13, 38:8, 38:15, 38:23, 39:12, 39:13, 39:22, 42:5, 43:24, 44:6, 45:1, 45:3, 45:9, 46:12, 47:4, 47:22, 48:11, 48:18, 52:6, 55:21, 55:24, 56:19, 57:2, 57:24, 58:24, 59:11, 59:19, 59:20, 60:13, 60:23, 63:19, 63:22, 64:3, 71:7, 71:20, 72:2, 74:11, 83:4, 83:15, 84:19, 84:23

**day-to-day** [5] - 69:22, 75:5, 146:10, 168:8, 223:22

**days** [6] - 94:17, 123:18, 174:24,

214:16, 215:14, 216:20

**DC** [7] - 2:12, 34:8, 96:8, 206:16, 207:6, 207:13, 229:3

**deal** [8] - 19:2, 19:4, 25:16, 25:17, 68:8, 184:12, 203:14, 211:20

**dealing** [3] - 41:10, 178:24, 217:16

**dealings** [1] - 25:24

**Deborah** [1] - 22:16

**December** [2] - 36:6, 50:12

**deciding** [2] - 26:3, 221:19

**decision** [7] - 118:11, 118:16, 118:22, 124:8, 124:25, 146:25

**decisions** [4] - 164:24, 165:1, 208:11, 215:3

**declaration** [57] - 8:8, 8:11, 8:12, 8:13, 8:17, 9:2, 11:1, 39:2, 44:3, 51:19, 52:12, 52:15, 52:21, 53:21, 54:4, 54:6, 54:9, 55:20, 56:7, 56:12, 56:14, 95:11, 95:13, 95:22, 99:12, 99:22, 114:25, 115:3, 115:14, 115:16, 115:23, 116:9, 117:3, 117:6, 117:13, 130:17, 130:20, 131:6, 134:24, 184:7, 184:17, 186:22, 187:23, 199:10, 199:21, 206:18, 206:24, 209:9, 209:11, 209:25, 211:24, 216:4, 216:11, 224:22, 226:9, 226:10, 227:9

**Declaration** [3] - 51:23, 99:18, 184:4

**declarations** [1] - 11:7

**decrease** [1] - 128:17

**deep** [1] - 112:12

**defeats** [1] - 217:21

**defend** [1] - 229:4

**DEFENDANT** [8] - 13:3, 35:12, 64:2, 85:10, 101:3, 144:16, 174:10, 189:12

**Defendant** [1] - 162:14

**defendant** [7] - 7:20, 35:22, 93:7, 93:9, 177:11, 223:6

**defendants** [10] - 38:8, 39:4, 99:2, 116:15, 134:16, 223:2, 223:17, 229:16, 230:6, 230:19

**Defendants** [3] - 17:6, 43:24, 126:22

**Defendants'** [6] - 28:7, 51:24, 99:19, 104:19, 119:16, 149:12, 151:5, 184:5

**defendants'** [5] - 32:3, 224:12, 225:10, 228:10, 229:12

**defense** [6] - 134:7, 134:17, 225:23, 226:3, 227:20, 229:20

**defenses** [2] - 224:13, 225:15

**defer** [2] - 70:25, 222:5

**definition** [1] - 173:19

**defunct** [2] - 61:21, 62:22

**degree** [8] - 50:14, 50:15, 64:20, 121:7, 145:4, 161:2, 176:5, 217:9

**delays** [3] - 191:18, 191:21, 191:22

**DeLeon** [2] - 179:7, 179:15

**deliver** [1] - 126:7

**delivering** [1] - 153:16

**delivery** [10] - 19:21, 31:14, 31:20, 150:11, 195:8, 195:15, 202:2, 202:3, 202:6, 203:13

**Delta** [1] - 226:13
**Delta's** [1] - 226:22
**demanding** [1] - 175:13
**Denver** [1] - 166:23
**deny** [2] - 230:13
**department** [17] - 21:22, 21:23, 21:24, 21:25, 22:2, 22:5, 22:9, 22:12, 22:15, 22:21, 26:8, 26:10, 27:4, 27:6, 27:9, 158:18, 159:7
**departments** [4] - 21:15, 21:19, 21:21, 25:23
**depose** [1] - 230:7
**deposed** [8] - 8:9, 89:20, 89:23, 90:4, 90:21, 106:6, 109:18, 230:1
**deposition** [30] - 38:13, 38:22, 38:25, 52:23, 53:6, 53:11, 53:18, 78:25, 90:14, 90:24, 91:7, 91:20, 91:25, 106:9, 106:16, 107:12, 109:20, 111:15, 111:20, 113:15, 119:21, 147:21, 147:24, 148:12, 148:16, 148:22, 161:11, 165:22, 201:14, 201:17
**depositions** [2] - 225:7, 229:25
**depository** [1] - 30:20
**Derrick** [1] - 64:6
**Describe** [2] - 194:4, 194:9
**describe** [11] - 64:18, 90:3, 113:17, 138:12, 146:21, 150:9, 152:20, 153:2, 153:9, 190:2, 194:3
**described** [3] - 40:21, 47:25, 195:19
**describing** [2] - 80:17, 116:10
**description** [1] - 62:9
**design** [8] - 14:22, 18:7, 49:5, 49:25, 57:5, 57:13, 57:25, 75:20
**designated** [1] - 115:11
**designating** [1] - 22:3
**designation** [1] - 90:2
**designations** [1] - 195:16
**designee** [3] - 11:19, 125:7, 125:18
**designing** [2] - 20:1, 20:12, 65:20
**desk** [5] - 41:3, 63:3, 63:9, 66:7, 88:13
**destination** [1] - 14:3
**determine** [5] - 45:21, 98:10, 98:24, 228:21, 230:23
**determined** [1] - 226:19
**determines** [1] - 197:6
**develop** [2] - 61:25, 200:17
**developed** [16] - 42:15, 42:18, 54:17, 78:8, 176:11, 176:13, 183:19, 183:23, 197:10, 197:11, 197:12, 198:18, 202:8, 204:10, 204:12
**developer** [5] - 16:9, 30:4, 168:20, 176:10, 179:23
**developers** [12] - 15:2, 15:4, 15:18, 16:8, 21:4, 29:12, 149:16, 150:16, 166:15, 166:20, 168:18, 173:18
**developing** [2] - 59:13, 60:15
**development** [17] - 14:22, 15:9, 18:6, 18:7, 18:17, 49:5, 50:1, 57:6, 57:14, 58:1, 60:5, 60:11, 75:20, 75:23, 121:18, 153:18, 161:4

**DI** [1] - 11:2
**dialed** [1] - 117:15
**difference** [1] - 177:14
**different** [18] - 19:11, 39:14, 48:9, 56:10, 58:3, 60:20, 61:9, 76:9, 131:21, 146:8, 147:3, 172:4, 194:20, 205:10, 217:20, 218:17, 223:13, 230:9
**differing** [1] - 77:6
**difficult** [1] - 148:1
**digit** [1] - 218:23
**digital** [8] - 14:5, 14:9, 14:13, 145:6, 145:23, 164:18, 177:8, 194:25
**Digital** [2] - 189:23, 192:19
**diligence** [1] - 103:2
**diligently** [1] - 46:5
**Dimensions** [1] - 221:10
**direct** [14] - 17:12, 70:4, 70:8, 74:22, 75:1, 84:12, 84:15, 97:7, 97:24, 98:2, 193:16, 196:17, 209:4, 210:12
**DIRECT** [16] - 3:6, 3:9, 3:14, 3:18, 3:22, 4:3, 4:7, 4:10, 13:2, 35:11, 64:1, 85:9, 101:1, 144:15, 174:9, 189:11
**directing** [1] - 103:11
**Directing** [5] - 87:2, 99:21, 106:16, 181:7, 181:9
**direction** [8] - 79:25, 80:1, 96:7, 150:15, 155:4, 166:18, 167:7, 173:19
**directions** [1] - 96:10
**directly** [9] - 27:8, 27:14, 78:6, 154:3, 155:11, 156:20, 201:13, 206:9, 206:11
**Director** [1] - 189:21
**director** [5] - 145:6, 145:23, 150:10, 179:25, 189:24
**directory** [8] - 71:6, 72:7, 72:13, 73:2, 73:6, 73:8, 73:22, 79:14
**disclosure** [2] - 216:7, 228:10
**Disclosure** [4] - 17:4, 121:14, 151:8, 181:10
**disclosures** [20] - 32:4, 34:2, 75:11, 81:11, 102:19, 104:19, 104:24, 105:4, 108:3, 121:11, 162:7, 162:15, 173:7, 173:9, 173:10, 173:11, 173:15, 216:7, 220:13, 224:13
**discovery** [1] - 10:12
**discussed** [5] - 41:6, 41:9, 72:18, 79:1, 198:12
**discussion** [3] - 79:24, 80:5, 121:16
**Discussion** [1] - 34:16
**discussions** [3] - 70:20, 80:8, 120:19
**dislike** [1] - 223:17
**display** [1] - 160:25
**displaying** [1] - 203:3
**dispute** [6] - 115:19, 123:23, 223:4, 223:7, 223:16, 224:6
**disregarded** [1] - 215:16
**disseminate** [7] - 180:25, 181:3, 182:10, 183:11, 183:15, 183:18, 211:11
**disseminating** [1] - 182:18
**dissemination** [4] - 178:25, 182:25, 183:3, 183:6

**distance** [1] - 226:18
**distances** [2] - 177:2, 177:3
**distribute** [1] - 65:11
**distributed** [3] - 31:21, 65:10, 202:12
**distribution** [9] - 19:25, 20:11, 65:6, 146:3, 150:19, 169:3, 169:8, 195:18, 202:13
**DISTRICT** [2] - 1:1, 1:1
**District** [41] - 92:25, 112:4, 112:8, 112:19, 114:4, 119:2, 119:7, 120:15, 121:10, 122:10, 123:19, 124:4, 126:24, 127:13, 134:18, 135:23, 137:6, 183:12, 202:22, 213:16, 214:6, 214:10, 214:12, 214:15, 215:11, 215:21, 216:17, 216:19, 219:2, 221:18, 222:14, 223:3, 223:4, 224:9, 224:16, 225:18, 227:13, 229:6, 229:8, 229:15
**district** [2] - 221:12, 223:12
**divided** [1] - 76:11
**DIVISION** [1] - 1:2
**Division** [3] - 92:25, 131:18, 176:3
**division** [2] - 76:10, 196:6
**DJ** [1] - 229:8
**docket** [4] - 7:4, 8:23, 92:24, 93:4
**DOCKET** [2] - 1:3, 1:8
**docs** [1] - 92:9
**document** [40] - 8:17, 17:2, 17:21, 32:2, 37:24, 38:11, 38:15, 38:20, 44:18, 46:16, 67:1, 75:14, 83:24, 84:1, 84:11, 91:13, 92:4, 92:5, 92:6, 92:23, 93:19, 99:16, 102:21, 103:8, 110:4, 110:25, 111:13, 147:17, 148:9, 148:23, 149:13, 151:15, 151:18, 162:23, 178:10, 178:13, 178:16, 181:13, 181:19, 193:18
**documentation** [1] - 186:23
**Documents** [2] - 169:7, 187:3
**documents** [88] - 20:22, 20:25, 21:1, 21:2, 21:5, 21:8, 21:9, 21:10, 21:12, 21:13, 28:24, 29:9, 29:20, 29:21, 29:25, 30:5, 30:11, 32:24, 33:24, 37:16, 39:8, 49:10, 50:22, 68:23, 69:1, 69:3, 70:15, 70:18, 78:22, 79:5, 80:11, 80:13, 81:4, 82:4, 82:22, 94:13, 94:15, 94:17, 96:20, 121:17, 122:6, 122:9, 123:1, 123:8, 123:10, 123:13, 123:16, 158:13, 158:16, 167:21, 168:4, 169:3, 169:13, 169:18, 169:24, 170:2, 172:13, 187:2, 187:5, 187:11, 187:16, 188:24, 197:21, 201:23, 203:16, 203:24, 207:12, 207:21, 207:23, 208:7, 208:8, 208:12, 208:13, 208:15, 215:9, 215:11, 216:4, 216:8, 225:21, 225:22, 225:23, 225:25, 226:2, 226:5, 227:18, 227:20, 228:24
**dollars** [1] - 224:7
**done** [25] - 47:9, 69:23, 72:25, 97:14, 97:15, 97:19, 105:23, 105:25, 106:3, 106:24, 107:16, 137:22, 139:15, 148:5, 162:4, 165:12, 170:4, 173:17, 173:18, 175:17, 191:21, 207:10, 218:14, 226:1
**door** [4] - 88:10, 90:7, 203:9

**dos** [1] - 156:1
**dot** [1] - 14:8
**dot-com** [1] - 14:8
**double** [1] - 44:12
**double-check** [1] - 44:12
**Doug** [1] - 86:8
**down** [17] - 21:4, 28:15, 34:21, 63:16, 84:21, 100:16, 142:17, 174:1, 182:22, 189:7, 194:9, 194:16, 205:9, 208:9, 210:2, 212:22, 220:1
**download** [3] - 169:24, 187:12, 187:15
**downloaded** [2] - 30:1, 36:18
**downloads** [3] - 36:19, 69:10, 73:13
**Downs** [2] - 78:9, 78:16
**dozens** [1] - 37:9
**DRAKE** [4] - 4:7, 4:8, 174:9, 184:14
**Drake** [9] - 156:19, 156:22, 171:23, 171:25, 174:6, 174:13, 184:4, 184:16, 226:8
**drops** [2] - 194:18, 197:5
**drove** [1] - 87:5
**DTD06/23/09** [1] - 92:10
**Dupoux** [11] - 42:24, 43:9, 43:19, 44:22, 45:12, 45:14, 45:15, 47:10, 47:18, 47:25, 54:15
**Dupoux's** [3] - 43:21, 44:7, 45:11
**during** [13] - 9:24, 11:19, 14:8, 38:25, 53:17, 58:6, 90:23, 100:5, 106:9, 115:1, 134:2, 148:12, 201:17
**During** [2] - 93:2, 159:3
**Dustin** [4] - 11:18, 32:16, 63:22, 64:6
**DUSTIN** [5] - 3:14, 3:15, 64:1, 74:14, 83:14
**duties** [1] - 35:24
**DX** [2] - 17:11, 37:19
**DX-30** [5] - 4:23, 37:19, 37:25, 38:2, 38:9
**DX-32** [4] - 4:25, 43:14, 43:25, 45:11
**DX-33** [1] - 44:11
**DX-5** [22] - 4:21, 4:24, 5:1, 5:2, 5:3, 16:24, 17:3, 17:7, 17:11, 17:13, 17:20, 18:3, 39:15, 39:18, 40:8, 42:8, 48:13, 48:22, 66:19, 67:1, 67:4, 67:9

**E**

**early** [1] - 52:23
**easier** [1] - 219:24
**easily** [1] - 226:19
**EAST** [1] - 2:6
**Eastern** [35] - 92:25, 112:4, 112:8, 112:19, 114:4, 119:2, 119:7, 120:15, 121:10, 122:10, 123:19, 124:4, 127:13, 134:18, 135:22, 137:6, 183:12, 202:22, 213:16, 214:5, 214:10, 214:11, 214:15, 215:11, 215:21, 216:17, 216:18, 219:2, 223:3, 223:4, 224:9, 224:16, 227:13, 229:6, 229:8
**EASTERN** [1] - 1:1
**easy** [1] - 49:17

**economy** [2] - 229:5, 229:13
**Eddie** [1] - 164:12
**edit** [2] - 36:17, 202:7
**edited** [1] - 55:6
**editing** [4] - 194:15, 194:25, 197:3, 200:13
**editor** [1] - 197:4
**editorial** [2] - 63:9, 194:14
**editors** [2] - 179:11, 179:12
**Edmonds** [3] - 101:12, 128:6, 128:18
**educational** [4] - 64:18, 85:17, 145:2, 175:24
**EDWARD** [4] - 189:11, 198:16, 207:19, 211:22
**Edward** [1] - 189:15
**efficiency** [2] - 221:8, 221:23
**efficiently** [1] - 19:24
**effort** [1] - 215:20
**efforts** [4] - 25:9, 132:19, 158:3, 183:4
**eight** [6] - 15:11, 175:17, 179:14, 182:4, 182:8, 185:8
**Eight** [1] - 179:4
**either** [9] - 33:16, 90:17, 103:22, 106:24, 107:16, 137:5, 143:19, 210:22, 223:5
**electronic** [2] - 21:9, 21:10
**elicit** [1] - 134:9
**Elizabeth** [2] - 71:11, 74:2
**Elmo** [2] - 32:2, 75:15
**email** [2] - 96:19, 96:20
**EMC** [1] - 213:21
**employed** [10] - 13:8, 13:15, 35:17, 36:5, 45:22, 54:16, 56:8, 64:7, 64:16, 144:21
**employee** [18] - 11:19, 24:21, 55:18, 57:22, 72:7, 95:18, 101:18, 130:17, 133:16, 133:18, 135:21, 135:22, 137:2, 137:15, 190:25, 214:14, 216:19, 224:24
**employees** [30] - 15:1, 15:21, 15:24, 26:18, 42:19, 42:22, 43:1, 53:13, 57:4, 57:12, 58:23, 66:2, 71:18, 71:25, 88:13, 133:6, 133:9, 133:12, 135:13, 137:6, 148:19, 161:6, 161:14, 161:15, 162:25, 201:11, 201:12, 217:17, 217:18, 217:20
**employer** [7] - 13:10, 35:19, 35:20, 55:18, 56:5, 64:9, 71:19
**enable** [3] - 90:15, 97:20, 160:19
**enables** [1] - 67:22
**end** [11] - 10:22, 15:8, 17:24, 36:15, 113:8, 125:22, 138:17, 176:2, 179:23, 182:14, 217:5
**endeavors** [1] - 155:5
**ended** [1] - 177:7
**ends** [1] - 182:15
**engineering** [6] - 71:11, 75:19, 176:6, 189:21, 189:25, 190:21
**England** [2] - 207:9, 220:14
**Englewood** [16] - 176:21, 176:23, 179:16, 179:18, 179:20, 180:4, 180:19, 183:20, 184:23, 185:23, 186:3, 186:12,

186:25, 187:6, 187:7, 217:14
**enjoy** [1] - 175:18
**enjoyed** [1] - 176:4
**ensure** [1] - 103:2
**entered** [1] - 132:20
**entire** [5] - 33:9, 126:8, 132:17, 132:25, 133:2
**entirely** [2] - 53:1, 61:8
**entities** [5] - 56:10, 104:2, 214:20, 214:21, 218:7
**entitled** [3] - 152:23, 216:22, 220:22
**entity** [2] - 108:17, 109:6
**entry** [4] - 66:6, 195:9, 195:14, 195:15
**entry-level** [1] - 66:6
**episode** [1] - 37:11
**episodes** [41] - 13:23, 17:18, 17:20, 17:21, 17:25, 18:3, 20:18, 20:23, 21:16, 22:3, 23:21, 48:24, 67:3, 72:16, 72:22, 74:8, 74:24, 84:16, 152:1, 152:4, 154:6, 156:7, 156:8, 156:21, 157:24, 158:10, 158:14, 158:20, 168:5, 182:22, 183:1, 183:7, 183:12, 183:16, 183:19, 193:21, 195:24, 196:3, 198:11, 217:12
**episodic** [7] - 159:23, 161:4, 161:17, 165:5, 165:9, 169:3, 169:7
**equally** [2] - 9:7, 9:12
**equation** [1] - 216:24
**Eric** [2] - 133:15, 196:7
**ERNST** [1] - 2:11
**ESE** [1] - 2:14
**essentially** [3] - 38:6, 41:5, 176:11
**establish** [3] - 46:18, 119:2, 119:6
**estimate** [2] - 160:9, 211:2
**et** [1] - 77:25
**evening** [2] - 186:14, 186:17
**event** [2] - 57:18, 126:12
**Everywhere** [2] - 150:14, 183:3
**EVIDENCE** [2] - 3:4, 4:1
**evidence** [29] - 8:2, 9:24, 10:1, 11:9, 34:3, 46:17, 52:2, 66:21, 91:21, 93:13, 95:6, 98:16, 104:19, 138:6, 140:14, 143:19, 143:22, 149:12, 151:5, 154:19, 162:14, 181:9, 184:8, 215:10, 217:6, 217:7, 222:11, 222:12, 229:19
**evidencing** [1] - 121:17
**EVIDENTIARY** [1] - 1:14
**ex** [1] - 86:8
**ex-FBI** [1] - 86:8
**exact** [5] - 58:10, 58:11, 136:3, 136:12, 141:7
**exactly** [3] - 91:16, 91:18, 149:18
**EXAM** [1] - 4:12
**examination** [6] - 97:7, 99:11, 101:24, 127:5, 208:19, 210:12
**EXAMINATION** [49] - 3:6, 3:7, 3:9, 3:10, 3:11, 3:12, 3:14, 3:15, 3:16, 3:18, 3:19, 3:20, 3:22, 3:23, 3:24, 3:25, 4:3, 4:4, 4:5, 4:7, 4:8, 4:10, 4:11, 4:13, 13:2, 28:2, 35:11, 48:20, 57:1, 61:2, 64:1, 74:14, 83:14, 85:9, 94:22, 99:8, 101:1,

126:17, 135:10, 142:6, 144:15, 159:15, 171:1, 174:9, 184:14, 189:11, 198:16, 207:19, 211:22

**examine** [2] - 91:9, 149:8

**examined** [2] - 9:11, 216:8

**example** [8] - 19:10, 19:12, 41:21, 110:23, 166:17, 170:3, 194:13, 216:6

**examples** [1] - 146:15

**Except** [1] - 184:24

**except** [3] - 55:9, 220:19, 229:2

**exception** [3] - 45:5, 46:19, 137:8

**excerpts** [2] - 10:11, 143:14

**exclude** [1] - 109:24

**excluded** [1] - 47:16

**excuse** [1] - 166:2

**Excuse** [2] - 35:1, 188:10

**excused** [13] - 12:6, 34:14, 34:22, 34:24, 63:19, 63:21, 84:23, 84:25, 100:16, 174:4, 174:5, 189:5, 189:7

**executive** [2] - 102:3, 120:22

**exercise** [1] - 103:2

**exhibit** [10] - 16:23, 39:14, 44:2, 44:3, 93:11, 93:13, 93:25, 115:22, 166:2, 166:4

**EXHIBIT** [22] - 4:22, 5:4, 5:5, 5:6, 5:7, 5:8, 5:9, 5:10, 5:11, 5:12, 5:13, 5:14, 5:15, 5:16, 5:17, 5:18, 5:19, 5:20, 5:21, 5:22, 5:25, 6:3

**Exhibit** [62] - 17:9, 17:11, 28:7, 34:2, 40:1, 40:17, 43:13, 43:16, 43:18, 44:10, 44:25, 49:18, 51:23, 52:19, 74:16, 75:8, 76:19, 87:13, 87:16, 87:17, 87:25, 88:15, 88:17, 92:21, 99:12, 99:22, 102:20, 103:5, 104:19, 105:14, 110:3, 110:9, 110:12, 110:23, 114:25, 117:7, 119:16, 119:24, 120:3, 121:22, 122:2, 122:5, 137:25, 138:5, 147:15, 149:12, 151:5, 151:7, 151:11, 153:21, 154:9, 154:19, 155:7, 158:20, 162:13, 181:10, 182:20, 184:3, 188:3, 193:17, 193:25, 196:18

**exhibits** [5] - 9:23, 10:6, 16:17, 44:9, 178:4

**EXHIBITS** [1] - 4:19

**exist** [1] - 157:13

**existed** [1] - 99:3

**existence** [2] - 59:9, 62:16

**exists** [1] - 157:13

**expect** [3] - 9:25, 11:9, 230:20

**expedite** [1] - 8:2

**expeditiously** [1] - 222:12

**experience** [9] - 46:22, 47:5, 93:3, 94:4, 110:25, 121:7, 150:14, 190:2, 220:18

**experienced** [1] - 120:21

**experiences** [1] - 150:21

**expertise** [5] - 146:14, 176:12, 176:13, 203:1, 215:1

**Experts** [1] - 230:2

**experts** [3] - 147:5, 154:13, 229:24

**explain** [11] - 13:20, 14:19, 21:25, 35:21, 36:9, 37:5, 38:2, 38:17, 65:3, 67:19, 226:4

**explained** [1] - 217:8

**explanation** [2] - 37:3, 227:21

**explosion** [1] - 14:8

**expose** [1] - 150:21

**Express** [1] - 92:8

**extended** [1] - 175:7

**extends** [3] - 33:10, 49:24, 81:12

**extension** [1] - 40:13

**extensive** [13] - 199:5, 199:22, 199:23, 199:24, 200:5, 200:8, 200:10, 200:11, 201:8, 208:19, 209:4, 209:15, 230:16

**extensively** [7] - 199:3, 199:8, 199:16, 209:16, 209:22, 210:4, 220:20

**extent** [8] - 21:7, 21:11, 23:16, 26:6, 69:7, 80:6, 161:13, 225:6

**extremely** [2] - 141:4, 148:24

**Eye** [9] - 36:1, 36:9, 36:11, 40:22, 41:22, 41:25, 61:15

# F

**F-E-I** [1] - 136:24

**face** [3] - 96:16, 105:13

**face-to-face** [1] - 96:16

**Facebook** [2] - 45:16, 46:7

**facilitates** [1] - 150:8

**facility** [2] - 212:15, 216:9

**fact** [29] - 9:4, 53:14, 54:22, 98:10, 99:3, 113:7, 115:10, 117:22, 123:4, 123:23, 130:3, 132:20, 134:9, 137:17, 138:22, 162:8, 173:9, 175:18, 187:16, 208:24, 212:14, 214:11, 215:2, 220:21, 223:17, 223:18, 226:9, 227:4, 230:24

**factors** [2] - 221:13, 221:14

**facts** [9] - 8:10, 53:23, 54:1, 98:16, 213:5, 213:20, 222:22, 228:16, 230:12

**factual** [2] - 98:13, 98:18

**failed** [1] - 226:6

**fair** [4] - 53:4, 110:24, 160:10

**Fair** [1] - 192:7

**fairly** [2] - 87:20, 88:24

**fall** [1] - 42:11

**falls** [2] - 36:15, 40:14

**familiar** [21] - 24:21, 26:14, 27:12, 27:16, 32:12, 32:15, 33:5, 33:12, 33:16, 40:5, 42:6, 59:21, 67:3, 70:8, 76:7, 81:14, 82:6, 121:10, 154:5, 157:5, 157:14

**family** [13] - 16:14, 36:3, 71:25, 76:17, 124:1, 127:8, 127:10, 145:12, 145:14, 175:2, 175:7, 175:8, 175:13

**Fantasy** [5] - 40:9, 40:10, 50:4, 55:2, 55:4

**far** [12] - 68:19, 80:18, 84:17, 120:13, 141:21, 141:22, 150:25, 172:14, 176:23, 180:5, 226:25, 230:16

**farm** [1] - 203:9

**favor** [1] - 221:24

**FBI** [1] - 86:8

**feature** [2] - 27:2, 27:3

**features** [1] - 15:7

**FEBRUARY** [3] - 1:4, 1:9, 231:9

**February** [3] - 41:24, 103:6, 103:7

**federal** [2] - 93:4, 216:21

**FEDERAL** [1] - 2:21

**Federal** [8] - 10:11, 92:8, 213:21, 215:16, 216:21, 217:3, 220:5, 221:9

**feed** [1] - 37:15

**feeds** [2] - 153:17, 153:20

**Fei** [6] - 133:16, 135:24, 136:23, 136:24, 136:25, 137:8

**few** [11] - 10:10, 55:10, 124:19, 124:21, 124:24, 146:15, 167:4, 199:25, 200:6, 215:6, 220:8

**fewer** [1] - 207:23

**fiancée** [1] - 192:3

**field** [1] - 47:13

**FIGG** [1] - 2:11

**figure** [1] - 143:10

**file** [13] - 10:9, 19:23, 122:13, 122:17, 194:18, 195:5, 197:5, 197:7, 197:9, 197:11, 205:25, 206:5, 215:4

**filed** [46] - 10:9, 11:8, 44:13, 93:25, 94:18, 95:16, 95:17, 99:2, 105:15, 109:19, 112:2, 113:8, 113:22, 114:1, 114:12, 114:15, 114:25, 116:11, 116:14, 116:16, 117:1, 118:8, 118:17, 118:20, 119:3, 119:8, 123:19, 135:19, 136:4, 136:15, 137:7, 137:10, 143:1, 178:13, 206:24, 214:17, 214:20, 215:4, 216:4, 221:17, 221:21, 221:22, 223:13, 230:19

**files** [6] - 19:22, 31:22, 194:7, 194:20, 195:13

**filing** [11] - 44:15, 102:18, 113:4, 114:5, 118:12, 118:23, 207:1, 213:20, 214:4, 214:10, 225:10

**filings** [3] - 102:24, 103:3, 115:15

**film** [2] - 190:9, 190:22

**filters** [1] - 37:15

**final** [1] - 195:11

**finally** [1] - 191:22

**financial** [7] - 24:13, 69:17, 69:21, 71:12, 74:4, 164:8, 177:17

**fine** [5] - 10:7, 12:13, 12:21, 125:15, 126:9

**finish** [2] - 124:20, 144:7

**finished** [1] - 194:17

**firefighter** [1] - 145:16

**firm** [5] - 96:10, 101:12, 102:10, 128:6, 214:25

**FIRM** [1] - 1:20

**firms** [3] - 131:21, 131:25, 132:2

**first** [32] - 8:6, 10:18, 12:17, 27:24, 41:5, 42:2, 45:10, 58:14, 59:18, 68:5, 86:5, 88:8, 92:4, 92:5, 93:9, 93:24, 103:16, 103:21, 104:5, 110:17, 110:19,

117:22, 120:21, 144:13, 151:5, 151:13,
177:24, 181:11, 184:11, 213:16,
221:17, 225:13
**First** [6] - 17:4, 121:14, 151:8, 178:8,
178:12, 221:8
**firsthand** [1] - 44:24
**fit** [1] - 90:9
**five** [4] - 121:7, 161:6, 179:12, 192:20
**flew** [1] - 186:15
**flight** [1] - 185:17
**flights** [1] - 226:13
**flipped** [1] - 49:18
**FLOOR** [1] - 1:24
**Florida** [24] - 15:13, 16:9, 16:12,
16:15, 29:14, 30:4, 31:17, 31:19, 51:5,
51:10, 54:3, 54:20, 54:23, 55:7, 56:17,
63:7, 63:8, 63:12, 218:18, 218:24,
220:11, 226:1, 228:17, 228:11
**flown** [1] - 175:19
**fluctuates** [1] - 147:10
**fly** [4] - 174:24, 175:1, 185:15, 187:19
**focus** [3] - 14:10, 112:18, 225:19
**focused** [1] - 230:20
**folks** [12] - 68:22, 149:16, 155:12,
157:15, 161:20, 161:21, 161:22, 167:7,
168:9, 223:24, 227:1, 230:11
**Folks** [1] - 230:1
**follow** [3] - 97:14, 97:15, 229:12
**follow-up** [2] - 97:14, 97:15
**followed** [2] - 71:4, 97:16
**following** [3] - 87:17, 88:18, 209:24
**foot** [1] - 35:10
**Football** [6] - 40:9, 40:10, 40:11, 42:1,
50:4, 55:2
**FOR** [3] - 1:20, 2:5, 2:8
**FOREGOING** [1] - 231:9
**forgot** [2] - 72:1, 126:3
**form** [4] - 41:18, 153:7, 158:22, 211:4
**formal** [2] - 101:23, 102:2
**formation** [4] - 108:11, 108:15,
108:19, 108:21
**formats** [2] - 195:11, 206:6
**formed** [9] - 47:20, 108:17, 129:10,
129:19, 135:3, 223:8, 223:9, 225:3
**former** [6] - 42:19, 42:22, 43:1, 61:8,
182:25, 183:5
**Fort** [3] - 55:6, 63:8, 63:11
**forth** [2] - 96:21, 185:8
**Fortune** [1] - 211:3
**forum** [1] - 134:6
**Foundation** [1] - 58:21
**foundation** [20] - 20:5, 45:4, 45:6,
45:24, 46:18, 47:18, 57:15, 57:18,
59:16, 59:18, 60:7, 71:16, 129:12,
158:23, 159:1, 171:6, 171:19, 208:3,
211:5
**founder** [1] - 104:6
**four** [9] - 103:16, 103:21, 103:22,
108:4, 108:7, 174:24, 194:20, 209:6,
220:13

**fourth** [1] - 46:5
**FOX** [1] - 221:17
**frame** [1] - 143:11
**franchise** [3] - 97:22, 98:7, 134:25
**Francia** [1] - 15:19
**Francisco** [6] - 72:7, 72:24, 77:1, 77:3,
77:5, 228:17
**frankly** [1] - 59:7
**free** [2] - 148:17, 212:22
**freely** [2] - 228:16, 229:16
**frequently** [1] - 23:22
**Friedman** [2] - 197:20, 198:6
**Frisco** [1] - 167:17
**Froehlich** [2] - 68:11, 68:14
**FROM** [1] - 231:10
**front** [11] - 16:18, 37:17, 37:20, 66:18,
87:18, 87:21, 91:13, 99:14, 102:21,
104:12, 179:23
**front-end** [1] - 179:23
**FTP** [3] - 37:12, 37:13, 61:16
**full** [14] - 13:6, 15:3, 15:14, 15:17,
15:21, 35:15, 35:23, 110:17, 110:19,
133:10, 144:18, 152:3, 174:12, 225:13
**full-time** [5] - 15:3, 15:14, 15:17,
15:21, 35:23, 133:10
**function** [2] - 24:4, 146:13
**functions** [2] - 73:16, 223:21

## G

**Galabova** [1] - 150:11
**gather** [1] - 204:23
**gathered** [1] - 228:7
**GC** [1] - 92:7
**Geer** [1] - 192:22
**general** [25] - 7:10, 9:10, 20:16, 26:24,
42:16, 50:24, 100:19, 101:8, 101:11,
101:20, 102:6, 102:14, 102:23, 107:2,
121:9, 129:22, 131:14, 132:22, 137:17,
140:20, 158:8, 214:23, 215:1, 217:19,
223:19
**Generally** [1] - 210:16
**generated** [1] - 165:17
**generates** [1] - 165:15
**Genovese** [1] - 169:1
**gentle** [1] - 208:23
**gentleman** [2] - 24:18, 86:8
**gently** [1] - 209:3
**geographically** [2] - 195:12, 203:5
**Georgia** [13] - 166:14, 174:23, 184:17,
184:24, 185:4, 185:7, 185:12, 185:14,
186:15, 187:17, 187:18, 226:11, 229:11
**Gervais** [3] - 11:18, 32:16, 63:23,
64:4, 64:6, 64:7, 65:24, 83:16, 84:21,
228:1, 228:12, 228:14, 228:16
**GERVAIS** [6] - 3:14, 3:15, 3:16, 64:1,
74:14, 83:14
**Gigolos** [1] - 49:6
**Gilstrap's** [1] - 229:23
**given** [9] - 9:6, 73:1, 73:7, 96:10,

141:12, 148:22, 148:25, 203:1, 215:1
**Goessling** [27] - 105:4, 105:7, 105:11,
105:15, 105:19, 109:13, 109:18,
109:24, 109:25, 110:21, 111:1, 111:15,
111:24, 140:3, 140:4, 140:8, 141:2,
141:13, 141:15, 141:19, 142:4, 219:17,
219:18, 219:20, 219:22, 219:24, 230:5
**Goessling's** [1] - 111:19
**Golf** [4] - 157:17, 157:20, 157:22,
158:5
**graduated** [2] - 145:3, 145:4
**graduating** [1] - 86:13
**Graham** [1] - 86:8
**grant** [2] - 222:13, 229:7
**granted** [3] - 139:9, 139:10, 217:22
**granting** [1] - 229:14
**greater** [1] - 64:15
**Greg** [1] - 193:13
**GROUP** [1] - 1:23
**group** [9] - 14:25, 23:25, 71:21,
146:13, 161:19, 163:23, 167:13,
179:11, 182:17
**Group** [3] - 174:18, 180:12, 213:15
**growing** [1] - 223:16
**grown** [1] - 131:12
**guess** [15] - 19:24, 44:17, 77:6, 81:6,
132:24, 146:25, 150:10, 153:11,
167:11, 169:1, 184:10, 185:19, 198:22,
200:12, 207:12
**guy** [1] - 31:5

## H

**half** [3] - 10:10, 212:6, 217:25
**halfway** [1] - 182:22
**Halifax** [3] - 15:12, 16:3, 29:17
**hallway** [2] - 90:7, 156:23
**Hampshire** [10] - 104:8, 104:16,
106:25, 107:17, 124:13, 139:6, 215:6,
215:7, 220:14, 220:15
**hand** [5] - 10:15, 55:3, 88:21, 178:5,
178:15
**handed** [1] - 166:8
**handle** [1] - 69:22
**handled** [1] - 179:25
**handles** [1] - 73:12
**handling** [1] - 12:17
**hands** [1] - 63:2
**Handsaker** [1] - 161:24
**happy** [1] - 144:7
**hard** [2] - 21:11, 190:12
**Harish** [2] - 150:2, 150:6
**Harris** [10] - 66:14, 67:14, 67:17, 68:5,
68:8, 68:10, 68:12, 68:22, 69:4, 219:9
**Hayley** [2] - 196:9, 196:12
**head** [3] - 73:19, 161:8, 205:9
**headquartered** [8] - 51:7, 51:9, 76:25,
77:4, 77:7, 217:13, 228:6, 228:18
**headquarters** [11] - 55:6, 63:7, 63:11,
77:13, 174:20, 176:21, 177:19, 183:20,

**217:**4
**heads** [2] - 150:13, 150:14
**hear** [2] - 135:22, 222:6
**heard** [8] - 46:11, 112:20, 113:17, 115:1, 123:8, 123:22, 208:24, 223:19
**HEARING** [1] - 1:14
**hearing** [17] - 7:3, 7:23, 8:25, 9:1, 10:22, 11:5, 11:20, 39:9, 50:21, 126:20, 126:22, 141:12, 144:7, 144:11, 190:12, 213:19, 229:24
**hearings** [1] - 125:9
**hearsay** [13] - 44:20, 45:6, 46:19, 46:23, 47:1, 47:2, 47:16, 47:21, 48:6, 48:7, 58:21, 60:7, 71:16
**held** [6] - 142:12, 142:14, 177:4, 177:6, 219:11, 223:14
**help** [4] - 46:2, 48:5, 94:4, 120:8
**helpful** [1] - 148:2
**helps** [2] - 167:12, 179:23
**Henry** [1] - 133:18
**HEREBY** [1] - 231:8
**herring** [1] - 230:10
**Hi** [1] - 28:5
**high** [4] - 85:21, 85:22, 112:11, 190:4
**High** [1] - 175:25
**HILARY** [1] - 2:18
**Hill** [2] - 24:18, 24:19
**himself** [3] - 45:15, 95:18, 228:8
**hindsight** [1] - 225:2
**hired** [27] - 101:7, 101:10, 101:17, 119:10, 120:8, 120:18, 129:22, 130:2, 130:5, 131:11, 131:13, 135:18, 136:2, 136:3, 136:7, 136:11, 136:13, 136:14, 136:16, 136:17, 137:7, 137:9, 139:4, 214:16, 214:18, 216:20
**Hirsch** [3] - 27:2, 27:5, 27:9
**history** [7] - 46:22, 47:13, 62:20, 122:13, 122:17, 129:15, 216:8
**Hoffmann** [2] - 215:17, 216:23
**Hoffmann-LaRoche** [2] - 215:17, 216:23
**Hofstra** [1] - 64:20
**hold** [2] - 180:8, 213:17
**holding** [1] - 68:6
**Holdings** [1] - 221:10
**home** [7] - 36:21, 36:22, 95:5, 95:6, 185:11, 187:17, 201:24
**homegrown** [3] - 152:9, 156:17, 164:6
**honor** [1] - 224:5
**Honor** [162] - 7:7, 7:13, 7:19, 7:24, 8:19, 9:19, 9:21, 10:4, 10:8, 11:13, 11:17, 11:23, 12:2, 12:12, 12:19, 12:22, 12:25, 20:9, 27:21, 34:1, 34:4, 34:12, 34:14, 34:20, 34:23, 34:25, 35:2, 35:5, 35:10, 38:8, 38:10, 38:15, 38:19, 38:23, 39:1, 39:12, 41:4, 44:1, 44:6, 44:15, 45:1, 45:7, 47:15, 48:6, 48:19, 51:22, 52:3, 52:6, 52:9, 55:21, 55:24, 56:10, 56:19, 57:16, 58:20, 58:25, 60:18, 60:24, 61:8, 61:20, 63:12, 63:15, 63:20,

63:22, 70:19, 71:21, 71:23, 83:4, 83:12, 84:19, 84:22, 84:24, 85:5, 87:25, 89:4, 91:19, 93:12, 97:7, 97:23, 98:15, 100:18, 104:18, 106:12, 107:4, 110:9, 110:11, 111:8, 119:18, 120:2, 124:17, 125:6, 125:14, 125:16, 125:19, 126:5, 126:7, 126:15, 129:11, 131:1, 131:23, 131:24, 134:8, 135:7, 138:6, 140:9, 140:19, 141:24, 141:25, 142:18, 142:19, 143:5, 143:13, 143:21, 143:25, 144:9, 144:12, 147:18, 147:23, 148:13, 149:5, 149:10, 154:18, 154:20, 159:13, 162:17, 162:20, 166:3, 171:21, 173:24, 174:3, 178:3, 178:15, 184:2, 184:6, 184:13, 187:21, 188:1, 188:4, 189:5, 198:15, 200:1, 204:18, 205:3, 205:14, 207:17, 209:10, 211:16, 211:19, 212:24, 213:1, 213:4, 213:11, 213:12, 219:14, 219:15, 221:4, 221:5, 222:5, 222:10, 222:15, 222:18, 224:10
**Honor's** [4] - 9:13, 10:4, 11:1, 11:14
**HONORABLE** [1] - 1:15
**host** [5] - 19:16, 19:21, 61:8, 61:9, 152:11
**hosted** [6] - 31:11, 31:16, 31:17, 36:14, 76:20, 228:2
**hosting** [2] - 19:20, 62:6
**hour** [2] - 136:21, 137:4
**Hours** [1] - 49:6
**hours** [2] - 136:20, 185:18
**house** [4] - 62:2, 62:22, 67:11, 152:11
**housed** [1] - 61:22
**Houston** [19] - 86:1, 87:5, 95:24, 96:2, 96:5, 101:12, 114:10, 114:11, 114:14, 120:9, 128:6, 128:8, 130:6, 130:8, 130:24, 131:9, 133:15, 214:25, 224:25
**HowStuffWorks** [3] - 7:20, 221:16, 229:10
**HOWSTUFFWORKS** [1] - 2:5
**Hristina** [2] - 150:11, 151:2
**hub** [1] - 63:8
**Hudson** [1] - 169:1
**hundred** [1] - 107:9

**I**

**I-20** [1] - 227:4
**idea** [11] - 33:18, 33:24, 56:13, 56:15, 78:4, 81:4, 82:3, 82:18, 82:21, 84:7, 129:13
**identical** [1] - 182:5
**identification** [7] - 16:24, 17:3, 37:25, 43:14, 119:16, 219:7, 219:8
**identified** [14] - 48:13, 67:10, 95:18, 103:12, 108:10, 130:23, 134:16, 139:21, 148:19, 167:7, 178:21, 193:24, 196:20, 228:9
**identifies** [3] - 45:15, 227:18, 227:19
**identify** [6] - 21:19, 46:2, 131:5, 133:12, 179:5, 224:14
**identifying** [1] - 201:18

**identity** [1] - 147:25
**illustrate** [1] - 38:16
**Immediately** [1] - 88:10
**impeach** [1] - 107:5
**impeachment** [1] - 184:10
**implement** [2] - 19:14, 22:6
**implementation** [4] - 14:23, 18:8, 161:23, 165:13
**implemented** [1] - 147:2
**implementing** [1] - 15:7
**implies** [1] - 123:1
**implying** [1] - 212:9
**important** [7] - 192:6, 219:8, 219:11, 220:2, 220:5, 220:6, 225:6
**impression** [2] - 53:5, 216:5
**improper** [1] - 126:25
**IN** [1] - 2:17
**in-house** [3] - 62:22, 67:11, 152:11
**Inc** [6] - 76:4, 76:13, 76:16, 76:22, 76:25, 93:9
**inception** [1] - 61:15
**inches** [3] - 112:11, 112:12
**include** [2] - 35:24, 69:3
**included** [3] - 11:6, 67:4, 98:19
**includes** [5] - 18:22, 28:14, 28:15, 102:15, 149:16
**including** [5] - 13:24, 14:24, 139:16, 158:5, 218:18
**income** [5] - 55:19, 56:5, 101:25, 132:4, 132:6
**inconvenienced** [2] - 134:17, 227:13
**inconvenient** [1] - 134:6
**incorrect** [1] - 199:7
**increase** [2] - 128:17, 128:19
**Indeed** [1] - 214:20
**INDEX** [2] - 3:1, 4:19
**India** [1] - 167:4
**Indiana** [2] - 51:17, 62:17
**indicate** [2] - 45:17, 122:8
**indicated** [2] - 48:3, 79:12
**indicates** [1] - 42:1
**indicating** [2] - 75:9, 81:22
**individual** [10] - 22:11, 23:3, 23:7, 24:5, 73:1, 82:20, 165:25, 194:16, 194:17, 228:8
**individuals** [19] - 47:7, 70:8, 70:12, 71:8, 72:19, 84:10, 84:14, 103:16, 103:17, 148:4, 148:5, 149:20, 149:23, 150:22, 158:2, 167:6, 172:25, 179:10, 180:5
**industry** [1] - 190:3
**infer** [1] - 94:14
**inference** [1] - 94:19
**inform** [1] - 72:20
**information** [25] - 23:15, 23:19, 24:7, 41:15, 43:8, 47:14, 48:25, 54:20, 69:6, 69:13, 71:5, 73:4, 73:7, 79:2, 79:11, 79:13, 88:22, 138:18, 159:23, 160:23, 161:1, 161:16, 187:15, 201:19, 228:7

**informed** [3] - 43:3, 43:6, 59:8
**infringed** [2] - 142:14, 223:15
**infringement** [20] - 28:8, 30:15, 50:18, 50:19, 54:25, 151:6, 151:13, 181:24, 193:19, 193:24, 196:18, 196:20, 217:12, 221:20, 225:15, 225:19, 225:24, 226:3, 227:20, 228:20
**Infringement** [4] - 17:5, 151:9, 178:9, 181:11
**infringers** [1] - 224:4
**infringing** [2] - 75:21, 217:4
**ingested** [1] - 197:3
**initial** [17] - 32:4, 34:2, 54:24, 75:11, 81:11, 93:20, 102:19, 104:19, 104:24, 105:3, 108:3, 116:14, 162:6, 162:15, 173:6, 173:11, 173:15
**input** [1] - 53:13
**inquire** [1] - 72:15
**inquired** [1] - 89:12
**inquiries** [1] - 74:6
**inside** [11] - 88:5, 88:9, 88:10, 89:1, 90:6, 90:11, 90:17, 145:25, 147:3, 158:11
**inspected** [1] - 123:2
**inspection** [6] - 18:14, 68:3, 122:14, 122:20, 122:23, 123:6
**institution** [1] - 59:9
**instructed** [3] - 91:4, 94:15, 130:5
**intellectual** [2] - 223:11, 224:5
**intend** [1] - 224:13
**intends** [2] - 184:9, 224:3
**intent** [1] - 216:13
**interact** [2] - 159:4, 168:9
**interaction** [2] - 60:2, 96:19
**interactive** [1] - 190:24
**Interactive** [20] - 26:15, 26:18, 26:25, 27:3, 27:5, 76:4, 76:12, 76:16, 76:22, 76:25, 77:4, 77:16, 79:2, 82:11, 82:14, 83:22, 84:4, 84:8, 228:14, 228:18
**Interactive's** [1] - 79:8
**interest** [1] - 129:2
**interested** [2] - 195:12, 219:21
**interestingly** [1] - 224:10
**interface** [3] - 37:7, 37:9, 41:9
**interface/tool** [1] - 38:3
**internal** [1] - 72:13
**Internet** [15] - 30:2, 40:18, 44:20, 47:19, 65:10, 146:24, 169:4, 169:8, 169:25, 179:1, 194:11, 196:4, 196:25, 197:16, 198:12
**interstate** [1] - 227:2
**interview** [3] - 128:11, 128:14
**interviewed** [2] - 121:2, 128:13, 139:4
**intimately** [1] - 154:4
**introduce** [1] - 95:5
**introduced** [1] - 149:6
**invalid** [5] - 110:1, 110:22, 111:16, 142:13, 219:20
**invalidity** [7] - 111:2, 134:7, 134:16,

139:22, 224:11, 229:20, 230:4
**inventing** [2] - 106:19, 106:23
**invention** [4] - 105:23, 106:2, 107:25, 121:18
**inventor** [5] - 104:13, 105:7, 105:10, 141:3, 219:13
**inventors** [5] - 106:19, 109:14, 129:6, 219:17, 223:9
**investigate** [4] - 27:10, 70:14, 70:17, 95:21
**investigating** [1] - 27:1
**investigation** [14] - 73:3, 74:6, 86:24, 87:4, 95:9, 97:1, 97:5, 97:11, 97:19, 98:3, 98:6, 98:20, 100:6, 140:22
**investigations** [1] - 86:9
**investigative** [2] - 94:3, 96:10
**investigator** [8] - 8:7, 9:2, 85:16, 86:2, 86:6, 86:12, 86:15, 93:3
**invoice** [1] - 86:20
**invoke** [1] - 12:1
**involve** [5] - 67:12, 140:23, 224:11, 225:14, 225:16
**involved** [15] - 14:9, 21:16, 26:5, 59:13, 60:15, 65:17, 66:12, 98:2, 109:14, 110:1, 110:2, 166:16, 194:2, 223:22, 223:23
**involvement** [4] - 20:1, 26:11, 60:4, 60:11
**involving** [1] - 133:22
**IS** [1] - 231:9
**issue** [13] - 13:25, 38:24, 39:3, 44:17, 139:21, 141:9, 143:4, 146:22, 148:8, 191:3, 213:23, 230:8, 231:1
**issued** [1] - 138:1
**issues** [6] - 7:22, 10:12, 16:14, 103:13, 143:21, 224:11
**Issues** [1] - 221:8
**item** [1] - 9:21
**items** [3] - 17:13, 46:25, 91:4
**iteration** [1] - 150:6
**itself** [5] - 31:18, 41:16, 65:20, 68:21, 109:6
**iTunes** [1] - 36:19

## J

**J.R** [7] - 3:18, 3:19, 9:1, 85:5, 85:9, 94:22, 99:8
**JACKSON** [2] - 2:21, 231:13
**Jacques** [2] - 42:24, 43:19, 54:15
**James** [2] - 15:22, 104:5
**January** [1] - 152:5
**Jason** [1] - 15:21
**JENNIFER** [2] - 2:10, 2:13
**Jennifer** [2] - 7:14, 7:15
**JEREMY** [1] - 1:23
**Jeremy** [1] - 7:8
**Jerry** [1] - 33:7
**Jersey** [37] - 67:18, 68:15, 69:2, 133:19, 145:10, 151:3, 169:5, 169:10,

169:13, 169:16, 172:14, 172:15, 176:1, 176:22, 176:23, 179:16, 179:18, 179:20, 180:4, 180:19, 180:23, 183:21, 184:23, 185:4, 185:5, 185:8, 185:24, 186:13, 186:25, 187:6, 187:7, 217:14, 218:8, 219:10, 220:7, 220:10, 225:25
**Jesus** [1] - 163:23
**Ji** [3] - 133:16, 135:24, 136:23
**Jim** [2] - 23:8, 128:13
**job** [33] - 14:20, 16:15, 26:18, 27:11, 60:14, 62:9, 65:3, 70:3, 70:7, 70:9, 73:10, 73:11, 102:23, 119:11, 119:22, 128:15, 129:21, 131:10, 131:14, 132:7, 132:9, 133:3, 137:13, 145:22, 168:8, 175:6, 175:13, 176:15, 177:5, 182:25, 189:20, 191:16, 223:21
**jobs** [1] - 132:5
**Joe** [1] - 80:23
**JOHN** [1] - 1:20
**John** [1] - 189:15
**John's** [1] - 145:3
**Johnny** [3] - 7:7, 95:1, 222:18
**joined** [2] - 109:10, 125:9
**joining** [2] - 14:14, 176:8
**joint** [3] - 191:1, 191:8, 191:15
**Jonathan** [1] - 15:20
**Joseph** [2] - 77:17, 144:20
**Joshua** [1] - 161:24
**journalism** [2] - 45:20, 47:13
**journalist** [1] - 47:6
**journalists** [1] - 46:2
**JR** [1] - 1:20
**Judge** [2] - 221:10, 229:23
**JUDGE** [1] - 1:16
**judicial** [11] - 213:6, 221:8, 221:13, 221:23, 222:21, 226:12, 226:16, 226:25, 227:3, 229:5, 229:13
**JUDSON** [1] - 1:21
**Julia** [1] - 24:22
**Juliano** [2] - 25:20, 25:21
**July** [4] - 87:3, 98:11, 117:14, 117:18
**jumped** [1] - 126:9
**June** [9] - 92:13, 92:14, 94:2, 94:9, 113:8, 136:7, 178:14, 181:22, 212:4
**junior** [1] - 102:10

## K

**Kaplan** [3] - 93:21, 123:17, 215:12
**Katta** [1] - 150:14
**keep** [6] - 23:15, 23:19, 24:13, 28:14, 69:17, 204:16
**Ken** [1] - 73:21
**Kenny** [2] - 192:23, 192:25
**kept** [3] - 81:5, 81:6, 82:22
**Kerr** [2] - 15:22, 16:7
**Kevin** [2] - 168:21, 192:22
**key** [4] - 146:25, 218:6, 221:1, 221:3
**kids** [1] - 175:12
**kind** [4] - 119:1, 175:14, 214:5, 227:24

**Kirkland** [3] - 191:10, 198:21, 198:24
**kit** [2] - 153:18, 161:4
**knack** [1] - 62:10
**knowledge** [75] - 28:23, 29:8, 32:8,
33:2, 44:24, 48:8, 48:25, 49:4, 49:9,
49:25, 50:3, 50:20, 53:23, 54:18, 55:12,
55:15, 56:21, 57:5, 57:13, 62:12, 62:22,
63:1, 69:15, 72:16, 75:2, 75:5, 75:20,
78:7, 78:20, 80:11, 80:24, 80:25, 81:16,
83:9, 84:15, 95:3, 95:14, 99:4, 106:4,
106:21, 106:22, 107:7, 108:2, 108:14,
108:18, 123:21, 123:24, 129:17, 135:3,
139:25, 140:10, 140:17, 148:7, 158:24,
161:18, 165:4, 165:9, 165:16, 165:19,
171:23, 172:21, 180:24, 182:9, 184:22,
187:10, 188:7, 188:17, 188:23, 198:3,
217:9, 217:11, 218:3, 219:1, 228:23,
230:12
**knowledgeable** [33] - 20:17, 20:21,
22:13, 23:11, 24:6, 24:17, 25:1, 68:17,
69:13, 69:20, 79:21, 80:16, 81:11,
103:13, 108:10, 109:1, 158:4, 158:9,
158:18, 159:7, 171:18, 181:2, 183:10,
183:14, 195:23, 196:1, 196:2, 196:10,
197:18, 198:10, 217:9, 228:8, 228:14
**known** [4] - 39:3, 95:15, 188:14,
189:16
**knows** [5] - 47:18, 57:19, 60:8, 208:4,
224:10

## L

**label** [6] - 91:13, 91:17, 91:21, 94:5,
94:7, 94:9
**labeled** [1] - 92:6
**Lack** [1] - 129:11
**lack** [1] - 100:4
**lacks** [2] - 20:4, 45:24, 158:22, 171:6,
171:19, 208:3
**Lacks** [1] - 211:4
**lady** [1] - 133:15
**lag** [1] - 203:2
**Lagana** [2] - 73:21, 73:23
**LaGuardia** [5] - 174:25, 185:15,
185:20, 186:2, 186:14
**laid** [1] - 158:23
**landline** [1] - 90:20
**LANE** [2] - 2:2, 2:18
**language** [6] - 146:19, 213:19, 216:3,
216:6, 216:13, 216:25
**large** [2] - 145:14, 211:11
**largely** [1] - 81:8
**LaRoche** [2] - 215:17, 216:23
**Las** [1] - 34:8
**last** [19] - 27:25, 33:8, 35:9, 45:11,
45:13, 45:14, 45:17, 46:7, 46:9, 52:24,
93:20, 99:22, 125:22, 165:22, 178:12,
178:14, 191:19, 193:14, 227:9
**late** [1] - 14:8
**latest** [1] - 46:9

**Latino** [2] - 155:9, 155:17
**Lauderdale** [3] - 55:7, 63:8, 63:11
**law** [10] - 11:14, 34:17, 101:12, 127:17,
131:21, 131:25, 132:2, 214:25, 217:23,
220:25
**LAW** [2] - 1:20, 1:23
**Lawrence** [2] - 196:9, 196:12
**laws** [1] - 223:8
**lawsuit** [23] - 93:25, 94:18, 106:6,
106:16, 112:2, 113:4, 113:22, 114:5,
114:12, 114:15, 116:11, 123:19,
136:17, 137:10, 213:21, 214:4, 214:11,
214:16, 215:3, 215:5, 216:16, 221:17,
223:23
**lawsuits** [3] - 131:17, 131:20, 138:2
**lawyer** [1] - 110:25
**lawyers** [3] - 90:15, 95:21, 96:7
**lay** [3] - 45:3, 45:6, 59:17
**laymen's** [3] - 152:20, 153:2, 153:4
**Lea** [1] - 90:14
**lead** [1] - 102:9
**leaders** [1] - 161:20
**leadership** [2] - 155:3, 161:21
**leading** [3] - 20:4, 130:25, 131:22
**leads** [2] - 75:23, 157:6
**learn** [2] - 46:20, 92:15
**learned** [4] - 51:2, 92:18, 176:6, 228:6
**learning** [1] - 41:5
**lease** [5] - 112:23, 113:1, 118:12,
118:16, 118:22
**leased** [2] - 113:19, 118:7
**least** [8] - 51:12, 97:3, 124:9, 141:4,
198:22, 224:12
**leave** [3] - 12:12, 133:3, 186:17
**leaving** [2] - 186:17, 216:5
**led** [4] - 16:11, 26:25, 53:8, 202:24
**Lee** [3] - 68:10, 164:12, 172:20
**left** [3] - 43:10, 72:4, 125:22
**legal** [4] - 121:6, 134:10, 143:15,
188:21
**legitimate** [1] - 223:8
**Lego** [1] - 153:11
**Legos** [3] - 153:5, 153:6, 159:18
**less** [3] - 213:25, 218:8, 219:2
**letter** [2] - 92:8, 94:13
**lettering** [1] - 91:5
**level** [3] - 66:6, 172:6, 172:8
**leverage** [2] - 154:16, 156:10
**leverages** [2] - 155:2, 157:4
**leveraging** [2] - 156:6, 157:13
**LGA** [1] - 195:16
**license** [4] - 102:7, 102:12, 109:11,
132:20
**licensed** [6] - 86:15, 109:6, 127:17,
127:20, 127:23, 128:1
**licensees** [1] - 139:11
**licenses** [3] - 139:8, 139:10, 139:14
**licensing** [13] - 95:23, 102:16, 109:2,
120:19, 120:22, 129:23, 131:15,

132:17, 137:19, 138:14, 220:17, 221:7,
223:23
**LIDDLE** [10] - 2:17, 3:22, 3:23, 3:24,
3:25, 101:1, 126:15, 126:17, 135:10,
142:6
**Liddle** [24] - 7:9, 9:10, 12:5, 99:11,
99:18, 100:19, 101:5, 124:20, 125:23,
126:1, 126:2, 126:12, 126:19, 141:2,
214:8, 214:15, 214:18, 220:17, 220:19,
221:1, 221:3, 223:20, 224:8, 225:1
**Liddle's** [3] - 95:11, 214:3, 224:22
**Lieberman** [18] - 7:15, 7:25, 11:22,
12:14, 46:10, 85:3, 111:4, 127:5, 141:8,
142:8, 143:12, 144:6, 162:11, 212:16,
213:3, 213:8, 222:17, 229:3
**LIEBERMAN** [130] - 3:18, 3:20, 3:22,
3:24, 4:3, 4:5, 4:7, 4:10, 4:12, 4:15,
7:24, 8:6, 8:18, 8:21, 9:21, 10:8, 10:25,
11:4, 11:13, 11:17, 11:23, 12:10, 12:16,
85:5, 85:11, 87:24, 88:4, 89:3, 89:7,
91:19, 91:23, 93:12, 93:16, 94:20, 97:6,
97:23, 98:15, 99:9, 100:13, 100:18,
101:4, 104:18, 104:22, 106:11, 106:14,
107:11, 110:8, 110:14, 111:7, 111:10,
111:12, 119:17, 119:20, 120:2, 120:6,
121:24, 122:1, 122:3, 122:4, 124:16,
125:6, 125:14, 125:16, 125:24, 126:4,
129:11, 130:25, 131:22, 134:8, 135:11,
138:5, 138:9, 141:1, 141:14, 141:23,
142:19, 143:13, 144:9, 144:12, 144:17,
147:23, 148:17, 148:23, 149:10,
149:11, 154:18, 154:22, 159:2, 159:13,
162:12, 162:17, 166:8, 166:10, 171:2,
171:9, 171:13, 171:20, 171:24, 173:23,
174:3, 174:6, 174:11, 178:3, 178:7,
178:15, 178:18, 184:1, 184:6, 185:2,
187:25, 189:4, 189:8, 189:13, 190:18,
198:14, 200:1, 205:13, 207:20, 208:5,
208:6, 209:1, 209:10, 209:13, 211:9,
211:15, 212:25, 213:11, 222:5, 222:7,
222:9
**Lieberman's** [2] - 222:20, 224:20
**LIEBERMANN** [1] - 2:10
**lieu** [1] - 8:12
**lieutenants** [1] - 172:6
**lieutenants/managers** [1] - 172:8
**life** [1] - 44:5
**light** [1] - 143:22
**likely** [2] - 10:13, 225:16
**Limelight** [5] - 202:5, 210:18, 210:23,
211:1, 211:10
**Limine** [1] - 110:5
**limit** [1] - 141:13
**limitation** [1] - 98:21
**limited** [3] - 25:11, 80:6, 97:25
**Linda** [1] - 69:23
**line** [3] - 91:25, 106:18, 210:2
**Line** [1] - 107:14
**LinkedIn** [11] - 43:19, 43:21, 44:7,
44:8, 44:18, 44:23, 45:11, 45:12, 45:13,

45:20, 47:1

**list** [31] - 15:17, 17:13, 17:17, 17:24, 32:3, 33:2, 33:6, 33:8, 33:9, 33:13, 40:1, 40:5, 42:9, 67:3, 81:10, 81:19, 82:12, 103:12, 122:24, 147:12, 147:14, 147:19, 148:4, 148:14, 148:22, 149:8, 149:15, 149:20, 168:1, 182:5, 230:10

**listed** [57] - 17:20, 17:25, 18:3, 28:20, 30:14, 32:11, 33:18, 40:7, 42:8, 49:6, 49:14, 54:24, 67:9, 74:24, 77:16, 78:2, 78:9, 80:23, 81:11, 82:2, 82:10, 82:13, 84:10, 84:17, 93:18, 103:16, 103:21, 104:1, 104:13, 104:15, 104:23, 105:3, 105:15, 109:1, 151:23, 154:2, 155:9, 155:20, 156:3, 156:13, 156:15, 157:1, 157:3, 157:11, 157:20, 157:23, 158:20, 163:3, 167:17, 170:17, 173:6, 173:15, 178:19, 179:2, 182:22, 196:3, 220:13

**listen** [1] - 62:1

**listening** [1] - 225:20

**listing** [8] - 28:11, 29:3, 32:7, 48:23, 49:22, 149:1, 166:4, 170:7

**literally** [1] - 218:2

**litigate** [1] - 126:23

**litigating** [1] - 223:12

**litigation** [19] - 18:14, 38:12, 55:12, 55:15, 68:3, 80:8, 109:17, 131:15, 132:19, 134:3, 140:21, 140:23, 141:5, 214:19, 214:20, 215:13, 215:14, 216:4, 223:22

**live** [22] - 8:13, 11:8, 30:22, 43:12, 48:4, 61:16, 63:5, 65:25, 127:11, 145:10, 150:3, 151:2, 166:14, 174:22, 174:23, 175:10, 180:22, 184:17, 185:4, 191:10, 198:25

**lived** [4] - 79:12, 185:7, 198:21, 198:24

**lives** [19] - 18:17, 30:20, 46:8, 47:20, 51:5, 54:3, 56:16, 104:8, 105:1, 139:5, 139:6, 151:3, 163:8, 163:9, 164:9, 167:15, 167:16, 180:23, 219:25

**living** [6] - 43:12, 85:15, 128:8, 130:8, 141:16, 145:20

**LLC** [6] - 1:3, 1:8, 1:11, 93:8, 177:11, 223:7

**LLC's** [2] - 99:24, 162:15

**loan** [1] - 190:25

**Local** [1] - 121:19

**local** [3] - 100:1, 117:10, 121:11

**locate** [4] - 47:7, 120:9, 130:5, 166:4

**located** [101] - 14:15, 18:24, 21:1, 21:13, 22:9, 22:18, 23:9, 24:11, 24:19, 25:7, 25:14, 25:15, 25:21, 26:8, 27:18, 29:14, 29:20, 30:18, 32:22, 32:25, 33:22, 36:20, 43:9, 45:18, 47:11, 47:12, 48:15, 48:16, 63:11, 65:22, 67:16, 68:12, 69:1, 70:1, 70:12, 71:14, 72:5, 72:11, 72:22, 73:2, 73:17, 73:23, 74:1, 74:8, 76:1, 78:16, 78:23, 81:7, 81:25, 82:19, 83:2, 83:19, 95:23, 99:25, 115:5, 122:10, 123:16, 131:8, 133:13, 133:19,

139:2, 145:8, 145:25, 152:13, 152:14, 152:19, 154:14, 159:12, 159:21, 161:25, 162:1, 169:4, 169:9, 169:15, 169:18, 172:10, 172:11, 172:12, 177:13, 186:24, 187:2, 192:24, 192:25, 193:6, 197:15, 197:21, 197:25, 200:22, 201:9, 202:16, 203:17, 203:25, 217:18, 217:20, 218:4, 219:9, 224:25, 225:17, 225:25, 229:3, 229:17

**locating** [1] - 118:19

**location** [23] - 46:2, 70:14, 70:17, 72:15, 80:11, 81:14, 88:6, 88:9, 89:10, 89:13, 100:8, 114:11, 116:1, 141:13, 167:20, 168:4, 180:6, 188:7, 188:24, 225:22, 225:24, 228:23

**locations** [7] - 46:6, 48:4, 55:10, 62:19, 72:18, 112:21, 172:5

**Locke** [1] - 201:18

**log** [1] - 37:11

**Logan** [13] - 104:5, 104:6, 104:12, 105:10, 123:25, 124:1, 124:13, 128:13, 129:5, 139:5, 215:6, 220:14, 220:15

**London** [3] - 175:21, 207:9, 207:10

**LONGVIEW** [1] - 1:22

**Look** [1] - 209:25

**look** [32] - 19:13, 28:6, 28:10, 44:22, 45:12, 69:15, 74:19, 77:15, 79:14, 93:24, 103:5, 104:5, 117:5, 117:7, 121:13, 137:25, 151:10, 153:23, 155:3, 163:2, 170:6, 177:21, 178:8, 178:12, 181:12, 181:23, 182:20, 209:8, 209:14, 211:24, 214:22, 228:20

**looked** [6] - 43:11, 43:23, 45:13, 47:19, 73:6, 181:21

**Looking** [5] - 149:12, 155:17, 155:25, 178:19, 216:24

**looking** [8] - 41:20, 71:5, 105:13, 110:24, 115:22, 164:5, 164:7, 182:14

**looks** [3] - 19:14, 120:1, 215:19

**LOOP** [1] - 2:14

**loose** [1] - 166:8

**loosely** [1] - 90:6

**Los** [11] - 34:7, 78:17, 163:8, 163:10, 163:21, 163:24, 164:15, 164:22, 187:9, 190:10, 190:14

**loss** [1] - 101:25

**loud** [1] - 110:16

**love** [2] - 175:6, 175:7

**Love** [1] - 221:10

**low** [1] - 218:22

**lucky** [1] - 14:7

**Lufkin** [1] - 92:25

**lunch** [1] - 124:25

## M

**ma'am** [3] - 29:6, 32:5, 33:3

**machine** [1] - 194:16

**machines** [1] - 18:17

**MAGISTRATE** [1] - 1:16

**mail** [1] - 116:7

**Mailbox** [2] - 100:9, 112:14

**mailbox** [13] - 87:12, 112:8, 112:11, 112:17, 114:5, 115:12, 115:20, 116:4, 116:20, 122:18, 214:6, 214:8, 216:3

**mailboxes** [3] - 88:11, 88:19, 88:25

**main** [2] - 77:8, 161:22

**maintained** [1] - 98:25

**maintains** [1] - 24:1

**MAISEL** [1] - 2:10

**Maisel** [1] - 7:16

**majored** [1] - 64:21

**majority** [4] - 72:23, 72:24, 76:1, 158:17

**maker** [1] - 147:1

**manage** [3] - 131:20, 132:2, 133:11

**managed** [1] - 131:25

**management** [15] - 13:18, 14:21, 27:12, 148:19, 149:16, 150:18, 151:25, 152:10, 160:2, 160:12, 160:18, 205:23, 206:3, 210:23, 223:22

**manager** [7] - 64:24, 64:25, 65:4, 69:25, 150:6, 152:17, 190:21

**managers** [4] - 150:12, 161:24, 166:18, 172:6

**managing** [5] - 131:20, 132:18, 152:8, 202:9, 202:12

**MANBECK** [1] - 2:11

**Manhattan** [2] - 65:23, 68:13

**manufactured** [1] - 200:18

**Manufactured** [1] - 200:20

**March** [3] - 128:3, 191:13, 221:19

**Marcus** [1] - 193:15

**mark** [4] - 51:22, 162:10, 162:13, 184:3

**marked** [8] - 16:23, 17:2, 28:6, 37:24, 43:14, 75:7, 88:17, 119:15

**marketing** [9] - 25:9, 25:11, 25:12, 25:14, 25:18, 165:5, 165:20, 186:23, 187:5

**marking** [1] - 51:25

**married** [2] - 145:13, 175:11

**MARSHALL** [4] - 1:2, 1:6, 1:11, 2:6

**Marshall** [5] - 131:18, 226:15, 226:19, 227:3, 227:4

**Martin** [2] - 164:17, 172:20

**Marvel** [1] - 14:12

**Massachusetts** [28] - 18:25, 19:6, 30:13, 30:22, 105:16, 105:20, 106:25, 107:17, 115:17, 118:2, 118:4, 120:25, 124:10, 133:16, 139:2, 139:5, 141:16, 167:2, 200:23, 214:13, 215:5, 215:8, 219:18, 219:25, 220:18, 221:18, 229:9

**Matan** [2] - 152:18, 161:25

**matched** [1] - 73:8

**matches** [1] - 19:15

**material** [3] - 88:20, 197:2, 219:1

**Matt** [6] - 15:19, 16:10, 32:16, 35:6, 51:23, 63:4

**matter** [17] - 19:22, 39:11, 47:10, 48:9,

92:24, 98:1, 98:2, 142:1, 143:17, 144:11, 147:5, 154:13, 162:7, 188:8, 204:14, 211:20, 231:1
**matters** [1] - 102:11
**Matthew** [1] - 35:16
**MATTHEW** [5] - 3:12, 35:11, 48:20, 57:1, 61:2
**MCCONVILLE** [8] - 4:10, 4:11, 4:12, 4:13, 189:11, 198:16, 207:19, 211:22
**McConville** [13] - 125:8, 154:7, 170:12, 170:21, 171:3, 171:25, 189:9, 189:15, 189:17, 204:25, 207:21, 212:22, 227:6
**mean** [12] - 46:4, 46:12, 77:6, 77:12, 80:1, 146:2, 146:6, 150:7, 170:2, 185:4, 203:8, 221:13
**meant** [2] - 52:21, 121:22
**measure** [1] - 147:4
**media** [7] - 14:9, 64:24, 64:25, 65:4, 176:14, 191:4, 211:11
**MEDIA** [3] - 1:11, 2:8, 2:18
**Media** [9] - 66:14, 67:14, 67:17, 68:5, 68:8, 68:22, 69:4, 162:14, 177:11
**meet** [3] - 96:15, 152:25, 221:25
**meetings** [4] - 150:8, 167:12, 201:12, 219:6
**meetup.com** [2] - 45:17, 46:7
**Melinda** [1] - 15:20
**members** [10] - 20:20, 147:13, 147:25, 148:1, 149:15, 172:3, 179:5, 179:9, 192:24, 219:4
**memorandum** [7] - 10:10, 10:16, 11:5, 143:2, 143:6, 143:13, 230:18
**men** [3] - 42:19, 43:5, 48:3
**mention** [4] - 53:25, 54:7, 89:14, 162:24
**mentioned** [30] - 16:2, 22:20, 29:12, 29:16, 29:23, 30:12, 31:10, 36:7, 37:3, 51:1, 54:4, 54:5, 54:10, 54:12, 61:18, 63:6, 66:10, 68:22, 72:8, 78:13, 119:21, 138:22, 147:7, 164:6, 170:12, 172:25, 193:7, 199:3, 200:12, 205:12
**mentioning** [1] - 184:16
**message** [1] - 53:9
**Met** [1] - 28:15
**met** [7] - 32:15, 44:5, 46:21, 54:13, 54:15, 95:1, 201:12
**metadata** [2] - 23:1, 67:23
**metrics** [2] - 168:13, 218:14
**Meyers** [1] - 22:16
**mic** [1] - 35:8
**MICHAEL** [1] - 2:5
**Michael** [2] - 7:20, 164:17
**Michigan** [1] - 213:16
**Microsoft** [4] - 155:13, 190:23, 191:15, 216:23
**mid** [2] - 147:11, 152:5
**mid-January** [1] - 152:5
**middle** [1] - 93:20
**might** [14] - 8:2, 11:10, 19:12, 33:24, 46:25, 53:8, 55:3, 80:9, 81:5, 82:4,

91:19, 129:1, 141:10, 230:7
**migrating** [1] - 201:7
**Mike** [1] - 15:19
**mileage** [1] - 226:14
**miles** [9] - 37:1, 172:16, 174:23, 175:10, 176:25, 186:2, 186:4, 187:19, 226:15
**Miller** [1] - 93:21
**million** [2] - 98:11, 99:1
**millions** [1] - 224:7
**Milton** [1] - 174:23
**mine** [1] - 156:19
**Minneapolis** [2] - 93:23, 215:12
**Minnesota** [5] - 51:15, 62:15, 93:23, 123:17, 215:13
**minuscule** [1] - 218:21
**minutes** [12] - 10:10, 85:1, 124:19, 124:21, 125:2, 185:13, 186:9, 186:18, 199:25, 200:6, 217:15
**Minutes** [6] - 17:23, 28:14, 28:21, 49:14, 49:23, 74:20
**misinterpreted** [1] - 53:7
**misinterpreting** [1] - 57:21
**misleading** [4] - 116:22, 116:23, 215:20, 224:21
**misspoke** [2] - 52:20, 111:7
**misstated** [1] - 151:7
**mistyped** [1] - 169:12
**model** [2] - 223:24, 224:1
**modified** [1] - 204:9
**modify** [1] - 166:16
**modifying** [1] - 170:4
**modular** [1] - 90:10
**moment** [3] - 34:15, 35:1, 109:9
**Monday** [2] - 174:25, 186:6
**monetize** [2] - 129:19, 147:4
**monetizing** [1] - 223:10
**money** [1] - 73:13
**month** [2] - 114:18, 171:5
**months** [4] - 39:2, 44:13, 113:7, 191:19
**morning** [24] - 7:7, 7:13, 7:24, 9:12, 10:17, 11:20, 13:5, 28:4, 35:14, 63:17, 63:18, 85:12, 85:13, 94:24, 94:25, 101:5, 101:6, 126:14, 139:1, 141:15, 143:14, 143:25, 144:18, 186:6
**mornings** [2] - 174:25, 186:6
**Most** [3] - 145:15, 185:18, 186:7
**most** [36] - 14:14, 19:23, 20:16, 20:20, 22:12, 22:13, 23:4, 23:11, 30:25, 42:3, 62:8, 62:21, 68:17, 69:12, 69:20, 80:16, 158:8, 158:18, 159:7, 162:3, 171:17, 180:24, 181:2, 192:6, 196:1, 196:2, 196:10, 197:18, 203:12, 203:19, 203:21, 208:23, 211:11, 217:5, 218:6, 225:4
**mostly** [1] - 31:7
**Mother** [1] - 28:16
**motion** [40] - 7:3, 8:22, 12:15, 44:9, 44:15, 52:13, 95:16, 99:2, 109:19,

110:15, 113:8, 113:25, 114:24, 118:13, 118:17, 118:20, 118:23, 119:3, 119:7, 134:5, 135:19, 136:4, 136:15, 137:7, 184:20, 207:2, 207:25, 208:15, 214:12, 217:21, 217:22, 221:15, 221:16, 222:13, 225:10, 225:13, 225:19, 229:7, 229:14
**Motion** [4] - 51:24, 99:19, 110:5, 184:5
**motions** [2] - 118:8, 230:14
**movant** [1] - 125:21
**move** [20] - 11:9, 17:6, 38:8, 43:24, 87:24, 89:3, 93:12, 104:18, 110:8, 120:2, 138:5, 154:19, 162:14, 171:5, 184:4, 187:22, 191:18, 191:23, 192:13, 229:10
**moved** [16] - 114:22, 190:7, 190:8, 190:10, 190:14, 192:1, 192:9, 207:3, 207:6, 207:9, 207:13, 207:21, 207:22, 208:7, 208:8, 215:11
**movies** [1] - 26:4
**moving** [10] - 9:24, 10:1, 191:11, 191:14, 192:3, 192:12, 208:10, 208:12, 208:14, 227:8
**Moving** [1] - 205:9
**MPX** [5] - 153:15, 205:11, 205:21, 205:22, 206:1
**MR** [254] - 3:9, 3:10, 3:11, 3:16, 3:20, 4:5, 4:15, 4:17, 7:7, 7:19, 7:24, 8:6, 8:18, 8:21, 9:19, 9:21, 10:8, 10:17, 10:24, 10:25, 11:4, 11:13, 11:16, 11:17, 11:23, 12:1, 12:5, 12:10, 12:16, 17:8, 20:4, 28:3, 34:1, 34:6, 34:11, 38:10, 38:19, 39:1, 41:18, 44:1, 45:24, 46:15, 47:15, 48:5, 48:21, 51:22, 52:2, 52:8, 52:11, 56:3, 56:23, 57:15, 58:20, 59:16, 60:7, 60:18, 60:20, 70:19, 71:16, 71:22, 74:15, 83:7, 83:11, 85:5, 85:11, 87:24, 88:2, 88:4, 89:3, 89:5, 89:7, 91:19, 91:23, 93:12, 93:14, 93:16, 94:20, 94:23, 97:6, 97:10, 97:23, 98:5, 98:15, 98:23, 99:6, 99:9, 100:13, 100:14, 100:18, 101:4, 104:18, 104:20, 104:22, 106:11, 106:14, 107:4, 107:11, 110:8, 110:10, 110:14, 111:7, 111:10, 111:12, 119:17, 119:20, 120:2, 120:4, 120:6, 121:22, 121:24, 122:1, 122:3, 122:4, 124:16, 124:23, 125:6, 125:14, 125:16, 125:19, 125:24, 126:4, 126:15, 126:18, 129:11, 129:20, 130:25, 131:4, 131:22, 131:24, 132:3, 134:8, 134:14, 135:7, 135:11, 138:5, 138:7, 138:9, 140:9, 140:16, 140:19, 141:1, 141:14, 141:23, 141:25, 142:3, 142:7, 142:15, 142:19, 142:23, 143:5, 143:13, 143:25, 144:9, 144:12, 144:17, 147:18, 147:23, 148:13, 148:17, 148:21, 148:23, 149:10, 149:11, 154:18, 154:20, 154:22, 158:22, 159:2, 159:13, 159:16, 162:9, 162:12, 162:13, 162:17, 162:19, 162:22, 166:3, 166:7, 166:8, 166:9,

166:10, 166:11, 166:12, 170:24, 171:2, 171:6, 171:9, 171:12, 171:13, 171:19, 171:20, 171:24, 173:23, 174:3, 174:6, 174:11, 178:3, 178:7, 178:15, 178:18, 184:1, 184:3, 184:6, 184:13, 184:15, 185:2, 185:6, 187:21, 187:25, 188:3, 188:6, 189:2, 189:4, 189:8, 189:13, 190:18, 198:14, 198:17, 200:1, 200:4, 204:18, 204:21, 205:3, 205:4, 205:13, 205:15, 205:18, 207:16, 207:20, 208:1, 208:3, 208:5, 208:6, 209:1, 209:10, 209:13, 211:4, 211:9, 211:15, 211:18, 211:23, 212:20, 212:25, 213:4, 213:10, 213:11, 222:5, 222:7, 222:9, 222:18, 222:25, 226:22, 227:1, 230:22

**MS** [57] - 7:13, 12:19, 12:22, 12:25, 13:4, 17:6, 17:10, 20:9, 20:10, 27:20, 34:4, 34:13, 34:22, 35:1, 35:5, 35:10, 35:13, 38:8, 38:15, 38:23, 39:12, 39:13, 39:22, 42:5, 43:24, 44:6, 45:1, 45:3, 45:9, 46:12, 47:4, 47:22, 48:11, 48:18, 52:6, 55:21, 55:24, 56:19, 57:2, 57:24, 58:24, 59:11, 59:19, 59:20, 60:13, 60:23, 63:19, 63:22, 64:3, 71:7, 71:20, 72:2, 74:11, 83:4, 83:15, 84:19, 84:23

**MSN** [2] - 155:9, 155:17

**msnbc** [1] - 196:11

**msnbc.com** [2] - 191:1, 191:8

**multiple** [3] - 54:22, 54:23, 229:11

**mun** [1] - 156:1

**mun2** [4] - 156:1, 156:3, 156:5, 156:11

**must** [2] - 169:12, 208:22

## N

**name** [34] - 8:7, 13:6, 23:8, 24:8, 24:18, 27:23, 27:24, 27:25, 31:2, 33:8, 35:15, 64:4, 86:8, 87:10, 89:14, 93:6, 93:7, 93:8, 93:20, 95:1, 135:22, 135:23, 136:23, 144:19, 150:11, 152:6, 152:18, 161:6, 161:10, 165:23, 168:21, 174:12, 189:14, 189:16

**named** [6] - 24:21, 44:4, 133:16, 161:20, 164:1

**nameplate** [1] - 90:2

**names** [7] - 80:18, 148:1, 148:4, 148:19, 148:20, 166:4, 172:18

**nationwide** [1] - 87:11

**nature** [2] - 61:24, 141:10

**NBC** [112] - 4:1, 8:25, 14:11, 86:25, 112:3, 113:5, 113:7, 113:23, 116:16, 118:8, 118:17, 124:8, 125:18, 126:22, 136:18, 138:2, 139:17, 143:16, 143:20, 144:11, 144:12, 144:16, 144:23, 144:24, 145:5, 145:24, 145:25, 146:17, 151:14, 152:17, 154:1, 154:6, 157:25, 158:5, 158:9, 158:14, 158:19, 159:3, 159:8, 159:9, 159:11, 160:13, 161:17, 161:18, 162:7, 164:3, 164:5, 164:18, 169:12, 170:13, 171:18, 172:14, 172:15, 172:19, 172:23, 173:11,

173:15, 174:6, 174:10, 174:18, 175:6, 176:8, 176:15, 177:14, 177:16, 178:9, 180:12, 180:24, 181:2, 189:8, 189:12, 192:19, 193:21, 193:23, 194:10, 195:23, 196:1, 196:2, 196:4, 197:15, 197:18, 197:22, 198:4, 198:9, 198:10, 200:17, 201:5, 206:12, 206:21, 207:23, 208:8, 210:22, 212:25, 214:1, 214:21, 216:25, 217:7, 217:11, 220:2, 220:6, 221:15, 222:13, 226:7, 227:7, 227:11, 227:21, 229:1, 230:14

**NBC's** [3] - 125:7, 134:4, 161:23

**nbc.com** [5] - 151:22, 151:24, 152:4, 153:22, 164:19

**NBCUniversal** [12] - 144:22, 152:25, 162:14, 174:15, 174:18, 174:20, 177:11, 177:12, 177:19, 183:10, 183:14, 189:19

**NBCUNIVERSAL** [3] - 1:11, 2:8, 2:18

**near** [2] - 220:9, 225:18

**necessarily** [3] - 146:11, 156:7, 203:8

**necessary** [4] - 144:2, 160:15, 194:7, 194:20

**need** [8] - 7:22, 9:8, 10:22, 35:8, 59:17, 62:1, 75:15, 161:1

**needed** [2] - 18:13, 68:2

**needs** [4] - 10:19, 153:1, 160:6, 160:11

**negotiated** [4] - 102:7, 102:11, 109:10, 163:5

**Negotiating** [1] - 173:4

**network** [11] - 24:4, 146:18, 157:12, 158:6, 177:17, 195:9, 195:15, 202:6, 202:13

**Network** [6] - 146:17, 155:18, 155:20, 155:22, 155:25, 157:16

**Networks** [1] - 202:5

**networks** [9] - 19:21, 19:25, 20:12, 31:14, 31:20, 146:2, 202:2, 202:3, 203:13

**never** [11] - 32:18, 38:11, 44:2, 44:5, 46:21, 102:3, 102:7, 109:10, 147:19, 147:20, 148:14

**NEW** [2] - 1:25

**New** [191] - 14:16, 14:18, 15:11, 15:14, 16:13, 18:18, 21:6, 21:14, 22:10, 22:19, 23:10, 24:12, 24:20, 25:8, 25:15, 25:22, 25:25, 27:3, 30:9, 36:25, 37:1, 45:18, 46:8, 47:12, 65:23, 66:9, 67:17, 67:18, 68:13, 68:15, 69:2, 69:11, 70:2, 72:13, 72:25, 73:18, 73:24, 74:2, 74:5, 77:3, 81:9, 83:20, 86:9, 96:11, 104:8, 104:16, 106:25, 107:17, 124:13, 126:24, 133:19, 139:6, 145:8, 145:10, 149:21, 150:24, 151:1, 151:2, 151:3, 152:12, 152:19, 154:14, 154:15, 158:17, 159:12, 162:1, 167:7, 167:8, 169:5, 169:10, 169:14, 169:15, 169:16, 171:5, 172:10, 172:12, 172:14, 172:15, 172:20, 173:20, 174:21, 174:25, 176:1, 176:22, 176:23, 177:13, 179:16,

179:18, 179:20, 180:4, 180:19, 180:23, 183:20, 184:21, 184:23, 185:4, 185:5, 185:8, 185:20, 185:24, 186:11, 186:13, 186:25, 187:6, 187:7, 191:12, 191:14, 191:17, 192:1, 192:9, 192:12, 192:14, 193:4, 193:11, 193:13, 193:15, 194:13, 195:1, 195:4, 195:6, 195:10, 195:15, 196:7, 196:8, 196:16, 197:17, 197:23, 198:1, 198:8, 199:4, 199:8, 199:16, 200:7, 200:9, 200:13, 202:18, 206:15, 207:3, 207:6, 207:9, 207:14, 207:22, 207:24, 208:10, 208:15, 209:5, 209:18, 209:23, 210:5, 210:9, 210:14, 212:1, 212:10, 212:17, 215:6, 215:7, 217:13, 217:14, 218:4, 218:7, 218:8, 218:13, 218:14, 219:9, 219:10, 219:25, 220:7, 220:9, 220:10, 220:14, 220:15, 222:2, 222:14, 223:2, 224:16, 225:18, 225:25, 227:8, 227:15, 227:17, 229:4, 229:10, 229:15

**new** [13] - 27:1, 55:17, 59:2, 64:24, 64:25, 65:4, 142:1, 152:5, 180:10, 197:7, 211:20, 212:15, 214:19

**news** [2] - 177:17, 196:6

**News** [45] - 64:10, 64:12, 64:13, 64:23, 65:1, 65:5, 65:7, 66:3, 67:6, 67:8, 67:20, 67:25, 68:18, 68:24, 69:6, 69:8, 69:14, 69:17, 69:18, 69:25, 70:5, 70:9, 154:1, 154:6, 170:13, 174:18, 180:12, 189:23, 192:19, 193:21, 193:23, 194:10, 194:14, 194:23, 195:24, 196:4, 197:16, 197:22, 198:4, 198:10, 201:5, 206:12, 206:21

**next** [11] - 10:10, 33:10, 35:2, 85:4, 107:5, 122:12, 153:23, 171:5, 189:8, 203:9

**next-door** [2] - 203:9

**nice** [1] - 148:15

**night** [4] - 45:14, 45:17, 46:7, 46:9

**Nightly** [2] - 194:13, 194:23

**Nilesh** [3] - 179:7, 179:17, 179:24

**nine** [1] - 39:2

**Nineties** [1] - 14:8

**NO** [2] - 1:3, 1:8

**nobody** [4] - 216:17, 216:18, 220:8, 220:24

**non** [5] - 225:15, 225:19, 225:24, 226:3, 227:20

**non-infringement** [5] - 225:15, 225:19, 225:24, 226:3, 227:20

**None** [3] - 46:15, 162:17, 206:16

**none** [5] - 74:10, 106:19, 124:3, 124:6, 220:11

**Nonon** [1] - 15:20

**nonparty** [1] - 219:12

**nonstop** [1] - 226:12

**noon** [3] - 124:18, 144:3, 230:23

**Norlander** [18] - 32:16, 35:6, 35:7, 35:14, 35:16, 35:17, 39:15, 45:10, 47:5, 47:23, 48:12, 51:23, 57:3, 61:1, 61:5,

63:14, 227:25, 228:6
**NORLANDER** [8] - 3:9, 3:10, 3:11, 3:12, 35:11, 48:20, 57:1, 61:2
**North** [5] - 51:12, 62:14, 63:5, 105:1, 220:16
**north** [3] - 37:1, 150:4, 167:15
**northern** [1] - 218:10
**Norwalk** [2] - 36:23, 36:24
**note** [1] - 150:8
**notebook** [1] - 87:13
**noted** [1] - 17:23
**notes** [1] - 219:6
**nothing** [3] - 189:4, 225:21, 226:2
**Nothing** [7] - 83:11, 100:14, 142:15, 170:24, 189:2, 207:16, 212:20
**notice** [6] - 213:6, 222:21, 226:12, 226:17, 226:25, 227:4
**notify** [1] - 230:24
**Nova** [3] - 15:13, 16:3, 29:18
**November** [2] - 113:1, 127:22
**nowhere** [1] - 122:8
**number** [24] - 8:17, 8:23, 37:8, 45:14, 66:6, 100:2, 117:10, 117:16, 117:19, 117:23, 131:17, 149:22, 155:18, 156:25, 172:4, 172:17, 188:2, 193:20, 210:11, 214:9, 216:12, 218:12, 218:17, 229:22
**Number** [1] - 110:5
**numbered** [1] - 88:23
**numbers** [1] - 69:16
**numerous** [1] - 224:11
**NW** [1] - 2:11

# O

**o'clock** [1] - 125:4
**O'Keefe** [4] - 144:13, 144:20, 144:23, 227:16
**O'KEEFE** [6] - 4:3, 4:4, 4:5, 144:15, 159:15, 171:1
**O'Keefe's** [1] - 219:4
**oath** [2] - 106:8, 126:13
**Oath** [8] - 12:24, 35:4, 63:24, 85:8, 100:21, 144:14, 174:8, 189:10
**object** [2] - 38:10, 140:9
**Objection** [28] - 20:4, 41:18, 45:24, 47:15, 55:21, 55:24, 56:19, 57:15, 58:20, 59:16, 60:7, 60:18, 71:16, 83:4, 97:6, 97:23, 98:15, 129:11, 130:25, 131:22, 134:8, 158:22, 171:6, 171:19, 185:2, 200:1, 208:1, 211:4
**objection** [45] - 17:8, 20:7, 34:4, 39:10, 44:25, 45:25, 46:24, 47:3, 47:17, 47:21, 48:6, 48:8, 48:10, 52:4, 52:6, 55:23, 56:1, 56:20, 56:22, 70:19, 70:25, 71:22, 83:6, 88:1, 88:2, 89:5, 93:14, 97:8, 98:4, 104:20, 110:10, 120:4, 125:10, 129:14, 131:3, 134:11, 138:7, 147:18, 154:20, 162:16, 171:12, 171:22, 187:24, 187:25, 200:3

**obligation** [1] - 39:8
**observe** [1] - 90:20
**observed** [3] - 87:7, 87:9, 87:10
**obtain** [3] - 18:13, 68:2, 68:4
**obtained** [4] - 38:17, 89:16, 119:11, 139:11
**obvious** [1] - 224:18
**Obviously** [1] - 98:17
**obviously** [5] - 117:2, 142:25, 216:9, 219:21, 227:16
**occasion** [2] - 159:3, 212:18
**occasionally** [3] - 26:21, 61:11, 203:15
**Occasionally** [1] - 187:18
**occasions** [2] - 186:20, 212:2
**Occhiuto** [3] - 23:8, 23:9, 23:11
**occurs** [1] - 173:20
**October** [1] - 101:21
**OF** [59] - 1:1, 1:13, 1:14, 3:4, 3:6, 3:7, 3:9, 3:10, 3:11, 3:12, 3:14, 3:15, 3:16, 3:18, 3:19, 3:22, 3:23, 3:25, 4:1, 4:4, 4:7, 4:8, 4:11, 4:12, 4:19, 13:2, 13:3, 28:2, 35:11, 35:12, 48:20, 57:1, 61:2, 64:1, 64:2, 74:14, 83:14, 85:9, 85:10, 94:22, 99:8, 101:1, 101:3, 126:17, 135:10, 142:6, 144:15, 144:16, 159:15, 171:1, 174:9, 174:10, 184:14, 189:11, 189:12, 198:16, 207:19, 211:22, 231:10
**offer** [1] - 34:1
**offered** [4] - 95:5, 125:13, 128:15, 143:2
**Offering** [1] - 52:2
**Office** [2] - 127:24, 128:2
**office** [52] - 14:15, 36:20, 65:22, 77:8, 77:10, 77:11, 85:25, 89:9, 89:13, 89:25, 90:1, 90:3, 90:5, 90:18, 93:22, 95:10, 95:23, 95:25, 96:2, 96:5, 97:16, 112:4, 113:11, 113:14, 113:17, 114:23, 115:10, 118:12, 118:19, 118:22, 118:25, 119:2, 119:5, 119:7, 120:14, 123:10, 130:3, 130:6, 130:23, 131:5, 131:8, 145:7, 172:14, 172:15, 175:1, 180:18, 180:20, 214:5, 216:6, 216:18, 224:24
**officer** [3] - 79:1, 79:2, 79:8
**offices** [14] - 21:14, 89:9, 94:6, 97:5, 97:11, 118:1, 118:7, 118:11, 118:15, 118:16, 123:17, 152:12, 215:12, 224:8
**OFFICIAL** [1] - 2:21
**official** [1] - 90:2
**often** [1] - 192:14
**old** [3] - 180:13, 181:5, 182:19
**older** [1] - 61:10
**ON** [11] - 3:4, 4:1, 13:3, 35:12, 64:2, 85:10, 101:3, 144:16, 174:10, 189:12, 231:8
**on-air** [1] - 177:9
**once** [4] - 9:6, 26:21, 175:20, 175:21
**Once** [2] - 26:21, 194:14
**One** [8] - 15:12, 21:21, 41:3, 141:25,

150:12, 153:14, 161:24, 192:8
**one** [58] - 8:19, 10:4, 12:9, 16:2, 16:5, 16:8, 19:12, 24:2, 29:12, 29:13, 29:16, 31:24, 34:15, 37:10, 38:5, 40:17, 41:9, 42:2, 43:6, 50:8, 51:11, 51:15, 51:17, 62:15, 63:4, 65:9, 70:6, 75:9, 75:14, 76:14, 90:15, 96:25, 97:20, 98:12, 105:10, 108:4, 108:7, 109:13, 130:11, 130:13, 145:15, 160:5, 168:17, 168:23, 176:15, 188:13, 200:9, 200:11, 201:12, 208:11, 208:14, 212:18, 214:14, 219:17, 221:20, 230:2
**one-way** [1] - 96:25
**ones** [3] - 62:21, 77:24, 182:13
**ongoing** [1] - 14:23
**online** [35] - 18:4, 20:23, 21:3, 45:16, 47:7, 48:24, 58:6, 60:6, 68:18, 68:24, 72:17, 151:23, 152:2, 152:4, 154:2, 154:4, 154:12, 155:1, 155:10, 155:21, 156:4, 156:16, 157:3, 157:11, 157:16, 157:21, 157:23, 158:6, 158:10, 158:15, 160:24, 161:1, 165:5, 167:21, 197:22
**Open** [1] - 217:2
**open** [3] - 28:9, 48:22, 74:16
**OPEN** [1] - 7:1
**opened** [1] - 114:23
**operated** [1] - 177:12
**operates** [2] - 150:9, 150:10
**operating** [1] - 108:21
**operation** [7] - 23:13, 49:5, 49:25, 75:20, 79:22, 84:15, 108:11
**operations** [14] - 21:23, 22:20, 22:23, 23:3, 23:12, 25:3, 30:23, 69:22, 69:25, 71:9, 72:25, 75:6, 164:19, 179:25
**operators** [2] - 163:13, 163:16
**opinion** [2] - 97:20, 98:12
**opportunity** [1] - 10:20
**opposed** [2] - 70:23, 223:24
**opposition** [1] - 114:24
**Opposition** [1] - 99:19
**Options** [1] - 182:16
**oral** [2] - 143:21, 144:8
**order** [6] - 62:3, 129:19, 160:17, 160:20, 160:24, 206:1
**Oregon** [2] - 166:21, 168:24
**organization** [2] - 147:4, 158:12, 159:10, 159:11
**organized** [1] - 214:23
**original** [11] - 30:21, 31:8, 44:9, 44:13, 44:15, 117:1, 123:12, 123:15, 204:9, 215:9, 223:12
**originally** [2] - 62:3, 123:16
**Orman** [1] - 182:15
**otherwise** [1] - 44:21
**ought** [3] - 107:5, 227:3, 230:11
**outlawed** [1] - 223:25
**output** [1] - 195:5
**outside** [8] - 25:25, 62:18, 65:7, 67:12, 125:11, 167:8, 174:24, 187:6
**overall** [2] - 156:20, 158:8

**overloaded** [1] - 203:10
**overrule** [12] - 20:6, 45:25, 56:1, 60:19, 60:21, 97:8, 98:4, 129:14, 129:17, 134:11, 171:22, 200:3
**Overruled** [2] - 132:1, 185:3
**oversee** [1] - 131:15
**overseeing** [1] - 132:19
**overtook** [1] - 61:24
**overview** [1] - 145:1
**own** [3] - 153:10, 220:12, 220:18
**owned** [5] - 109:2, 123:25, 124:1, 177:12, 225:1
**owner** [3] - 87:8, 89:12, 89:17
**owners** [1] - 124:3
**Oxygen** [5] - 146:17, 156:25, 157:2, 157:4, 157:5

## P

**P-1** [4] - 5:24, 34:2, 34:5, 75:10
**P-2** [6] - 5:25, 6:1, 51:23, 52:7, 52:21, 75:8
**P-3** [4] - 6:2, 162:10, 162:13, 162:18
**P-4** [4] - 6:3, 184:3, 188:3, 188:5
**p.m** [5] - 125:5, 204:24, 231:4
**Pablo** [1] - 31:3
**pack** [1] - 87:11
**packages** [1] - 88:12
**packed** [2] - 191:24, 191:25
**Page** [1] - 121:21
**PAGE** [1] - 3:2
**page** [88] - 10:10, 17:11, 17:12, 17:13, 17:23, 17:24, 28:10, 28:20, 28:21, 29:2, 29:5, 29:6, 33:11, 33:14, 39:25, 43:19, 43:21, 44:7, 44:8, 44:18, 45:11, 45:16, 49:6, 49:7, 49:13, 49:14, 49:15, 49:22, 49:24, 50:5, 52:15, 52:19, 66:23, 66:24, 67:6, 74:20, 87:17, 87:18, 88:17, 88:18, 88:21, 91:13, 91:24, 93:11, 93:17, 93:24, 103:17, 103:21, 104:1, 104:12, 106:17, 107:12, 110:15, 110:17, 110:20, 121:15, 121:20, 122:5, 123:9, 154:9, 154:11, 154:23, 155:7, 155:10, 155:25, 156:12, 156:13, 156:15, 156:25, 157:3, 157:17, 163:2, 170:6, 178:12, 178:14, 181:12, 181:17, 182:16, 182:20, 182:21, 213:19, 217:1, 225:11, 225:13
**pages** [35] - 28:15, 48:23, 74:25, 77:25, 78:2, 81:12, 103:11, 151:17, 151:18, 151:23, 153:22, 153:23, 154:2, 154:24, 155:17, 155:21, 156:1, 156:4, 157:8, 157:11, 157:18, 157:20, 170:17, 171:15, 181:23, 182:3, 182:14, 193:18, 193:20, 193:24, 196:3, 196:5, 196:17, 196:20
**PAGES** [1] - 1:13
**paid** [8] - 97:21, 98:7, 130:7, 134:24, 134:25, 135:2, 136:21, 137:4
**Pandora** [1] - 14:12

**paper** [3] - 21:8, 21:11, 92:4
**papers** [7] - 8:22, 9:3, 44:13, 108:16, 108:21, 116:17, 117:1
**PAPOOL** [1] - 2:1
**Papool** [2] - 7:8, 91:8
**paragraph** [16] - 52:21, 99:21, 110:17, 110:19, 117:8, 178:10, 178:19, 178:21, 179:3, 181:21, 199:13, 206:19, 209:8, 209:14, 209:25, 211:25
**parent** [1] - 144:24
**parentheses** [1] - 92:9
**Paris** [1] - 175:22
**Park** [1] - 175:25
**PARKER** [1] - 2:13
**part** [33] - 26:14, 26:18, 27:11, 29:22, 29:23, 36:2, 51:12, 64:13, 64:14, 64:15, 65:12, 67:13, 70:3, 70:7, 71:20, 76:7, 76:13, 76:16, 77:16, 86:7, 102:23, 124:9, 129:21, 133:10, 147:22, 154:7, 183:3, 189:22, 208:8, 218:10, 218:24, 224:22, 228:21
**part-time** [2] - 86:7, 133:10
**participate** [2] - 80:5, 90:16
**particular** [18] - 14:25, 19:1, 22:11, 23:25, 24:5, 24:16, 25:16, 25:17, 36:8, 38:24, 42:23, 45:20, 68:7, 88:23, 194:8, 212:18, 213:23, 221:12
**particularly** [4] - 10:13, 26:22, 143:22, 175:18
**PARTIES** [1] - 7:1
**parties** [9] - 7:25, 8:9, 9:5, 19:16, 19:19, 70:21, 229:18, 229:19, 229:20
**parts** [2] - 217:19, 217:21
**party** [12] - 18:19, 31:10, 66:11, 66:14, 152:7, 155:13, 217:5, 218:6, 219:8, 225:17, 230:3
**Pass** [1] - 159:13
**pass** [8] - 27:21, 48:19, 74:12, 99:6, 124:16, 135:8, 184:1, 198:14
**past** [5] - 34:8, 41:21, 103:18, 103:24, 212:19
**Patel** [4] - 150:2, 163:3, 167:11, 173:2
**patent** [41] - 50:18, 50:19, 50:22, 104:10, 104:12, 105:8, 105:13, 105:15, 105:23, 106:2, 106:24, 107:25, 109:6, 109:25, 111:3, 111:16, 121:11, 129:6, 129:7, 129:23, 132:18, 132:24, 134:1, 134:3, 139:11, 140:8, 141:3, 142:12, 188:11, 188:14, 188:15, 219:14, 219:20, 221:5, 223:14, 223:23, 225:16, 229:22, 230:1, 230:8, 230:9
**Patent** [3] - 127:24, 128:2, 178:9
**patent-in-suit** [2] - 129:7, 129:23
**patentee** [1] - 221:7
**patents** [10] - 109:2, 129:19, 129:23, 129:24, 133:1, 133:2, 139:16, 223:10, 223:13
**patents-in-suit** [1] - 223:10
**patina** [1] - 215:19
**Patrick** [1] - 93:20

**Patty** [1] - 27:2
**Paul** [2] - 42:24, 54:14
**pay** [6] - 114:17, 128:17, 128:18, 128:19, 130:3, 173:4
**paying** [1] - 223:20
**payments** [1] - 135:4
**PAYNE** [1] - 1:15
**PDK** [3] - 153:18, 205:11, 205:23
**Pelzer** [1] - 15:21
**penalty** [1] - 53:22
**pending** [9] - 34:12, 83:11, 131:17, 170:24, 221:12, 229:6, 229:7, 229:9, 229:10
**Pennsylvania** [1] - 166:25
**people** [54] - 25:13, 27:13, 29:13, 32:11, 33:5, 45:21, 54:12, 61:25, 62:5, 66:6, 72:24, 73:1, 75:3, 75:23, 77:2, 81:10, 82:10, 82:12, 82:13, 84:17, 102:11, 103:16, 103:21, 103:22, 103:23, 138:16, 147:7, 147:9, 148:7, 148:20, 159:4, 166:13, 166:19, 168:23, 169:23, 171:18, 172:5, 172:21, 173:14, 179:14, 179:22, 180:24, 181:2, 186:7, 188:13, 192:4, 192:20, 195:22, 196:2, 198:25, 203:19, 208:11, 216:15, 217:10
**per** [1] - 128:22
**percent** [2] - 107:9, 129:4
**percentage** [8] - 102:15, 129:1, 129:2, 160:7, 160:10, 211:2, 218:23, 228:21
**Perfect** [1] - 213:10
**performed** [1] - 196:24
**performs** [1] - 24:3
**Perhaps** [2] - 45:3, 172:16
**perhaps** [1] - 45:6
**period** [1] - 191:2
**perjury** [1] - 53:22
**Permission** [2] - 52:8, 162:19
**permission** [3] - 9:14, 10:15, 224:3
**permits** [1] - 144:6
**person** [27] - 9:4, 24:16, 25:17, 44:4, 44:5, 54:8, 68:16, 69:12, 79:4, 111:20, 120:8, 120:18, 121:5, 136:2, 136:11, 137:9, 158:9, 164:1, 168:12, 184:7, 192:8, 192:10, 194:14, 196:1, 197:18, 219:5, 221:7
**person's** [1] - 135:23
**personal** [18] - 16:13, 53:23, 57:5, 57:13, 80:11, 83:8, 106:4, 108:14, 108:18, 129:17, 139:25, 148:7, 165:4, 165:8, 165:16, 165:19, 182:9, 188:23
**PERSONAL** [4] - 1:3, 1:8, 1:20, 2:17
**Personal** [142] - 7:3, 7:9, 7:10, 9:10, 89:9, 89:15, 89:21, 89:23, 92:9, 92:18, 93:8, 94:1, 94:6, 94:14, 94:16, 94:18, 95:16, 95:18, 95:23, 97:2, 97:21, 98:7, 98:25, 99:24, 100:20, 101:7, 101:10, 101:18, 102:6, 102:15, 102:19, 102:24, 103:12, 103:18, 103:19, 103:23, 103:24, 104:6, 104:23, 105:4, 107:3, 108:4, 108:7, 108:12, 108:15, 108:19,

108:23, 109:2, 109:5, 109:10, 109:14, 109:17, 109:19, 109:23, 110:4, 110:5, 111:1, 111:3, 111:14, 111:16, 111:23, 112:3, 112:7, 112:19, 112:23, 113:11, 113:19, 114:3, 115:4, 115:24, 116:10, 116:21, 117:9, 118:7, 118:15, 119:12, 119:13, 120:7, 121:9, 123:10, 123:25, 124:3, 124:12, 128:4, 128:9, 128:18, 128:21, 129:10, 129:24, 130:2, 130:6, 130:17, 132:21, 132:25, 133:7, 133:9, 134:24, 135:13, 137:18, 137:20, 137:23, 138:1, 139:9, 139:10, 139:15, 140:7, 140:12, 140:20, 141:5, 141:21, 142:9, 142:23, 213:24, 214:5, 214:7, 214:14, 214:18, 214:22, 214:24, 215:9, 215:14, 215:21, 215:24, 216:5, 216:9, 216:16, 218:1, 219:3, 219:23, 220:18, 221:21, 221:24, 222:19, 223:7, 223:11, 223:16, 223:25, 224:2, 224:6, 224:21, 224:23, 224:24

**Personally** [1] - 82:15
**personally** [3] - 40:17, 140:4, 167:19
**personnel** [3] - 183:10, 183:14, 188:18
**persons** [7] - 27:16, 33:2, 68:16, 69:20, 70:4, 103:13, 230:11
**perspective** [2] - 143:16, 164:8
**pertained** [1] - 208:13
**pertains** [1] - 50:25
**pertinent** [1] - 143:22
**Phelan** [9] - 87:6, 87:21, 89:1, 89:10, 99:25, 100:7, 112:15, 115:25, 115:25
**Phil** [3] - 179:7, 179:15, 179:23
**PHILLIPS** [1] - 2:5
**philosophy** [1] - 64:22
**phone** [7] - 41:6, 96:15, 96:19, 117:14, 117:19, 214:9, 216:12
**phones** [1] - 216:14
**photograph** [4] - 87:18, 87:20, 88:18, 88:24
**photographs** [3] - 87:7, 88:5, 96:21
**phrase** [1] - 116:12
**physical** [6] - 89:10, 112:4, 112:7, 114:3, 117:14, 120:14
**physically** [2] - 68:12, 177:18
**pick** [3] - 72:3, 92:4, 116:6
**pictures** [4] - 46:22, 95:6, 95:10, 95:25
**piece** [1] - 206:4
**Pitcock** [22] - 7:8, 27:22, 28:5, 46:13, 83:16, 84:11, 142:22, 147:23, 148:17, 171:3, 171:14, 172:3, 172:17, 173:5, 173:8, 204:13, 205:2, 208:18, 209:3, 209:17, 210:17, 211:13
**PITCOCK** [86] - 1:23, 1:23, 3:7, 3:10, 3:15, 4:4, 4:8, 4:11, 4:13, 17:8, 20:4, 28:3, 34:1, 34:6, 34:11, 38:10, 38:19, 39:1, 41:18, 44:1, 45:24, 46:15, 47:15, 48:5, 48:21, 51:22, 52:2, 52:8, 52:11, 56:3, 56:23, 57:15, 58:20, 59:16, 60:7, 60:18, 60:20, 70:19, 71:16, 71:22, 74:15, 83:7, 83:11, 143:5, 147:18,

148:13, 148:21, 154:20, 158:22, 159:16, 162:9, 162:13, 162:19, 162:22, 166:3, 166:7, 166:9, 166:11, 166:12, 170:24, 171:6, 171:12, 171:19, 184:3, 184:13, 184:15, 185:6, 187:21, 188:3, 188:6, 189:2, 198:17, 200:4, 204:18, 204:21, 205:3, 205:4, 205:15, 205:18, 207:16, 208:1, 208:3, 211:4, 211:18, 211:23, 212:20
**place** [19] - 58:18, 59:2, 90:19, 99:24, 107:25, 114:6, 115:4, 115:7, 115:25, 116:10, 116:21, 164:5, 194:25, 195:1, 195:3, 195:20, 201:14, 210:19, 215:25
**placed** [1] - 119:13
**places** [2] - 31:22, 218:18
**plaintiff** [6] - 7:9, 9:18, 93:6, 93:8, 220:22, 230:18
**plaintiff's** [6] - 10:3, 10:14, 28:7, 98:3, 151:13, 193:19
**Plaintiff's** [5] - 17:4, 99:19, 121:14, 151:8, 220:12
**Plainview** [1] - 85:22
**plan** [1] - 86:20
**planning** [2] - 71:12, 227:8
**Plano** [8] - 97:17, 112:24, 114:22, 114:23, 118:6, 118:21, 133:14, 224:8
**plans** [3] - 133:3, 171:4, 191:11
**platform** [2] - 152:6, 204:7
**platforms** [1] - 13:23
**play** [5] - 18:20, 19:23, 20:13, 183:6, 227:20
**playback** [2] - 146:4, 150:19
**played** [5] - 23:21, 23:22, 176:2, 178:20, 182:24
**player** [14] - 18:22, 19:5, 19:8, 30:13, 31:8, 150:13, 150:17, 152:1, 152:11, 153:18, 153:19, 161:3, 196:8, 205:9
**playing** [2] - 19:23, 66:13
**Plaza** [1] - 177:20
**plug** [1] - 90:19
**Podcast** [16] - 36:1, 36:9, 36:11, 38:5, 40:9, 40:10, 40:11, 40:12, 40:20, 40:23, 41:23, 50:8, 55:3
**podcast** [25] - 36:12, 36:17, 37:11, 38:7, 41:19, 42:2, 42:3, 53:12, 61:6, 61:9, 61:11, 61:13, 62:21, 63:3, 65:20, 67:23, 68:21, 196:22, 197:7, 197:19, 198:18
**podcasting** [6] - 39:3, 43:1, 51:1, 51:2, 52:16, 54:8
**Podcasts** [3] - 55:4, 186:24, 206:22
**podcasts** [113] - 29:3, 29:10, 35:25, 36:8, 37:4, 37:8, 38:4, 40:1, 40:5, 40:7, 40:8, 40:16, 40:24, 41:10, 41:12, 41:13, 41:16, 41:17, 42:7, 42:8, 42:14, 48:13, 49:13, 49:22, 50:1, 50:3, 50:4, 50:7, 51:11, 52:24, 53:3, 54:22, 54:23, 55:5, 58:5, 59:7, 59:14, 59:23, 60:4, 60:6, 61:14, 61:19, 61:24, 62:2, 62:6, 62:11, 62:24, 65:15, 66:3, 66:9, 66:11, 66:13,

66:16, 67:4, 67:5, 67:9, 67:13, 67:21, 67:24, 68:18, 68:20, 68:24, 69:7, 69:14, 69:18, 70:5, 70:10, 70:23, 73:14, 74:19, 77:20, 78:1, 83:9, 170:7, 170:10, 171:14, 171:18, 178:19, 178:21, 178:22, 178:25, 179:2, 179:6, 179:24, 180:2, 180:25, 181:4, 182:4, 182:5, 182:8, 182:10, 182:18, 183:12, 183:16, 183:19, 187:3, 187:4, 188:23, 196:20, 196:25, 197:16, 198:11, 206:12, 206:14, 206:15, 207:2, 207:5, 207:8, 217:11, 218:16, 218:20
**podium** [1] - 204:17
**point** [15] - 25:11, 39:9, 71:1, 90:17, 96:9, 126:6, 140:19, 143:19, 154:18, 195:9, 195:14, 213:9, 218:18, 225:7, 227:17
**pointed** [1] - 219:12
**points** [2] - 195:15, 197:4
**portfolio** [4] - 129:25, 132:18, 132:25, 133:2
**portion** [2] - 209:16, 218:21
**Portland** [2] - 166:21, 168:24
**position** [7] - 69:24, 141:5, 177:5, 177:6, 180:8, 180:10, 180:13
**possible** [2] - 203:6, 206:7
**possibly** [1] - 56:21
**Post** [2] - 190:16, 190:17
**post** [2] - 60:6, 95:10
**postgraduate** [1] - 121:6
**PostNet** [3] - 87:10, 87:19, 112:14
**potential** [4] - 48:14, 48:16, 74:7, 164:2
**potentially** [1] - 201:18
**practical** [1] - 231:2
**practice** [8] - 47:6, 121:18, 122:9, 123:8, 123:13, 123:16, 127:17, 127:20
**precisely** [2] - 213:13, 215:15
**preferably** [1] - 120:9
**preference** [1] - 162:12
**preparation** [1] - 101:24
**prepare** [2] - 88:12, 149:14
**prepared** [4] - 9:22, 147:12, 147:14, 148:6
**presence** [2] - 98:3, 218:10
**PRESENT** [1] - 7:1
**present** [8] - 8:3, 12:4, 23:2, 70:21, 80:2, 157:12, 184:7, 226:10
**presentation** [3] - 8:2, 125:21, 143:21
**presented** [4] - 17:18, 90:14, 143:20, 217:8
**PRESENTED** [2] - 3:4, 4:1
**president** [15] - 13:18, 14:20, 27:11, 71:10, 71:12, 75:19, 137:19, 138:14, 164:18, 174:17, 176:18, 180:9, 180:11, 180:14, 220:16
**press** [7] - 137:22, 138:1, 138:10, 138:12, 138:13, 138:13, 138:17, 138:22
**presumably** [1] - 204:10
**presumption** [1] - 217:3

**pretty** [1] - 184:9
**prevent** [1] - 109:19
**previous** [2] - 161:20, 177:5
**previously** [2] - 75:7, 181:21
**primarily** [3] - 169:4, 186:24, 190:21
**primary** [3] - 35:20, 153:12, 153:14
**prime** [1] - 177:16
**principal** [10] - 99:24, 114:6, 115:4, 115:7, 115:25, 116:10, 116:21, 118:1, 186:23, 215:24
**principally** [1] - 219:5
**printed** [1] - 21:5
**printout** [1] - 82:9
**private** [8] - 8:7, 9:2, 85:16, 86:2, 86:5, 86:12, 86:15, 93:3
**privilege** [1] - 140:11
**problem** [6] - 9:16, 10:18, 49:20, 204:18, 204:21, 226:20
**procedure** [2] - 41:11, 58:11
**proceed** [8] - 12:14, 12:25, 125:19, 126:5, 144:10, 220:20, 221:20, 222:1
**proceeding** [2] - 9:11, 148:3
**PROCEEDINGS** [2] - 2:24, 231:10
**Proceedings** [1] - 231:4
**proceedings** [3] - 9:7, 9:13, 9:25
**process** [12] - 21:16, 22:7, 32:17, 47:24, 118:19, 146:9, 194:10, 196:11, 197:6, 197:8, 202:7, 225:5
**processes** [1] - 158:4
**processing** [2] - 22:24, 200:13
**produce** [7] - 36:17, 39:8, 62:11, 152:1, 180:2, 194:19, 206:17
**PRODUCED** [1] - 2:25
**produced** [17] - 38:11, 38:12, 38:21, 39:5, 44:2, 46:17, 55:5, 62:22, 147:19, 195:5, 206:13, 206:15, 206:16, 206:22, 207:2, 207:5, 207:8
**producing** [1] - 35:24
**product** [14] - 13:18, 13:22, 14:21, 14:24, 18:22, 19:8, 19:10, 24:14, 25:10, 27:2, 27:11, 153:3, 164:18
**production** [6] - 36:11, 65:17, 68:20, 194:19, 197:4, 208:9
**products** [8] - 153:12, 153:14, 177:8, 177:9, 200:24, 201:2, 205:11, 228:22
**proffered** [2] - 226:8, 227:6
**profile** [5] - 45:12, 45:13, 45:17, 46:7, 46:9
**profiles** [1] - 160:20
**profit** [1] - 101:25
**program** [3] - 131:16, 132:18, 200:17
**programmers** [1] - 31:7
**programming** [11] - 13:24, 20:1, 20:12, 20:14, 21:22, 26:1, 26:2, 26:3, 26:8, 26:10, 228:23
**programs** [1] - 60:5
**promote** [1] - 229:13
**promoted** [3] - 101:20, 132:16, 176:10
**promotion** [1] - 137:14

**pronounce** [1] - 136:23
**proof** [1] - 217:5
**proper** [2] - 157:25, 223:4
**properties** [1] - 190:24
**property** [3] - 223:11, 224:3, 224:5
**propose** [1] - 10:3
**prosecution** [1] - 216:8
**protocol** [1] - 41:13
**prove** [1] - 188:13
**provide** [30] - 10:3, 15:17, 18:5, 18:22, 26:6, 146:1, 146:14, 150:15, 151:21, 153:25, 154:10, 154:25, 155:2, 155:8, 155:19, 156:2, 156:14, 157:1, 157:4, 157:6, 157:9, 157:19, 158:3, 165:2, 168:11, 172:23, 173:1, 194:6, 204:6, 218:7
**provided** [7] - 10:14, 44:14, 69:9, 73:5, 152:9, 161:17, 227:21
**provider** [1] - 210:23
**provides** [4] - 30:13, 67:20, 159:18, 160:2, 161:3, 163:17
**providing** [3] - 26:19, 27:7, 146:7
**provision** [1] - 84:15
**provisioning** [1] - 146:3
**publish** [2] - 40:24, 60:3
**publishing** [6] - 40:18, 41:17, 59:22, 146:9, 150:18, 194:11
**pulled** [2] - 172:18, 226:22
**purpose** [6] - 97:25, 126:20, 126:21, 149:7, 207:24, 223:10
**purposes** [1] - 152:25
**pursue** [2] - 224:3, 224:13
**pushes** [1] - 197:9
**pushing** [2] - 22:25
**put** [20] - 10:4, 11:10, 26:5, 58:5, 66:3, 67:20, 67:25, 75:15, 84:11, 88:22, 90:10, 112:18, 116:25, 134:3, 148:3, 149:17, 153:7, 163:18, 198:10, 227:24
**puts** [1] - 163:14
**putting** [3] - 21:16, 59:14, 199:21

## Q

**QA** [3] - 150:16, 167:5, 173:19
**quality** [2] - 149:17, 167:5
**quantitative** [3] - 176:18, 180:10, 180:14
**Queens** [2] - 14:18, 185:21
**questioned** [1] - 147:24
**questioning** [4] - 38:24, 91:6, 114:10, 115:1
**questions** [33] - 27:20, 34:11, 34:13, 48:18, 53:6, 53:14, 56:23, 60:23, 61:1, 71:1, 71:25, 74:11, 83:17, 84:19, 94:20, 98:18, 98:19, 99:6, 100:13, 107:22, 112:20, 135:12, 137:12, 138:16, 141:13, 141:23, 172:17, 173:5, 173:8, 173:23, 210:17, 211:13, 211:15
**quick** [1] - 169:22
**quite** [1] - 219:11

**quote** [2] - 217:2, 217:5
**quoting** [1] - 213:18

## R

**Radio** [24] - 64:10, 64:11, 64:13, 64:23, 65:1, 65:5, 65:7, 65:15, 66:2, 67:8, 67:11, 67:20, 67:25, 68:17, 68:24, 69:6, 69:7, 69:14, 69:17, 69:18, 69:25, 70:5, 70:9, 218:5
**radio** [3] - 64:22, 65:8, 65:9
**raise** [1] - 35:8
**Randell** [15] - 71:10, 71:14, 72:4, 72:14, 72:20, 73:4, 75:18, 79:20, 79:24, 80:3, 80:8, 80:20, 82:24, 228:12, 228:16
**Randell's** [2] - 73:10, 80:12
**rang** [1] - 117:15
**rates** [1] - 173:4
**rather** [2] - 145:14, 221:20
**reach** [1] - 90:17
**reached** [1] - 7:25
**read** [13] - 91:5, 91:12, 91:21, 92:1, 94:5, 99:16, 99:22, 107:5, 108:16, 108:20, 110:16, 209:17
**reading** [3] - 93:3, 121:6, 121:17
**reading** [1] - 110:23
**reads** [1] - 87:17
**ready** [2] - 7:11, 195:11
**real** [3] - 44:17, 169:22, 223:21
**really** [10] - 44:16, 95:4, 115:19, 122:17, 150:7, 164:7, 175:16, 175:17, 186:5, 218:20
**rear** [1] - 88:13
**reason** [5] - 26:17, 44:19, 80:7, 224:17, 225:10
**reasonable** [4] - 122:14, 122:23, 143:9, 144:5
**reasonably** [2] - 94:8, 214:17
**reasons** [4] - 41:3, 208:14, 216:21, 230:13
**receive** [1] - 129:1
**received** [4] - 85:19, 92:7, 148:14, 191:22
**receiving** [1] - 117:23
**recent** [3] - 41:20, 42:3, 213:21
**recently** [3] - 14:14, 31:3, 62:23
**reception** [2] - 90:6, 90:7
**recess** [4] - 85:1, 125:4, 204:14, 204:22
**Recess** [3] - 85:2, 125:5, 204:24
**recognize** [7] - 16:23, 17:12, 37:24, 39:18, 43:16, 110:4, 151:18
**recollection** [2] - 91:20, 148:10
**RECORD** [1] - 231:10
**record** [17] - 7:2, 7:6, 8:15, 17:1, 34:16, 46:19, 49:21, 62:10, 91:12, 94:6, 99:17, 99:23, 147:22, 208:23, 215:20, 224:22, 228:21
**recording** [2] - 36:13, 194:25

**records** [7] - 23:15, 24:13, 24:17, 69:6, 69:17, 69:21, 194:13
**recoveries** [1] - 129:3
**recovery** [1] - 129:2
**RECROSS** [4] - 3:25, 4:13, 142:6, 211:22
**RECROSS-EXAMINATION** [4] - 3:25, 4:13, 142:6, 211:22
**recruited** [1] - 190:23
**red** [1] - 230:10
**REDIRECT** [12] - 3:11, 3:16, 3:20, 3:24, 4:5, 4:12, 57:1, 83:14, 99:8, 135:10, 171:1, 207:19
**redirect** [7] - 34:12, 83:11, 125:25, 142:2, 170:24, 211:19, 211:21
**Redmond** [7] - 197:14, 198:19, 199:15, 206:13, 206:22, 207:3, 208:9
**reduce** [1] - 203:2
**reduction** [5] - 121:17, 122:9, 123:7, 123:13, 123:16
**Reed** [4] - 133:14, 135:15, 135:18, 136:20
**reexam** [1] - 134:3
**reference** [15] - 8:16, 114:10, 115:7, 117:8, 122:5, 128:25, 133:22, 135:15, 135:21, 155:18, 157:17, 172:13, 182:22, 216:11, 224:25
**referenced** [1] - 129:5
**references** [2] - 157:8, 224:12
**referred** [8] - 15:18, 16:8, 21:7, 26:15, 52:17, 138:16, 138:20, 215:10
**referring** [8] - 16:9, 37:6, 52:18, 54:14, 116:3, 116:20, 170:16, 170:18
**refers** [1] - 205:23
**refrain** [1] - 140:13
**refresh** [2] - 91:20, 148:9
**refused** [3] - 55:19, 56:6, 56:11
**regard** [7] - 29:8, 83:9, 151:24, 153:11, 172:25, 196:5, 215:20
**regarding** [25] - 11:24, 52:16, 55:12, 55:15, 75:2, 79:21, 81:16, 103:13, 108:14, 108:18, 111:2, 121:11, 140:14, 171:18, 172:22, 173:9, 173:10, 180:24, 181:3, 182:9, 183:11, 183:15, 196:10, 208:12, 217:11
**regarding..** [1] - 211:14
**regards** [4] - 154:13, 155:15, 165:13, 168:14
**regular** [7] - 25:5, 25:24, 68:10, 69:16, 77:18, 86:21, 226:17
**regularly** [1] - 211:10
**relate** [1] - 68:23
**related** [13] - 20:22, 21:12, 24:13, 50:7, 50:22, 51:11, 83:9, 139:15, 165:20, 169:3, 169:7, 188:8, 188:22
**relates** [6] - 35:22, 141:9, 142:1, 142:3, 157:6, 165:25
**relating** [18] - 19:17, 26:11, 26:19, 27:14, 27:17, 36:8, 63:10, 69:18, 70:5, 70:9, 70:15, 70:18, 74:4, 164:13,

186:24, 187:4, 225:22, 228:24
**relation** [1] - 158:13
**relationship** [6] - 13:12, 36:24, 64:11, 71:18, 160:19, 177:10
**relatively** [1] - 55:17
**release** [6] - 138:1, 138:10, 138:12, 138:13, 138:17, 138:23
**releases** [1] - 137:22
**relevance** [2] - 78:4, 141:11
**relevant** [37] - 8:25, 10:13, 28:23, 29:9, 29:22, 30:25, 33:18, 39:8, 48:25, 49:9, 50:22, 55:12, 55:15, 77:15, 80:25, 81:3, 81:4, 81:16, 82:4, 161:16, 167:20, 168:4, 184:19, 188:17, 201:18, 201:23, 202:17, 203:12, 203:19, 203:21, 207:12, 218:3, 220:7, 226:3, 226:5, 229:17, 230:12
**relies** [1] - 47:1
**relocate** [1] - 16:15
**relocated** [1] - 191:17
**relocating** [4] - 191:12, 193:8, 193:10, 193:11
**rely** [2] - 46:25, 173:1
**remain** [3] - 12:9, 62:4, 125:17
**remained** [1] - 86:12
**remarks** [4] - 126:5, 144:8, 213:8, 222:20
**remember** [18] - 52:24, 53:2, 78:25, 79:3, 79:4, 79:5, 119:1, 119:6, 119:9, 136:12, 136:16, 136:17, 137:5, 137:8, 148:1, 199:21, 201:17, 210:19
**remind** [1] - 126:12
**remote** [2] - 55:10, 180:6
**remotely** [1] - 120:22
**remove** [2] - 91:4, 92:3
**removed** [1] - 94:9
**Rena** [2] - 163:2, 163:9
**render** [1] - 15:8
**rep** [1] - 31:4
**repeat** [15] - 49:17, 49:20, 54:2, 56:2, 57:7, 70:6, 76:14, 97:9, 118:14, 119:4, 167:22, 169:6, 181:1, 188:10, 188:19
**repeatedly** [1] - 137:18
**rephrase** [5] - 103:20, 111:10, 167:23, 171:20, 209:2
**reply** [1] - 8:22
**report** [4] - 124:12, 193:12, 193:13, 193:14
**reported** [3] - 179:10, 179:12
**REPORTED** [1] - 2:24
**reporter** [1] - 145:18
**REPORTER** [5] - 2:21, 2:21, 190:11, 190:14, 190:17
**REPORTER'S** [2] - 1:14, 231:7
**reports** [1] - 215:5
**repository** [1] - 18:17
**represent** [3] - 87:21, 88:25, 92:11
**representation** [5] - 44:20, 117:5, 149:1, 215:23, 225:4
**representative** [3] - 12:6, 19:1, 68:7

**representatives** [8] - 12:9, 12:11, 19:2, 19:4, 32:7, 68:8, 71:4, 230:3
**represented** [3] - 115:3, 137:18, 214:7
**representing** [1] - 115:24
**represents** [2] - 17:16, 17:17
**request** [11] - 11:24, 122:14, 122:20, 122:23, 123:6, 123:18, 143:3, 203:2, 215:13, 226:11
**requested** [1] - 91:10
**requests** [1] - 164:13
**require** [2] - 124:21, 146:11
**requirements** [1] - 121:5
**requires** [1] - 161:2
**research** [2] - 24:3, 24:6
**researched** [1] - 43:11
**reserve** [1] - 143:7
**reside** [16] - 14:17, 65:24, 124:3, 124:6, 145:9, 148:5, 149:2, 150:23, 150:25, 154:15, 158:2, 158:17, 167:8, 184:24, 187:6, 199:15
**resided** [1] - 227:7
**residence** [2] - 105:16, 191:9
**resident** [5] - 42:8, 127:6, 226:11, 227:10, 227:17
**resides** [10] - 105:20, 108:5, 118:4, 124:9, 150:4, 170:21, 171:4, 201:21, 224:9, 228:10
**resolved** [1] - 223:15
**resource** [1] - 45:21
**resources** [10] - 47:7, 149:17, 150:16, 154:15, 155:5, 156:10, 161:19, 167:5, 167:6, 173:19
**respect** [89] - 15:1, 15:5, 19:5, 20:21, 23:4, 23:20, 25:17, 25:18, 25:24, 28:19, 28:24, 33:19, 36:10, 37:3, 37:4, 44:9, 44:10, 44:14, 45:10, 47:23, 47:25, 48:12, 49:1, 49:10, 57:5, 57:13, 65:14, 72:16, 74:23, 78:13, 78:20, 79:8, 82:2, 106:24, 109:2, 118:11, 118:15, 118:21, 118:25, 119:5, 134:16, 139:11, 143:20, 146:22, 151:22, 154:1, 154:10, 154:25, 155:8, 155:19, 156:2, 156:14, 157:2, 157:10, 157:19, 165:9, 165:23, 167:18, 167:21, 170:9, 170:13, 173:2, 178:21, 182:25, 183:6, 188:18, 188:24, 193:23, 194:5, 195:23, 196:4, 196:19, 196:24, 209:3, 213:24, 214:1, 217:24, 218:5, 227:19, 227:23, 227:25, 228:1, 228:3, 228:5, 228:13, 229:19, 230:4, 230:8, 230:9
**respectfully** [1] - 38:19
**respond** [4] - 143:7, 213:9, 222:19, 224:20
**responded** [2] - 119:21, 119:25
**response** [14] - 10:20, 10:25, 53:14, 92:7, 95:16, 107:6, 122:8, 144:1, 144:2, 222:21, 224:23, 230:18, 230:20, 230:22
**responsibilities** [29] - 14:20, 26:19, 27:13, 27:17, 28:19, 36:8, 60:15, 65:4, 65:14, 70:3, 70:4, 70:7, 70:9, 70:22,

73:10, 73:11, 74:23, 78:11, 129:21, 131:11, 131:14, 132:14, 137:13, 145:23, 146:22, 164:19, 168:8, 170:9, 170:13

**responsibility** [11] - 36:16, 67:10, 74:22, 75:1, 76:21, 78:19, 84:12, 158:11, 171:16, 179:6, 219:5

**responsible** [31] - 14:22, 15:6, 18:6, 22:2, 22:24, 25:13, 26:3, 31:7, 40:17, 40:19, 55:2, 59:22, 61:5, 61:14, 62:5, 65:6, 65:19, 66:10, 67:5, 74:19, 151:25, 154:3, 157:22, 167:19, 168:2, 168:3, 168:5, 168:9, 178:23, 200:25, 206:4

**rest** [1] - 81:19

**Restate** [1] - 98:22

**restate** [2] - 20:8, 134:13

**result** [3] - 32:16, 119:12, 229:5

**resulted** [1] - 229:24

**resumé** [1] - 167:17

**returning** [1] - 15:14

**reveal** [1] - 140:22

**revealed** [1] - 215:10

**revenue** [10] - 102:16, 158:19, 159:4, 159:8, 165:5, 165:17, 165:23, 198:4, 218:20, 218:22

**reverse** [1] - 186:7

**review** [4] - 102:24, 143:7, 147:20, 162:23

**reviewed** [1] - 137:23

**reviewing** [2] - 134:4, 208:22

**REYES** [1] - 2:1

**Richard** [5] - 117:20, 120:24, 128:13, 133:17, 138:13

**Richards** [1] - 15:22

**Ridge** [1] - 175:25

**Riesco** [1] - 15:19

**right-hand** [1] - 88:21

**ROAD** [1] - 1:21

**Rob** [1] - 144:13

**Rob's** [2] - 183:4, 183:8

**ROBERT** [5] - 4:3, 4:4, 144:15, 159:15, 171:1

**Robert** [2] - 35:16, 144:20

**ROBERTSON** [1] - 2:14

**Robins** [3] - 93:21, 123:17, 215:12

**Rock** [3] - 193:1, 193:2, 193:11

**Rockefeller** [7] - 174:20, 175:1, 177:20, 193:3, 197:17, 197:23, 198:8

**role** [28] - 19:19, 20:11, 20:14, 23:12, 61:12, 79:8, 141:12, 150:5, 151:21, 153:10, 153:25, 154:10, 154:24, 155:8, 155:19, 156:2, 156:14, 157:1, 157:9, 157:18, 173:2, 176:20, 178:20, 182:24, 183:5, 193:23, 194:3, 196:19

**roles** [1] - 21:20

**rolled** [2] - 117:20, 214:13

**rollover** [1] - 117:23

**room** [8] - 89:10, 90:8, 90:9, 90:11, 90:12, 90:21, 115:10, 216:2

**rooms** [5] - 90:18, 112:23, 113:1,

113:11, 113:19

**ROTHWELL** [1] - 2:11

**round** [1] - 214:19

**ROY** [1] - 1:15

**RPR** [2] - 2:21, 231:13

**RPR-CRR** [2] - 2:21, 231:13

**RSS** [3] - 37:15, 197:7, 197:11

**rule** [3] - 45:6, 46:20, 217:20

**Rule** [7] - 12:1, 12:7, 45:5, 121:19, 122:6, 122:12, 216:6

**rules** [1] - 121:11

**ruling** [3] - 10:14, 70:25, 231:1

**run** [9] - 15:16, 50:7, 51:12, 51:15, 51:17, 176:11, 215:7, 215:8

**rundown** [2] - 37:14, 85:17

**running** [4] - 55:2, 132:17, 182:21, 227:2

**runs** [8] - 54:22, 54:23, 76:13, 76:17, 150:7, 163:13, 163:16, 227:4

**Rutgers** [2] - 176:1, 176:2

**Ryan** [2] - 15:20, 68:11

## S

**S-E-A-N-A** [1] - 27:25

**safe** [6] - 33:17, 80:10, 81:3, 82:3, 82:18, 82:21

**salary** [2] - 128:20, 223:21

**sales** [15] - 31:5, 73:15, 73:16, 73:20, 158:19, 159:5, 159:8, 159:9, 159:10, 159:11, 161:21, 186:23, 187:5, 198:3, 203:14

**salesperson** [1] - 203:15

**Sam** [1] - 196:12

**Sameer** [2] - 150:12, 151:2

**Sameer's** [1] - 150:17

**Sameera** [1] - 15:22

**San** [6] - 72:7, 72:24, 77:1, 77:3, 77:5, 228:17

**Sansoto** [1] - 24:9

**Sanzillo** [2] - 24:8, 24:10

**save** [1] - 10:5

**savvy** [2] - 61:10, 61:13

**saw** [4] - 10:17, 88:25, 90:3, 126:10

**Saxton** [1] - 193:15

**scattered** [1] - 62:13

**scenery** [1] - 190:5

**scheduled** [1] - 192:13

**scheduling** [10] - 21:21, 21:25, 22:2, 22:5, 22:6, 22:9, 22:12, 22:14, 219:6

**school** [4] - 85:21, 85:22, 176:3, 190:4

**School** [1] - 175:25

**science** [1] - 145:4

**scope** [4] - 97:7, 97:24, 129:17, 211:19

**scores** [2] - 221:4

**Scotia** [3] - 15:13, 16:3, 29:18

**SCOTT** [5] - 4:7, 4:8, 174:9, 184:14

**Scott** [12] - 156:19, 171:23, 174:6, 174:13, 180:16, 181:5, 182:19, 184:4, 213:14, 217:1, 219:12, 220:5

**screen** [4] - 81:15, 83:25, 84:11, 203:3

**Seana** [3] - 12:22, 13:7, 218:1

**SEANA** [4] - 3:6, 3:7, 13:2, 28:2

**season** [1] - 38:5

**Seattle** [19] - 34:8, 152:14, 159:21, 159:25, 161:7, 161:25, 162:4, 168:13, 170:21, 193:6, 196:9, 199:1, 201:9, 201:10, 201:11, 201:15, 204:11, 212:15, 226:1

**SEC** [1] - 176:3

**second** [15] - 8:19, 8:23, 9:14, 46:5, 101:15, 104:23, 105:10, 110:16, 110:19, 112:17, 120:18, 144:7, 206:21, 214:24, 221:21

**second-year** [1] - 101:15, 214:24

**Secret** [1] - 145:17

**section** [2] - 61:22, 122:12

**See** [1] - 110:22

**see** [50] - 16:18, 20:6, 28:12, 29:3, 29:6, 32:5, 32:9, 33:2, 33:3, 40:3, 41:24, 43:21, 49:15, 49:18, 57:18, 78:9, 78:10, 81:15, 82:10, 82:12, 84:1, 88:9, 89:8, 91:18, 92:5, 93:18, 97:16, 102:20, 103:12, 120:10, 120:19, 121:6, 121:16, 122:5, 155:18, 156:12, 162:23, 163:2, 164:9, 166:13, 170:7, 175:2, 182:21, 193:20, 199:13, 199:19, 199:20, 202:17, 206:19, 212:2

**seeing** [1] - 79:11

**seeking** [1] - 109:19

**seem** [2] - 94:8, 200:5

**segment** [1] - 194:17

**segments** [1] - 194:16

**select** [2] - 37:10, 38:7

**selected** [1] - 197:4

**sending** [1] - 96:24

**senior** [8] - 120:21, 164:17, 174:17, 176:17, 180:11, 180:13, 220:17

**sense** [1] - 73:1

**sensitivity** [1] - 143:17

**Sent** [1] - 94:11

**sent** [7] - 12:19, 94:9, 94:15, 94:17, 123:18, 195:7, 195:8

**sentence** [12] - 99:22, 110:16, 110:18, 110:19, 117:7, 206:21, 209:15, 209:16, 209:21, 210:4, 211:24, 225:13

**separate** [1] - 212:2

**September** [2] - 113:20, 117:24

**sequestration** [1] - 11:25

**series** [5] - 17:18, 17:21, 17:24, 26:4, 182:4

**serve** [1] - 31:22

**served** [2] - 103:6, 203:11

**server** [6] - 37:12, 37:13, 202:23, 203:5, 203:7, 203:9

**servers** [16] - 31:17, 31:19, 31:22, 61:17, 62:25, 159:24, 169:16, 198:1, 202:15, 210:18, 210:21, 210:22, 211:1, 211:10, 225:23, 225:25

**Service** [1] - 145:17

**service** [8] - 26:5, 87:12, 145:16, 146:7, 152:7, 155:3, 156:18, 226:17
**services** [11] - 146:1, 146:20, 150:13, 152:24, 157:14, 176:19, 177:8, 177:9, 180:10, 180:15, 204:7
**serving** [1] - 120:18
**set** [10] - 19:1, 68:7, 120:9, 129:9, 152:23, 153:5, 153:6, 153:23, 167:12, 217:3
**sets** [1] - 150:8
**setting** [3] - 120:14, 176:13, 225:5
**settlements** [1] - 139:14
**setup** [3] - 30:8, 161:18, 179:24
**seven** [3] - 15:2, 15:17, 145:15
**several** [2] - 113:7, 132:2
**Shane** [2] - 15:22, 16:7
**shareholders** [1] - 103:23
**Sharon** [1] - 7:15
**SHARON** [1] - 2:9
**sheets** [2] - 93:4, 101:25
**ship** [1] - 87:12
**shipped** [1] - 88:12
**short** [1] - 221:6
**shortly** [1] - 10:9
**Show** [1] - 182:15
**show** [22] - 32:1, 32:2, 33:9, 33:14, 54:9, 75:7, 76:24, 81:10, 81:19, 82:9, 91:19, 111:24, 119:15, 126:22, 162:6, 194:10, 194:13, 194:14, 194:16, 194:24, 197:4, 206:18
**showing** [4] - 10:6, 79:5, 79:13, 106:15
**shown** [3] - 123:10, 194:21, 217:6
**shows** [63] - 28:11, 28:16, 28:20, 28:25, 30:14, 49:1, 49:5, 49:11, 75:2, 76:19, 76:20, 77:19, 77:23, 78:6, 146:23, 151:22, 153:22, 153:24, 154:2, 154:4, 154:11, 154:14, 154:17, 154:23, 154:24, 155:1, 155:9, 155:18, 155:20, 156:1, 156:3, 156:12, 156:15, 156:25, 157:2, 157:9, 157:10, 157:16, 157:18, 157:20, 158:5, 158:6, 159:23, 160:3, 161:4, 165:17, 165:20, 167:18, 168:1, 170:14, 170:16, 170:18, 170:20, 193:24, 194:1, 194:5, 194:8, 196:5, 196:11, 197:22, 217:25, 228:2, 228:13
**Showtime** [41] - 13:11, 13:14, 13:15, 13:17, 13:18, 13:20, 13:22, 13:24, 14:6, 14:14, 14:15, 14:21, 14:23, 15:18, 18:3, 19:16, 20:18, 20:23, 23:15, 23:19, 24:1, 24:13, 24:16, 24:21, 25:18, 25:23, 26:4, 27:12, 27:13, 29:13, 29:17, 30:6, 30:15, 31:11, 31:16, 217:24, 228:4, 228:19, 228:22
**Showtime's** [1] - 13:12
**showtime.com** [1] - 25:2
**showtimeanytime.com** [40] - 13:24, 14:1, 14:24, 15:1, 15:5, 15:8, 15:10, 17:19, 17:22, 18:1, 18:7, 18:11, 18:20, 18:23, 19:9, 19:13, 19:17, 20:13, 20:15,

20:19, 20:24, 21:17, 22:4, 23:1, 23:5, 23:13, 23:16, 23:20, 24:7, 24:14, 25:10, 25:14, 25:19, 25:25, 26:6, 26:12, 26:20, 27:14, 27:17, 29:22
**showtimeanytime.com's** [2] - 22:14, 25:2
**Shreveport** [4] - 226:13, 226:14, 226:18
**sic** [1] - 228:9
**sic]** [1] - 121:15
**side** [7] - 12:9, 126:11, 190:7, 196:8, 208:9, 216:24, 219:13
**SIEBMAN** [1] - 2:5
**sign** [3] - 55:19, 56:6, 56:11
**signed** [4] - 117:2, 117:13, 130:16, 212:4
**significance** [3] - 213:24, 214:2, 220:22
**significant** [2] - 213:25, 218:12
**signifies** [1] - 88:23
**Silva** [1] - 31:3
**similar** [4] - 62:8, 153:4, 156:9, 197:2
**similarly** [1] - 230:20
**Simon** [2] - 192:11, 192:22
**simply** [8] - 10:11, 31:5, 41:20, 47:19, 98:18, 143:14, 148:9, 220:23
**single** [3] - 62:21, 218:23, 224:14
**single-digit** [1] - 218:23
**sister** [2] - 145:18, 175:9
**site** [22] - 14:3, 15:1, 15:5, 18:8, 18:11, 18:20, 19:9, 19:13, 19:15, 28:11, 31:17, 41:14, 41:24, 59:15, 65:11, 74:4, 76:13, 79:22, 84:5, 164:20, 176:11, 226:23
**sites** [18] - 65:16, 65:21, 66:3, 67:21, 67:25, 75:21, 76:18, 79:9, 84:4, 84:7, 146:11, 164:25, 165:2, 172:24, 176:12, 176:14, 191:4, 228:15
**sitting** [1] - 156:22
**situation** [1] - 190:22
**Six** [1] - 182:11
**six** [5] - 44:13, 133:11, 182:18, 226:12, 226:20
**Skaggs** [16] - 9:1, 85:6, 85:12, 89:8, 91:24, 94:22, 94:24, 99:8, 99:10, 100:15, 112:20, 113:15, 113:17, 114:10, 115:1, 225:7
**SKAGGS** [4] - 3:18, 3:19, 3:20, 85:9
**Skaggs'** [2] - 9:5, 123:8
**skills** [1] - 94:3
**Skype** [1] - 62:23
**small** [3] - 90:6, 161:19, 218:24
**Smith** [2] - 7:20, 7:21
**SMITH** [4] - 1:20, 2:5, 2:5, 7:19
**snafu** [1] - 178:4
**so..** [1] - 75:17
**So..** [1] - 76:11
**software** [24] - 36:14, 37:4, 37:6, 40:21, 42:7, 42:9, 42:12, 42:14, 42:23, 54:10, 54:13, 57:6, 57:9, 57:14, 176:7, 176:9, 179:25, 197:10, 197:11, 197:13,

197:15, 204:2, 204:6, 206:4
**sold** [1] - 191:15
**sole** [6] - 14:10, 46:4, 130:17, 132:4, 132:6, 224:24
**solely** [2] - 75:3, 151:24
**solution** [22] - 150:11, 152:8, 152:9, 153:8, 153:15, 155:12, 155:15, 155:16, 155:22, 155:24, 156:8, 156:17, 156:20, 157:5, 157:7, 157:25, 164:4, 164:6, 165:2, 165:14, 168:14
**solutions** [5] - 27:10, 145:6, 145:24, 163:14, 168:11
**someone** [3] - 117:15, 117:18, 214:24
**sometimes** [1] - 76:10
**somewhat** [1] - 90:8
**somewhere** [5] - 147:11, 169:9, 172:19, 191:16, 203:11
**sons** [1] - 145:14
**soon** [1] - 231:2
**sorry** [38] - 21:23, 46:13, 52:3, 52:20, 54:24, 70:6, 72:1, 75:10, 78:3, 80:2, 94:11, 110:18, 111:7, 121:20, 121:24, 126:3, 126:9, 143:5, 150:23, 159:17, 163:10, 164:10, 166:3, 167:22, 169:6, 169:12, 169:14, 178:1, 190:11, 190:13, 193:3, 201:5, 202:1, 206:10, 209:20, 209:24, 211:8, 219:15
**Sorry** [3] - 39:24, 193:3, 205:15
**sort** [4] - 23:23, 46:3, 195:12, 215:15
**sought** [1] - 109:23
**source** [26] - 18:10, 18:13, 18:16, 30:18, 30:19, 30:20, 30:21, 31:8, 46:1, 46:4, 55:18, 56:5, 67:24, 68:2, 132:4, 132:6, 197:25, 198:1, 204:3, 204:4, 204:10, 217:5, 225:21, 225:22
**sources** [4] - 45:15, 46:6, 46:15, 46:23
**Southern** [6] - 26:9, 126:24, 222:14, 224:16, 225:18, 229:15
**space** [16] - 92:9, 94:14, 94:16, 112:7, 114:3, 114:11, 114:14, 114:17, 114:20, 118:25, 119:5, 130:3, 130:23, 131:5, 131:8, 155:4
**Spanish** [1] - 146:19
**speakerphone** [1] - 90:15
**speaking** [4] - 89:17, 96:17, 135:24, 154:8
**specific** [20] - 27:6, 30:8, 30:10, 36:14, 41:24, 49:2, 55:3, 55:10, 56:8, 61:20, 62:17, 70:25, 72:19, 76:9, 80:18, 152:25, 153:8, 160:6, 161:23, 165:25
**specifically** [22] - 14:10, 31:23, 35:25, 37:10, 38:5, 42:22, 45:15, 46:8, 51:9, 52:19, 53:10, 54:9, 56:12, 61:15, 62:20, 74:9, 79:10, 80:13, 82:23, 89:14, 178:10, 179:22
**Specifically** [3] - 40:9, 62:14, 170:2
**speculate** [1] - 56:20
**speculation** [2] - 55:25, 83:5
**Speculative** [1] - 55:22
**spell** [1] - 27:23

**spent** [1] - 165:11
**spoken** [1] - 48:1
**sports** [7] - 41:3, 50:4, 50:7, 51:11, 83:9, 158:5, 218:16
**Sports** [13] - 17:23, 28:21, 40:8, 40:16, 40:23, 40:24, 42:8, 42:14, 43:2, 48:12, 51:7, 57:4, 57:12
**sports-related** [3] - 50:7, 51:11, 83:9
**sportswriting** [1] - 45:20
**spread** [1] - 55:8
**Square** [1] - 145:8
**St** [1] - 145:3
**staff** [1] - 206:17
**stage** [1] - 207:15
**stand** [7] - 10:5, 12:23, 75:14, 91:2, 174:7, 205:1, 227:9
**stand-alone** [1] - 75:14
**standard** [1] - 223:1
**standpoint** [1] - 63:11
**stands** [1] - 153:18
**start** [7] - 7:23, 63:1, 127:3, 156:13, 162:10, 182:14, 197:3, 216:25, 217:2, 217:7, 226:7
**started** [8] - 86:7, 128:20, 132:9, 132:15, 177:7, 190:4, 191:8, 194:14
**starting** [10] - 28:10, 49:6, 49:23, 50:4, 74:20, 91:25, 106:18, 126:11, 128:20, 182:21
**startling** [1] - 219:1
**starts** [2] - 27:23, 194:12
**Starts** [1] - 182:15
**state** [8] - 7:5, 46:8, 64:4, 93:4, 117:9, 122:22, 186:22, 226:11
**State** [17] - 27:18, 48:15, 48:17, 127:17, 134:25, 166:19, 183:16, 201:21, 207:13, 207:16, 219:2, 219:18, 220:8, 223:9, 227:7, 227:10
**statement** [2] - 53:4, 168:17
**statements** [4] - 52:16, 101:25, 102:1, 134:23
**States** [3] - 175:20, 202:16, 211:3
**states** [1] - 62:18
**STATES** [2] - 1:1, 1:16
**stating** [2] - 92:8, 94:13
**station** [2] - 28:17, 190:5
**stay** [4] - 95:5, 95:6, 132:7, 210:15
**stayed** [2] - 132:9, 212:16
**stays** [1] - 147:10
**steady** [1] - 147:10
**STENOTYPE** [1] - 2:24
**step** [10] - 34:21, 63:16, 84:21, 100:16, 125:11, 142:17, 174:1, 189:7, 212:22, 219:16
**steps** [11] - 58:11, 89:8, 119:1, 119:6, 119:9, 140:20, 140:23, 195:19, 195:23, 196:24, 197:1
**Steve** [2] - 7:15, 7:25
**STEVEN** [1] - 2:10
**still** [11] - 28:9, 44:12, 55:2, 61:11,

61:21, 62:3, 83:25, 126:2, 132:19, 183:8, 227:10
**stipulate** [1] - 8:10
**stipulations** [1] - 9:17
**Stokes** [1] - 196:7
**stop** [1] - 197:3
**store** [3] - 92:9, 112:14, 160:23
**stored** [6] - 94:14, 159:24, 169:16, 172:14, 197:17, 198:1
**storing** [1] - 153:16
**story** [1] - 46:3
**stray** [1] - 230:3
**stream** [1] - 96:25
**streamline** [1] - 229:13
**STREET** [2] - 2:6, 2:11
**strictly** [1] - 196:6
**strike** [3] - 66:1, 84:13, 203:20
**Strike** [1] - 202:1
**striking** [1] - 218:25
**studying** [1] - 145:18
**stuff** [1] - 204:16
**stunning** [1] - 218:25
**Style** [4] - 157:8, 157:10, 157:12, 157:15
**subcontractor** [1] - 66:15
**subject** [9] - 8:1, 9:6, 39:10, 46:3, 98:1, 98:2, 126:4, 147:5, 154:13
**submission** [1] - 143:8
**submit** [5] - 10:20, 37:14, 56:13, 143:3, 217:23
**submitted** [13] - 8:8, 8:21, 9:3, 39:1, 44:3, 44:8, 46:17, 51:20, 52:12, 115:16, 115:23, 143:14, 162:7
**submitting** [3] - 86:20, 116:9, 199:10
**subscribers** [1] - 13:23
**subscription** [1] - 27:8
**subsequently** [1] - 92:15
**subsidiary** [1] - 13:14
**substantial** [1] - 223:21
**substantially** [1] - 222:1
**sue** [1] - 124:8
**sued** [1] - 215:14
**suggest** [3] - 213:13, 216:13, 222:2
**suggested** [1] - 10:13
**suggests** [1] - 123:1
**suit** [5] - 110:1, 129:7, 129:23, 221:21, 223:10
**Suite** [14] - 99:25, 100:8, 115:8, 115:11, 115:19, 115:25, 116:4, 116:12, 117:8, 122:15, 122:24, 123:2, 215:25, 216:9
**SUITE** [5] - 1:21, 2:2, 2:12, 2:15, 2:22
**suite** [10] - 14:24, 89:9, 115:12, 115:17, 116:22, 216:1, 225:1, 225:5, 225:6, 225:8
**suites** [2] - 89:13, 89:18
**summarize** [1] - 114:3
**summary** [1] - 132:13
**supervises** [1] - 148:7

**supervision** [1] - 15:25
**supplied** [2] - 226:8, 227:8
**Support** [3] - 51:23, 99:18, 184:5
**support** [21] - 52:12, 146:10, 146:12, 146:16, 146:19, 147:3, 150:16, 155:5, 155:11, 155:15, 155:24, 156:6, 156:11, 156:21, 157:6, 160:6, 160:11, 160:21, 161:22, 170:19, 183:8
**supported** [4] - 152:12, 155:12, 156:18, 158:2
**supports** [2] - 150:20, 168:15
**suppose** [1] - 160:22
**supposedly** [1] - 46:16
**surprise** [2] - 44:16, 46:25
**surprising** [1] - 217:17
**surprisingly** [1] - 116:6
**surroundings** [1] - 87:7
**suspect** [1] - 221:5
**sustain** [11] - 39:9, 44:25, 46:24, 47:2, 47:17, 47:21, 48:7, 48:9, 56:22, 83:6, 131:2
**Suze** [1] - 182:15
**swore** [1] - 53:22
**Syfy** [5] - 154:24, 155:1, 155:2, 155:4, 155:23
**syndicate** [1] - 153:17
**syndicated** [1] - 176:12
**Synergy** [11] - 66:15, 67:14, 67:16, 67:18, 67:20, 68:9, 68:11, 68:22, 69:4, 69:9, 219:9
**system** [25] - 21:3, 21:8, 22:6, 29:23, 30:1, 31:21, 150:18, 151:25, 152:10, 160:3, 160:12, 160:18, 160:19, 187:11, 194:12, 194:25, 195:2, 195:18, 197:3, 197:19, 200:13, 202:25, 205:23, 206:4
**systems** [10] - 20:1, 20:12, 32:9, 78:7, 146:5, 163:17, 163:18, 194:19, 196:3, 197:21

---

## T

**T.V** [1] - 183:2
**tab** [1] - 37:19
**Tab** [11] - 16:20, 39:23, 66:19, 166:7, 166:9, 169:21, 177:21, 178:1, 178:2, 181:14, 181:15
**table** [1] - 90:8
**taller** [1] - 35:9
**task** [1] - 173:19
**Tattoli** [3] - 179:8, 179:13, 179:19
**Tattoli's** [1] - 180:3
**taught** [4] - 41:4, 43:6, 54:8, 54:10
**taxes** [5] - 97:22, 98:7, 134:24, 134:25
**teacher** [1] - 145:21
**team** [11] - 14:25, 15:2, 15:9, 15:18, 18:5, 18:6, 19:7, 20:20, 21:15, 22:20, 22:23, 23:4, 23:13, 23:25, 24:2, 24:3, 24:6, 26:1, 26:2, 26:3, 73:16, 73:20, 74:1, 74:4, 75:23, 145:25, 146:7, 146:25, 147:7, 147:8, 147:9, 147:12,

147:25, 148:2, 148:18, 148:20, 149:15,
149:18, 149:23, 150:6, 150:9, 150:10,
150:13, 150:15, 151:21, 151:24,
152:11, 152:21, 153:3, 153:25, 154:3,
154:6, 154:7, 154:10, 154:13, 154:25,
155:3, 155:8, 155:11, 155:14, 155:19,
156:2, 156:14, 156:18, 157:1, 157:9,
157:19, 157:22, 158:1, 158:16, 159:18,
163:13, 163:16, 163:17, 166:13,
166:15, 167:19, 168:1, 168:2, 168:5,
168:14, 169:14, 169:23, 170:19, 172:4,
172:6, 172:9, 172:22, 173:1, 173:21,
178:23, 179:6, 179:9, 180:1, 180:3,
181:5, 182:19, 183:2, 183:5, 183:8,
183:23, 192:5, 192:8, 192:19, 192:20,
192:24, 194:1, 194:4, 198:25, 217:10,
219:4
  **team's** [2] - 146:21, 194:18
  **teams** [8] - 24:2, 32:20, 32:22, 32:25,
72:18, 72:21, 80:17, 172:22
  **tech** [5] - 61:10, 61:13, 82:7, 157:5,
158:2
  **technical** [18] - 32:8, 50:14, 50:15,
72:23, 152:16, 154:15, 155:5, 155:14,
156:10, 157:15, 161:23, 186:23, 187:5,
190:7, 190:8, 196:8, 203:1, 217:15
  **technological** [4] - 60:5, 218:9,
218:10, 218:12
  **technologies** [2] - 147:1, 170:19
  **technologist** [1] - 31:4
  **technology** [68] - 14:5, 14:13, 18:2,
18:4, 18:19, 20:17, 20:22, 21:12, 26:11,
59:14, 60:16, 66:12, 67:8, 67:11, 67:12,
67:13, 68:17, 68:19, 68:23, 79:1, 79:8,
146:22, 151:22, 152:3, 154:1, 154:5,
154:11, 154:25, 155:9, 155:20, 156:3,
156:15, 157:2, 157:10, 157:19, 158:9,
158:14, 160:17, 163:14, 164:3, 164:12,
164:13, 164:18, 172:23, 173:1, 173:12,
174:17, 176:18, 178:24, 180:9, 180:11,
180:14, 180:25, 181:3, 182:10, 182:17,
183:11, 183:15, 183:18, 183:23,
184:22, 188:14, 188:18, 188:22, 194:6,
198:10, 218:3, 218:7
  **Ted** [4] - 125:7, 154:7, 189:9, 189:17
  **TED** [8] - 4:10, 4:11, 4:12, 4:13,
189:11, 198:16, 207:19, 211:22
  **Telemundo** [2] - 146:18, 155:12
  **telephone** [6] - 90:12, 90:16, 90:20,
100:1, 117:10, 117:19
  **television** [7] - 26:7, 28:17, 74:24,
190:9, 190:24, 228:2, 228:13
  **temporal** [1] - 213:23
  **temporarily** [2] - 15:13, 16:15
  **temporary** [2] - 90:10, 137:2
  **ten** [4] - 15:2, 80:16, 80:21, 85:1
  **term** [3] - 77:6, 90:6, 188:21
  **terms** [15] - 10:5, 26:24, 41:11, 68:20,
73:12, 80:13, 147:1, 152:20, 153:2,
153:4, 154:17, 162:2, 165:15, 220:3,

220:17
  **terrestrial** [1] - 65:8
  **test** [4] - 98:2, 221:25, 222:9, 223:3
  **testified** [13] - 61:6, 148:11, 159:17,
167:11, 180:8, 202:2, 210:11, 219:19,
227:25, 228:1, 228:3, 228:12, 230:9
  **testifies** [1] - 230:4
  **testify** [12] - 8:13, 9:4, 9:14, 156:23,
172:1, 219:13, 219:22, 219:25, 220:1,
220:24, 228:19, 230:2
  **testifying** [8] - 53:2, 82:25, 126:3,
129:15, 140:14, 159:24, 160:4, 220:21
  **testimony** [43] - 8:24, 9:6, 9:12, 38:16,
38:25, 44:24, 52:17, 53:19, 61:4, 74:18,
79:18, 109:20, 109:23, 110:2, 111:19,
123:8, 123:22, 126:13, 134:9, 139:1,
141:3, 141:7, 141:10, 142:8, 161:11,
167:19, 167:25, 169:9, 185:9, 205:5,
209:4, 217:8, 218:2, 218:5, 218:8,
218:11, 218:13, 219:15, 221:6, 225:17,
225:20, 230:7
  **tests** [1] - 168:23
  **Texas** [101] - 8:13, 27:18, 31:24, 48:15,
48:17, 70:12, 74:8, 85:20, 85:22, 86:1,
86:3, 86:10, 86:11, 86:13, 86:16, 87:5,
89:24, 92:25, 95:24, 97:2, 98:3, 98:8,
100:3, 105:24, 106:3, 106:20, 108:1,
108:5, 108:8, 112:5, 112:8, 112:19,
112:24, 114:4, 117:11, 117:15, 119:2,
119:7, 120:15, 121:11, 122:10, 123:20,
124:4, 124:6, 127:6, 127:12, 127:13,
127:18, 130:3, 130:6, 130:8, 131:9,
133:14, 133:15, 134:18, 134:24,
134:25, 137:7, 149:24, 167:17, 177:2,
177:3, 183:12, 183:16, 184:21, 195:20,
195:22, 197:12, 198:9, 202:22, 202:23,
213:25, 214:6, 214:10, 214:12, 214:15,
215:8, 215:12, 215:22, 216:17, 216:18,
216:19, 218:24, 219:2, 219:3, 220:1,
220:9, 220:11, 220:20, 220:22, 220:24,
221:22, 223:3, 223:5, 223:9, 224:9,
224:17, 227:14, 229:6, 229:8
  **TEXAS** [8] - 1:1, 1:6, 1:11, 1:22, 2:3,
2:6, 2:15, 2:22
  **text** [1] - 138:13
  **Thakur** [2] - 179:7, 179:17
  **Thangudu** [1] - 15:23
  **THAT** [1] - 231:8
  **that..** [1] - 166:5
  **THE** [191] - 1:15, 1:23, 3:12, 7:2, 7:12,
7:17, 7:21, 8:5, 8:15, 8:20, 9:16, 9:20,
10:7, 10:21, 11:3, 11:12, 11:15, 11:21,
11:24, 12:3, 12:8, 12:13, 12:18, 12:21,
13:1, 17:9, 20:6, 27:22, 27:24, 28:1,
34:5, 34:15, 34:18, 34:20, 34:21, 34:24,
34:25, 35:3, 35:7, 38:14, 39:7, 39:20,
44:17, 45:2, 45:8, 45:25, 46:10, 46:13,
46:24, 47:17, 48:7, 51:25, 52:4, 52:7,
52:10, 55:23, 56:1, 56:22, 56:24, 57:17,
58:22, 59:4, 59:17, 60:8, 60:19, 60:21,

60:25, 61:3, 63:14, 63:15, 63:16, 63:17,
63:18, 63:21, 70:24, 71:17, 71:24,
74:13, 83:6, 83:13, 84:20, 84:22, 84:25,
85:3, 85:7, 88:1, 88:3, 89:6, 91:22,
93:15, 97:8, 98:1, 98:17, 100:15,
100:17, 104:21, 106:13, 110:12, 111:4,
111:9, 111:11, 119:19, 120:5, 124:18,
125:3, 125:12, 125:15, 125:17, 125:20,
126:2, 126:9, 126:16, 129:14, 131:2,
132:1, 134:11, 135:9, 138:8, 140:13,
140:17, 140:24, 141:8, 142:1, 142:5,
142:16, 142:18, 142:21, 142:25, 143:9,
143:24, 144:4, 144:10, 148:11, 148:25,
149:4, 149:6, 154:21, 158:25, 159:14,
162:16, 162:18, 162:21, 166:6, 171:7,
171:8, 171:22, 173:25, 174:2, 174:5,
178:6, 178:17, 184:9, 185:3, 187:24,
188:2, 188:5, 189:3, 189:6, 190:11,
190:13, 190:14, 190:16, 190:17, 200:3,
204:13, 204:19, 204:22, 204:25,
205:16, 207:18, 208:4, 208:22, 209:12,
211:6, 211:17, 211:20, 212:21, 212:24,
213:2, 213:7, 222:3, 222:6, 222:8,
222:16, 222:24, 226:16, 226:24,
230:15, 230:25, 231:9, 231:10
  **themselves** [3] - 66:17, 67:13, 146:12
  **thePlatform** [46] - 152:8, 152:9,
152:13, 152:16, 152:21, 152:23, 153:3,
153:13, 154:16, 155:2, 155:23, 156:6,
156:9, 157:4, 157:14, 159:18, 160:19,
161:3, 161:7, 161:14, 161:15, 161:19,
161:21, 161:22, 161:24, 162:3, 162:24,
163:5, 164:2, 164:4, 166:17, 173:3,
173:4, 173:6, 173:9, 173:10, 173:11,
173:14, 200:25, 201:3, 201:7, 202:9,
202:11, 203:22, 205:6
  **ThePlatform** [1] - 152:14
  **thereon** [1] - 91:5
  **they've** [1] - 131:12
  **They've** [1] - 67:22
  **thinking** [2] - 126:10, 192:4
  **third** [23] - 9:21, 18:19, 19:16, 19:19,
31:10, 46:5, 66:11, 66:14, 70:20, 80:22,
93:11, 93:17, 105:3, 105:11, 152:7,
155:13, 210:2, 218:6, 219:8, 225:17,
229:18, 229:19, 230:3
  **third-party** [9] - 18:19, 31:10, 66:11,
66:14, 152:7, 155:13, 218:6, 219:8,
225:17
  **thirdhand** [1] - 46:23
  **THIS** [1] - 231:8
  **THOMAS** [1] - 1:20
  **Three** [3] - 192:18, 199:5, 210:10
  **three** [18] - 12:10, 15:3, 91:3, 91:9,
112:23, 145:14, 150:15, 172:10,
198:25, 209:6, 212:2, 212:10, 215:22,
217:8, 226:8, 227:11, 227:23, 227:24
  **THROUGH** [1] - 1:13
  **throughout** [2] - 38:4, 202:16
  **throughs** [1] - 69:10

**Thursday** [2] - 186:10, 186:14
**Thursdays** [1] - 175:2
**ticketing** [4] - 21:3, 21:8, 29:23, 30:1
**tie** [1] - 225:21
**tied** [1] - 36:18
**tight** [1] - 176:2
**timely** [1] - 44:12
**title** [10] - 13:17, 17:2, 37:11, 37:14, 64:23, 69:24, 99:16, 145:5, 174:16, 189:20
**today** [18] - 7:15, 8:2, 9:25, 38:16, 79:18, 82:25, 86:19, 116:10, 126:20, 143:6, 144:2, 144:6, 172:1, 192:23, 215:10, 222:11, 227:9, 230:19
**together** [3] - 148:3, 149:17, 153:7
**Tom** [2] - 163:13, 163:16
**TONYA** [2] - 2:21, 231:13
**took** [11] - 53:18, 87:7, 87:18, 88:18, 88:24, 95:10, 107:25, 113:14, 126:13, 132:17, 201:14
**tool** [38] - 36:14, 37:5, 37:6, 37:12, 38:6, 39:3, 40:21, 41:10, 41:16, 42:7, 42:9, 42:12, 42:14, 42:23, 43:2, 43:7, 51:1, 51:2, 52:16, 52:25, 53:3, 53:12, 54:8, 54:11, 54:13, 54:17, 57:6, 57:9, 57:14, 57:23, 58:5, 58:13, 58:18, 59:2, 59:9, 60:12
**tools** [2] - 60:5, 66:8, 180:1
**top** [11] - 29:5, 64:21, 67:6, 88:20, 128:23, 161:7, 170:6, 172:6, 172:8, 182:21, 225:13
**top-level** [2] - 172:6, 172:8
**topics** [1] - 147:6
**total** [1] - 218:21
**touchstone** [1] - 213:12
**tough** [2] - 55:17, 160:9
**toward** [1] - 88:13
**track** [2] - 23:19, 69:10
**Trademark** [2] - 127:24, 128:2
**traditional** [1] - 65:7
**traffic** [1] - 186:7
**trained** [1] - 66:7
**training** [5] - 101:24, 102:2, 190:6, 190:8, 214:25
**transcript** [4] - 91:18, 106:15, 213:19, 217:2
**TRANSCRIPT** [3] - 1:14, 2:25, 231:9
**TRANSCRIPTION** [1] - 2:25
**Transfer** [3] - 51:24, 99:20, 184:5
**transfer** [38] - 8:22, 44:9, 44:15, 52:13, 95:17, 99:2, 113:8, 113:25, 114:24, 118:8, 118:13, 118:18, 118:20, 118:23, 119:3, 119:8, 134:5, 135:19, 136:4, 136:15, 137:7, 184:20, 190:25, 207:2, 207:25, 208:15, 214:12, 217:21, 217:22, 221:15, 221:16, 222:13, 225:11, 225:14, 229:2, 229:14, 230:14
**transferred** [2] - 213:15, 220:25
**transferring** [1] - 65:18
**transfers** [1] - 190:22

**transition** [1] - 156:5
**transitioned** [1] - 152:5
**travel** [11] - 8:12, 96:15, 175:18, 199:3, 199:7, 199:16, 200:7, 200:8, 200:10, 210:14, 220:19
**Travel** [1] - 14:12
**traveled** [7] - 34:7, 192:14, 209:5, 209:18, 209:22, 210:5, 210:8
**Traveling** [1] - 199:24
**traveling** [2] - 175:15, 229:4
**travelled** [1] - 212:1
**trial** [9] - 109:20, 111:21, 111:24, 133:22, 134:17, 219:22, 221:2, 225:16, 227:13
**Trideed** [2] - 164:1, 164:5
**TRIDEED** [1] - 164:1
**tried** [7] - 139:22, 140:3, 140:4, 140:8, 221:4, 223:2, 223:14
**triggers** [2] - 194:19, 197:8
**trip** [2] - 175:22, 200:9
**trouble** [2] - 96:14, 96:23
**true** [1] - 9:9
**trump** [1] - 221:13
**trusts** [1] - 124:1
**truth** [1] - 106:8
**try** [8] - 11:9, 45:3, 46:5, 103:2, 167:23, 188:13, 224:15, 227:15
**trying** [2] - 53:10, 166:4
**turn** [31] - 16:20, 17:11, 29:2, 37:19, 39:14, 39:25, 43:13, 49:13, 53:21, 66:18, 66:23, 87:13, 88:15, 91:24, 92:20, 93:10, 93:17, 99:12, 102:18, 107:12, 110:3, 117:6, 121:15, 122:2, 147:15, 151:4, 151:17, 154:16, 155:7, 169:21, 193:17
**turned** [2] - 226:9, 226:10
**turning** [1] - 109:13
**Turning** [4] - 110:15, 153:21, 154:9, 156:12
**TV** [43] - 20:18, 20:23, 28:16, 48:24, 77:19, 77:23, 146:23, 150:14, 151:22, 154:1, 154:11, 154:24, 155:1, 155:9, 155:18, 155:20, 156:1, 156:3, 156:15, 157:2, 157:8, 157:10, 157:18, 157:20, 158:10, 158:14, 159:23, 160:3, 161:4, 161:17, 165:5, 165:9, 167:18, 168:1, 168:5, 169:3, 169:7, 177:9, 190:3, 190:4, 196:3, 198:11
**twice** [3] - 9:8, 38:4, 175:16
**twice-weekly** [1] - 38:4
**Twitter** [3] - 45:16, 46:6, 47:1
**two** [37] - 8:24, 10:10, 10:12, 12:10, 14:6, 14:14, 21:21, 42:18, 42:19, 43:1, 50:11, 54:12, 55:5, 56:9, 62:14, 62:17, 81:12, 94:17, 101:11, 113:11, 114:17, 123:18, 124:1, 127:11, 150:12, 153:14, 161:22, 185:18, 201:12, 205:10, 205:19, 210:16, 212:16, 212:19, 215:14, 227:11, 230:2
**Two** [2] - 13:16, 220:13

**two-and-a-half-page** [1] - 10:10
**TX** [1] - 100:1
**TYLER** [1] - 2:15
**type** [3] - 37:13, 37:14, 88:20
**types** [3] - 23:19, 194:20, 216:20
**typical** [1] - 47:5
**typically** [5] - 45:21, 210:15, 212:19, 229:23, 230:2

---

# U

**ultimately** [1] - 128:14
**Ultimately** [1] - 229:1
**umbrella** [5] - 36:16, 40:14, 42:11, 76:8, 84:8
**uncles** [1] - 175:9
**under** [21] - 15:24, 36:15, 40:14, 42:10, 42:11, 53:5, 53:22, 61:22, 76:21, 79:24, 80:1, 84:8, 121:19, 126:13, 143:8, 143:10, 186:8, 196:6, 221:14, 223:8, 231:1
**understood** [2] - 120:24, 121:2
**undisputed** [3] - 8:14, 214:3, 223:20
**unilateral** [1] - 218:9
**UNITED** [2] - 1:1, 1:16
**United** [3] - 175:19, 202:16, 211:3
**universal** [1] - 53:12
**universe** [1] - 10:2
**University** [6] - 64:20, 85:20, 86:10, 86:13, 145:3, 176:1
**unrebutted** [1] - 218:2
**unusual** [1] - 90:23
**up** [54] - 7:23, 10:15, 10:21, 32:1, 37:16, 37:20, 38:24, 43:11, 44:21, 44:22, 71:4, 71:5, 72:3, 73:6, 75:15, 79:3, 79:14, 80:9, 83:25, 90:10, 91:2, 92:4, 97:14, 97:15, 97:16, 111:24, 116:7, 120:9, 120:14, 124:20, 129:10, 142:2, 143:18, 150:8, 150:13, 150:14, 167:12, 174:25, 176:13, 178:15, 194:7, 194:21, 197:9, 197:16, 198:12, 204:14, 204:19, 205:1, 205:9, 205:17, 219:3, 225:1, 225:6, 226:22
**up-to-date** [1] - 44:21
**updated** [1] - 44:11
**updates** [1] - 46:9
**upload** [15] - 36:17, 37:11, 38:4, 38:7, 41:20, 62:24, 63:3, 66:9, 169:24, 187:12, 187:14, 195:9, 195:14, 195:17, 202:8
**uploaded** [8] - 30:1, 36:13, 41:23, 42:2, 42:3, 55:5, 195:13, 206:5
**uploading** [4] - 35:25, 41:11, 41:13, 61:14
**upset** [3] - 55:19, 56:6, 56:11
**upstream** [1] - 160:16
**URL** [1] - 40:14
**USA** [2] - 146:17, 155:18, 155:20, 155:22, 155:25
**usage** [3] - 23:20, 24:7, 69:7

**useful** [2] - 148:24, 160:25
**user** [3] - 15:8, 203:6, 203:8
**users** [1] - 203:10
**uses** [1] - 67:8
**USING** [1] - 2:24

## V

**valid** [4] - 134:21, 142:12, 142:14, 223:15
**validity** [1] - 134:1
**valuable** [1] - 16:14
**various** [17] - 10:11, 29:3, 30:14, 31:22, 47:6, 48:24, 52:16, 65:19, 75:3, 139:20, 143:14, 148:19, 160:3, 168:1, 172:3, 173:18, 206:6
**vast** [1] - 158:16
**Veale** [4] - 24:22, 24:24, 25:1, 25:7
**Vegas** [1] - 34:8
**vendor** [2] - 66:12, 66:14
**venture** [3] - 191:1, 191:8, 191:16
**Venue** [3] - 51:24, 99:20, 184:5
**venue** [12] - 52:13, 95:17, 99:2, 126:25, 134:5, 141:12, 143:4, 184:20, 223:4, 225:11, 225:14, 229:24
**venues** [1] - 229:11
**verdict** [1] - 223:14
**Verizon** [1] - 221:9
**versus** [4] - 7:3, 110:6, 213:14, 223:2
**VIA** [1] - 2:25
**via** [3] - 37:12, 92:7, 224:4
**Vice** [1] - 13:18
**vice** [14] - 14:20, 27:11, 71:10, 71:12, 75:19, 137:19, 138:14, 164:18, 174:17, 176:18, 180:9, 180:11, 180:14, 220:16
**Vice-president** [1] - 13:18
**vice-president** [14] - 14:20, 27:11, 71:10, 71:12, 75:19, 137:19, 138:14, 164:18, 174:17, 176:18, 180:9, 180:11, 180:14, 220:16
**video** [72] - 18:20, 18:22, 19:5, 19:8, 19:17, 19:20, 19:22, 19:23, 20:2, 20:13, 21:16, 21:23, 22:20, 22:23, 22:24, 23:3, 23:12, 26:19, 27:8, 30:13, 31:8, 31:11, 31:18, 31:22, 72:16, 72:21, 74:8, 84:16, 145:6, 145:23, 146:1, 146:3, 146:20, 150:17, 150:19, 151:25, 152:10, 153:16, 153:19, 155:11, 155:22, 156:18, 157:5, 157:7, 160:2, 160:12, 160:18, 161:17, 163:14, 164:2, 164:13, 165:14, 167:21, 168:10, 179:11, 179:12, 180:2, 189:21, 189:24, 191:3, 194:21, 197:2, 200:13, 201:2, 202:7, 202:8, 202:17, 203:2, 205:22, 205:25, 206:3
**Video** [1] - 146:9
**videos** [9] - 23:1, 23:17, 155:6, 156:7, 157:23, 157:25, 158:3, 165:3, 198:4
**view** [3] - 68:16, 173:7, 194:15
**viewed** [1] - 213:20

**viewing** [2] - 161:4, 206:6
**Virginia** [1] - 25:20
**virtually** [4] - 9:23, 10:2, 172:18, 220:6
**Virtually** [1] - 217:10
**visit** [1] - 212:10
**visited** [3] - 100:5, 100:7, 212:17
**visitors** [1] - 23:23
**visits** [1] - 89:17
**Vistaprint** [1] - 221:9
**Vito** [4] - 179:7, 179:12, 179:19, 180:1
**VOLUME** [1] - 1:13
**VP** [1] - 164:12
**VS** [2] - 1:5, 1:9

## W

**wait** [2] - 124:25, 202:17
**waiting** [1] - 156:23
**walk** [2] - 88:11, 91:2
**wall** [2] - 90:10
**WAN** [1] - 2:18
**Wan** [1] - 7:16
**wants** [3] - 26:4, 202:17, 229:10
**Ward** [18] - 7:8, 7:12, 12:3, 95:1, 99:10, 112:20, 114:9, 122:3, 124:18, 125:25, 126:10, 135:12, 137:12, 139:8, 139:20, 142:22, 143:24, 222:18
**WARD** [53] - 1:20, 1:20, 3:19, 3:23, 3:25, 4:17, 7:7, 9:19, 10:17, 10:24, 11:16, 12:1, 12:5, 88:2, 89:5, 93:14, 94:23, 97:10, 98:5, 98:23, 99:6, 100:14, 104:20, 107:4, 110:10, 120:4, 121:22, 124:23, 125:19, 126:18, 129:20, 131:4, 131:24, 132:3, 134:14, 135:7, 138:7, 140:9, 140:16, 140:19, 141:25, 142:3, 142:7, 142:15, 142:23, 143:25, 213:4, 213:10, 222:18, 222:25, 226:22, 227:1, 230:22
**Ward's** [2] - 98:18, 131:1
**WASHINGTON** [1] - 2:12
**Washington** [34] - 96:8, 152:15, 159:21, 159:25, 161:16, 166:19, 168:13, 191:10, 192:2, 193:6, 197:14, 198:19, 198:21, 199:16, 201:9, 201:15, 201:21, 201:24, 204:11, 206:13, 206:16, 206:22, 207:3, 207:6, 207:13, 207:22, 207:24, 208:9, 217:16, 220:8, 227:7, 227:10, 229:3
**watch** [1] - 13:23
**watched** [1] - 23:23
**waves** [1] - 81:13
**ways** [4] - 19:11, 30:10, 65:9, 69:10
**Web** [39] - 14:3, 18:11, 19:9, 28:11, 31:17, 59:15, 65:11, 65:15, 65:21, 66:3, 67:21, 67:25, 74:4, 75:21, 76:13, 76:18, 79:9, 79:22, 84:4, 84:5, 84:7, 146:11, 164:20, 164:25, 165:2, 172:23, 176:11, 191:4, 194:7, 194:21, 194:22, 195:13, 197:9, 201:6, 206:6, 226:23, 228:2, 228:15

**Wednesday** [1] - 144:3, 230:23
**week** [9] - 41:21, 52:24, 136:21, 165:22, 174:24, 175:16, 185:8, 193:14, 212:18
**weekly** [1] - 38:4
**weeks** [5] - 124:13, 210:16, 212:16, 212:19, 215:6
**weigh** [1] - 221:24
**weight** [2] - 216:22, 219:14
**well-known** [1] - 39:3
**whatsoever** [1] - 120:14
**whereabouts** [1] - 43:12
**wherewithal** [1] - 146:12
**whole** [1] - 24:4
**wholly** [1] - 226:6
**wide** [1] - 112:12
**wife** [6] - 127:11, 130:11, 145:13, 145:19, 175:12, 175:21
**Wife** [1] - 28:15
**wiki** [5] - 21:2, 21:7, 29:23, 29:25, 187:14
**willing** [1] - 220:4
**WILLOW** [1] - 2:22
**WILSON** [1] - 2:14
**winding** [1] - 208:8
**wishes** [2] - 126:5, 219:15
**withdraw** [1] - 71:22
**withdrawn** [9] - 115:22, 119:10, 138:11, 152:20, 171:16, 173:7, 181:8, 194:3, 197:24
**witness** [73] - 10:5, 10:6, 11:10, 12:17, 23:12, 25:16, 27:21, 34:14, 34:22, 35:2, 35:9, 38:13, 38:16, 38:22, 38:25, 44:22, 46:20, 46:25, 47:18, 48:8, 48:19, 56:20, 57:19, 63:19, 63:21, 74:12, 84:23, 84:25, 85:4, 91:20, 94:21, 97:24, 98:19, 99:7, 100:19, 104:5, 104:23, 105:3, 106:11, 119:17, 124:16, 125:8, 125:22, 131:1, 135:8, 140:22, 144:13, 147:24, 148:3, 159:1, 159:13, 174:3, 178:5, 184:1, 184:6, 189:5, 189:8, 198:14, 205:2, 205:13, 205:17, 209:11, 219:1, 219:12, 220:2, 220:12, 221:1, 221:3, 224:14, 224:18, 227:6, 227:22
**WITNESS** [15] - 27:24, 34:20, 34:25, 63:15, 63:17, 84:22, 100:17, 101:2, 142:18, 149:4, 171:8, 174:2, 190:13, 190:16, 212:24
**witness'** [6] - 147:21, 148:6, 148:9, 148:18, 158:24, 187:22
**witnesses** [47] - 8:24, 11:8, 11:25, 12:4, 12:10, 12:11, 20:17, 28:24, 29:9, 30:25, 33:18, 48:14, 48:16, 49:10, 50:22, 70:14, 70:18, 72:15, 74:7, 77:15, 79:15, 80:16, 81:4, 81:17, 81:22, 82:2, 103:12, 103:22, 104:1, 104:2, 108:4, 108:8, 125:23, 125:24, 129:16, 134:7, 134:15, 139:21, 139:23, 140:1, 140:10, 142:20, 142:23, 148:11, 149:2, 167:20, 168:4, 188:8, 188:24, 203:12, 203:21,

212:25, 213:5, 217:8, 218:6, 218:10,
218:12, 218:17, 219:9, 220:4, 220:7,
220:13, 220:19, 220:23, 225:17, 226:5,
226:8, 227:11, 227:18, 227:19, 227:23,
228:24, 229:17, 229:18
 **woman** [1] - 24:8
 **word** [6] - 91:16, 208:19, 209:15,
209:22, 210:4
 **words** [1] - 8:17
 **workflow** [1] - 180:1
 **workflows** [1] - 160:16
 **works** [24] - 26:12, 57:23, 59:8, 72:19,
76:4, 77:21, 77:22, 77:23, 78:1, 83:21,
84:4, 108:8, 163:21, 163:23, 164:10,
164:15, 164:22, 168:20, 180:3, 197:19,
198:8, 203:7, 228:13, 228:17
 **workweek** [1] - 132:11
 **world** [3] - 137:18, 194:18, 197:5
 **worldwide** [1] - 202:19
 **worry** [1] - 75:16
 **Wright** [6] - 71:11, 72:9, 72:11, 73:4,
74:2, 80:20
 **Wright's** [1] - 73:11
 **write** [3] - 18:8, 30:5, 30:11
 **writer** [3] - 35:23, 50:16, 50:17
 **writers** [3] - 41:8, 62:9, 62:25
 **writes** [2] - 29:13, 29:17
 **writing** [2] - 15:6, 166:16
 **written** [2] - 67:22, 168:12
 **wrote** [2] - 66:16, 67:14
 **www.cbs.com** [1] - 28:11

## Y

 **y'all** [1] - 96:15
 **Yarborough** [7] - 8:7, 8:9, 8:10, 8:11,
8:12, 96:12, 96:17
 **Yarborough's** [1] - 11:1
 **Yared** [1] - 79:4
 **year** [19] - 34:8, 101:15, 128:22,
187:19, 190:24, 192:13, 192:18, 199:6,
209:6, 209:23, 210:6, 210:9, 212:1,
212:6, 212:11, 212:12, 213:14, 214:24,
227:9
 **years** [20] - 13:16, 14:6, 14:14, 40:15,
50:11, 93:2, 94:3, 101:12, 144:24,
144:25, 145:13, 159:3, 175:11, 175:17,
175:22, 177:6, 180:20, 180:21, 185:8,
190:20
 **years'** [1] - 121:7
 **York** [143] - 14:16, 14:18, 15:11, 15:14,
16:13, 18:18, 21:6, 21:14, 22:10, 22:19,
23:10, 24:12, 24:20, 25:8, 25:15, 25:22,
25:25, 27:3, 30:9, 36:25, 37:1, 45:18,
46:8, 47:12, 65:23, 66:9, 67:17, 68:13,
69:2, 69:11, 70:2, 72:13, 72:25, 73:18,
73:24, 74:2, 74:5, 77:3, 81:9, 83:20,
96:11, 126:24, 145:8, 149:21, 150:24,
151:1, 151:2, 152:12, 152:19, 154:14,
154:15, 158:17, 159:12, 162:1, 167:7,

167:8, 169:14, 169:15, 171:5, 172:10,
172:12, 172:15, 172:20, 173:20,
174:21, 174:25, 176:24, 177:13,
184:21, 185:20, 186:11, 187:7, 191:12,
191:14, 191:17, 192:1, 192:9, 192:12,
192:14, 193:4, 193:11, 193:13, 193:15,
194:13, 195:1, 195:4, 195:6, 195:10,
195:15, 196:7, 196:8, 196:16, 197:17,
197:23, 198:1, 198:8, 199:4, 199:8,
199:16, 200:7, 200:9, 200:13, 202:18,
206:15, 207:3, 207:6, 207:9, 207:14,
207:22, 207:24, 208:10, 208:15, 209:5,
209:18, 209:23, 210:5, 210:9, 210:14,
212:1, 212:10, 212:17, 217:13, 218:4,
218:7, 218:13, 218:14, 219:9, 219:25,
220:7, 220:9, 222:2, 222:14, 223:2,
224:16, 225:18, 227:8, 227:15, 227:17,
229:4, 229:10, 229:15
 **YORK** [2] - 1:25
 **Young** [1] - 196:7
 **young** [2] - 55:17, 133:15
 **yourself** [8] - 32:12, 41:17, 63:4,
79:21, 102:7, 109:10, 145:11, 172:11

## Z

 **ZeitGeist** [3] - 196:23, 196:25, 197:6
 **zero** [1] - 121:7
 **Zimmer** [4] - 192:23, 192:25, 215:17,
216:22
 **Zuckerman** [1] - 196:7