1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF TEXAS

3                       MARSHALL DIVISION

4   PERSONAL AUDIO, LLC            )(

5                                  )(     CIVIL DOCKET NO.

6                                  )(     2:13-CV-13-JRG-RSP

7   VS.                            )(     MARSHALL, TEXAS

8                                  )(

9   TOGI ENTERTAINMENT, INC.       )(     MAY 29, 2014

10                                 )(     1:30 P.M.

11                       MOTION HEARING

12        BEFORE THE HONORABLE JUDGE ROY S. PAYNE

13              UNITED STATES MAGISTRATE JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                         minutes of this hearing.)
17

18  FOR THE DEFENDANT:  (See sign-in sheets docketed in
                         minutes of this hearing.)
19

20  COURT REPORTER:     Ms. Shelly Holmes, CSR-TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464
24

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

1                          I N D E X

2

3    May 29, 2014

4                                              Page

5         Appearances                           1

6         Hearing                               3

7         Court Reporter's Certificate         53

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LAW CLERK:  All rise.

 2              THE COURT:  Good afternoon.  Please be seated.

 3              For the record, we're here for the hearing on the

 4  motions to compel in the Personal Audio versus Togi

 5  Entertainment matter, which is 2:13-13 on our docket.

 6              Would counsel state their appearances for the record?

 7              MS. HENRY:  Good morning, Your Honor -- good

 8  afternoon, Your Honor.  Claire Henry on behalf of Plaintiff.

 9  Along with me today are Jeremy Pitcock and Papool Chaudhari.

10  We're ready.

11              THE COURT:  All right.  Thank you, Ms. Henry.

12              MR. SMITH:  Your Honor, Michael Smith for How Stuff

13  Works.  We also have Mr. Mark Reiter and Mr. Jason Lo, who will

14  be presenting for us today.  We're ready to proceed, Your

15  Honor.

16              THE COURT:  Thank you, Mr. Smith.

17              MS. AINSWORTH:  Good afternoon, Your Honor.  Jennifer

18  Ainsworth and Sharon Davis for CBS Corporation, NBC Universal,

19  and the FOX Defendants.

20              THE COURT:  Thank you, Ms. Ainsworth.

21              MS. DAVIS:  Good afternoon, Your Honor.

22              THE COURT:  I guess let me start off by hearing from

23  Plaintiff on their -- on the first motion.  We can take up

24  the -- the motion regarding How Stuff Works first.

25              MR. CHAUDHARI:  Good afternoon, Your Honor.
```

```
1              THE COURT:  Good afternoon, Mr. Chaudhari.

2              MR. CHAUDHARI:  Just a housekeeping matter, Your

3    Honor.

4              THE COURT:  Yes.

5              MR. CHAUDHARI:  Both of these motions are sealed --

6    the briefs are sealed in its entirety, and we think that in

7    compliance with the protective order, that the Defendants for

8    the -- in the other -- in the other motion should be asked to

9    leave the courtroom and vice versa.

10             THE COURT:  Is there -- all right.  Are you raising

11   this out of concern for whether or not the Defendants'

12   technology will be revealed from one to the other?  In other

13   words, is this an issue that's simply up to the Defendants

14   or --

15             MR. CHAUDHARI:  Yeah, I mean -- I'm -- I'm happy to

16   defer to the Defendants on it, but we -- but we may have AEO

17   documents and be discussing AEO matters.

18             THE COURT:  Well, I guess I'll put it first to --

19   Mr. Smith, to your side, is -- does -- since we're taking up

20   your motion first or the motion regarding your client, do you

21   want the counsel for the other Defendant to be out of the

22   courtroom?

23             MR. SMITH:  No, we don't, Your Honor.  We're fine with

24   them being here for this motion.

25             THE COURT:  Okay.  And, Ms. Ainsworth, Ms. Davis,
```

1   are -- what about y'all?

2           MS. AINSWORTH:  That's fine with us, Your Honor.

3   There's only attorneys here, no client representatives today.

4           THE COURT:  Okay.  Well, I appreciate you raising that

5   issue, Mr. Chaudhari, but we'll -- we'll go ahead and proceed.

6           MR. CHAUDHARI:  Thank you, Your Honor.

7           I think -- you know, before we get lost in the weeds

8   of this -- of this motion, I think there's just one -- I think

9   there's one basic fact that we should really call to the

10  Court's attention, and that's that the technical 30 -- 30(b)(6)

11  damages dep -- I'm sorry, the technical deposition for How

12  Stuff Works, the 30(b)(6) dep -- 30(b)(6) deposition occurred

13  on May 7th.  It was scheduled for May 7th.  Their damages

14  deposition was scheduled for May 9th.  And during the technical

15  deposition on May 7th of Arensberg, it was clear to Plaintiff

16  that he wasn't educated on the technical aspects of how audio

17  podcasts were made available on the How Stuff Works website.

18          And at that time, at that deposition, Mr. Lo here

19  made -- you know, put it on the record their -- their position

20  that they've set forth in their briefing in this motion.

21  And -- and I was there, and I put on the record that we were

22  going to file a motion to compel on this issue.  And the very

23  next day, we get a document produced by How Stuff Works, which

24  I'll put on the ELMO here for the Court's convenience.  Here's

25  the first page of it.

1          Perfect.

2          And -- and what this document is, as confirmed by How

3  Stuff Works's damages witness on the -- on the very next day,

4  on May 9th, are -- is a document here that reflects the number

5  of downloads of the audio podcasts that are made available on

6  the How Stuff Works website.

7          Further, prior to that, How Stuff Works has always

8  produced damages documents related to audio.  In fact, one that

9  was presented to Mr. Emmer is right here.  You'll see here it

10 says, accused divisions, and one of them here is non-video

11 display, which Mr. Emmer confirmed referred to audio podcasts.

12 So I think before we get into all the -- you know, what I call

13 the weeds on this, it should be made very clear that How Stuff

14 Works has produced damages discovery on audio.  Therefore, I

15 mean, there's really no reason that they shouldn't have

16 produced technical discovery, as well.

17         If we go back to January 2013, that's when -- when

18 Personal Audio filed its complaint against How Stuff Works.  In

19 its complaint, it alleged claim -- it alleged that How Stuff

20 Works infringes Claim 31.  Claim 31 is an apparatus claim that

21 goes to the dissemination of media content.  Or I'll use the

22 words of Defendants in their -- in a letter brief that they

23 have submitted to the Court for a motion for summary judgment.

24 And they've referred to the claim as claiming devices that

25 distribute content to a user upon request.

```
 1            Well, I mean, whether that's audio or video, it makes
 2    no difference.  I mean, the claim at issue is an apparatus
 3    claim for this device that distributes this content.
 4            Now, in July of 2013, the -- Personal Audio served
 5    infringement contentions against How Stuff Works, and in those
 6    infringement contentions, we specifically did say that we
 7    alleged that How Stuff Works infringes this apparatus claim.
 8            Now, what we -- what we provided is we did provide
 9    examples of how the audio -- how video content was made
10    available on the website.  We did not provide an example of how
11    audio content is made available on the website.
12            THE COURT:  And why not?
13            MR. CHAUDHARI:  We didn't think it's necessary.  We
14    don't even think that providing the example of video content
15    was necessary.
16            THE COURT:  Were you aware -- did you hold the belief
17    at that time that they were infringing in the -- in connection
18    with their audio podcasts?
19            MR. CHAUDHARI:  Yes.
20            THE COURT:  And is there any reason why that belief
21    wasn't reflected in your contentions?
22            MR. CHAUDHARI:  We didn't think that there was any
23    need to reflect every single show or -- or podcast.  I mean,
24    let's --
25            THE COURT:  Did you amend your contentions as to NBC
```

1   and CBS to include a contention regarding the audio podcasts?

2            MR. CHAUDHARI:  We did, Your Honor.

3            THE COURT:  Why did you do it in that -- with respect

4   to that Defendant but not with respect to How Stuff Works?

5            MR. CHAUDHARI:  Frankly, you know, in a typical -- in

6   a typical patent case, and you've got apparatus claims, and --

7   and let me rephrase that.

8            The accused -- although we -- although we have

9   referred to video and audio content as accused products in the

10  past, that is -- the only reason that we ever did that was to

11  distinguish them from other aspects of these websites or

12  webpages that have non -- that -- that have content that

13  doesn't infringe the patent-in-suit.  The patent is directed

14  to -- to the apparatus claim.

15           Now, the -- now, our concern at the time that we

16  created the infringement contentions was damages, right?  In a

17  typical case, if you don't list all of your products, you may

18  not be able to get damages on those products.  But we listed

19  those products, the products are the apparatuses.  They're not

20  the shows.  They're not the audio shows.  They're not the video

21  shows.  But why did we do it as to NBC and CBS?  It was just

22  an -- an abundance of caution, Your Honor.

23           THE COURT:  Why would you -- I guess I'm having a

24  problem understanding you say that you -- the only reason you

25  didn't do it as to How Stuff Works was because it was

1   unnecessary, but you did do it as to NBC and CBS.  Why would

2   you feel it was necessary there but not necessary for this

3   Defendant?

4          MR. CHAUDHARI:  So one -- again, that we believe that

5   this was done in an abundance of caution related to -- to

6   damages, which ended up being -- becoming a non-issue as to How

7   Stuff Works because they've produced damages to -- discovery

8   related to audio.

9          The other issue is that specifically as to How Stuff

10  Works, the shows -- the video shows that are listed in the

11  infringement contentions have a corresponding audio show.

12         Now, that is -- that's distinguished from NBC and CBS

13  where the shows -- the audio shows that we added when we

14  amended those contentions were not ones that were related to

15  video programs that were previously set forth in the original

16  infringement contentions.

17         THE COURT:  Well, is it your position that How Stuff

18  Works infringes in connection with their video programming just

19  the same way as in their audio podcasts?

20         MR. CHAUDHARI:  Well, it's -- we contend that it's the

21  same apparatus.  Now, you know, the -- the claim has different

22  elements to what that apparatus has and what it -- and what it

23  has to do, so there is a difference.  The --

24         THE COURT:  Then why don't you need to cover that in

25  your infringement contentions?

1          MR. CHAUDHARI:  Because the infringement contention --

2    because the claim is an apparatus claim.  The accused product

3    is the -- is the apparatus.  It's not -- it's not how it's --

4    it's not -- it's not aspects of the How Stuff Works website,

5    and that's why -- like I said, we take the position that we

6    didn't even need to disclose video programs in the infringement

7    contentions, although we did.

8          THE COURT:  How is How Stuff Works to be on notice

9    that you are claiming that they infringe in connection with

10   their audio podcasts?

11         MR. CHAUDHARI:  Because in their words, the claim

12   is -- it's for devices that distribute content to a user upon

13   request.

14         Now, I mean, the discovery order requires How Stuff

15   Works and -- and all parties to produce all documents relevant

16   to any claims and defenses.  Our claim is that they infringe

17   this claim that, as they put it, covers devices that distribute

18   content to a user upon request.

19         I -- I -- you know, we think it's unreasonable to read

20   our infringement contentions as a -- as a limitation on the --

21   on the content itself because content isn't accused in this

22   case.

23         THE COURT:  And you're saying that the devices are the

24   same?  That everything that --

25         MR. CHAUDHARI:  Same or similar.  I mean, they've

1    said -- you know, if -- I'm going to just elaborate quickly on

2    that.  The -- the technical -- the technical exp -- the

3    technical witness on the May 7th deposition testified as to

4    using Akamai servers to provide video content, and in the

5    opposition to the motion to compel, there's a declaration from

6    Noel Brown who says that they use Akamai servers to provide

7    the -- to put MP3 audio content on the How Stuff Works

8    website.

9          THE COURT:  Well, you've gotten the technical

10   discovery as to the video?

11         MR. CHAUDHARI:  That's correct.

12         THE COURT:  And why -- if -- if that's the same as the

13   audio, then why do you need it again?

14         MR. CHAUDHARI:  Well, I -- I don't know that it's the

15   same.  I mean, I -- I mean --

16         THE COURT:  Aren't you telling me that it's the same,

17   and that's why your infringement contentions apply to both?

18         MR. CHAUDHARI:  Well, I mean, I -- I don't know if

19   it -- if -- I don't -- I don't know if it operates in exactly

20   the same manner, or at least I didn't -- I didn't have any idea

21   of that until -- until seeing the declarations that are in the

22   opposition.

23         THE COURT:  But you -- you are saying that you knew

24   about the audio podcasts of How Stuff Works at the time you

25   filed your infringement contentions in August?

1          MR. CHAUDHARI:  Yes.

2          THE COURT:  You simply did not make any reference to

3    the audio at that time?

4          MR. CHAUDHARI:  That's correct.

5          THE COURT:  So if the Court concludes that your

6    infringement contentions should have included that, there's no

7    excuse for not having included it?  It was available to you, it

8    was known to you?

9          MR. CHAUDHARI:  Well, we still maintain that we

10   didn't have -- you know, if we had access to the servers --

11         THE COURT:  I understand.

12         MR. CHAUDHARI:  -- at the time -- at the time that we

13   served our infringement contentions, that'd -- that'd be a

14   whole different situation.

15         THE COURT:  But you're not contending that there was

16   anything that you didn't know at that time about audio podcasts

17   that prevented you from including that in your infringement

18   contentions?

19         MR. CHAUDHARI:  That's correct.

20         THE COURT:  Okay.  And tell -- give me the answer

21   again just so I can understand clearly.  You -- what is it that

22   you contend put How Stuff Works on notice from your

23   infringement contentions that the audio podcasts recovered -- I

24   mean, and I guess I'm thinking about what the Defendants cited

25   on the first page of their response brief.

1          MR. CHAUDHARI:  Sure.

2          THE COURT:  Document 161 where they quote from your

3    infringement contentions as saying only those shows currently

4    available at the website are known to infringe at this time.

5          MR. CHAUDHARI:  Yeah, that's a reference to shows that

6    either were made -- either -- either were made available

7    previously but aren't anymore or may be -- may be available in

8    the future.

9          Looking at the infringement contentions, and that

10   would be Plaintiff's Exhibit 3, and I'm on Page 2, and it's

11   Section 1, Subsection B, and we state in our infringement

12   contentions Claims 31 and 32 are infringed by an apparatus as

13   described in the PR 3-1(c) chart below.  And in that chart --

14   that was on -- I'm sorry, that was on Page 2.  On Page 5, we

15   see the element that the -- the -- our contention corresponds

16   to that -- that apparatus preamble, and we say, for example,

17   the webpages and associated data storage servers and

18   communication interfaces at howstuffworks.com are used to

19   disseminate a series of episodes represented by various

20   media files via communication interfaces connected to the

21   Internet.

22         THE COURT:  And is there anything that makes reference

23   to the -- to the audio podcasts as opposed to the video?

24         MR. CHAUDHARI:  No, there is not.

25         THE COURT:  And in the -- in the Defendants' brief,

```
 1   they cite to a statement -- this is on the same page as you
 2   were referring to before -- that the currently available
 3   listing of series episodes which infringe can be found at --
 4   and then it lists a portion of their website that deals with
 5   videos.  That would appear to me to be stating that the -- that
 6   the shows that you felt were infringing were videos.
 7        MR. CHAUDHARI:  But -- but, again, shows only go to
 8   damages.  I mean -- I mean, a show is not an accused product
 9   here because we're talking about a server side apparatus claim
10   with dissemination of media content.  I think that's the --
11   that's the key here.  The key confusion here is that we're --
12   is that we are looking at videos and shows and -- and referring
13   to them as accused products when the claim doesn't claim the
14   shows.  The claim claims a server apparatus that disseminates
15   those shows.  The shows go to damages only.
16        THE COURT:  Okay.  Go ahead.  I think I interrupted
17   your argument.  So you can -- if there's other argument you
18   want to provide on your motion, please go ahead.
19        MR. CHAUDHARI:  Yes, Your Honor.
20        So just going forward in time after the service of the
21   infringement contentions, we received How Stuff Works's Patent
22   Local Rule 3-4 production, albeit a month late, but we did
23   receive it.  And the documentation there only related to video,
24   but the discovery period in this case as to How Stuff Works
25   opened in August and -- and closed on May 12th.  Yet other than
```

1   their 3-4 production, we received no other documents until the

2   last day for substantial completion of document production.

3   Had we received -- had we received a rolling production

4   throughout the discovery period, we would have been able to

5   readily determine that -- that we weren't going to get anything

6   technical wise from them on audio and could have raised the

7   issue months ago.

8          But even then, we still raised the issue -- as soon as

9   we did get that production on -- on March 31st, we recognized

10  the issue, we raised it, we went into the meet and confer, and

11  our position is that we -- we resolved the issue, that we --

12  that they told us they were going to give us technical

13  discovery on audio podcasts.  And I understand that -- that

14  that's not their position here today.  But there's really no

15  need for the Court to get involved in a he-said/she-said

16  here.

17         But I think that the key takeaway is that we had -- we

18  had teed up a motion -- a meet and confer, we were on the verge

19  of filing a motion to compel.  Had Defendant told us that they

20  weren't producing technical discovery on audio podcasts, we

21  would have filed our motion the next day.

22         THE COURT:  Which would have been when?

23         MR. CHAUDHARI:  So the meet and confer occurred on

24  April the 11th.  That was a Friday, so we would have filed our

25  motion on April 14th.

```
 1              THE COURT:  Okay.  About four weeks before it was

 2   filed?

 3              MR. CHAUDHARI:  That's correct, Your Honor.

 4              THE COURT:  Okay.

 5              MR. CHAUDHARI:  So -- and, you know, all this goes to

 6   this notion that we weren't diligent in bringing this issue to

 7   the Court.  Again, if -- if -- if we had gotten the document

 8   production in the course of discovery, as we should have, we

 9   would have been able to tee this up months ago.  Even -- even

10   after receiving the document production on March 31st, we were

11   ready to -- to file a motion on April 14th, but we -- but we

12   had an in-person meet and confer and talked with them, and we

13   left with the understanding that they were going to give us

14   technical discovery on audio.  After all, it's undisputed that

15   the -- that the -- it's undisputed that they've produced

16   damages discovery on audio, and then reiterated that at the

17   meet and confer, as well.

18              THE COURT:  And is there anything in writing on that

19   or are we just dealing with your impressions versus theirs from

20   the discussions?

21              MR. CHAUDHARI:  Yeah, I believe it is our impressions

22   versus theirs, which is why I have been saying, he-said,

23   she-said.  I don't think we have a -- we don't have a writing

24   that memorializes the -- the minutes of the meet and confer.

25              THE COURT:  All right.
```

1          MR. CHAUDHARI:  And if I can just close this out.

2          THE COURT:  Uh-huh.

3          MR. CHAUDHARI:  You know, in -- in the opposition, we

4    get these -- of Defendants provided detailed declarations from

5    Mr. Arensberg, their technical 30(b)(6) witness, and also Noel

6    Brown, and they go into really in depth discussion as to how

7    audio content is provided.  And this was done on May 22nd.  And

8    the Arensberg deposition took place on May 7th.

9          Now, even -- even if you accept their position that

10   there's some -- even if you accept that there's any merit to

11   Defendants' argument regarding audio, I mean, really all they

12   had to do here was provide some of this discovery back then,

13   couple weeks ago, instead of waiting until this motion was

14   filed and then going into all this detail in the opposition.

15         I mean, after all, what they could have done is

16   produce this stuff and -- and held a battle on the relevance at

17   a later time such as a motion in limine or motion to strike

18   portions of an expert report, but instead, because they've

19   taken this route, you know, it's -- it's really forced us to be

20   here today in a -- in what's a -- in -- in a disfavorable

21   motion to compel, because we know the Court doesn't favor

22   motions to compel.

23         I say that because I think our -- our central point is

24   that we're here because -- we're here because there's obviously

25   a -- a misunderstanding between the parties as to what's

 1  actually infringing in this case.

 2       Two, the Defendant, you know, was not diligent in

 3  producing documents.  Had they been, we could have resolved

 4  this issue months ago.

 5       And, three, instead of waiting until an opposition on

 6  a motion to compel, they could have just given us this

 7  discovery and fought over it later.

 8       THE COURT:  Are you suggesting that you now have the

 9  technical discovery that you were seeking?

10       MR. CHAUDHARI:  I'm suggesting that the declarations

11  are a component of it.

12       THE COURT:  Okay.  But they're not -- they don't

13  satisfy your -- what you think you need?

14       MR. CHAUDHARI:  That's correct.

15       THE COURT:  Okay.  All right.  Thank you,

16  Mr. Chaudhari.

17       MR. LO:  Good afternoon, Your Honor.  Jason Lo for How

18  Stuff Works.

19       I want to start with the last point, Your Honor, was

20  asking about which was the diligence that the Plaintiff engaged

21  in in raising up this issue.  And throughout the papers,

22  Plaintiff has said we only made one production, and we made our

23  3-4 production late.  That is factually incorrect.  As we

24  raised in our brief and as we noted -- and it's in Exhibit 6,

25  which is -- which are our invalidity contentions -- we told the

1   Plaintiff on October 10th, the day we were supposed to, that we

2   had gathered source code and that it was available for

3   inspection.  That is not in dispute.

4           And with the Court's permission, I want to hand up

5   another document because usually in these cases when we tell

6   the Plaintiff that we've got source code for inspection, they

7   come right away and they say, you know, we want to schedule a

8   time, and we want to look at your source code.

9           We actually never heard back from the Plaintiff, and

10  so after a series of correspondence -- and this is what I want

11  to hand up to the Court, if I may -- on October 30th, my

12  colleague sent to the Plaintiff a letter saying, we said in our

13  invalidity contentions, we have source code available for

14  inspection.  Please let us know when you want to come to look

15  at it.

16          And so with the Court's permission, I will hand this

17  up.

18          THE COURT:  All right.

19          MR. LO:  We got no response on that letter, no request

20  to inspect the source code.  And, in fact, the source code

21  inspection never happened until May of this year, four days

22  before they filed this motion.  So that source code has been

23  sitting around since October of 2013.  We wrote a follow-up

24  letter inviting them to come to inspect it.  They never did so.

25  And had they done so, they probably would have been on notice

1  that this was an issue, and they would have raised this issue

2  earlier.

3         In their briefs, they also say we did our 3-4

4  production late, and they make a reference to this November

5  19th production.  That is inaccurate.  The November 19th

6  production was something that was in addition to our 3-4

7  production.  Our 3-4 production was always the source code that

8  was sitting there available for inspection.  And then in

9  November, we produced approximately six or 7,000 more pages of

10  documents.  In both sets of documents, had they bothered to

11  look at them, they would have seen only video materials on the

12  technical side.  They would not have seen anything on audio.

13         They put --

14         THE COURT:  Mr. Lo, one thing, do you disagree with

15  their statement that you made damages disclosures regarding

16  audio?

17         MR. LO:  Yes, in the way it is framed in that sense,

18  Your Honor.  We provided -- and -- and this is a good example

19  of the document that is on the -- on the projector right now.

20  The way the company works is it -- it provides company wide pro

21  forma statements, and How Stuff Works has a lot of things that

22  are not relevant in this case.  And so let's put aside audio

23  for a second.

24         One of the things that the company puts on the How

25  Stuff Works website are just articles that you can go on and

1  read.  There's no audio content.  There's no video content.

2  Even the advertising revenue from those are included just in

3  the ordinary course of business in our normal financial

4  statements.  And so the reason we provided not only the audio

5  income data but also income data from, for example, non-video,

6  from Google ads and things like that was because our damages

7  expert ultimately would have needed a way to back out of that

8  information.  And as Your Honor knows, if the company keeps a

9  document in its ordinary course of business and they give it to

10  me to produce to the other side, I can't just take a black

11  marker and say, you know, I don't think audio is in the case,

12  I'm going to redact this.  I'm not going to give it to you.

13        We gave them the documents as they are kept -- the

14  numbers as they are kept by the company, and then we also tried

15  to gather additional audio stuff and additional Google stuff,

16  additional non-display stuff so that ultimately our expert

17  would have a basis to say here are the overall numbers and

18  here's how I'm backing it out so that I can figure out what

19  portion is attributable to video.

20        THE COURT:  All right.  And you mentioned that if --

21  if the Plaintiff had examined your source code earlier on, they

22  would have been aware of this -- of this issue.

23        MR. LO:  Yes.

24        THE COURT:  Tell me about that.  How would they have

25  been aware?

1          MR. LO:  Because the video -- and we -- we put this in

2     the declaration.  So, for example, one major difference -- and

3     this part is publicly accessible.  The videos are served using

4     a totally different computer language, HTML, and it's the

5     language that we all -- we don't see, but we interact with when

6     we browse CNN.com or something like that.  So when they looked

7     at the source code, they would know that it's all the HTML

8     stuff is in there.  All of the audio that they pointed to is in

9     a different language and interacts with a totally different

10    kind of server.  And, in fact, if Your Honor just used a web

11    browser to go to one of these RSS XML pages, unless somebody

12    had previously installed an additional software on top of it,

13    that browser wouldn't be able to read that.  So if you look at

14    the source code and you simply look at -- at a very high level,

15    what language is at issue, you would know.

16          There -- there's obviously better ways to know.  And

17    once you dig into it, you would also know that the content

18    there is different, but just that they -- even if one is not a

19    computer science expert, just looking at the different

20    programming languages, you would know that there are no XML

21    or -- or RSS materials in there.

22          THE COURT:  All right.

23          MR. LO:  The -- I won't belabor the point in terms of

24    the notice as -- as Personal Audio concedes, they did not

25    mention anything about the audio podcasts.  And as counsel

1  concedes, there are differences between the audio and the

2  video.  They've now seen our declarations.  They do not contend

3  right now that they are done on the -- that they distributed in

4  the same way because there are differences in terms of

5  machinery.  There are differences in terms of the personnel who

6  do the video versus audio.  There are differences in terms of

7  the work flow that happens from beginning to end.  All of those

8  differences are laid out, and they don't really go through --

9  and they should have done this in their opening brief on an

10  element-by-element basis, tell the Court how they are

11  reasonably similar.

12        Under Honeywell, that's what you've got to do when

13  you're coding them to do so.  And actually I should pause

14  there.

15        As the Court started the conversation with

16  Mr. Chaudhari, you don't even get to the reasonably similar

17  analysis because there's no dispute that these audio pages were

18  available at the time they did the contentions.  Personal Audio

19  has now said they were aware of them.  They thought they

20  infringed.  And under the local rules and under Honeywell and

21  Orion, when something is publicly available, you have to put

22  those in your contentions.  There's simply no excuse.

23        And it's telling that throughout their briefing, they

24  refer to these as their preliminary infringement contentions.

25  Well, that preliminary portion went out the door about six or

1   seven years ago, and the rules have changed, and those are not

2   preliminary contentions.  Those are contentions which under

3   AEG, the Plaintiff has to exercise due diligence by looking at

4   all publicly available information in order to -- in order to

5   form their contentions, and they've not done that.  They

6   concede that.  And that in itself ends the inquiry.  You never

7   even get to the reasonable similarity, nor -- nor do you get to

8   the -- nor do you get to the diligence analysis.

9        The last thing I want to point out in terms of the

10  differences -- and this is -- again, we can tell just by

11  looking at the infringement contentions that they amended for

12  CBS and for NBC.  The Court has already pointed out that they

13  put in different claim charts for the audio versus video.  So

14  even under their own analysis, their -- they didn't just say,

15  everything infringes for the same reason.  They did a separate

16  claim chart when they did their contentions for audio and they

17  amended it.  That's Point No. 1.

18       Point No. 2 is if the Court takes a look at their

19  contentions for video versus audio, the Court will notice that

20  there are different claims asserted between the two sections.

21  So, for example, in the video, they assert claims -- additional

22  Claims 33 and 34, and those claims are not asserted when it

23  comes to what they call the podcasting video, which is, I

24  think, their shorthand for audio media.  I'm not close enough

25  with the -- how the things work behind -- behind the scene for

1    CBS or NBC to know exactly why.  But just on the face of these

2    contentions, that is another indicia that there is a

3    substantial difference such that they chose not to assert two

4    out of the four claims when it came to the audio.

5         THE COURT:  All right.

6         MR. LO:  So unless the Court has any additional

7    questions, I'm prepared to rest.

8         THE COURT:  I don't think so, Mr. Lo.  Thank you.

9         MR. LO:  Thank you.

10        THE COURT:  Mr. Chaudhari, if you want to respond?

11        MR. CHAUDHARI:  I'll keep this brief.

12        I led off our discussion here today discussing this

13   document that was produced on the day between the technical

14   30(b)(6) witness and the damages 30(b)(6) witness for How Stuff

15   Works.  The day after Mr. Lo went on the record on -- on his

16   position and -- and also the day after I -- I went on the

17   record and said we're going to file this motion.

18        Now, as we discussed earlier, this is a document that

19   shows the number of downloads of audio podcasts broken out by

20   podcast in the relevant -- in the relevant infringing time

21   period.

22        Now, nowhere in the brief or -- or in Defendants'

23   argument here today did they address this document.  They don't

24   address this document because this document is a concession

25   from Defendant that audio belongs in this case, the day

1    after -- the day after they said the technical documents on

2    audio aren't in this case.  There's no technical -- you know,

3    the day after they said that audio is not in this case.  The

4    day after I said, I'm going to -- that we're going to file a

5    motion to compel to get audio discovery, they give us a

6    document that -- that sets forth the number of downloads of

7    audio podcasts on the How Stuff Works website.

8                   THE COURT:  Well --

9              MR. CHAUDHARI:  There's no reason to produce that

10   unless you concede that audio is a part of this case.

11             THE COURT:  Mr. Chaudhari, Mr. Lo indicated that they

12   produced damages discovery globally and then separately for

13   audio and other non-video damages elements so that their expert

14   could isolate the revenue relating to video alone.  Is -- why

15   would this not be consistent with that?

16             MR. CHAUDHARI:  What I'm suggesting is that this

17   having been produced on May 8th, the day after Mr. Lo went on

18   the record saying audio is not in this case, the day after I

19   said that we're going to file a motion to compel on audio, the

20   day after that, they produced this document.  That only goes to

21   audio and only goes to downloads.  They didn't produce this

22   back on March 31 on their -- on the deadline for substantial

23   completion or -- or at any other time in the -- in the relevant

24   discovery period.  They produced it the day after they said

25   that audio is not in the case and the day after I said I was

1    going to file a motion to compel.

2              THE COURT:  Okay.

3              MR. CHAUDHARI:  As to the -- and I just wanted to --

4    just a housekeeping point.  On the -- on this issue about the

5    3-4 production, we don't dispute that they said in their

6    invalidity contentions that they were making source code

7    available, but our understanding is that the 6,000 pages that

8    we did receive in November of 2013 was a part of their 3-4

9    production.  And although we don't have the correspondence here

10   before you today, we -- we -- we have always maintained that

11   position.

12             THE COURT:  What do you say in response to what Mr. Lo

13   said about your CBS-NBC amended contentions where when you

14   included audio, you provided separate charts and also relied on

15   different claims?

16             MR. CHAUDHARI:  That's right.  Well, as to video as to

17   NBC, CBS, and FOX, we do assert Claims 31, 32, 33, and 34.  As

18   to How Stuff Works in its entirety, we've only asserted --

19   we've only asserted Claims 31 and 32.

20             THE COURT:  So you're saying that if you were to amend

21   with respect to audio regarding How Stuff Works, you would not

22   do what you did with CBS and NBC?

23             MR. CHAUDHARI:  We would not be adding Claims 33 and

24   34.

25             THE COURT:  All right.  And would you rely upon any

 1   different element-by-element analysis of the infringement

 2   concerning audio, as opposed to that which you've done

 3   regarding video for How Stuff Works?

 4        MR. CHAUDHARI:  We would -- we would point to -- we

 5   would point to what we assert as the compilation file, which

 6   is a -- it's -- as Mr. Lo says, it's -- I believe it's an XML

 7   file versus an HTML file, but it's also available on the How

 8   Stuff Works website.  But, yeah, we would -- it would be

 9   essentially the same, except for pointing to these different

10   webpages that are -- that are -- that are on the same site.

11        THE COURT:  Okay.  Thank you, Mr. Chaudhari.

12        I'd like to move to the other motion at this time.

13        Mr. Pitcock.

14        MR. PITCOCK:  Yes, Your Honor.  Good afternoon.

15        I -- there's a fundamental difference in the motion to

16   compel against the network Defendants in that the main part of

17   the dispute, at least on the technical side, is whether or not

18   we were entitled to discovery on what are known as native

19   mobile applications.

20        Unlike websites, which send an HTML file publicly to

21   the browser and which you can analyze, native applications are

22   written in machine code, and it is impossible to tell how they

23   work absent discovery.  So there -- there was no way at the

24   time we filed our preliminary infringement contentions that we

25   could have accused these products, the native mobile apps, of

1    infringement.

2           So what we did in our -- in our local rules is we

3    tried to be as broad as possible in our -- in our infringement

4    contentions, and particularly at 3-1(a), this is an exhibit --

5    Exhibit 1 to our opening brief.  On all of these, we say

6    Personal Audio presently contends that Defendant infringes

7    asserted Claims 31 through 34 directly by video media

8    disseminated by the network Defendant.  Further, to the extent

9    that discovery shows that Defendant utilizes third-party

10   computers to host the accused instrumentality, including at

11   least the accused websites, such hosting would necessarily be

12   at the direction and control of the Defendants.

13          So we always contemplated that there may be other

14   websites that we were unaware of that were controlled by the

15   Defendants, and we always contended that it was possible that

16   they were using the same apparatus to infringe in a different

17   way.  But there was no way at the time we filed our

18   infringement contentions or really there's no way without

19   discovery that we could ever have in good faith said, yes, they

20   have a compilation file, here's what it is, and it comes

21   over -- comes over the -- the wire in response to a client

22   device request.  So that's the first point.

23          The second point is, you know, that there -- there's

24   some discussion about, you know, whether we should have

25   realized, based on their source code production, you know, what

1   they were and were not putting into the case.  With respect to

2   the network Defendants, they -- you know, we were hoping to

3   focus our technical expert -- I mean, there are millions of

4   lines of code to potentially analyze.  It makes no sense to

5   send an expert, you know, across the country to go look at a

6   computer for days on end without some of the supporting

7   technical documentation that we only received in part on March

8   30th.  There was no reason -- and when we did go to inspect the

9   network Defendants' source code, they hadn't even produced all

10  the source code relevant to the accused websites.  In fact,

11  they had -- despite their description of them, had not produced

12  source code for any of the server side stuff, which we asked

13  for and we had to have our expert go back and inspect again so

14  that we could, you know, look at the right code for the various

15  websites.

16        So, you know, Ms. -- I shouldn't personalize it, but

17  the Defendants in their opposition, you know, they point to --

18  they point to, you know, an article about the Defendants'

19  native mobile apps.  There's nothing in this article that

20  indicates whether or not, you know, particular compilation

21  files relating to episodes are sent to the requesting client

22  device.  There's no way to know that information absent

23  discovery.  When they failed to produce much in the way of

24  documentation on March 30th, we sent a letter.  Our request --

25  we requested specific categories of documents which was set

1    forth in the reply brief.  We specifically asked for, you know,

2    documents that would be broad enough to cover any request for

3    media disseminated over the Internet in a few different

4    categories.  And then when we had our meet and confer, they at

5    no time said, okay, well, we're only going to give you this,

6    but we're not going to give you anything else, or we would have

7    known to bring our motion to compel at that time.  We were just

8    left in the position of -- they didn't even give us deadlines

9    for their production.  As we received documents, it became more

10   and more clear.

11          And then, finally, at the technical depositions of the

12   witnesses, which occurred mostly in the week right before the

13   end of fact discovery because we weren't able to take them any

14   earlier from lack of documentation, at that time, it -- that's

15   when they said, okay, well, even though you asked for a

16   30(b)(6) topic on native mobile apps and how they work, we're

17   not going to -- you know, we're just not going to produce a

18   witness on that topic.

19          THE COURT:  All right.  Thank you, Mr. Pitcock.

20          MR. PITCOCK:  Oh, I'm sorry -- I'm sorry, Your Honor,

21   there -- there is a second part of the brief which was on

22   advertising.  I -- I apologize.

23          And so looking at their reply brief, there's -- there

24   was also advertising information.  If you look at that same

25   correspondence, we asked for a lot of information related to

 1   advertising, and that was also not produced, although at the

 2   meet and confer, it was our understanding that they were going

 3   to produce those materials.  And, again, it wasn't until the

 4   late depositions that it became apparent that they had not

 5   produced all the relevant documentation.

 6             THE COURT:  Thank you.

 7             MS. DAVIS:  Good afternoon, Your Honor.

 8             THE COURT:  Good afternoon, Ms. Davis.

 9             MS. DAVIS:  Let me start, I think, with the issue of

10   the Plaintiff's disclosures in their infringement contentions.

11             As is the case with respect to the argument that you

12   heard earlier, there's nothing in Plaintiff's infringement

13   contentions that makes reference to native mobile apps.  And

14   you didn't hear -- Mr. Pitcock indicated that -- that in order

15   to know whether or not the native mobile apps infringe, that

16   somehow his contention is that he needed discovery to know

17   that.  But at no point either in the infringement contentions

18   or during the entire factual discovery period where we were

19   discussing documents, at no point did any of the counsel for

20   Personal Audio ever raise the issue of native mobile

21   applications being an accused product in this case.

22             At no point -- and we went through this in detail in

23   the briefing, Your Honor.  At no point -- first of all, as I

24   said in the infringement contentions -- and if you look at Page

25   3, for example, of the FOX infringement contentions, which is,

1    I think, what Mr. Pitcock pointed to, it's very clear it's

2    referring to websites, explicitly, multiple times.  Only those

3    shows at websites believed to be upon information and belief

4    under the direction and -- and control of FOX are listed below.

5    However, other websites under control of the Defendants may be

6    shows through discovery to infringe.

7              The only way you can understand these infringement

8    contentions is that they were accusing the FOX -- in this case,

9    FOX.com website and these servers related to the delivery of

10   that website as being the infringing apparatus.  That's what

11   they said repeatedly in their infringement contentions and as

12   we'll look at -- at the correspondence that was relating to

13   fact discovery here.

14             We also pointed out that in their -- in their list of

15   accused products, they refer to the example compilation HTML

16   file that they're identifying.  And as Mr. Pitcock himself

17   admits, native mobile apps don't -- don't have HTML files that

18   would fall and be this type of file.

19             When we get to the podcasts, they identified the XML

20   files that are related to the delivery of those files as being

21   the alleged infringed compilation file.  There's no way that we

22   could take from that an understanding that they were also

23   accusing a totally separate type of technology that is in a

24   different computer language that is downloaded to a device

25   rather than being a system that uses a browser that is --

1    uses -- just uses a different player.  We're talking about

2    totally separate technologies here that they're now seeking to

3    add to the case this entirely new technology.

4            And you already heard from Mr. Pitcock that he can't

5    even -- even now say whether or not the native mobile apps

6    infringe or don't infringe, which shows you that it's not just

7    a matter of looking at a few servers.  There is different

8    technology, and the claims require the use of a compilation

9    file.  That compilation file is a file that has to get sent to

10   the user's device.  It has certain characteristics that are

11   required by the claim.  That has nothing to do with what type

12   of server you're using.

13           That has to do with a mechanism by which the video is

14   delivered on that particular kind of system, and that's

15   entirely different for the apps as -- than it would be for the

16   websites.

17           And really, what they're asking for -- I mean, I think

18   would require -- it would require us to revisit technical

19   documents.  It would require new source code, new witnesses,

20   and presumably they would want new expert reports at this stage

21   of the game.

22           THE COURT:  Ms. Davis, tell me, do you contend that

23   anything that occurred during the discovery would have put them

24   on notice that you are taking the position that native mobile

25   apps were not accused here?

1          MS. DAVIS:  The first time, Your Honor, that -- that

2     the issue of native mobile apps was ever raised by Plaintiff

3     was in their 30(b)(6) notice, and we did respond to their

4     30(b)(6) notice by objecting on the grounds that native mobile

5     apps had not been identified in the preliminary infringement

6     contentions and that we would provide witnesses with respect to

7     products that were identified in the preliminary infringement

8     contentions.

9          If you look at the correspondence, Your Honor, in

10     fact -- and -- and there's been a lot of discussion about the

11     meet and confer.  Let me be clear because I was in the meet and

12     confer.  We did it right here at this table.  At no point

13     during the meet and confer did Personal Audio ever say, we

14     would like discovery about mobile apps.  At no point were those

15     words used.  They're not in the letter.  They're not in my

16     responsive letter.  And, in fact, you can tell from my

17     responsive letter, which is at -- at Exhibit 9, you can tell

18     that what we were talking about, that we did not include mobile

19     apps.

20          In fact, as I -- if you look at my letter at Page 3,

21     this was right before the meet and confer, so this was the --

22     they had sent a letter with a list of requests.  And we were

23     providing a detailed response pursuant to Paragraph 9 of the

24     discovery order.  And what we said is with respect to technical

25     documents, as we discussed in our telephone conversation,

1  because Plaintiff's counsel and I had a conversation about

2  where we were on the document issues in advance of this letter

3  and the meet and confer.  I said, we remain unclear as to what

4  kinds of documentation Personal Audio lacks that would be

5  relevant to the claims or defenses in this case.  We felt like

6  at this point and -- and then we discussed it further in the

7  meet and confer, we felt like we had already produced technical

8  documents.  We were asking, you know, hey, what is it that

9  you -- that you think you don't have?  And they had made a

10 distinction between design and operation.  We were asking about

11 that.  And then there were specific topics that we responded to

12 as to the status of those.

13         It's telling -- a couple of things, Your Honor.  With

14 respect to one of the categories that Plaintiffs cite at the

15 beginning of their reply brief, and they say, oh, we should

16 have realized from looking at those categories that they meant

17 to include mobile apps.  Well, in my letter with respect to

18 Category G, which is one of those topics, I said, we have

19 produced documents showing this information.  If there is

20 additional material that you want and have not received, please

21 let us know.  Okay?  So we were saying, we think we've produced

22 everything on this topic.  They didn't come back to us and say,

23 oh, yes, but you haven't produced that stuff on mobile apps to

24 us.  They didn't come back and say that.

25         When we went to the meet and confer, there were

1    specific topics that we talked about.  None of them involved

2    anything to do with mobile apps.  And we resolved all of the

3    outstanding issues by agreeing what we were and were not going

4    to produce.  It was mostly honestly in the damages area.  On

5    the technical side, we had offered source code for

6    production -- for inspection, and we had produced a lot of

7    documents.

8              I also want to point out with respect to the

9    correspondence that in the reply brief, Plaintiff suggests that

10   we should have realized that they were including mobile apps

11   because there were some categories that they -- the ones they

12   list in their brief that they say are broader, and then there

13   were other categories that were limited to the accused website.

14             Two points on that, Your Honor.  First is in my letter

15   of April 17th, Exhibit 9, on Page 4, I actually specifically

16   add -- address something related to that issue.  When we got to

17   those -- those last K through R topics, I said, in our phone

18   conference, you indicated that these requests were duplicative

19   of A through J, because that was the conversation we had.  They

20   sort of had a very long list.  It was A through R of technical

21   documents that they were asking about.  None of those, of

22   course, included the words "app," "mobile app," "native mobile

23   app."  That was not in there.

24             But they had this A through R list, and so when we

25   were going through them, it kind of got -- it got repetitive,

1   and I said, oh, are these just duplicative -- and just kind of

2   phrased it a little different way, and they said, yes.  And so

3   that's in my letter.

4          We had -- and the second thing is that even the

5   categories that they mention, Your Honor, that they include in

6   their reply brief, all of those -- those A, B, C, F, and G,

7   even in those, most of them actually do refer, once again, to

8   the cite or the page.  If you look at, for example, F, delivery

9   of advertisements on the site or page.  Category C, content

10  such as advertising on the site or page.  All of their

11  references were always throughout the case, throughout the

12  correspondence, they were always talking to us in terms of the

13  webpages and websites that they contended infringe.

14         In fact, their letter itself, the -- the letter that

15  they sent on -- on April 3rd, the detailed letter, specifically

16  says in the -- on the first page, it says, the accused websites

17  are accused to infringe.  And then goes on.  They -- the

18  message -- the only thing we can take from their contentions

19  and from all of the correspondence throughout this, even after

20  the meet and confer on April 24th, was that they were accusing

21  websites of infringing.  And that's what they were seeking

22  discovery on.  At no point did they raise the issue of native

23  mobile apps.

24         Under this Court's laws, we've already talked about in

25  the earlier argument, Your Honor -- first of all, there's

 1   really no dispute that the native apps were known to

 2   Personal Audio.  There's no secret that you can go to iTunes

 3   and look for NBC, CBS, and FOX and find the existence of these

 4   apps.

 5          Now, I guess Plaintiff's argument is that, yeah, we

 6   maybe knew about them, but we didn't know whether or not they

 7   infringe, so you are supposed to, I guess, you know, read our

 8   mind and know that we were also wondering if those might

 9   infringe.  But they certainly didn't do anything to put us on

10   notice of that.

11          So under the law, they were responsible for putting

12   those in their infringement contentions or certainly at least

13   doing something -- if they felt like they didn't have enough

14   information, certainly doing something to put us on notice of

15   that publicly accessible accused infringing product before the

16   very end of fact discovery in the case.

17          And if we get into the whole issue of reasonable

18   similarity a little bit, they can't possibly meet the

19   reasonable similarity test even just based on what they've

20   admitted, Your Honor.  It's clear that the products -- the --

21   the native mobile applications, everyone admits, I think they

22   don't dispute, are written in a different computer language,

23   function differently, do not use the same kind of compilation

24   file at all.  They don't even have the same type of -- of

25   language as any of the other accused products.  They just

1   simply do not function the same.

2          The most that they've been able to say is essentially

3   there are some servers which may be somewhat similar types of

4   servers that play some limited role in this process.  That's

5   the most they've been able to say.  And, in fact, in their

6   reply brief, they point to testimony of some of the NBC and

7   CBS and FOX witnesses, and I don't want to get too far into the

8   technicalities because I don't think we need to do that here,

9   but the discussion that they have about how the native mobile

10  applications interact with servers at the platform, which is

11  a -- a con -- a contractor, someone who does -- who operates

12  video content management systems, that conversation relates to

13  servers that are not even the servers that are involved in the

14  infringement chart that they provided for the video on the

15  websites.  That's a totally different set of servers, so to

16  speak, than what is listed in the -- what is identified in the

17  infringement contentions that serves the compilation files that

18  are identified in the infringement contentions.

19         So really -- I mean, they're similar only in the sense

20  that there might be servers involved in both.  And that

21  certainly is not sufficient to meet the reasonably similar

22  standard under this Court's precedent.

23         THE COURT:  Give me your response on the advertising.

24         MS. DAVIS:  Oh, certainly, Your Honor.  On the -- on

25  the advertising, I thought -- as I indicated in our opposition

1   brief -- well, let me step back for a moment.  This is another

2   issue where from our perspective, it was not clearly raised in

3   what they had asked for.

4         What they had asked for and -- and indicated to us

5   that they were looking for was customer -- customer relations

6   promotion advertising, like they were looking for things where

7   we put on a commercial or something like that that said you can

8   download episodes at FOX.com.  And that's what they had asked

9   for, and we had had conversations around that.

10        Subsequent to that, during the depositions, it became

11  clear that they were looking for something different which was

12  they were looking for documents that showed how the networks

13  approached potential advertisers or advertising agencies to

14  promote the idea of advertising on the videos on websites.

15        In response to that, we agreed to investigate.  They

16  made that request during the deposition process.  We agreed to

17  investigate.  And as I told -- I indicated in my opposition

18  brief and I told counsel in our meet and confer, what we have

19  been -- what we have been able to -- what we have gotten and

20  gathered and are willing to produce are the -- sort of template

21  or what they have is they have slide decks that they use for

22  this and they have been able to collect that provide the

23  information I believe that Plaintiffs want.  And I think we

24  agreed, and Plaintiffs can tell me if I'm wrong, but

25  Mr. Chaudhari was on the call where we talked about it, that

 1    they were fine with getting these sort of template or the

 2    generalized slide decks, rather than demanding that we go back

 3    and pull every version that might have been used over that

 4    couple of year period because these are things where like, you

 5    know, if they're making a presentation on Tuesday, they would

 6    put in a new coverage page, et cetera.

 7            THE COURT:  Have you produced those?

 8            MS. DAVIS:  I haven't produced them.  As I told you

 9    yesterday, they're ready to go.  I mean, I can produce them in

10    a day.

11            The issue -- the issue that they were going to

12    identify for us whether there were other identifiable types of

13    documents that they were looking for, and -- and essentially we

14    talked about it.  I thought we had more or less reached an

15    agreement or thought that we -- that when they got the slide

16    decks, that we could probably -- if there's anything else

17    specific that they wanted, that we could work out a -- a scope

18    of production on that.

19            So I don't think we have an ongoing dispute, but --

20    but I can let -- Plaintiff can -- can clarify their position on

21    that if they want to.

22            THE COURT:  What are you waiting for to make that

23    production?

24            MS. DAVIS:  I was just waiting to understand from them

25    is -- is that what they want.  We talked about it yesterday

1  afternoon, so it just hasn't -- it's literally like, you know,

2  pushing -- you know, putting it through the Bates numbering

3  process and -- and pushing a button.

4          THE COURT:  All right.

5          MS. DAVIS:  They're good to go.

6          THE COURT:  Thank you.

7          Mr. Pitcock, do you want to respond?

8          MR. PITCOCK:  I just wanted to point out, Your Honor,

9  that I think it's pretty clear that we were looking for

10  information about the use of the Internet to disseminate video

11  media, whether it was in a native mobile app or otherwise.  In

12  the 30(b)(6) topics that we served on April 2nd, long before

13  the meet and confer, we also asked for broad categories of

14  discovery.  And they're -- they're relevant not only to the

15  issue of do these native apps infringe, which we could not --

16  she's -- she's pointing to nothing that would allow us to have

17  used public information to accuse them of infringement at the

18  time we filed our infringement contentions, is, you know, they

19  are potential non-infringing substitutes if, in fact, they

20  don't infringe.

21          These native apps are written specifically in part for

22  Apple, and so one of their potential defenses is, you know, we

23  are, you know, precluded from getting any damages against

24  licensed Apple devices.  And so all this information -- I

25  believe it was very clear that we were seeking information rog

1    in our 30(b)(6) requests and in our conversations --

2            THE COURT:  When's the first time you believe that you

3    used the term or some similar term, the native mobile apps, in

4    connection with your requests for discovery and disclosure?

5            MR. PITCOCK:  I mean, I know they objected -- I -- I

6    can't remember, Your Honor, and I'll be happy to supplement the

7    record and -- and find this out.  There's been a great deal of

8    correspondence between the parties.

9            THE COURT:  Was it in connection with the 30(b)(6)

10   deposition?

11           MR. PITCOCK:  Well, I believe they objected and said

12   that they weren't going to produce anybody on native mobile

13   apps even though they didn't move for protective order.  So my

14   understanding is they waived that objection.

15           So at least by that time, before we took the technical

16   30(b)(6) depositions, they were aware that we wanted that

17   specific information enough to object to producing a witness on

18   those grounds.

19           I think it's pretty clear that it would fall, you

20   know, under some of the categories that were -- we did not use

21   the exact phrase "native applications," but, you know, we asked

22   for Topic 17, the design and operation and method of use of all

23   communication interfaces connected to the Internet for

24   receiving requests received from remotely located client

25   devices and for responding to such requests.

```
 1          Again, you know, we did not -- we cannot know, absent

 2   discovery, whether these applications infringe the compilation

 3   file limitation in the patent-in-suit.

 4          THE COURT:  Well, did you know you were looking at

 5   that issue?  Was that something that was in your mind back

 6   before they first objected to it?

 7          MR. PITCOCK:  Yes.  I mean, when -- when -- when they,

 8   you know, didn't give us much in the way of documentation, and

 9   there was no way -- they gave us so little, there was really no

10   way to sort of discern, you know, what were they just not

11   producing at all?  What were they going to produce a little

12   later?  What did they need clarification on and what we wanted?

13   I mean, it was just a handful of documents for most of these

14   network Defendants.

15          And so when we went through there, they asked us, you

16   know, give us a category of everything that you want.  We wrote

17   out a letter, and we -- we said, you know, we want all these

18   broad categories of documents, including the ones in the reply

19   brief, and this certainly would have been responsive.  There

20   were lots of specific technologies that I did not name in

21   particular that I would have thought were responsive to those

22   requests.

23          THE COURT:  Why -- why not?

24          MR. PITCOCK:  I -- I didn't -- I mean, maybe I made a

25   mistake, and I'd be willing to admit it.  I just -- I always
```

1   thought with infringement contentions, you were only supposed

2   to put in the things that you had a good faith basis to believe

3   were infringing at the time, but if you had a good faith basis

4   for believing that a Defendant infringed a claim of a patent,

5   that you could get discovery on other instrumentalities used to

6   perform similar or the same functions.

7        THE COURT:  I just am wondering why you wouldn't

8   identify native mobile apps.  If it's in your head and you

9   don't know if it's in their head, why not say it?

10        MR. PITCOCK:  Well, I suppose -- you know, again,

11  we -- we were at the end of discovery.  We needed to take

12  depositions.  I suppose I could have been even more detailed

13  than the multi-page letter and all the different deficiencies,

14  but really, at that point, it was kind of like serving document

15  requests after the substantial compliance date.  I mean, I

16  wasn't looking to be incredibly specific because I didn't have

17  any information with which to narrow my request.  I was

18  looking for broad discovery on relevant documentation, which I

19  believe they should have already produced under the standing

20  order.

21        THE COURT:  All right.  Talk about Ms. Davis's remarks

22  about the advertising documents.

23        MR. PITCOCK:  I was -- I was not on that call, Your

24  Honor, so if you don't mind, I'm going to defer to

25  Mr. Chaudhari.

```
 1              THE COURT:  Okay.

 2              MR. CHAUDHARI:  Just really quickly, we -- we

 3  definitely want the documents that Ms. Davis referred to, but

 4  we still think there's a whole host of other -- at least we --

 5  there may be a whole host of other documents that relate to the

 6  Defendants promoting their advertising.

 7              THE COURT:  And have you made known to Ms. Davis what

 8  you think those other documents would include?

 9              MR. CHAUDHARI:  Yeah, we -- we discussed this on -- on

10  the meet and confer yesterday, documents that -- that tout --

11  documents to potential advertisers that, you know, tout the --

12  tout their functionality, tout the ability to -- to -- to

13  advertise on their show.  We -- we -- that's -- we think that

14  information is highly relevant to -- to damages in this case.

15              THE COURT:  And tell me how you would intend to use

16  that for damages.

17              MR. CHAUDHARI:  I mean, it goes to the -- it goes to

18  commercial success of the -- of the -- of the Defendants' use

19  of the -- of the infringing devices.

20              THE COURT:  All right.  Thank you.

21              MS. DAVIS:  Your Honor, I just want to -- I want to

22  clarify one thing because I think I may have misspoken a bit.

23              With -- with respect to the 30(b)(6) notice, just to

24  be -- just to be clear, because I think I might have left a

25  misimpression that we specifically recognized at that point
```

1  that -- that they were asking for native mobile apps and made

2  an objection on that basis, and I -- I misremembered the

3  record, and I apologize for that.

4          The -- even in the 30(b)(6) notice, they

5  specifically -- they describe accused websites, and they define

6  accused websites by reference to the specific sites that they

7  had indicated in their infringement contentions, and then they

8  added language that said, and any other website that has these

9  characteristics.  And so we objected in our objections, and

10  said -- said nothing about mobile apps, and it said nothing

11  about mobile apps in the request which are all -- refer to the

12  accused websites.

13          What we objected to was we objected saying, we will

14  provide witnesses only as to those websites that you have

15  identified in the preliminary contentions.  It was only when we

16  got into the depositions, which was after our meet and confer,

17  that they started asking our witnesses questions about native

18  mobile apps, and we objected saying, native mobile apps are not

19  in the case, and that's how we -- we got here.

20          But I -- so just to be clear, even in their 30(b)(6)

21  notice, you will not find the word "native mobile apps," and

22  you will actually find words limiting it to accused websites

23  and describing the accused websites that are the subject of the

24  30(b)(6) notice.  So just to be clear on that.

25          And with respect to the -- with respect to the

1    advertising documents, I mean, I think you get the sense from

2    the conversation, I mean, we've just been asking for some way

3    to narrow or focus what types of documents they're really

4    looking for because telling me that they want all the documents

5    that say good things for their case doesn't really help me find

6    and make a request for my client.

7            So, I mean, we've talked about maybe if there were

8    specific kinds of reports or things like that that they can

9    identify -- that we can identify together, I mean, maybe I can

10   provide them some additional information.  But I think they

11   have what they need now with the promotional materials that

12   we're producing, and obviously with respect to commercial

13   success, they have all the revenue and usage numbers that they

14   need for that.

15           Thank you, Your Honor.

16           THE COURT:  All right.  Thank you, Ms. Davis.

17           We'll take a -- about a 10-minute recess now, and I'll

18   come back.  Thank you.

19           LAW CLERK:  All rise.

20           (Recess.)

21           LAW CLERK:  All rise.

22           THE COURT:  Thank you.  Please be seated.

23           With respect to the motion filed against How Stuff

24   Works, which is Document No. 128, that motion is denied.

25           The Court finds that under the circumstances there,

1   there was not an adequate way for the Defendant to know that

2   the Plaintiff was accusing the systems that provide the audio

3   podcasts.  And accordingly, the Court does not find that they

4   breached their obligations regarding discovery.

5          With respect to the motion against NBC, CBS, and the

6   FOX entities, which is Document No. 131, while the Court

7   believes it would have been preferable for the Plaintiff to

8   have made clear earlier in the process that it considered that

9   the native mobile apps were at issue in the matter, the Court

10  does believe that under the circumstances of this case and

11  given the technology involved, the Plaintiff is entitled to

12  narrowly tailored discovery regarding the manner in which the

13  native mobile apps function, consisting both of technical

14  documents and a 30(b)(6) witness on that topic.

15         I'm going to ask the parties to meet and confer on

16  that matter and to file an agreed order on Monday.  To the

17  extent it's agreed, obviously, that's all I need.  To the

18  extent that there are disagreements, I want each side to set

19  out what it believes the limitations and the scope of that

20  discovery should be.  And I will enter an order promptly

21  thereafter deciding that.  But it is my intent that this be as

22  focused as possible.

23         And I'm not making any judgment about what the effect

24  of that discovery will be on the rest of the case, but I simply

25  want to get that accomplished promptly.

1              Does either side have any questions about the rulings

2    that are --

3              MR. PITCOCK:  No, Your Honor.

4              THE COURT:  All right.

5              MR. SMITH:  Not as to HSW, Your Honor.

6              THE COURT:  All right.

7              MS. DAVIS:  Your Honor, just one question.  I assume,

8    based on what you indicated, that we would not be getting into

9    the issue of damages documents with respect to the mobile apps

10   at this point, that we would just be focusing on the technical

11   discovery to determine whether it's going to be an accused

12   product?

13             THE COURT:  That's what I'm focused on at this time.

14             MR. PITCOCK:  And, Your Honor, I guess just a

15   follow-up on the requested discovery on advertising.  I just

16   wanted to know your -- Your Honor's ruling on that.

17             THE COURT:  Well, I -- what I would like to see happen

18   on that is to see the -- that production made, and then if --

19   if you think there's other production you need, it sounds to me

20   like Ms. Davis is open to conferring on that.  If it's a matter

21   you can't resolve, then you can bring it back up.

22             MR. PITCOCK:  Appreciate it, Your Honor.

23             THE COURT:  All right.

24             MS. DAVIS:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1            LAW CLERK:  All rise.

2         (Recess.)

1                             CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    _____          _____
     SHELLY HOLMES                              Date
10   Official Reporter
     State of Texas No.: 7804
11   Expiration Date:  12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25