**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PERSONAL AUDIO, LLC | § | |
| | § | |
| v. | § | Case No. 2:13-CV-00013-JRG-RSP |
| | § | LEAD CASE |
| TOGI ENTERTAINMENT, INC. et al. | § | |
| | § | |

**CLAIM CONSTRUCTION**
**MEMORANDUM AND ORDER**

On April 24th 2014, the Court held an oral hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 8,112,504 (the "'504 Patent"). After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 80, 86 and 91), the Court issues this Claim Construction Memorandum and Order.

**BACKGROUND**

The '504 Patent issued with 35 claims on Feb. 7, 2012 based upon an application filed March 4, 2009. The '504 Patent is based upon a series of two prior filed parent patents (U.S. Patent Nos. 6,199,076 and 7,509,178), the earliest of which dates to an Oct. 2, 1996 filing date. The parent patents were subject to a claim construction order in *Personal Audio, LLC v. Apple, Inc. et al.*, 9:09-cv-00111, Dkt. 258 (E.D. Tex Dec 21, 2010)(J. Clark). The parties present nine terms for construction that may be grouped as seven claim construction disputes. All of the disputed terms are contained within independent claim 31, the sole asserted independent claim.

The '504 Patent relates to a system for dynamically and interactively selecting and playing particular programs from a program library. 1:23-24[1]  More particularly, the '504 Patent relates to an audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. Abstract.  The host organizes the program segments and creates scheduled programming in accordance with preferences associated with each subscriber.  Abstract.  A playback unit at the subscriber location reproduces the program segments received from the host and includes mechanisms for interactively navigating among the program segments.  Abstract.

As noted above, all of the disputed terms are found in claim 31:

31. Apparatus for disseminating a series of episodes represented by media files via the Internet as said episodes become available, said apparatus comprising:

one or more data storage servers,

one or more communication interfaces connected to the Internet for receiving requests received from remotely located client devices, and for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said requests to the requesting client device,

one or more processors coupled to said one or more data storage servers and to said one or more communications interfaces for:

storing one or more media files representing each episode as said one or more media files become available, each of said one or more media files being stored at a storage location specified by a unique episode URL;

from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file in one of said one or

---

[1] References to the '504 Patent are made in the form of col:lines.

more data storage servers at a storage location identified by a predetermined URL, said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes; and

employing one of said one or more communication interfaces to:

(a) receive a request from a requesting client device for the updated version of said compilation file located at said predetermined URL;

(b) download said updated version of said compilation file to said requesting client device; and

(c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files.

**APPLICABLE LAW**

**1.     Claim Construction**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *See id.* at 1313.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*,

3

388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.   *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.   Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.   *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.   *Phillips*, 415 F.3d at 1314.   First, a term's context in the asserted claim can be very instructive.   *Id*.   Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.   *Id*. Differences among the claim terms can also assist in understanding a term's meaning.   *Id*.   For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.   *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"   *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"   *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).   This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.   *Phillips*, 415 F.3d at 1316.   In these situations, the inventor's lexicography governs.   *Id*.   The specification may also resolve ambiguous claim terms "where

the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.   But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.   The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).   Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.   *Id*. at 1318.   Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court.   *Id*.   Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

5

**AGREED TERMS**

The parties have agreed to four claim terms.  Dkt. 77 at 2.

| Term | Agreed Construction |
|---|---|
| "disseminate a series of episodes … as said episodes become available" | distributing a group of connected succession of episodes … as new episodes become available |
| "responding to each given one of said requests" | responding to each given one of the requests received from remotely located client services |
| "data file" | computer file containing data |
| "a predetermined URL" | a URL determined in advance |

**DISPUTED TERMS**

**1. "episodes"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a television show, radio show, etc., that is one part of a series | audio programs |

**"media file"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data file containing at least audio data, which may also contain graphics, images, audio and video data | data file containing at least audio data |

The primary dispute between the parties is whether episodes and media files can contain television programs.  Defendants assert that the issue need only be addressed with regard to the "episode" term.

Personal Audio asserts that there is nothing in the specification that limits the terms to only audio data.  Personal Audio asserts that the specification references other forms of data such as images and text data as being relevant media files, citing passages which include "may advantageously be accompanied by text . . . Similarly, images stored in the image database 134

6

may be used to provide a multimedia presentation which combines images …with concurrently presented audio….may likewise consist of audio, text and/or image segments….” (6:9-18) and “image presentation may be synchronized with the audio programming to provide coherent multimedia programming” (6:29-31).   Personal Audio also notes that a disclosed preferred embodiment discloses a “personal computer CPU 105 is also preferably connected to a conventional personal computer video display 118” (5:36-37).   Personal Audio asserts it would make no sense to describe a personal computer video display if video data were not contemplated as being with the scope of the invention.   Dkt. 80 at 8.   Personal Audio also asserts that dictionary definitions do not indicate that the ordinary meaning of the terms is limited to just audio programming.   *Id.*

Personal Audio asserts that “media files” which represent the “episodes” can thus include different types of a “multi-media presentation” including the “synchronized” images and the term therefore should not be limited to only audio data.   At the oral hearing, Personal Audio agreed to the constructions of “episodes” to mean “program that is part of a series” and “media file” to mean “data file containing at least audio data.”

Defendants assert that the specification makes clear that the claimed invention is directed toward an audio player.   Defendants assert that the claims must be read in light of the specification.   Dkt. 86 at 4.   Defendants assert that the Abstract describes an “audio program” system (Abstract), the Background of the Invention states that it is “an object of the present invention” to provide easy access to rich selection of audio programming” (2:11-17), and the Summary of Invention states “[t]he present invention takes the form of an audio program player which automatically plays a predetermined schedule of audio program segments” (2:20-25). Defendants provide numerous citations to the specification to assert that “episodes” and “media

files" refer to audio files.  Dkt. 86 at 5.  Defendants note that one of the objects of the invention is to select programming "without the need for a visual display screen and using only simple selection controls."  Dkt. 86 at 5 (quoting 2:11-17).   Defendants assert that in light of the specification, "episodes" thus refers to audio programs, not television shows.  *Id.*  Defendants note that dependent claim 35 refers to the apparatus as an "audio program player."

Defendants assert that the images and text referred to by Personal Audio are not "episodes" but merely images and text accompanying audio programming.  Dkt. 86 at 6 (citing 6:9-11, 6:28-31, 44:26).  As to the personal computer which has a video display, Defendants assert that the specification passage in question references an "illustrative embodiment of … an audio player device illustrated at 103" and teaches that "the [audio] player 103 may be advantageously implemented by a conventional laptop or desktop personal computer including a …CPU 105."  Dkt. 86 at 7 (quoting 4:41-45).  Defendants assert that the fact that a conventional personal computer includes a video display does not support the proposition that the disclosed audio player has anything to do with accessing television shows.  Dkt. 86 at 7.  Defendants assert that the specification states "the present invention [is] to provide easy access to rich selection of audio programming."  Dkt. 86 at 7 (quoting 2:12-13).  Defendants assert that the video display is described with reference to providing "visible menu options" (6:20-21) or to display images "synchronized with audio programming" (6:29-30).

As to "media file," Defendants assert that there is no need to complicate the construction of the term and that the fundamental dispute will be determined by the construction of "episodes."  Dkt. 86 at 8.

8

Analysis

The parties have agreed to the construction of "media file," however, the fundamental dispute remains as to whether the construction of "episodes" should exclude television and other visual programming.  As described below, the Court finds that these terms are not limited to audio data but may include video or other data.

Personal Audio is correct that the programming in the specification clearly is contemplated to include images and text in addition to the audio.  Defendants do not contend that their construction excludes such text and images, rather Defendants seek to limit the programming to audio files that may include such text or images.  At the oral hearing, Defendants acknowledged the purpose of their construction was to exclude television programming and the like.  The parties do not, however, dispute that an ordinary meaning of "episodes" is not limited to only audio programming.  Defendants assert that the specification only teaches one type of "episode" (audio programming) and the ultimate question is whether the claims should be so limited.

Claim construction starts with the language of the claims themselves and the terms of the claim are generally given their ordinary and customary meaning.  *Phillips* at 415 F.3d at 1312-1313.  Here the parties have agreed that the ordinary meaning of "episodes" does not exclude television programming.  Defendants have not pointed to any language of exclusion or disavowal in the specification that narrows this ordinary meaning.  In contrast, Personal Audio has pointed to passages in the specification in which images and text are contemplated. 6:9-18.  Furthermore, although the specification does not explicitly teach "television programming," the specification does teach "multimedia programming": "image presentation may be synchronized with the

9

audio programming to provide coherent multimedia programming." 6:29-31.   Thus, rather than limiting the programming to audio programming, the specification provides an example of programming expanded beyond audio programming.   Although this expansion does not explicitly contemplate television programming, when combined with the ordinary meaning and the lack of language of exclusion in the specification, this expansion of the programming type counsels for a construction that does not contain the affirmative and categorical exclusion Defendants seek.

**The Court construes "episodes" to mean "program that is part of a series" and construes "media file" to mean "data file containing at least audio data."**

2.   **"downloading a data file…to the requesting client device" / "download said …compilation file to said requesting client device"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data from the data/compilation file is transferred from a storage location on a server to a requesting device | transferring/transfer the file…to the requesting client device for non-temporary storage and later use |

The two primary disputes between the parties are whether (1) the downloaded file must be placed in non-temporary storage or whether "downloading" encompasses file streaming and (2) whether the entire file must be downloaded.

Personal Audio asserts that other claims (Claim 1) require both "downloading" a media file and "storing," pointing to the language:  "storing said downloaded data," "downloading one or more new media files," and "storing said one or more new media files in said digital memory."   Claim 1.   Personal Audio asserts that this language strongly indicates that merely "downloading" does not require storage as otherwise the "storing" language in Claim 1 would be rendered superfluous.   Dkt. 80 at 9.   Personal Audio also asserts that the specification utilizes

"downloading" broadly in the context of just receiving the file: "The player 103 further includes a conventional high speed data modem 115 for receiving (downloading) the program information 107 from the remote server 101 and for transmitting (uploading) program selections …." 5:45-49.

Personal Audio further asserts that extrinsic evidence points to a broader meaning of downloading.  In particular, Personal Audio asserts that during the claim construction for the '504 Patent parent patent the parties in that case did not argue that "downloading" included a storage component, supporting the notion that one skilled in the art would not construe the term to require storage.  Dkt. 80 at 10 (citing Ex. E at 36).  Personal Audio also asserts that a third party prior art witness subpoenaed by the Defendants equated streaming with downloading.  Dkt. 91 at 3-4, n. 3.

Defendants assert that the ordinary meaning of "downloading" requires storage so that the file can be used later whereas "streaming" a file to a computer allows the computer to play the file but the file is not left on the computer after it is played.  Dkt. 86 at 9 (citing extrinsic evidence).

Defendants cite to the specification which describes the ability to play audio programs upon request at a later time.  Dkt. 86 at 10 (citing 8:62-9:11).  Defendants further assert that downloading is described as loading a file into the audio player: "the download file or files …[are] moved from storage unit 145… into local storage…"  (8:37-42) and

> In accordance with the invention, it is desirable to download the equivalent of a full session's programming in addition to the currently scheduled session programs so that, in the event of a temporary communication link or host failure, programming will be nonetheless be available.

(23:57-61).  Defendants also quote "the subscriber may wish to designate for future play a program segment already loaded into the player 103 by virtue of a prior download" (18:60-62) and "hyperlinks of this type may be used to identify program segments which are not available in the player 103 because they were not downloaded for inclusion in a scheduled session" (14:55-57).  Defendants also quote the description of figure 2: "FIG. 2 illustrates the sequence of major events which are executed [sic] the program dissemination system contemplated by the invention" (8:17-19) and the download step 207 of that figure which is described as files "moved from storage unit 145…into local storage 107 in the client/player 103" (8:37-42).   Defendants also cite to the description of automobile uses which describe the data downloaded to removable media which can then be inserted into a portable player.  Dkt. 86 at 11 (citing 23:62-24:3, 7:58-8:8).  Defendants assert that consistently the specification teaches that files are moved into storage and the programs can be played whenever and wherever desired.

Defendants also assert that the prosecution history supports their position.  Defendants assert that claim 31[2] was distinguished from the prior art on the basis that the prior art disclosed streaming media to a user's device, rather than storing the media content in the device.  Defendant quotes:

> [the art] does not store either media content or the episode table of contents on the client workstations 600, but instead streams this information to the workstation from central storage in response to client requests.  Dkt. 86 Ex. D (January 2011 Amend.), at 19 (emphasis added).

> the combination of Gabbe and Clanton] would not result in the transfer of episode media files for storage at the client set-top box." *Id*. at 19.

---

[2] Defendants assert that the statements of distinction were made with regard to claims 1 and 8 but that the patentee stated "claim 31 is believed to be allowable for the same reasons advanced above with respect to claims 1 and 8." Dkt. 86 at 12, n. 4 (quoting Ex. D at 29 and also citing Ex. C at 22 and Ex E at 14-15).

Gabbe's table of contents data is … stored on the server side and is <u>streamed</u> to the client workstation for display at the client workstation in response to a user request. *Id*. at 22-23 (emphasis added).

Clanton describes a video on demand system in which the media files are <u>streamed</u> to the set-top box for real-time production on the connected television set but the media files are not stored in the memory. Dkt. 86 Ex. C (Sept. 2010 Amend.) at 13 (emphasis added).

any movie or program which the user elects to view is then <u>streamed</u> from the streaming media server for presentation in real time on the connected television set. The media files themselves are not stored by Clanton's set-top-box…" *Id* . at 17 (emphasis added).

Gabbe does not store either media content or the episode table of contents on the client workstations 600, but instead <u>streams</u> this information to the workstations from central storage in response to client requests. *Id*. At 18 (emphasis added).

Clanton's set-top box <u>streams</u> media files from the server and does not store them in its digital memory"; Dkt. 86 Ex. E (July 2011 Resp.) at 5 (emphasis added).

Gabbe's table of contents is <u>streamed</u> to the workstation display, but not stored…. *Id*. At 9 (emphasis added).

Defendants cite to the expert (Porter) declaration as noting that the distinguished streaming includes a temporary storage of data so that it can be displayed or heard but it does not include a non-temporary storage for later use.  Dkt. 86 at 13-14.

Defendants also cite to their own extrinsic evidence asserting that downloading includes storage.   Dkt. 86 at 14.   Defendants assert that Personal Audio's extrinsic evidence even indicated that downloading included transferring the data "into the memory of [a] computer system."  Dkt. 86 at 14 (citing The Free Dictionary).

Defendants further assert that in the prior Apple litigation, Personal Audio described the prior art as consisting of systems in which "content was streamed in and not stored locally" and "the named inventors…solved this [problem] by inventing a personal audio player that could,

*inter alia*, receive and store…audio programs." Dkt 86 at 14 (quoting Ex. B at 2).  Defendants also cite to a 1996 document by inventor Logan in which a downloading product was distinguished from streaming audio technologies of the day.  Dkt. 86 at 15.

As to Personal Audio's arguments regarding differences between the claims, Defendants assert that Claim 1 does not merely add "storing" but is directed toward storing in a specific location: in "said digital memory."  Defendants assert that the specification taught alternative storage location (such as the removable media cartridge) and that Claim 1 was directed at a particular location.  Thus Defendants assert that their construction does not render parts of Claim 1 superfluous.   As to Personal Audio's citation to 5:45-49 which states "a conventional high-speed data modem 115 for receiving (downloading)…transmitting (uploading)…," Defendants assert this single passage does not indicate that storage is not a component of downloading.  Defendants assert this phrase merely describes the modem as being a conduit for transferring data.  Dkt. 86 at 16.  At the oral hearing, Defendants asserted that "receiving" in this passage is not a definition of downloading but merely a functional description of the direction in which program information is flowing.  Defendants' Hearing Slide 30.  Defendants assert that the specification makes clear when describing the same figure which the 5:45-49 passage describes that the "compilation file 145 is transferred [by the FTP server] to the program data store 107 in the player 103."  6:64-7:1. Defendants assert that to depart from the ordinary meaning the specification must be clear, and here the specification does not indicate a clear intent to redefine the term.  Dkt. 86 at 17.

As to the prior arguments of Apple with regard to "download," Defendants assert that storage was not relevant in that case because it is well known that Apple's iTunes product included storing a copy of the file on the player device.  Dkt. 86 at 17.  As to Personal Audio's

arguments that the file history statements do not reach a level required for prosecution disclaimer, Defendants assert that prosecution disclaimer applies when a party seeks to limit a term to a narrower construction than the ordinary meaning.   Here, Defendants assert, the proposed construction is the ordinary meaning and the prosecution history supports that view. Dkt. 86 at 17-18.

Defendants also assert that "downloading a file" requires that the entire file be transferred.   Defendants assert that Personal Audio's construction merely requires some undefined amount of data from a file to be transferred.  Defendants assert there is no basis in the claim language for Personal Audio's position.  Dkt. 86 at 18.  Defendants assert that Personal Audio has provided no support in the intrinsic record for Personal Audio's position and that Personal Audio cannot rewrite the clear claim language.

In reply, Personal Audio asserts that Claim 31 is directed toward the server-side apparatus, as distinct from the receiving device.   Personal Audio asserts that Defendants' negative exclusion relates to the receiving device storage and thus focuses on the client side device rather than the server side device.  Dkt. 91 at 2.

Personal Audio also asserts that Defendants' construction is directly contradicted by the portion of the specification which describes "downloaded" data stored in a buffer (a temporary storage):

> When a communications pathway such as an Internet or cellular phone link is available to connect the player 103 to the server, an immediate request may be sent to the server to download a needed but locally unavailable segment. In that case, the downloading and playing may proceed concurrently by placing the downloaded information into a memory buffer to which the downloaded program segment is written as it is concurrently read for reproduction as described U.S. Pat. No. 5,371,551 issued to James Logan and Daniel F. Goessling. To eliminate breaks in the program sequence, the player 103 may advantageously perform a

look-ahead operation, sending a file request to the file server via the communication link by pre-scanning the program sequence file 214 to identify program segments to be played which are not in local storage and requesting those segments before they are needed.

14:63-15:4.

Personal Audio asserts that claims 1 and 8 referenced in the prosecution history are very different claims that include both "downloading" and "storing."  Personal Audio asserts that the patentee argued these claims were distinct from streaming.    Personal Audio asserts that it was "storing" that was being distinguished from streaming, not "downloading."   Personal Audio asserts that multiple arguments were being made for allowance of claims 1 and 8 and the prosecution statement was merely conclusory boilerplate language.  Personal Audio asserts that no person of ordinary skill could reasonably conclude that the claims with and without "storing" could be allowable for precisely the same reason over "streaming" art.  Dkt. 91 at 5.

Analysis

For the reasons discussed below, the Court construes the terms at issue to mean "transferring a data file / transfer the compilation file … from a storage location on a server to a requesting device."  This construction conforms to the Defendants construction except for not including the "for non-temporary storage and later use" limitation.  At the oral hearing, Personal Audio agreed to such a construction.

As an initial matter, though each party asserts the ordinary meaning is known, the parties have not cited conclusive extrinsic evidence as to an established ordinary meaning.  Moreover, as noted in *Phillips*, the intrinsic evidence is usually the single best guide to the meaning of a claim. *Phillips*, 415 F.3d at 1312-1315.  Further, the claims themselves provide substantial guidance in determining the meaning of particular claim terms and a term's context in the claim can be very

instructive.  *Id.* at 1314.   Here the claims are clear.   For example, claim 1 recites "receiving downloaded data" and then "storing said downloaded data"; "downloading via the Internet the current version of a compilation file … and storing said current version of said compilation file is said digital memory," and "downloading one of more new media files … and storing said one or more new media files in said digital memory."   Similar language is found in claim 13.   Thus claims 1 and 13 multiple times refer to "downloading…and storing."   The usage of the claims of both "downloading" and "storing" strongly supports Personal Audio's position that "downloading" does not itself mean "storing."   Defendants correctly point out that the "storing" is into digital memory, however, the claims could have been drafted to merely state "downloading" into digital memory if as Defendants assert downloading means storing. However, the claims explicitly utilize two separate and different terms.   In contrast claim 31 merely utilizes "downloading."   The context of claim 31 emphasizes this difference as claim 31 is directed toward the server side apparatus whereas claims 1 and 13 are directed toward the media player (where the media files are stored after downloading).   Thus, in addition to the differences in the claim language in which claim 31 does not recite the storing of the downloaded media file, the context of claim 31 also supports Personal Audio's position.

Furthermore, though the specification generally describes a system in which the media player stores the downloaded data, the specification does utilize the term "download" in the context of merely transferring, even on the media player side: "[t]he player 103 further includes a conventional high speed data modem 115 for receiving (downloading) the program information 107 from the remote server 101 and for transmitting (uploading) program selections …." 5:45-49. Though Defendants assert this passage is merely a functional description of the direction in

which program information is flowing, such a functional description of "downloading" clearly supports Personal Audio's position.

Defendants' primary arguments are based upon the prosecution history.   However, because the file history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful in claim construction proceedings." *Phillips*, 415 F.3d at 1317.   The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed a proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.,* 311 F.3d 1384, 1388 (Fed. Cir. 2002).   Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal."   See *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003).   An "ambiguous disavowal" will not suffice.   *Schindler Elevator Corp. v. Otis Elevator Co*., 593 F.3d 1275, 1285 (Fed. Cir. 2010) (citation omitted).   Here at most the prosecution history is ambiguous, and a more natural reading of the prosecution history does not equate "downloading" with "storing." First, it is noted that each passage that Defendants point to references "store," "stored," or "storage."   It is these terms that are distinguished from streaming, not "download."   In context of the claims discussed (application claims 1 and claim 8 which depended from claim 1) it is noted that the patent explicitly distinguished storing from streaming, not downloading.   The claims in question contained both storing and downloading, yet it was storing that was distinguished.   Further it is noted that the prosecution history arguments with regard to claims 1 and 8 provided extensive multiple grounds of distinction over the prior art[3], not just the "storage" arguments cited by Defendants. Dkt. 86 Ex. C at 12-19, Ex. D at 13-20 and Ex E at 2-7.  In the context of claim 31

---

[3] Claim 31 was rejected over the same obviousness combination.

which is directed toward a server side apparatus and is a claim that did not include the "storing" limitations of claim 1, it is clearer that the distinctions being emphasized were the distinctions relevant to the language of claim 31.   Though perhaps lacking complete "clarity," the prosecution history does not mandate an interpretation of "downloading" that requires the "storing" limitation.

Thus, the claims, specification and prosecution history, when read together, do not require a storage limitation to be imported into the "download" term.  Defendants' inclusion of "for non-temporary storage and later use" is rejected.  Defendants have raised a valid objection to Personal Audio's usage of transferring "data from the data/compilation file."  The claims recite downloading the file or download the file. On its face, such language requires downloading of the data file not merely some undefined portion of the file.  This conforms to the specification which describes transferring the file as opposed to a portion of the file.  8:17-52. Personal Audio has not cited to intrinsic evidence supporting the position that the claim language which references downloading the file should be interpreted to mean something else.  Thus, Personal Audio's construction which would include just some data of the file is not proper.  The Court's construction therefore requires "transferring a data file / transfer the compilation file." As noted above, Personal Audio accepted such a construction at the oral hearing.

**The Court construes "downloading a data file…to the requesting client device" / "download said …compilation file to said requesting client device" to mean "transferring a data file / transfer the compilation file … from a storage location on a server to a requesting device."**

### 3.  "URL"

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| the address of a resource (as a document or Web site) on the Internet | an address for a file on the Internet, which address contains the path and/or filename of the file |

The parties dispute whether the URL must contain the path and/or filename of the file.

Personal Audio asserts that "URL" is a common term of widespread usage.  Personal Audio cites to a Federal Circuit case which construed URL as "something that identifies the location of relevant information segments.  This can include web pages, audio clips, images and the like.  It can be an absolute URL or a relative URL, as long as it specifies one or more Internet addresses of information segments relating to Internet Content."  *ACTV, Inc. v. The Walt Disney Company,* 346 F.3d 1082, 1090 (Fed. Cir. 2003).  Personal Audio objects to requiring the address to contain a path and/or filename.  Personal Audio cites to Defendants' expert (Porter) who testified that a URL did not have to contain a path and/or file name.  Dkt. 80 at 12.  At the oral hearing, Personal Audio agreed to the construction of "the address of a resource on the Internet."  Personal Audio acknowledges that the claim does recite "a data file [is] identified by a URL."  Personal Audio asserts that a URL can identify a file, such as an HTML file (for a web page), that does not contain an explicit file and/or pathname.  Dkt. 91 at 5.

Defendants do not dispute that Personal Audio's construction is consistent with the ordinary meaning of URL.  Dkt. 86 at 19.  Defendants assert that their construction is proper however in the context of the claim language, specification and extrinsic evidence.  Defendants assert that Claim 31 requires "a data file identified by a URL," "URLs specifying the storage locations of one or more…files" and "one or more media files identified by one or more corresponding episode URLs."  Defendants assert that this language indicates that the claimed

URLs unambiguously require that URLs must include something more than just the address of a web site on the Internet.  Defendants assert that a mere address of a Web site neither identifies any particular file nor specifies the storage location of a particular file.  Dkt. 86 at 19.  Defendants assert that the specification further supports such a position: "URL field specifies the location of the file … in the file storage facility."  18:55-57.  Defendants also point to dictionary evidence for the proposition that a Web site does not specify the location of a file but rather such information is provided by a filename, pathname or directory.  Dkt. 86 at 20.

Analysis

Both parties agree that "URL" has an understood ordinary meaning.  At the oral hearing, Defendants emphasized that the surrounding claim language requires the URLs in question to be more limited than the ordinary meaning, in particular, limited to a file.  However, giving the term "URL" the understood ordinary meaning does not contradict the claim language.  The claim still requires the other recited limitations.  In some portions of the claim a data file is "identified" by the URL and in other cases the URL specifies the storage location of the media files.  The claims themselves thus provide the additional specificity with regard to the claimed URL and each particular file.  The construction provided by the Court below does not negate such surrounding language.

**The Court construes "URL" to mean "the address of a resource on the Internet."**

### 4. "storage location"

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| ordinary meaning | a location in a storage facility |

Personal Audio asserts that though the specification describes the preferred embodiment as a "facility," the specification makes clear that the storage location for data can be at any place accessible by the Internet.  In particular, Personal Audio points to the specification passage: "The Program_Segment record's URL field specifies the location of the file containing the program segment in the file storage facility indicated at 304 in FIG. 4 (i.e., normally on the FTP server 125 seen in FIG. 1, but potentially including storage areas on the web server 141 or at any other accessible location on the Internet)." 18:55-60.  Personal Audio asserts that this passage makes clear that the preferred embodiment of a "facility" is not required.  Personal Audio also asserts that a URL for a storage area on a web server or "any other accessible location on the Internet" would not necessarily require a path and/or filename.  Dkt. 80 at 13.  Personal Audio asserts that there is no need to redefine "location" as "facility."

Defendants assert that their construction conforms to the ordinary meaning of the claim language.   Defendants cite to a dictionary definition of the term "facility" as meaning "equipment necessary for doing something."  Dkt. 86 at 20.  Defendants thus assert the term has a broad meaning and it is unclear why Personal Audio objects to the term "facility."  Defendants assert that this conforms with the specification which uses "facility" as a generic term: "the file storage facility indicated at 304 (i.e., normally on the FTP server 125 seen in FIG. 1, but potentially including storage areas on web server 141 or at any other accessible location on the Internet)."  18:55-60.  Defendants assert that Personal Audio had provided no construction so thus it is unclear if a storage location is a storage device, the data center containing a device or even the city where the data center is contained.  Dkt. 86 at 21.   At the oral hearing, Defendants

asserted that Personal Audio's construction would read out of the claims the term "storage location."   Defendants assert at the oral hearing that Personal Audio's construction would encompass a generic top level domain URL which could be a set of servers that hosts all of the web pages for a domain, rather than pointing to a particular storage location for the claimed files.

Analysis

Personal Audio's arguments are more persuasive.   Defendants argue that "facility" is proper by asserting that the ordinary meaning of facility broadly includes "equipment." However, absent a further definition of "facility" being provided to the jury, such a broad definition may not be readily apparent as a jury may construe the term to be limited to a building or physical site in the more ordinary meaning of "facility."   Thus, Defendants' construction would require further construction of the meaning of "facility" otherwise creating potential jury confusion.   The specification however makes clear that the storage may be "file storage facility indicated at 304 in FIG. 4 (i.e., normally on the FTP server 125 seen in FIG. 1, but potentially including storage areas on the web server 141 or at any other accessible location on the Internet)."   18:55-60.   In this context it is clear that the disclosed storage may be a portion of a server or any accessible location on the Internet.   In this regard a storage location is not limited within the specification to a "facility" as the term would be understood by a jury and the broader ordinary meaning of storage location is applicable.   As to Defendants' assertions that Personal Audio's construction reads the limitation out of the claim, such is not the case.   The surrounding claim language makes this clear: "media files being stored at storage location specified by a unique episode URL," storing a compilation file "in one or more data storage servers at a storage location identified by a predetermined URL" and "one or more episode URL's specifying the storage locations of one more corresponding media files."   Thus the claim itself mandates

particulars with regard to each use in the claim of "storage location" and such claim language is not removed by an ordinary meaning of "storage location."

**The Court finds that "storage location" has its plain and ordinary meaning.**

### 5. Compilation File Terms

**"compilation file"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a data file containing episode attribute data that is assembled by a processor | a data file containing episode attribute data |

**"one or more processors…for…from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the processor assembles and stores an updated compilation file after new episodes in a series become available | ordinary meaning |

The primary dispute between the parties is whether a compilation file must be assembled by the processor.

Personal Audio asserts that the claim requires a processor coupled to the data storage server and the communication interface for "as new episodes … become available, storing an updated version of a compilation file."  Personal Audio asserts that this claim language makes clear that the claimed processor both assembles and updates the compilation file.  Dkt. 80 at 15. Personal Audio asserts that the specification also makes clear that the processor assembles the compilation file:  "the server … compiles one or more files for downloading" (8:28-29) and "[t]he compilation file 145 is previously written to the download directory by a download processing mechanism seen at 151 in the server 101. Download processing, as described in more detail later, extracts from the library 130 data defining compressed program, advertising, and

glue segments, and/or associated text program data….” (7:1-7).   Personal Audio quotes the Federal Circuit which has stated that “highly technical terms, or terms coined by the inventor are best understood by reference to the specification.”   *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013).   Personal Audio asserts that since the compilation file is assembled by the processor, it stands to reason that updates to the file are also performed by the processor.  Dkt. 80 at 15.

Personal Audio asserts that the Reasons for Allowance were based on compiling and updating by the processor:

> The prior art does not provide for a nor suggest for updating/downloading current version of a compilation file containing attribute data describing episodes and including one or more episode URLs identifying one or more corresponding media files representing said given one of said episodes.

Dkt. 91 Ex. J at FH00026.  Personal Audio asserts that the preamble and body of the claim describe a server side apparatus that operates dynamically as episodes become available and that these dynamically added episodes are updated in a listing of episodes.  Personal Audio asserts that thus when the claim recites “storing an updated version of a compilation file,” it is the processors of that apparatus that assemble and store an updated file.  Dkt. 91 at 6.  Personal Audio asserts that Defendants are trying to read out of the claims the actions of the processors, presumably to read the claims on prior art where humans wrote and updated play lists.  Dkt. 91 at 6.

Defendants assert that Personal Audio’s construction adds an unclaimed requirement as to a particular method as to how the compilation file is created.  Defendants assert that Personal Audio does not argue that the ordinary meaning requires such a limitation and that the claim language contains no language as to how the file is created.  Dkt. 86 at 22-23.  Defendants note

25

that the claim language does not even refer to the original compilation file but rather only to "an updated version of a compilation file."

Defendants further assert that the specification passages quoted by Personal Audio when read in full do not support Personal Audio:

> Based on the information supplied by the user, the server then compiles one or more files for downloading to the subscriber at step 207 which include programming and advertising segments as well as additional data and utility programs needed by the player 103 to begin operation.

8:27-32.  Defendants assert this passage teaches that the user supplies personal information and programming preferences that the server uses to compile programming and advertisement segments.  Defendants assert that if the claim term must be read to incorporate the limitations of the specification as contended by Personal Audio, then the compilation file must be compiled by the server "based on information supplied by the user."  Dkt. 86 at 23.  Defendants further note that this portion of the specification is described as only "preferably."  Dkt. 86 at 23 (citing 8:24).

As to the second passage cited by Personal Audio, Defendants assert that the full passage also demonstrates that the description relates to a preferred embodiment where the compilation file is based on user-specific information:

> The compilation 145 is previously written to the download directory by a download processing mechanism seen at 151 in the server 101. Download processing, as described in more detail later, extracts from the library 130 data defining compressed program, advertising, and glue segments, and/or associated text program data, based on selections and preferences made by (or inferred for) the user as specified in the subscriber data and usage log database 143.

7:1-9.  Defendants assert that Personal Audio's reliance on this passage would mean that the files are limited to those files based on selections and preferences made by the user.  Defendants

assert that Personal Audio cannot pick and choose features of the preferred embodiments.  Dkt.

86 at 23.   Defendants also cite to the following passage as teaching that the preferred

embodiment relates to a file that is compiled to personalize the file for specific users:

> FIG. 4 illustrates the principle data processing steps and information structures
> employed by the preferred embodiment of the invention to compile programming
> information personalized to the preferences of individual subscribers, to perform
> accounting functions which produce billing charges to subscribers and advertisers,
> and to determine royalty payments due to content providers.

16:64-17:3

As to the longer term which includes the storing requirement, Defendants assert that the

claim language is readily understandable.  Defendants assert that Personal Audio is adding an

"assembled" requirement when the claim only recites "storing."  Defendants assert that Personal

Audio cannot argue that the ordinary meaning of "storing" is "assembled."  Dkt. 86 at 24-25.

Defendants also assert that the claim does not require the processors to be "updating the

compilation file" as asserted by Personal Audio, but rather merely requires the processors to

"store" an updated file.  Defendants assert the claim is agnostic as to how these stored files are

created.  Dkt. 86 at 25.  Defendants assert the claim has two parts, in the first step the processors

store one or more media files with certain specified characteristics and in the second step the

processors store an updated version of a compilation file with certain specified characteristics.

Dkt. 86 at 25.  Defendants assert the claim includes no limitations as to how the file is updated.

As to Defendants' specification arguments, in reply Personal Audio asserts that it is

absurd to require everything in the specification to be read as a limitation.  Dkt. 91 at 6.  Personal

Audio asserts that the claim specifically calls out the requirements of a "compilation file":

said updated version of said compilation file containing attribute data describing currently available episodes in said series of episodes, said attribute data for each given one of said currently available episodes including displayable text describing said given one of said currently available episodes and one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes

Claim 31.  Personal Audio asserts that it would be a claim construction error to include other limitations from the specification into this language.  Dkt. 86 at 7.

Analysis

All parties agree that a compilation file includes "a data file containing episode attribute data."  Personal Audio seeks to further require the file to be assembled by the processor.  As noted in *Phillips*, the claims themselves are the beginning point for the Court's analysis.  *Phillips* at 415 F.3d at 1312-1313.  Here the claims explicitly recite what operations are required by the processors: (1) "storing one or more media files…" and (2) "from time to time … storing an updated version of a compilation file…."  Claim 31.  That the claims recite the storing operations of the processor but do not include the assembling operation counsels against Personal Audio's construction.  Further, Personal Audio seeks to read in an additional limitation as to how/where the compilation file is assembled as opposed to what a compilation file is.    Defendants are correct that the passages cited by Personal Audio do not support mandating the "assembled" language but rather focus on what a compilation file is as opposed to what assembles the file.  For example, the passages cited emphasize that a compilation file is a file related to a compilation of data that is personalized to provide programming, advertising, and text based on user selections and preferences.  The passages do not support reading in the limitation sought by Personal Audio, particularly when the claim language recites the particular operations that the processors are required to perform. Similarly, the Reasons for Allowance do not focus on

28

how/where the file is assembled but rather just that it is updated/downloaded.  This is more in line with the actually claim language as opposed to an added "assembled" limitation that is not explicitly recited.

The claims do not mandate what assembles the compilation file and the intrinsic record citations provided by Personal Audio do not mandate assembly by the processors.  As to whether the term "compilation file" requires a compilation of data that includes personalized data, as noted by Personal Audio, the claims themselves provide details as to what are the data components that form the compilation file.

**The Court construes "compilation file" to mean "a data file containing episode attribute data."  The Court finds that having construed compilation file, the remainder of the term "one or more processors…for…from time to time, as new episodes represented in said series of episodes become available, storing an updated version of a compilation file" has its plain and ordinary meaning.**

**6.  "employing one of said one or more communication interfaces to"**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| ordinary meaning | employing a single one of the communication interfaces to |

The dispute between the parties can be characterized as whether "employing one of said one or more" interfaces should be considered to be "employing only the same one of said one or more" or "employing at least one of said one or more" interfaces to perform the subsequently claimed steps (a), (b) and (c).

Personal Audio asserts that the claim defines "one or more communication interfaces" and that it would make little sense to claim multiple communication interfaces but restrict the claim to "employing" a single one of them.  Dkt. 80 at 16.  Personal Audio asserts that this situation is similar to *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) where the court refused to adopts a construction of "one" to mean "only one."  At the oral hearing it became clear that Personal Audio sought a construction that means one interface performs (a), one interface performs (b) and one interface performs (c), but the "one" interface does not have to be the same interface for each function.

Defendants assert that Personal Audio's construction would render the "one of said" portion of the term superfluous.  Defendants further assert that if "one" means the same thing as "one or more" then it would have been unnecessary for Claim 31 to recite "one or more" fourteen times.  Defendants assert that their construction is consistent with the plain meaning of the claim language.  Defendants assert that the claim requires "one" of the interfaces to be used for the subsequent steps of "(a) receive a request," "(b) download said updated version," and "(c) thereafter receive and respond to a request from said requesting client."  Claim 31.  Defendants assert that the claimed apparatus may contain other communication interfaces not employed to perform the claimed functions.   At the oral hearing, Defendants acknowledged that the construction they proposed limits the use of the interfaces such that only one interface may be employed for any of the claimed functions and the use of other interfaces for such functions is excluded.

Defendants assert the claim language is similar to *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) in which "means for randomly selecting one of said plurality of assigned numbers" was construed to mean selecting a single number not a

30

combination of numbers.   Defendants assert that the question in *IGT* was whether the "command" term in "issuing command over the network to one of said preselected gaming devices" was limited to only one command.   Defendants assert that because the command term preceded the one limitation and was not limited by the one phrase, the claim does not require only one command.   Defendants assert that the Court found that the "one of said preselected gaming devices" did however mean that only "one" modified "device" received the command(s) at issue.   Dkt. 86 at 28 (citing *IGT*, 184 F.3d at 1116-17).

In reply, Personal Audio asserts that the claim relates to a server side apparatus that services multiple client devices and that the server side apparatus can have multiple interfaces for multiple client devices.   Personal Audio asserts that what is recited in the claim is what happens when a single client device accesses the apparatus:   "employing one" interface to perform the steps (a), (b) and (c).   Personal Audio asserts that when a single client device communicates with the apparatus then one interface at a time is employed to conduct the communications.   Personal Audio asserts that some or all of the interfaces may be used for communications at different times with different client devices.

Personal Audio asserts that Defendants failed to distinguish *IGT*.   Personal Audio asserts that the *IGT* patents described a method of using a computer that controls multiple slot machines, where bonuses could be enhanced on specific machines by sending "commands" to the machines to encourage more betting.   Personal Audio asserts that as with the '504 Patent, the *IGT* patents dealt with how the computer interfaced with each slot machine device individually (in the '504 Patent the server dealing with individual client devices).   Personal Audio asserts that in *IGT* the defendants similarly tried to assert that a command must be sent to one and only one machine.   Dkt. 91 at 9.   Personal Audio asserts that the Federal Circuit found that "one" merely limited the

relationship between the issued command and the receiving slot machine and did not limit the number of commands that could be issued to a machine.  Dkt. 91 at 9-10.  Personal Audio asserts that Claim 31 recites a 1-to-1 communication between the apparatus and a single client device at a time where a single interface is employed for each of the three communication parts.  Personal Audio asserts that Defendants' construction would mean that only one communication interface may be used to communicate with all client devices.

Analysis

Both Personal Audio and Defendants raise valid points but both extend their arguments too far and neither *IGT* nor *WMS Gaming* support such extensions.   The particular claim language in Claim 31 for which construction is sought requires "employing one" interface to perform functions (a), (b), and (c).  An interpretation that would contemplate three interfaces where the first performs function (a), the second performs function (b) and the third performs function (c) is in direct contradiction of the explicit claim language.  Thus, Personal Audio's interpretation of the ordinary meaning of the claim language is rejected.   This claim language, however, just requires that there is one interface that performs all three steps.  There is no language of exclusion that prohibits other interfaces from also performing some or all of the three functions.    Moreover, Defendants have not identified support in the specification mandating the "only" one negative limitation sought by Defendants.  As the claims themselves do not require such a negative limitation and the specification does not require the negative limitation, it would be improper to interpret the claims to require "only one" interface to perform the three operations. Thus, Defendants attempt to exclude other interfaces from also performing some or all of the three functions, is rejected. The claim language itself establishes that the claim requires one interface for performing functions (a), (b), and (c).  However, the claim language

does not exclude other interfaces from also performing these functions.  None of the parties have pointed to portions of the specification that mandate narrowing or changing this plain meaning.

**Having resolved the disputes of the parties as described above, the Court finds that "employing one of said one or more communication interfaces to" requires no further construction and the plain and ordinary meaning applies.**

7. **"[employing one of said one or more communication interfaces to] …(c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files."**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| ordinary meaning | thereafter, in response to a request received from said client device for a media file identified by a URL included in the updated compilation file, download the requested media file to the client device |

The parties' primary dispute relates to whether "respond to a request" as used in step (c) requires the response to be a "download" by the "one of said one or more" interfaces.

Personal Audio asserts that the claim language does not require the response to be a download and there is no reason that "download" should be read into the claim term.  Personal Audio also objects that "download" (as construed by Defendants) adds an implicit requirement that the data is "stored."  Personal Audio asserts neither limitation is required by the claim language.

Defendants assert that the claim language when read in context of the entire claim compels Defendants' construction.  At the oral hearing Defendants made clear that their assertions with regard to "download" are independent of the dispute discussed above with regard to the requirement of storing.  Defendants assert that the claim earlier recites "one or more

communication interfaces … for responding to each given one of said requests by downloading a data file identified by a URL specified by said given one of said request to the requesting client device."   Defendants note that the parties have agreed that "responding to <u>each</u> given one said requests" means "responding to <u>each</u> given one of the requests received from remotely located client devices." Dkt. 100-1 at 4 (emphasis added).  Defendants assert that the claim thus requires that the interfaces respond to each request by downloading the file to the requestor.   Dkt. 86 at 29.    Defendants assert that because the claim requires a response to "each" request "by downloading," then the term at issue must be construed as the response to the request being a download.  Defendants assert that its construction is consistent with the specification which in all instances discloses that the host server responds to a request for a media file by downloading the file to the requesting audio player device.   Dkt. 86 at 30 (citing 24:19-21, 7:19-22, 27:15-20, 14:63-66).

<u>Analysis</u>

The issue as to whether "download" implies storage is addressed above and need not be addressed with regard to this term.

The claim language does not support Defendants' construction.  First, step (c) merely requires "respond to a request" for a media file identified by the episode URL.  Step (c) does not include a specific "download" requirement.   Earlier in the claim the "one or more communication interfaces" are described as being "for receiving requests received from remotely located client devices" and "for responding to each given one of said requests by downloading data."  However, as discussed above, the later "employing" limitation just refers to the operation of a particular "one" of said one or more communication interfaces with regard to steps (a), (b), and (c).  Earlier in the claim, the claim only requires "one or more communication interfaces" for

"responding to each given one of said requests by downloading a data file."  The earlier recitation of "one or more communication interfaces" does not require the subsequent "<u>one</u> of said one or more" interfaces to perform the download.  Rather the claim language just requires "one or more communication interfaces" for "responding to each given one of said requests by downloading."  As noted above, the "employing" language refers to what the claimed "one of said one or more" interface is employed for but it does not restrict other interfaces from also performing operations.  The step (c) claim language does not include a downloading requirement and the other claim language does not require the "<u>one</u> of said one of more communication interfaces" to be the same interface that performs the downloading recited earlier in the claim. Thus, the Court declines to import an additional "download" limitation into the term at issue.

**The Court finds that the term "[employing one of said one or more communication interfaces to] …(c) thereafter receive and respond to a request from said requesting client device for one or more media files identified by one or more corresponding episode URLs included in the attribute data contained in said updated version of said compilation files" needs no further construction other than the individual terms construed elsewhere herein and that the remainder of the term has its plain and ordinary meaning.**

**SIGNED this 19th day of June, 2014.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE